# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 11, 2001 Session

## STATE OF TENNESSEE v. THOMAS DEE HUSKEY

**Appeal from the Criminal Court for Knox County**
**No. 49828    Richard Baumgartner, Judge**

AND

## STATE OF TENNESSEE v. THOMAS DEE HUSKEY

**Appeal from the Criminal Court for Knox County**
**Nos. 49829, 49830, 50090    Richard Baumgartner, Judge**

---

### No. E1999-00438-CCA-R3-CD[1]
### June 28, 2002

---

The defendant, Thomas Dee Huskey, appeals as of right from his convictions and sentences for aggravated rape, rape, aggravated robbery, robbery, especially aggravated kidnapping, and aggravated kidnapping, for which he received an aggregate sentence of sixty-six years. The convictions relate to four victims and result from two trials that were consolidated for this appeal. The defendant raises numerous issues. Although we conclude that several errors occurred, only one requires reversal of any convictions. Because of improper consolidation, we reverse the judgments for the three aggravated rape convictions and one especially aggravated kidnapping conviction relating to the victim, D.C., but we affirm the remaining judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES AND DAVID G. HAYES, JJ., joined.

Herbert S. Moncier and Gregory P. Isaacs, Knoxville, Tennessee, for the appellant, Thomas Dee Huskey.

---

[1]Trial court Case Number 49828 was originally docketed for appeal as E1999-00481-CCA-R3-CD. This court ordered that E1999-00481-CCA-R3-CD be consolidated with E1999-00438-CCA-R3-CD for appeal and that the consolidated appeal proceed under number E1999-00438-CCA-R3-CD.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Erik W. Daab, Assistant Attorney General; and Randall E. Nichols, District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted in the Knox County Criminal Court in two cases, which will be referred to as the first rape case and the consolidated rape case. On October 20, 1995, the defendant was convicted by a jury in the first rape case for two counts of aggravated rape, a Class A felony, and one count of aggravated robbery, a Class B felony. The trial court sentenced the defendant as a Range I, standard offender to twenty-two years for each aggravated rape and eleven years for the aggravated robbery, ordering the sentences to run concurrently for an effective sentence of twenty-two years.

On May 24, 1996, in a consolidated trial, the defendant was convicted by a jury on three counts of aggravated rape and one count of especially aggravated kidnapping, a Class A felony, of one victim; two counts of rape, a Class B felony, and one count of aggravated kidnapping, a Class B felony, of a second victim; and two counts of rape and one count of robbery, a Class C felony, of a third victim. The jury deadlocked on charges relating to a fourth victim. The trial court sentenced the defendant as a Range I, standard offender to twenty-two years for each aggravated rape and twenty years for the especially aggravated kidnapping of the first victim, ordering the sentences to run concurrently for an effective twenty-two-year sentence. It sentenced the defendant to eleven years for each rape and ten years for the aggravated kidnapping of the second victim, ordering the sentences to run concurrently for an effective eleven-year sentence. For the third victim, the trial court sentenced the defendant to eleven years for each rape and three years for the robbery, ordering the sentences to run concurrently for an effective eleven-year sentence. The trial court also ordered the sentences relating to each victim in the consolidated rape trial to run consecutively to each other as well as to the sentence from the first rape trial, establishing an effective sentence of sixty-six years.

On appeal, the defendant raises the following issues, many of which relate to both the first rape case and the consolidated rape case and many of which have several subissues.[2] We will first address the issue of whether the trial court properly consolidated all of the cases in the consolidated rape case because our holding affects our analysis of many of the other issues before us. We will next address the issues that relate to both cases, then the issues that relate only to the first rape case, and finally the issues that relate only to the consolidated rape case.

I.      Whether the trial court erred in consolidating the cases in the consolidated rape trial.

---

[2]Judge Ray L. Jenkins initially presided over the defendant's cases but recused himself on October 18, 1995 before opening statements in the first rape trial. Judge Richard Baumgartner replaced Judge Jenkins and presided over both rape trials.

## ISSUES RELATING TO BOTH CASES

II.      Whether the trial court erred in denying the defendant's motion to dismiss for the denial of a speedy trial.

III.      Whether the trial court erred in denying his motion to suppress evidence obtained as the product of his unlawful arrest and the illegal search of his home.

IV.      Whether the trial court erred in denying his motion to suppress his statements.

V.      Whether the trial court erred in allowing the state to determine the order of his trials.

VI.      Whether reversible error occurred because the state failed to provide him with timely discovery and whether the trial court erred in refusing to review discovery materials.

VII.      Whether the state withheld exculpatory evidence.

VIII.      Whether the trial court erred by refusing to hear certain of his pretrial motions.

IX.      Whether the trial court erred in limiting his proof regarding his insanity defense.

X.      Whether the trial court erred in denying him a change of venue.

XI.      Whether the trial court improperly denied him access to various records relating to the victims.

XII.      Whether the trial court erred by allowing the state to use improper leading questions on direct and redirect examination and by allowing improper redirect examination.

XIII.      Whether the trial court erred in admitting evidence not disclosed to him in discovery and not listed in the state's notice of intention to use evidence.

XIV.      Whether the trial court erred by prohibiting the testimony of Henrietta Ogle regarding the character traits of persons addicted to cocaine.

XV.      Whether the trial court erred in denying his motions for a mistrial.

XVI.     Whether the state made improper comments in its opening statements and closing arguments.

XVII.    Whether the trial court properly sentenced him.

XVIII.   Whether the trial court erred in delaying and/or failing to rule on his post-trial motions.

XIX.     Whether the trial court erred by failing to rule on his motions in arrest of judgment.

XX.      Whether the trial judge was disqualified from presiding over the cases.

XXI.     Whether the misconduct of the prosecutor requires dismissal of the charges or that the prosecutor be disqualified.


**ISSUES RELATING ONLY TO THE FIRST RAPE TRIAL**

XXII.    Whether the trial court erred in staying all other proceedings against him until completion of the first rape case.

XXIII.   Whether the trial court erred in limiting his questioning on voir dire and in refusing to dismiss for cause potential jurors who knew about his cases.

XXIV.    Whether the trial court erred by refusing to have a hearing during trial on his motion to suppress a photographic line-up.

XXV.     Whether the trial court erred in admitting into evidence the victim's statements that were contained in a hospital record.

XXVI.    Whether the trial court erred in allowing the state's improper cross-examination of Officer Chuck Whitson, whom the defendant had called as an adverse witness.

XXVII.   Whether the trial court erred by failing to rule as the thirteenth juror.

**ISSUES RELATING ONLY TO THE CONSOLIDATED RAPE TRIAL**

XXVIII.  Whether the trial court erred in denying his motion to sever his factual defenses from his insanity defense.

XXIX.  Whether the trial court erred in the number of peremptory challenges it allowed the parties.

XXX.  Whether the trial court erred by allowing jurors to have telephone contact while sequestered.

XXXI.  Whether the trial court erred by allowing the state to elicit new testimony in its redirect examination of Detective Tom Pressley.

XXXII.  Whether the trial court erred in failing to grant his motion for judgments of acquittal due to the variance between the dates in the bill of particulars and those proven by the state and to instruct the jury on the dates alleged in the bill of particulars.

XXXIII.  Whether the trial court erred in denying his motions for judgment of acquittal.

We hold that some error exists with regard to Issues I, III, VI, XVI, XVII, XXV, and XXVI. With respect to these errors, only the consolidation error requires reversal.

## FACTS

### A.  First Rape Trial

The victim testified that on July 17, 1992, she spent the night at the East Fifth Avenue apartment of Tina Kelly, a friend. The morning of July 18, she walked to the Krystal on Magnolia Avenue to buy breakfast. She said that as she was walking back to her friend's apartment, the defendant, who was driving in the opposite direction, stopped his car and asked her for directions to Esau's Auction Company. She gave him directions, but the defendant said that he could not hear her. She went to the driver's side of the car, and as she raised her right arm to point the direction, the defendant pointed a gun under her arm. The defendant then pulled her through the window of his car and drove away while her legs were hanging outside the window. The defendant told her that he would kill her if she did not get her feet into the car. Although she tried to lift her head, the defendant kept pushing her down into the seat.

The victim testified that when the defendant stopped the car, she recognized that they were at a barn in Chilhowee Park. The defendant told her to get out of the car, but when she opened the

passenger's door, the defendant became very angry. The defendant told her that if she did not do everything he told her to do, he would kill her. The defendant, who called her derogatory names throughout, told her that she was going to perform oral sex on him and that he was going to have sexual intercourse with her. The defendant ran to the passenger's side of the car and told her to get on her knees. When she did not comply, the defendant, who had her hair wrapped in his hand, threw her against the car and then forced her to her knees. She began praying, and the defendant told her to shut up and grabbed her necklace, bearing a cross. The defendant then said, "Even God can't help you now." The defendant exposed his penis and put it in her mouth. The defendant was not satisfied and told her to do it right or he would kill her. She then performed oral sex on the defendant.

The victim testified that she had a pocketknife in her shorts pocket and that after she had left the car, she took the knife out of her pocket and opened the blade. However, when the blade locked, the knife clicked, which the defendant heard. She swung the knife at the defendant, but the defendant threw her to the ground, causing her to drop the knife. The defendant picked up the knife, told her that she had made a big mistake, and threw the knife behind him.

The victim testified that the defendant forced her to crawl into the barn, where he took $42.55 and a diamond tennis bracelet from her. The defendant had her take off her clothes, except for her socks and shoes, and crawl into a stall, where he vaginally raped her. The defendant made her change positions several times and had her stay in each position for the same amount of time, using his watch to keep time. The defendant attempted to rape her anally but was unsuccessful. The victim said that she did not see the defendant's gun after she got out of the car.

The victim testified that a rope was hanging from a board in the stall and that the defendant tried to put it around her throat. The rope, which she identified, was introduced into evidence. She said that the rope was too short for the defendant to put it around her throat, which upset him greatly. The defendant continued to rape her, and at some point, the defendant saw a shadow on the wall, causing him to stand and pull up his pants. The defendant said, "If it's the law, I'll protect you." The defendant then left the barn, and when she heard his car start, she opened the door and ran. Still nude, she ran through the parking lot next to the zoo, past the children's museum, and out the Beaman Lake gate. Before she got to Fifth Avenue, she stopped and put on her clothes, which she had been carrying. She said that she left her underwear in the barn.

The victim testified that she ran to Ms. Kelly's apartment and that she did not see a person from the time that she ran from the barn until she got to the apartment, where she passed Ms. Kelly's boyfriend on the steps. She did not tell him that she had been raped. She went inside the apartment and took a bath. Ms. Kelly was at work, and there was no telephone in her apartment. The victim could not move her arm and was in severe pain. Around 10:30 p.m., she telephoned her aunt, told her that she fell down the steps, and asked if she would drive her to the hospital. Her aunt took her to St. Mary's Emergency Room, where the victim initially complained only about her shoulder pain. She eventually told a nurse that she had been raped, and shortly thereafter, Jean Spangler from the

Sexual Assault Crisis Center (SACC)[3] interviewed her. She told Ms. Spangler what happened. Later, Knoxville Police Detective Stan McCroskey came to the hospital in the early morning hours of July 19. She described her attacker to him and agreed to meet him at the police station later that day. At the station, she again described her attacker, stating that he had a beard that was trimmed, not long and scraggly, and that his hands were neat and his fingernails were clean. She told the detective that her attacker's eyes were "too close together," and she also described the clothes that her attacker was wearing – jeans, a brown belt with a set of keys hooked around it, and a black T-shirt that had elephants and the words "T.I.G.E.R. Zoo" on it.

The victim testified that on the afternoon of July 19, she went to the barn with Detective McCroskey, another police officer, and a woman from the SACC. In the stall where she had been raped, they found her underwear as well as a brassiere that was not hers. They could not find her pocketknife. The victim stated that she returned to the police station sometime in October and was shown a series of photographs, from which she identified the defendant as her attacker. This same photograph array was shown to her in court, and she identified the photograph of the defendant. The victim also identified the defendant in court as her attacker.

The victim testified that she was not a prostitute and that she had never sold her body. She stated that she was addicted to cocaine and that before July 18, 1992, she had been in outpatient treatment once and inpatient treatment in January 1992, after which she stayed clean for several months before relapsing about three weeks before the rape. During that three-week period, she used mostly cocaine but also marijuana. She denied using Valium or Xanax during that time, and she could not remember if she drank alcohol. She stated that she was sober when she awoke the morning of the 18th. About four or five days after the rape, she returned to treatment, but she relapsed again after she got out. She stated that she was sober at the trial.

On cross-examination, the victim testified that on July 18, 1992, at the hospital, she described her attacker to Detective McCroskey, who completed a police report. According to the report, she had described her attacker as five feet, eight inches tall and weighing two hundred twenty pounds. She also described her attacker's hair as "collar length." On July 19, Detective McCroskey interviewed her at the police station, recording the interview. During this interview, she stated, "He wasn't that much taller than me. I'm about five seven. He was maybe 1 or 2 inches taller than me." Regarding her attacker's weight, she said, "I'm pretty sure it was over two hundred, but judging weight is not one of my better things." After Detective McCroskey told her that he was five feet, eight inches tall and weighed two hundred fifteen pounds, she responded that her attacker "was about [his] size, maybe." Also during the interview, she said that her attacker "seemed to be clean-cut . . . . [H]is hair wasn't shaggy or anything, and his beard and mustache were pretty even." She said that on October 27, 1992, Detective McCroskey showed her a photograph of the defendant with a

---

[3]The parties, witnesses, and the trial court frequently refer to the agency as the Rape Crisis Center. The records from the center as well as the motion to quash the defendant's subpoena filed by the center reveal the Sexual Assault Crisis Center to be the correct name.

ruler in the background. She acknowledged that the photograph showed that the defendant was over six feet tall and that the defendant had shoulder-length or longer hair.

The victim acknowledged that in an interview with defense counsel on May 14, 1995, she gave a different description of her assailant than the one she had given on July 18 and 19, 1992. During the May 14th meeting, she had stated, "I would say [he was] at least six inches taller than me. I'm about five seven. . . . He's around six foot, six one, something like that." She also said that her attacker's hair was "about down to his shoulders" and that the defendant looked "nasty. He had brown hair and a beard. He had Band-Aids all over his hands." She also stated that according to the transcript of the May 1995 interview, she had said that she was addicted to cocaine but had been clean for about a year and a half at the time of the attack. However, she testified that she may have said a month and a half. She also acknowledged that she had told defense counsel that she had been clean for at least six months before the attack and had relapsed after the attack. At trial, she testified that she did not use cocaine the day of the attack but admitted to using it the day before the attack. Also, she said in the May 1995 interview that she did not drink alcohol or use any drugs other than cocaine. She explained at trial that she was referring to the time when she made the statement, not the time of the attack. Defense counsel also questioned her in the interview about how she supported her drug habit, to which she responded that she worked and wrote bad checks for about fifteen hundred dollars, although she paid the checks later. She admitted at trial that she only had three warrants for writing bad checks, totaling about seventy dollars, and that these warrants were from 1993.

The victim testified that she had been treated at the Detoxification and Rehabilitation Institute (DRI) three times, once as an outpatient and twice as an inpatient, the last being on July 22, 1992. She acknowledged that according to the DRI intake records, the July 22, 1992 admission was her fourth. The records also showed that she stated that she had legal problems relating to writing bad checks and failing to appear in court. She could not explain why the only warrants for writing bad checks were from 1993. The DRI records also provided that she went to the emergency room on July 18, 1992, because she was "'jumped'/raped." She testified, however, that she did not use the word "jumped" and that she did not know that "jumped" was a street term for agreeing to have sex for money but not getting paid. Regarding her recent drug use, the intake records showed that she had stated that she both used marijuana and drank alcohol one week ago. She also acknowledged that the DRI records indicated that she had her first "blackout" at age twenty-five, but she testified that this was the only time she had ever had one. In response to being asked about the DRI records showing that she said she had experienced drug-induced hallucinations, she stated that the writing on the records was not hers. Regarding her drug history for the previous six months, the DRI records showed that she had been doing two and one-half grams of cocaine per day. The victim said that this amount of cocaine would cost about two hundred dollars.

The victim testified that she had a job driving a school bus for handicapped children and that she wrecked the bus while under the influence of drugs. She was not fired for this, but she voluntarily quit. She said that she had never been fired from a job because of her drug habit, but her habit had caused her to quit jobs. She said that she worked at Walgreen's during the six months

before the attack but could not remember if she quit that job before July 18, 1992. She stated that she financed her drug habit from money earned by working and from money that she received in a settlement. She said that she also got drugs from friends.

The victim testified that she did not know what medication she received at the hospital on July 18, 1992, but she acknowledged that her DRI records indicated that she took Percocet while there. She admitted that the DRI records showed that she had stated that her reasons for wanting to quit doing drugs was "to refresh [her] memory." She testified that by this she did not mean that she was having trouble with her memory or with hallucinations. Rather, she meant that she wanted to clear her "head of any kind of fog, depression, so on and so forth." She acknowledged that her response on the DRI form to whether she had a problem remembering things was, "Yes, short-term memory loss."

The victim also testified on cross-examination that she did not know if the Magnolia Avenue area was a high-crime, high prostitution area. Regarding July 18, 1992, she said that she was not carrying any personal identification but that she was carrying a knife. She stated that when the defendant stopped his car and asked her for directions, they were only a few blocks from Esau's. She said that the defendant pulled her into the car through the driver's window with one hand, while his other hand held the gun. The defendant held her head down as he drove away, and she did not know which hand the defendant used to steer the car. After she got out of the car, the defendant knocked her down, and then he grabbed her upper right arm and pulled her close to him. At that time, she reached into her right shorts pocket with her right hand and grabbed her knife. She said that she could not open the knife to the point that the safety would catch with one hand, but she was able to use her fingers to open the knife and then use her leg to extend the blade. When the safety clicked, the defendant threw her against the car, causing her to drop the knife. She said that the defendant was violent, hitting her and ramming her head into the side of the barn.

The victim testified that when she ran from the barn, she did not see anyone in Chilhowee Park. She did not stop at any of the houses on Fifth Avenue to ask for help or tell anybody about the attack once she reached Ms. Kelly's apartment. She also did not tell her aunt about the attack but told her that her shoulder hurt from falling down the stairs. She admitted that she had arthritis in her shoulder as well as in other parts of her body but said she went to the hospital because her shoulder was injured during the attack. She said that she did not have medical insurance at that time but acknowledged that the hospital records indicated that she said she had insurance. After being admitted and talking to a nurse for some time, the victim told her that she had been raped. The nurse was the first person whom she told that she had been raped.

On redirect examination, the victim testified that when she was running from the barn to her friend's apartment, she did not stop at a house to ask for help because she was terrified and in shock. She stated that she initially did not reveal her real reason for being at the hospital because she did not want to tell anybody about the rape. She just wanted to be able to move her arm and go home. The victim again identified the defendant as the person who attacked and raped her. The state rested its case.

The defense called Henrietta Ogle, a certified alcohol and drug counselor, who testified that she was familiar with the general characteristics of individuals who are addicted to cocaine. She stated that crack cocaine was extremely addictive, physically and psychologically. She said that two and one-half grams of cocaine would have a street value of three to four hundred dollars and that smoking that amount per day would be a severe addiction.

Dr. Roger Allen Hubbard, the director of molecular pathology at Blount Memorial Hospital, testified that he specialized in DNA analysis. He stated that a rape kit would include a comb to obtain the victim's pubic hair, which would likely contain hairs from the rapist; tubes to store the victim's blood; tubes to store the victim's vaginal secretions; and cotton swabs to obtain semen from the vagina. Through DNA analysis, the rape kit evidence can identify individuals with a very high probability of accuracy. He stated that the standard procedure for preserving DNA evidence involved allowing the swabs to air dry for twenty-four to forty-eight hours and then storing them in a non-plastic envelope. He said that once the sample was dry, the DNA was very stable and would not spoil, unless it was subjected to adverse conditions such as sunlight or extreme heat. Dr. Hubbard said that the samples did not need to be refrigerated and that allowing the swab to stay wet for an extended period of time, like in a plastic bag or in a refrigerator, can compromise the integrity of the DNA. He testified that bathing would not affect the ability to find DNA in the vaginal canal because the quantity of DNA needed to perform a test was very small.

Ralph E. Green testified that he owned and operated Esau, Incorporated, which included Esau's Antiques and Collectibles Market. He said that Esau's Antique and Collectible Extravaganza was at Chilhowee Park in the Jacobs Building on the third weekend of most months. He stated that an Extravaganza, which included approximately three hundred fifty vendors and drew about eight thousand customers, was held on Saturday, July 18, 1992. He said that the vendors set up on Friday from 11:00 a.m. to 8:00 p.m. as well as on Saturday starting at 7:00 a.m. He said the Extravaganza opened at 9:00 a.m. and customers would usually line up at the front and back entrances before it opened. On cross-examination, Mr. Green testified that most customers would not enter the park through the Beaman Lake gate because they would have to walk farther to get to the Jacobs Building.

Knoxville City Police Officer Chuck Whitson was listed as a state's witness but was called by the defense. He testified that the rape kit from the victim had been kept by the police department since July 18, 1992, and that it had never been sent to the laboratory for analysis. He stated that he took photographs during his investigation of the case but that he did not have any photographs of the victim showing bruises or abrasions. He said that he did not remember any bruises or abrasions on the victim, who was wearing a hospital gown when he first saw her, and that none were brought to his attention. He said if he had seen any bruises or abrasions, he would have taken photographs of them.

On cross-examination, Officer Whitson testified that he never examined the victim for bruises or abrasions. He stated that when he went to the hospital, he only talked briefly with the victim, who appeared to be really nervous, upset, and reluctant. He stated that on the following day, he accompanied the victim to the crime scene, and he identified the rope that had been entered into

evidence as the rope that he removed from the stall. He said that the rape kit was not sent to the laboratory because no one requested that it be sent. Then, after about one year, the samples were taken out of the refrigerator and stored in a non-refrigerated warehouse. Subsequently, he talked to a person at the Federal Bureau of Investigation (FBI) Laboratory and determined that there was no need to send the samples for analysis.

Dr. Paul E. Kaufman was qualified as an expert in forensic medicine and testified that he had reviewed the victim's DRI records. He stated that if the records were accurate, the victim had a serious addiction. He said that if the victim ingested two and one-half grams of cocaine per day for six months, she would have a substantially impaired judgment, memory, and concentration ability. She would also have a substantially impaired ability to accurately recall and describe events. On cross-examination, Dr. Kaufman testified that he had never interviewed the victim and had never interviewed a cocaine addict who had been brutally raped.

Dr. John Bruce Irwin testified that he treated the victim in the emergency room at St. Mary's Hospital on July 18 and early July 19, 1992. He stated that according to the hospital records, he did not find any abrasions or bruises on the victim. The victim complained about tenderness in her right shoulder and right elbow, and his examination revealed tenderness in her right shoulder, elbow, and hip. He stated that arthritis was consistent with pain and can be consistent with tenderness. He said that the victim's injuries could have been consistent with falling down stairs. He testified that he did not find any evidence of a disturbance or redness around the victim's vaginal or anal areas. He also did not find any evidence of forceful entry in either the vagina or anus. He stated that the records did not show that the victim was given Percocet, which is a strong, highly addictive, oral pain medication.

On cross-examination, Dr. Irwin testified that he did not have an independent recollection of the victim. He said that his records did not indicate that the victim was under the influence of drugs but did state that the victim was tearful and upset.

The parties stipulated that a complete search of all pertinent records revealed that there were no charges against the victim with the exception of the three warrants for writing bad checks in 1993, which were introduced into evidence. In the state's rebuttal proof, it introduced a settlement sheet from a civil case involving the victim. The sheet showed that the victim received approximately $36,000 in April 1991. The jury found the defendant guilty of two counts of aggravated rape and one count of aggravated robbery.

B. Consolidated Rape Trial

The defendant was tried for offenses against four victims, D. C., G. T., D. L., and A. D. D. C. was the state's first witness and testified that during the second week of August 1991, she was working as a prostitute outside the Circle-In, a bar in Knoxville. She said that around dusk, after the defendant drove past her a few times, she asked him if he was looking for a date and told him that she charged twenty dollars for oral sex and thirty dollars for vaginal intercourse. She stated that the

defendant was driving a small, yellow Toyota truck and was wearing corduroy pants, a flannel shirt, and work boots, on which there was red clay. The defendant accepted her offer, although he did not give her any money at that time. She got into the passenger's side of the truck, and as the defendant drove away, he pulled out a pistol. She reached to open her door, and the defendant told her to jump because she was going to die anyway. The defendant drove on Magnolia Avenue, not stopping for red lights, to Chilhowee Park, where he parked his truck near a barn. The defendant got out of the truck, and as he was walking to the passenger's side, she tried, unsuccessfully, to get out the driver's side. The defendant opened the passenger's door, grabbed her hair, pulled her out of the truck, and took her into the barn, locking it once inside. The defendant told her to cooperate or he would snap her neck.

D. C. testified that once inside the barn, the defendant, who had his hand around her throat, told her to remove all of her clothes. She complied. The defendant then made her stand against a wall with her arms and legs spread, and he hit her several times. He then forced her to her knees and made her perform oral sex. The defendant, still holding her throat, made her stand next to a wire fence in the barn. He told her to spread her arms and legs, which she did, and then the defendant tied her hands and feet to the fence and had sexual intercourse with her. The defendant pulled his penis out of her vagina, ejaculated on her stomach, and had intercourse with her again. The defendant then put his hand on her throat, untied her, and took her to a trough in the barn. He forced her to bend over the trough, and he anally raped her. The defendant then made her lie on the ground, where he held her with his knees on her arms and both hands on her throat. He started choking her, but stopped when they saw lights from a car. The defendant then stood, kicked her, gathered her clothes, and left the barn, locking it and telling her that if she screamed or moved, he would shoot her. The defendant called her derogatory names throughout the episode, which lasted four to five hours, and told her that he was going to get and kill "all you whores."

D. C. testified that after the defendant left the barn, she stayed in the barn for about two hours because she could not move her legs. After regaining movement in her legs, she was able to unlock the barn and started walking, still naked, toward Magnolia Avenue. A man gave her a coat and drove her to the Circle-In. D. C. identified the defendant as the person who raped her.

D. C. testified that after returning to the Circle-In, she spoke with Knoxville Police Officers Mark Pressley and Doug Stiles but that she did not file a formal complaint. On November 2, 1992, while incarcerated on charges for forgery, fraud, and aggravated robbery, she told Knox County Sheriff's Lieutenant Larry Johnson and Detective Mike Upchurch what the defendant had done to her. They showed her an array of six photographs, from which she identified the defendant as her attacker.

D. C. testified that she was in jail at the time of her testimony for violating her probation by failing to appear in court and that she had been convicted of soliciting prostitution, forgery, fraud, robbery, driving under the influence, driving on a suspended license, and driving on a revoked license. She stated that in August 1991, she frequently used drugs and alcohol but that she was not under the influence of drugs or alcohol the day she was raped.

On cross-examination, D. C. acknowledged that she had testified at a hearing on April 15, 1996, and that before both that hearing and the trial, she talked with the prosecuting attorneys. She said that before the April 15 hearing, she and the other victims – G. T., D. L., and A. D. – attended a meeting in the district attorney's office, where they were shown a chart containing facts relating to each of their cases. She was friends with the other victims, who were also prostitutes, and they watched out for each other on the street.

D. C. admitted that at the April 15, 1996 hearing, she said the rape occurred during the first or second week of August. She explained that she was now certain that it occurred during the second week of August because she was making "regular" money when the rape occurred, stating that the first week of the month the prostitutes made "good" money. She acknowledged that in her previous testimony, she had stated that after the rapes, she talked to Mark Pressley and "papers [were] filed, but nothing happened at that time." She admitted that nothing was filed regarding her case in 1991. Also, in her April 15 testimony, she stated that she stopped prostituting herself in 1994 and that she did not have a charge for prostitution in 1995. At trial, she testified that she was simply mistaken, acknowledging that she was arrested for prostitution on September 15, 1995. In her hearing testimony, she said that she had never robbed anybody. She testified, however, that in 1992, she had helped set up dates in order that two men could then rob people and that she had taken a woman's car after fighting with her, although the charges relating to this event were dismissed. She also stated that she pled guilty to robbing a food market in 1994 but explained that she was driving the car and did not know that the two men accompanying her were going to rob the store. D. C. said that she also pled guilty to fraud and forgery charges for cashing stolen checks, although she stated that she did not steal the checks.

D. C. testified that she first gave a statement to police on November 2, 1992, while in jail on six charges. She said that shortly after giving her statement, her bond was reduced from $50,000 per charge to $1,500 per charge, which enabled her to make bond. She said the police sometimes go lighter on people who help them. She acknowledged that although in her November 2 statement she said the defendant threatened her by saying he would break every bone in her body, she had said on direct examination that the defendant threatened her by saying he would snap her neck. She explained that "it all happened." She also admitted that her November 2 statement did not mention the defendant telling her to take off her clothes. Further, in her statement, she stated that the defendant said he was going to hit her and commented, "like this – all you boys do." At trial, she explained that this comment referred to men's general tendency to hit women. She admitted that events, specifically being forced to perform oral sex, were not in the correct chronological order in her statement, stating that the events occurred as she testified on direct examination.

D. C.'s November 2 statement also provided that she saw the defendant about one week after the rapes. She said that he was driving a blue, four-door Chevrolet Impala and was wearing a gold and black band uniform that had tassels on the shoulders. According to her statement, when the defendant propositioned her, she grabbed him and tried to stab him, at which point the defendant punched her in the face. She testified that the statement was incorrect because although she did try to stab him, she did not grab him and he did not punch her in the face. She explained that she tried

to grab him and that the defendant "punched the gas" and drove away. D. C. admitted that her statement said that she had been barred from the Circle-In for "pulling knives." She explained that she was barred only for twenty-four hours for pulling a knife on a man who had hit her.

D. C. testified that after she made bond in November 1992, she went to the Detoxification and Rehabilitation Institute (DRI). On her admission form, she stated that her occupation was cleaning houses. She testified that this statement was not a lie because although she was a prostitute, she also cleaned houses at that time. She said that the admission form correctly stated that she was having hallucinations and blackouts at that time as a result of heavy drinking and using cocaine. Her admission form indicated that she was using three-fourths of an ounce of cocaine per day as well as Dilaudid and Demoral. She had also stated on the form that she had been raped when she was an adult.

D. C. testified that she pled guilty in 1994 to five counts of fraud and one count of robbery, receiving eight years of probation. On September 15, 1995, she was arrested for prostitution. Although she told her probation officer about the arrest, her probation was not revoked. On December 28, 1995, she was arrested for driving under the influence (DUI). Her prostitution case was continued until May 16, 1996, just three days before the defendant's trial began. She received a five-day sentence, which was ordered to run concurrently with her DUI sentence.

G. T. testified that in February 1992, she encountered the defendant while working as a prostitute. One Tuesday morning around 8:00 a.m., she was on the Gay Street viaduct when the defendant stopped his car near her. She asked him what kind of date he wanted, but he did not respond. Without discussing the type of date or payment, she got into the defendant's car and suggested that he drive to Cahaba Lane, which the defendant did. She testified that she intended to have sex with the defendant for money.

G. T. testified that when they arrived at Cahaba Lane, she and the defendant walked into the woods. She was carrying a pocketbook and was walking in front of the defendant. The defendant eventually told her to stop and asked her to remove her shirt, which she did. The defendant then asked her to put her arms behind her back. She complied, and the defendant tied her wrists together with a rope. When she turned around to face the defendant, he "started ripping out" her brassiere with a pocketknife and then told her to get on her knees. She got on her knees with her face to the ground. The defendant pulled down her pants and underwear and inserted his penis into her anus, which hurt and caused her to cry. She "bucked up" on him, kicking him with her left foot, at which point he stopped and told her to turn around. The defendant then attempted to have vaginal intercourse with her, but he could not achieve an erection. The defendant did touch her clitoris. After telling her that she was "too tight down there," the defendant grabbed the back of her head and her throat and forced her to perform oral sex. Afterward, he told her that if she screamed, he would shoot her. Although she never saw the defendant with a gun, she "took his word" that he had one. The defendant then left her in the woods.

G. T. testified that the defendant called her derogatory names throughout the rape and told her that she was just like all the others. She said that after the defendant left, she was able to free her hands. After putting on her torn brassiere and shirt, she found her pocketbook, which the defendant had taken from her, with twenty-five dollars missing. She walked to Dimension 3, a hair salon, and asked for a glass of water. The police were called, and she told Officer Mark Young and later Detective Tom Pressley what happened. G. T. stated that she had rope burns on her wrists and scratches on her knees. Photographs of these injuries were introduced into evidence. She testified that she rode in Detective Pressley's car and directed him to the crime scene. When they arrived, they saw a car, which she believed was the defendant's, and as they approached the car, they saw the defendant, whom she identified as the person who raped her.

On cross-examination, G. T. testified that she had been a prostitute for about ten years as of February 1992, when she initiated contact with the defendant and got into his car without an agreement as to the type of date they were going to have. She admitted that her intention was to have sex for money and that she suggested that they drive to Cahaba Lane, which was a "long way" from the Gay Street viaduct but a common place to take dates.

G. T. stated that she had talked to the district attorney since she testified in a hearing on April 16, 1996, but that he only told her to tell the truth. She acknowledged that in her April 16 testimony, she stated that she never saw a weapon at any time and she never mentioned the defendant having a knife or cutting her brassiere. She admitted that in her April 16 testimony, she never said that the defendant penetrated her anally or that she experienced pain from being penetrated anally. She stated that she previously testified that she performed oral sex before the defendant unsuccessfully attempted to vaginally rape her. She said that her testimony on direct examination was accurate, conceding that the defendant did not penetrate her vagina. G. T. testified that she attended a meeting with the other victims at the district attorney's office but that the district attorney did not discuss the facts of the other victims' cases with her. She acknowledged, though, that in her April 16 testimony, she stated that she remembered the district attorney telling her about a matrix that summarized each of the victims' cases.

G. T. testified that she did not tell the people in Dimension 3 that she was a prostitute. Likewise, she did not reveal to police that she was a prostitute in her February 27, 1992 statement. In that statement, she said that she had been kidnapped, raped, and robbed by a man who had picked her up on Jackson Avenue, that he drove her to a wooded area and forced her to perform oral sex, and that she then walked to a nearby business and called the police to report the crime. She admitted that her statement did not mention being anally or vaginally raped.

The state offered Knox County Sheriff's Detective Dan Stewart and Knoxville Police Detective Thomas Pressley for cross-examination, submitting that their testimony would be cumulative. In cross-examination, Detective Pressley testified that his department has reported that prostitutes in Knoxville are often drug addicts, thieves, and liars, especially when they want something. On February 26, 1992, around 2:00 p.m., he went to the Dimension 3 hair salon regarding a dispatch that Knox County Sheriff's deputies had G. T. When he arrived, G. T. told him

that she had been applying for a job at Southeastern Janitorial Service on Jackson Avenue and that as she was leaving, a white male, driving a gray car with a child restraint seat on the backseat, offered her a ride to her job. G. T. told him that the man kidnapped her, drove her to Cahaba Lane, and forced her to perform oral sex on him. Detective Pressley said she did not tell him that she was a prostitute, that she voluntarily got into the defendant's car, or that she suggested going to Cahaba Lane. He stated that Cahaba Lane was a remote area about two miles from Dimension 3. Because the complaint was made at 2:00 p.m., he assumed that the incident occurred around 1:00 p.m. Later that day, after he learned that G. T. was a prostitute, he confronted her, and she admitted that she was a prostitute and that she had lied about being abducted after leaving a job interview on Jackson Avenue.

Detective Pressley testified that G. T. directed him to the crime scene and that the defendant was there when they arrived. He arrested the defendant and took him to jail, but Knox County was responsible for charging him. He stated that he was subpoenaed four times regarding the defendant's case relating to G. T., but each time G. T. did not appear in court. The charges relating to G. T. were ultimately dismissed.

On redirect examination, Detective Pressley testified that the car he saw when he arrived at Cahaba Lane matched the description G. T. had given him, including that a child restraint seat was on the backseat. He later determined that the car had been driven by the defendant. He stated that as they walked into the woods, they saw the defendant, whom G. T. identified without hesitation as her attacker.

D. L. testified that she had been working as a prostitute for about two weeks when she met the defendant at the Circle-In on a day in the middle of September 1992. She asked him if he wanted a date, to which he responded that he wanted oral sex performed on him and that he would pay her fifty dollars. She agreed and got into his car, which she believed was a blue Buick. It was around 1:30 or 2:00 p.m. at this time. The defendant told her that he was going to drive to where he took P. J., another prostitute whom they both knew. While in the car, the defendant gave her fifty dollars, which she put in one of her socks. The defendant drove to a dead end street, where he parked in front of a billboard, and then they walked to a mattress that was a few feet into some woods. He told her to remove her shirt and to get on her knees, which she did. She did not remove her brassiere or her shorts. The defendant then went to his car and got something out of his trunk, and when he returned, he pulled her up, put her hands behind her back, and tied them with twine or rope. At this point, the defendant took money out of her sock, but he did not take the fifty dollars that he had given her. Instead, from her other sock, he took over one hundred dollars that she had made earlier in the day.

D. L. testified that as the defendant led her further into the woods, he had his hands around her neck and said, "I hate all prostitutes" and "I am going to kill you, bitch." She begged for her life, telling the defendant that she had two children and that she wanted to see her father again. At some point, she escaped from the defendant and ran toward the car, but the defendant caught her. She then told him that somebody had driven up and seen them. The defendant then untied her hands, put her

in the car, and told her to put her shirt on. As he was driving, he told her that if she got out of the car at a stop light, he would find her and get her. The defendant dropped her off at the NAPA store on Magnolia Avenue. She was able to get the defendant's license plate number when he drove away. D. L. stated that she did not call the police at that time because she was scared that she would be arrested. However, two or three weeks later, she saw the place where she had been robbed in the newspaper, and she then went to the Tennessee Bureau of Investigation's (TBI) office and told them what had happened to her. She stated that she was not under the influence of drugs or alcohol on the day of this incident.

On cross-examination, D. L. testified that when she knelt on the mattress at Cahaba Lane, she intended to perform oral sex on the defendant. She stated that everything was fine until the defendant jerked her up and tied her hands behind her back. She said that as the defendant pushed her up the hill, he had one hand on the back of her neck and one hand holding her hands behind her back. After unsuccessfully trying to run away from the defendant, she told him that she saw a car and that they would be discovered. At that point, she asked the defendant to untie her, which he did, and then the defendant told her to put on her shirt. She then asked the defendant to drive her back to the Circle-In, to which he responded that he would drop her off on Magnolia Avenue. She stated that she never had sex with the defendant and that she thought that the defendant was trying to take back the fifty dollars he had given her but mistakenly took the money from the wrong sock. She said that the defendant never hit her and that she never saw the defendant with a weapon. D. L. stated that she continued to prostitute herself after this incident.

Knox County Sheriff's Detective Michael Grissom testified that during his investigation of the defendant's cases, D. L. gave him a license plate number. As a result of checking the license plate number through the Records Division, he went to the house of Frank Huskey, the defendant's father, in Pigeon Forge, Tennessee. When he arrived, he saw a 1983 Buick LeSabre with a license plate number of VLZ-894. On cross-examination, Detective Grissom stated that information concerning his department's investigation of events on Cahaba Lane would not have appeared in the newspaper until October 20, 1992.

A. D. testified that on October 5, 1992, around 5:00 to 5:30 a.m., she was working as a prostitute on Magnolia Avenue when the defendant, who was wearing a beige work uniform, drove into the KFC parking lot in a small, beige truck. When she approached the defendant's truck, he offered her fifty dollars to go to a location that was farther away than where she normally went. The defendant told her it was a secluded area near a church. The defendant did not say what sexual act he wanted for the fifty dollars. After talking to the defendant for some time, she agreed to go with him, feeling comfortable with him because he knew people she knew.

A. D. testified that they had a friendly conversation on the drive to Cahaba Lane, a place where she had never been. The defendant parked the truck and came to the passenger's door. He opened the door, hit her in the face, grabbed her hair, and pulled her out of the truck. The defendant pulled her toward the woods, and she struggled and begged him not to take her into the woods. The defendant told her there was a mattress in the woods, to which she responded that she would do

-17-

whatever he wanted outside the woods. The defendant eventually agreed and told her to remove her clothes, which she did. The defendant stood over her, took a knife out of his pocket, called her derogatory names, and said, "I will cut your throat if you don't do what I tell you to." The defendant forced her to perform oral sex and vaginally raped her, although he did not ejaculate. The defendant said that he was going to take her to the mattress, and she again begged him not to, at which point he forced her to perform oral sex until he ejaculated. As the defendant was fastening his pants, she asked him to take her back to Magnolia Avenue, to which the defendant responded that he would not because she would jump out at a red light and scream rape. She asked again, explaining that she did not know where she was, and the defendant told her to get dressed and he would take her. However, as she was getting dressed, the defendant got in his truck and left. She said that when the defendant left, it was daylight.

A. D. testified that she walked toward Asheville Highway. She was crying, her hair was wet, and she had mud all over her. A woman in a car stopped, and she asked the woman for a ride home. The woman refused but called the police to help her. The parties stipulated that a telephone call was made from telephone number 524-5499 at 8:02 a.m., on October 5, 1992, regarding A. D. to the 9-1-1 authority in Knox County. She continued walking until she reached a gas station. While telephoning a friend, she saw police officers, but she did not ask them for help because she was on parole. She stated that she reported the rapes to the police two or three weeks later, after she saw a picture of Cahaba Lane while watching the news on television. A. D. identified the defendant as the person who raped her.

A. D. testified that at the time of trial, she was in jail because she had violated her parole. She had been on parole three times, and each time she had violated the terms of her parole by using cocaine. She stated that she had her senses when she encountered the defendant the morning of October 5, 1992, although she admitted that she had used cocaine earlier in the morning around midnight.

On cross-examination, A. D. testified that she was not friends with the other victims but that they did help each other survive on the streets. When she approached the defendant, she was hoping to get paid for having sex with him. Although her usual practice was to receive payment in advance, the defendant did not pay her before she got into his truck. She stated that the knife with which the defendant threatened her was a pocketknife and that the defendant never opened the blade. She said that the defendant never bound her. When questioned about whether not getting paid after having sex angered her, she stated, "Usually, if you don't get paid, and then you have sex, then it is forced sex." She stated that sometimes dates were rough with her.

A. D. testified that in October 1992, she was using about two hundred dollars worth of cocaine per day. She admitted that she used cocaine about five hours before she met the defendant but stated that cocaine did not affect her ability to remember what happened to her. She said that after being raped by the defendant, she was concerned for her safety, but she acknowledged that she asked the defendant for a ride back to Magnolia Avenue, approximately a fifteen minute drive, because she did not know where she was.

-18-

A. D. testified that she did not report the rapes on October 5, 1992, and that she did not go to the hospital or see a doctor on that date. She said that no one from the sheriff's department ever asked for the clothing that she was wearing when she was raped. She said that on October 26, 1992, the police came to the Circle-In, and she told Detective Tommy Stiles that a man had taken her to Cahaba Lane and raped her a few weeks earlier. Later that night, she went to the Knox County Sheriff's Department and talked to Dan Stewart and Mike Upchurch. When they asked her if she would testify before the grand jury regarding what the defendant did to her, she asked "Would it help a friend?"

A. D. testified that she and the other victims met with the district attorney before testifying at the April 16, 1996 hearing. She said that the district attorney talked to each victim individually and that they did not discuss the facts of the cases. She stated that there was a chart regarding all of the cases but that she did not see it.

A. D. testified that in November 1988, she was indicted for eleven counts of drug-related offenses. She said that she received an effective sentence of eight years for agreeing to plead guilty to possession of cocaine with intent to sell, possession of marijuana, possession of diazepam with intent to sell, possession of methyprylon with intent to sell, and possession of glutethimide with intent to sell. She stated that she was not a drug dealer but was living with one at that time and that she pled guilty on the advice of her attorney. A. D. acknowledged that a statement she made to the Community Alternatives to Prison Program (CAPP) regarding the convictions provided,

> I was told to plead guilty of the current offense. I was staying at a friend's house . . . . I did not know he had coke and pot in his house, but I did know about the Valium and other pills. On the sale and delivery charges, I did those. I sold an eight-ball to an undercover agent and about an ounce of pot. I was selling for money.

She testified that she did not remember what she told the people at CAPP but that she sold the drugs for a friend, reiterating that she was not a drug dealer.

A. D. testified that she was released from jail on November 5, 1995, but that she was arrested on April 26, 1996. She said that she entered a plea bargain and that she hoped to receive help from the state regarding her parole violation. She admitted that the district attorney sent a letter to the parole board asking them to consider her drug problem when determining whether to revoke her parole. On redirect examination, A. D. testified that the district attorney was not at her last parole board hearing and that she did not know that he was going to write a letter on her behalf.

The defendant's first witness was Knox County Sheriff's Detective Michael Freeman, who testified that as part of the investigation of the incidents that occurred at Cahaba Lane, he went to Teague's Statuary in Sevier County, Tennessee on October 23, 1992, to recover employment records regarding the defendant, including his time cards. According to the time cards, on Monday, October

5, 1992, the defendant clocked in at 7:58 a.m., clocked out at 12:11 p.m., and then back in at 1:08 p.m. On Tuesday, September 22, 1992, the defendant clocked in at 7:52 a.m., clocked out at 11:56 a.m., back in at 12:55 p.m., and then out at 4:43 p.m. He stated that to drive from Teague's to Cahaba Lane would take about fifty minutes to one hour.

On cross-examination, Detective Freeman testified that on November 2, 1992, he took a statement from D. C., in which she described what the defendant had done to her and that she identified the defendant from a photograph array. He said that when he was at Teague's Statuary, he saw a reddish color rope that was "twine-like" but thicker. He stated that the amount of time it would take to drive from Teague's Statuary to Cahaba Lane would depend upon how fast the person drove and the traffic conditions. He said that if the defendant left work at 4:43 p.m. on September 22, 1992, then he should have arrived in Knoxville approximately one hour later.

On redirect examination, Detective Freeman testified that if D. C. described the twine that was used on her as brown and smaller than a pen, then it would not have been the same rope that he saw at the Teague's Statuary. On recross-examination, he stated that there were other colors of twine at Teague's.

James Wesley Sanderson testified that he acquired Teague's Statuary on September 1, 1992. He said that to drive from Knoxville to Teague's Statuary involved traveling through or around Gatlinburg, Pigeon Forge, and the Great Smokey Mountain National Park. He said that the traffic in this area was hectic, especially during the tourist season, including October. He said that the twine that Detective Freeman saw was in a shed behind his property and that he did not use twine in conducting his business. He stated that he normally arrived at work between 7:45 and 8:00 a.m. and would see the defendant. He said that if the defendant had come to work with mud on his clothes, he would have noticed.

On cross-examination, Mr. Sanderson stated that because of the nature of the defendant's job, the defendant would have been greasy and would have had cement on him by the end of each day. He said that the shed behind his property was about one hundred yards from the statuary.

James David Gill, a librarian and records custodian for the Knoxville News Sentinel, testified that the paper reported that sunrise on October 5, 1992, occurred at 7:34 a.m. He stated that the newspaper's first article regarding the investigations of the Cahaba Lane incidents occurred on October 21, 1992.

Dr. Paul Kaufman was qualified as an expert about to how alcohol and drugs affect a person's perception of and ability to recall events. He testified that he reviewed records pertaining to D. C. dated November 19, 1992, and referring to her past drug usage. He stated that D. C. had a serious, extensive drug abuse problem in the early 1990's, using cocaine, Dilaudid, Demerol, and alcohol in staggeringly-high doses. He said that a person abusing drugs at D. C.'s level would have a substantially impaired memory, judgment, and ability to recall and restate events that had

happened.  He also stated that people with serious drug problems tend to lie to maintain their lifestyle.

Dr. Kaufman testified that he had not interviewed A. D.  Defense counsel provided Dr. Kaufman with a hypothetical in which he described a person that used two hundred dollars of cocaine per day, used acid, injected Demerol, and drank alcohol excessively.  Dr. Kaufman stated that assuming the facts in the hypothetical were true, the person had a serious drug dependency and would have characteristics similar to the ones he described relative to D. C.

The jury convicted the defendant of three counts of aggravated rape and one count of aggravated robbery for the offenses against D. C.  It convicted him of two counts of rape and one count of robbery for the offenses against G. T.  It convicted him of two counts of rape and one count of aggravated kidnapping with regard to A. D.  The jury deadlocked on all counts relating to D. L.

## I. CONSOLIDATION

The defendant contends that the trial court erred in consolidating the four rape cases, arguing that the state's motion to consolidate was untimely, that the offenses were not part of a common scheme or plan, and that evidence of each offense would not have been admissible in the trials of the other offenses.  The state contends that the trial court properly consolidated the cases.

On March 21, 1996, the state moved to consolidate the presentments relating to D. C., A. D., D. L., and G. T. pursuant to Rules 8(b) and 13(a), Tenn. R. Crim. P.  The defendant opposed this motion, which had the same effect as asking for a severance under Rule 14(b)(1), Tenn. R. Crim. P. See Spicer v. State, 12 S.W.3d 438, 444 (Tenn. 2000).  Thus, consolidation was proper only if a severance was not required under Rule 14(b)(1), which states,

> If two or more offenses have been joined or consolidated pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

Because the trial court's decision regarding consolidation is determined from the evidence presented at the hearing, "appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses." Spicer, 12 S.W.3d at 445.

At the consolidation hearing on April 15 and 16, 1996, all four victims testified about their encounters with the defendant.  The victims' testimony was substantially similar to their testimony at trial.  Testimony particularly relevant to the issue of consolidation included the following:  D. C. testified that in the first or second week of August 1991, she was twenty-five years old and working as a prostitute when the defendant picked her up on the corner of Central Avenue and Magnolia

Avenue around 6:30 or 7:00 p.m. As the defendant drove away, he pulled out a pistol. During the drive, he told her that she could jump out of the truck because she was going to die anyway. The defendant drove to a barn near the zoo, where he then raped her. The defendant pulled her hair, hit her, and choked her during the episode. The defendant tied her hands together with rope at one point and called her derogatory names throughout the encounter. She said that it was not common for dates to call her derogatory names. The defendant also told her that he was going "to kill all you pretty whores" and "all you bitches."

A. D. testified that in the first week of October 1992, she was twenty-five years old and working as a prostitute when the defendant approached her around 5:30 a.m. She was on Magnolia Avenue, and the defendant suggested that they go to Cahaba Lane, offering her fifty dollars, which was more than she usually made. She stated that the defendant mentioned people she knew, which made her more comfortable about going with the defendant. Once at Cahaba Lane, the defendant hit her and called her derogatory names. The defendant threatened to kill her, stating that he had a knife, although she said she never saw a knife. She stated that it was not common for dates to hit her or to call her derogatory names, although she said that it sometimes happened. She said that the defendant did not tie her up with rope.

D. L. testified that in September 1992, she was nineteen years old and working as a prostitute when the defendant picked her up at the Circle Inn around 1:00 p.m. The defendant offered to pay her fifty dollars if she performed oral sex, for which she normally charged twenty-five dollars. The defendant told her he wanted to go where he took P. J., who was someone she knew. She accepted the defendant's offer, and then he drove to Cahaba Lane. During the encounter, the defendant tied her up with rope, choked her, and threatened to kill her, stating that he hated all prostitutes. She did not remember if the defendant used profanity.

G. T. testified that in February 1992, she was twenty-five years old and working as a prostitute when the defendant picked her up on the Gay Street viaduct around 8:00 or 8:30 a.m. She suggested that they go to Cahaba Lane, and the defendant drove there without her giving him directions. She stated that the defendant tied her hands together with rope and attempted to rape her anally. He then grabbed her by her hair and forced her to perform fellatio on him. He also attempted to have vaginal intercourse with her. During the rapes, the defendant threatened to shoot her, although she did not see a gun. She stated that she had never been tied up before and that it was unusual for dates to hit her, although it happened "at times." She also said that dates did not usually curse her.

Based upon the testimony of these four victims, the trial court found that there was a common scheme or plan and that the evidence in each case would be admissible in the other cases if they were to be tried separately. Regarding the common scheme or plan, the trial court stated,

> These are the things that struck me about the testimony: First of
> all, the time frame. The time frame we have here are offenses

occurring between August of 1991 and October 1992, a period of, approximately, fourteen months. . . .

The cases, of course, speak to time frames. I recall time frames of nineteen months and greater periods of time than this in the cases where consolidation was granted. But, in any event, it is a fourteen-month time frame that we are dealing with here.

In each case, we have a young, white female prostitute between the ages of eighteen and twenty-two years old, who were all picked up either on or adjacent to Magnolia Avenue or on the Gay Street viaduct, . . . approximately a quarter mile from Magnolia Avenue, all within, I would estimate, a one-mile radius of one another within the downtown area of Knoxville, Tennessee.

Of course, three of these victims were taken to Cahaba Lane. One of them was taken to the Chilhowee Park area, zoo area, general area around the zoo, or the animal barns out there.

In each case – or in many of the cases – again now these next remarks that I address, I would point out that these did not necessarily happen in all four cases, but they happened in a minimum of two, sometimes in three, sometimes in four of the cases.

The testimony of these victims was that Mr. Huskey used profanity, and a great deal was made about this. Particularly, he used the phrase "bitch" and "whore" and "slut" and made references to prostitutes on a number of occasions with a number of these different victims.

We talked about that a good deal, and the testimony was that this was not common. Despite what some people might think, that the use of profanity and the use of derogatory comments to prostitutes engaged in their profession or on "dates" is not a common thing for them to experience.

Further, there was physical violence in virtually every case – in all cases – and threatened violence either with a weapon or the threatened use of a weapon with virtually all of these victims. The defendant pulled the hair of three of the four victims. His nature was abusive.

A particularly interesting aspect, I thought, was the characteristic – personal characteristic that, if the victim cried or begged, this would anger the perpetrator, and he would react by either physically assaulting and/or threatening to physically assault the victim, if they engaged in that kind of conduct.

The type of sex acts. Oral sex in each case, the attempted and/or accomplished vaginal sex; the attempted or accomplished anal sex of these individuals. Three of the four were left at the scene of the crime; one was returned to town. He robbed some of these victims . . . at least, in two of the cases. . . .

There was the force – the commonality of the forced removal of clothing of all these victims, again something that you would think not uncommon. But the testimony that was elicited was that it was somewhat uncommon; that many times clothing is not removed to accomplish the sex act.

The practice of tying these victims up. He tied three of the four victims up during the perpetration of the crime.

Again, with some of these victims he put them at ease by mentioning other prostitutes that the victims knew, in an effort to give them a sense of security, so that they would be at ease, in terms of going with him on a date – a prostitute date.

Also, in a couple of the cases, he increased the price that would normally be demanded for the type of service, in an effort to convince the prostitutes – these victims – that they should go to a location that they would not otherwise have agreed to go to.

Like I say, there are some differences here. These things that I have mentioned certainly don't apply in each and every case. Some of them do; many of them don't apply in every case. The time of day, for instance, was different. The exact sexual acts. There was some differences. There is no question that there are some differences, but I don't think that the case law requires a finding of identical acts throughout the course.

The question is whether or not the similarities outweigh the differences and lead to the conclusion that the defendant was the individual who committed the offenses. I think, when you examine all the facts in these cases and look at the overall picture,

which I think you are required to do by the case law, that the manner and method – the acts of the perpetrator provide a commonality in these cases that runs throughout the cases.

The trial court also analyzed whether the evidence of each case would be admissible in trials of the others using Rule 404(b), Tenn. R. Evid., stating that one of the exceptions to the general rule prohibiting evidence of other crimes is identifying the defendant as the perpetrator based upon the fact that the acts are part of a common scheme or plan. The court stated that it then considered, pursuant to Rule 404(b), whether the probative value of the evidence of the other crimes or wrongs was outweighed by the danger of unfair prejudice. In its ruling regarding the admissibility of the evidence of the other offenses, the trial court stated that the "probative value of the evidence outweighs any unfair prejudice; or to say it another way, the probative value is not outweighed by the unfair prejudice, and the evidence in these cases is so related that the proof of one tends to establish the proof of the other."

The defendant first contends that the state's March 21, 1996 consolidation motion was untimely, arguing that the motion violated Rule II of the Knox County Criminal Court Local Rules of Practice, which provides that pretrial motions be filed no later than thirty-one days after arraignment. The state contends that the motion was filed timely pursuant to Rule 12(b)(5), Tenn. R. Crim. P., and that the local rule relied upon by the defendant is applied with flexibility, does not preclude a court from considering motions after the operative date, and does not provide any remedy for a violation.

Rule 12(b)(5), Tenn. R. Crim. P., provides that requests for consolidation must be made "prior to trial," which has been interpreted to mean "sometime earlier than 'the day of the trial when the jury is waiting in the hall.'" Spicer, 12 S.W.3d at 444 n.6 (quoting State v. Hamilton, 628 S.W.2d 742, 744 (Tenn. Crim. App. 1981)). In the present case, the state filed its motion for consolidation almost two months before trial. Thus, the state correctly argues that it complied with Rule 12(b)(5). However, the defendant asserts that the state failed to comply with Rule II of the Knox County Criminal Court Local Rules of Practice, which states in pertinent part,

> **Time for Filing Pretrial Motions.** All pre-trial motions made pursuant to Rule 12(b) and Rule 21 Tenn. R. Crim. P. must be filed and served no later than 31 days after arraignment.

Obviously, the state did not comply with this rule.

The state argues that the rule is applied flexibly and does not preclude a court from considering motions after the operative date. It states that nearly all of the defendant's pretrial motions were filed after the time allowed by the local rule. We note that on one occasion during pretrial motion hearings, the trial court commented, in response to an argument by the defendant concerning the local rules, "What you are urging this court to do at this time is to enforce local rules that are not uniformly enforced in this court or in any other court. Both sides in this litigation have

violated the local rules on a number of occasions, continue to do so. . . . I am going to rule on this motion on its merits." Furthermore, we note that Rule XI of the Knox County Criminal Court Local Rules of Practice provides that the "Court may modify or abstain, in its discretion, from applying any of the foregoing rules when to follow the rules would be unfair or would work any injustice." Considering the trial court's comments regarding the local rules and the fact that almost every motion, both from the state and from the defendant, was filed after the thirty-one day deadline, the trial court must have opted to exercise its discretion by not applying Rule II. Accordingly, the state's motion to consolidate was not untimely due to violating the local rule.

The defendant next argues that the trial court erred in consolidating the indictments because the offenses were not parts of a common scheme or plan. In Tennessee, there are three categories of common scheme or plan evidence:

> (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes;
>
> (2) offenses that are part of a larger, continuing plan or conspiracy; and
>
> (3) offenses that are all part of the same criminal transaction.

State v. Moore, 6 S.W.3d 235, 240 & n.7 (Tenn. 1999) (noting that common scheme or plan evidence for consolidation or severance purposes is the same as common scheme or plan evidence for evidentiary purposes). At the motion hearing, the parties and the trial court focused on the first category. On appeal, the state also asserts that the victims' testimony establishes a larger, continuing plan to terrorize prostitutes.

For the offenses to reveal a distinct design, the "modus operandi employed must be so unique and distinctive as to be like a signature." Moore, 6 S.W.3d at 240 (quoting State v. Carter, 714 S.W.2d 241, 245 (Tenn. Crim. App. 1986)). Although the offenses do not have to be identical in every respect, a common scheme or plan is not found merely because there was evidence that the defendant committed the multiple offenses or because the similarities of the offenses outweigh the differences. Id. at 240-41. "Rather, the trial court must find that a distinct design or unique method was used in committing the offenses." Id. at 241. The method of perpetrating the crimes must employ "'such unusual particularities'" that a reasonable person could believe it unlikely that different people were using this method. Id. at 240 (quoting Harris v. State, 189 Tenn. 635, 644, 227 S.W.2d 8, 11 (1950)).

In this case, the trial court stated, "The question is whether or not the similarities outweigh the differences and lead to the conclusion that the defendant was the individual who committed the offenses." As noted above, our supreme court in Moore stated that this was not the proper test to determine whether multiple offenses reveal a distinct design. The trial court did not specifically find

-26-

that a distinct design or unique method was used in committing the crimes. Thus, we consider whether the evidence establishes the use of a distinct design or unique method.

First, we do not believe that the trial court's piecemeal approach to considering the similarities of the offenses was appropriate. See, e.g., Shirley, 6 S.W.3d at 249. In other words, we do not believe a trial court can use events that happened in some of the cases to support consolidation of all of the cases. Id. (noting, for example, the fact that the perpetrator wore a green army jacket in two robberies and a black shirt and grey sweatshirt in the other two did not support the presence of a distinct design). With this in mind, we note that the similarities found in all four cases include that the defendant picked up young, white female prostitutes in the same area; that the defendant treated them violently, which A. D. and G. T. testified was not common for dates to do; and that the defendant threatened to kill the victims. Also, D. C. and A. D. testified that the defendant called them derogatory names. G. T.'s testimony at the consolidation hearing implies that the defendant called her derogatory names. This implication is confirmed by her trial testimony. We note that although D. L. said at the hearing that she could not remember if the defendant used profanity, she testified at trial that the defendant called her "bitch." Regardless, we do not believe that these similarities establish a distinct design or unique method in committing the offenses relative to all four victims.

However, we believe that additional similarities in D. L.'s, A. D.'s, and G. T.'s cases establish that the crimes relative to these victims were committed with a distinct design or unique method. First, these crimes occurred in February, September, and October 1992, shrinking the time period in which the crimes were committed. Moreover, and more importantly, although all four victims were hired for sex and voluntarily got into the defendant's car, D. L., A. D., and G. T. had pleasant drives with the defendant, who drove them to the same, remote location, the dead end area of Cahaba Lane, where he then attacked them. We believe that this method – "hiring" young, female prostitutes from the same area and driving them, under the pretense that they would perform sex for money, to a specific, remote area, where the defendant could then attack them without the risk of detection – is sufficiently unique to establish a common scheme or plan.

We note that another panel of this court has determined that similarities in the victims, the location, the timing, and the means by which the perpetrator committed the crimes established a distinct design. State v. Marcus Fitzgerald, No. W2000-02669-CCA-R3-CD, Shelby County, slip op. at 5 (Tenn. Crim. App. Jan. 15, 2002). In Fitzgerald, both victims were African-American females who lived in the same neighborhood and knew the defendant as "Bubba." The offenses, aggravated rapes, occurred in different abandoned houses on the same street and within twenty-four hours of each other. The perpetrator, who was undisguised, had brief conversations with the victims before each offense. He then grabbed the victims by the neck from behind and dragged them into the vacant houses. Although only one victim saw the defendant with a knife, he threatened both victims with a knife and both were released after the offense. In the present case with respect to D. L., A. D., and G. T., the defendant chose similar victims from the same area and took them to the same, remote location. Although the offenses occurred over seven months, the undisguised defendant "hired" each victim to provide sex for money and had pleasant drives with each to Cahaba

-27-

Lane. Once there, the defendant hit or choked the victims or pulled their hair, threatened to kill them, and called them derogatory names. As in Fitzgerald, the crimes against D. L., A. D., and G. T. reveal a distinctive design.

In contrast, when D. C. got into the defendant's car, the defendant pulled out a gun and then drove erratically, not stopping for red lights, to a barn at the zoo. Although the defendant threatened the other victims with the use a weapon, he did not display a weapon to any of the other victims and did not threaten them until he had reached his isolated destination. Thus, the offenses against D. C. were accomplished differently than the offenses in the other cases. Accordingly, we conclude that the trial court abused its discretion in consolidating D. C.'s case with the other three cases under the distinct design category of common scheme or plan evidence.

The state contends on appeal that the offenses fall within the second category of common scheme or plan – the larger, continuing plan or conspiracy category – and argues that the defendant's threats to kill all prostitutes combined with the abusive nature of the offenses reveal a larger, continuing plan to terrorize prostitutes. With respect to this contention, we note that the defendant told D. L. that he hated all prostitutes and that he was going to kill her. He told D. C. that he was going "to kill all you pretty whores" and "all you bitches." D. C. and D. L. testified that the defendant tied their wrists together with rope, which was not common for dates to do. All four victims testified that the defendant treated them violently, threatened to kill them, and called them derogatory names. The state argues that the defendant used violence in perpetrating the offenses in order to frighten the victims, who were willing to have sex with him without force. It maintains that the defendant committed all of the offenses in order to promote his goal of terrorizing prostitutes.

"The larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993); Neil P. Cohen et al., Tennessee Law of Evidence § 404[12][c], at 4-93 (4th ed. 2000) ("The unifying concept of crimes admitted under this theory is not their high degree of similarity but the common goal or purpose toward which each crime is directed."). This theory was not argued at the hearing, and the defendant's reply brief addresses the state's argument by merely stating that it was rejected in State v. Rickman, 876 S.W.2d 824 (Tenn. 1994). We disagree with the defendant's interpretation of Rickman, in which our supreme court held that there was no sex crimes exception to the general rule that evidence of other crimes is not admissible in criminal prosecutions. Id. at 829. Rickman does not involve, or mention, common scheme or plan evidence. Thus, Rickman did not reject the state's argument that the defendant's larger, continuing plan to terrorize prostitutes established a common scheme or plan.

On the other hand, case law reveals that the larger, continuing plan category is difficult to separate from the distinct design category, especially in the area of sex crimes. This court has rejected the contention that sex crimes against different victims in the same household can be consolidated based upon a common goal of achieving sexual gratification. Hallock, 875 S.W.2d at 290. Hallock provides the following example to illustrate the fallacy in classifying such crimes as a larger, continuing plan: "X is on trial for three counts of burglary, each involving a different

building, a different form of entry, and a different day. His overall purpose, however, was to acquire money for college. Clearly, without more, X is entitled to severance under Rule 14(b)(1)." Id. at 290; see also State v. Adams, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992) (holding that a shared motivation is insufficient to prove a common scheme or plan even when the offenses share some similarities). Despite defining the larger, continuing plan category as focusing on the perpetrator's purpose in committing the crimes, this example in Hallock reveals that, at least when evidence of the other crime is being offered to prove identity, a distinctive design is required. The fact that a defendant has a common goal in committing crimes does not mean that proof of the individual, disparate crimes will reveal his identity. This conclusion is supported by the holding in State v. Ronald Prentice, cited by the defendant as supplemental authority, in which this court concluded that a common motive to terrorize the victim, the defendant's estranged wife, was insufficient to show a common scheme or plan when the assaults were otherwise unrelated in time, location, and character. No. M2000-02937-CCA-R3, Davidson County, slip op. at 4 (Tenn. Crim. App. Dec. 28, 2001).

Our review of Tennessee cases in which the larger, continuing plan was the category of common scheme or plan also supports our conclusion that only the signature crimes category can be used when the basis for 404(b) admissibility is identity. In the wake of Hallock and Adams, the larger, continuing plan category has typically been applied to cases involving crime sprees, when the defendant commits several crimes close in time to each other. See, e.g., State v. Hall, 976 S.W.2d 121, 146 (Tenn. 1998) (appendix) (holding the burglaries, larcenies, and murders committed by the defendants during the week following their escape from a Kentucky prison were part of a larger plan to flee the country and the Kentucky authorities); State v. Joe N. Anderson, Jr., No. E1998-00378-CCA-R3-CD, Hamilton County (Tenn. Crim. App. Dec. 9, 1999), app. denied (Tenn. Sept. 11, 2000) (concluding that the perpetrators had a larger goal to rob and murder after they attempted to rob and then shot the first victim at his home then killed a sleeping truck driver in the early morning of the same day). In those cases that mention identity as one of the bases for 404(b) admissibility, it is not proof of the other crime itself which provides evidence of identity but evidence found at the other crime scene that tends to connect the defendant to other crimes in the scheme. See, e.g. Hall, 976 S.W.2d at 146 (appendix) (discussing that evidence found at some of the crime scenes linked the defendants to other crimes in the spree); Joe N. Anderson, Jr., slip op. at 8 n.3 (noting that the evidence of the other crime was relevant to identity because proof that the defendant fired the gun at the victim in the first crime tended to establish that he was the shooter in the second crime). Additionally, our supreme court has observed that identity is the most frequent basis for using evidence of a distinctive design. Moore, 6 S.W.3d at 239; Shirley, 6 S.W.3d at 248.

Based upon Hallock and its progeny along with our supreme court's current trend to disfavor the consolidation of cases, we do not believe that a generalized goal to terrorize prostitutes occurring over a fourteen-month period provides a sufficient basis to consolidate D. C.'s case with the others. As discussed above, the similarities in D. C.'s case do not amount to a signature crime. We do not believe that a generalized goal to terrorize prostitutes can establish the identity of the defendant as

the perpetrator in D. C.'s case, especially given the differences in location and abduction in her case. Thus, the trial court erroneously found D. C.'s case to be part of a common scheme or plan.

We next address whether evidence of each offense would have been admissible in the trials of the others if they had not been joined. We first consider the admissibility of the other crimes evidence as it relates to D. L., A. D., and G. T. The primary issue in a severance case under Rule 14(b)(1), Tenn. R. Crim. P., is "whether evidence of one offense would be admissible in the trial of the other if the two offenses remained severed." Spicer, 12 S.W.3d at 445 (noting that in its most basic sense, whether offenses should be tried separately is "really a question of evidentiary relevance"); Moore, 6 S.W.3d at 239. The evidentiary rule at issue is Rule 404(b), Tenn. R. Evid., which excludes evidence of other crimes, wrongs, or acts committed by the defendant when offered only to show propensity to commit those crimes, wrongs, or acts. However, Rule 404(b) does not bar such evidence when offered at trial to prove another relevant issue such as to show motive of the defendant, intent of the defendant, identity of the defendant, absence of mistake or accident if that is a defense, or "a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other." Collard v. State, 526 S.W.2d 112, 114 (Tenn. 1975). However, our supreme court has noted that admission of common scheme or plan evidence has expanded by circular argument in that the evidence is often considered relevant and admitted "merely because it is evidence of a common scheme or plan," and it has concluded that admission of common scheme or plan evidence is proper only when introduced to show motive, identity, intent, absence of a mistake or accident if that is a defense, or some other relevant issue. Moore, 6 S.W.3d at 239 n.5.

The state contends that evidence of each offense would have been admissible in the trials of the others because the evidence established identity, intent, and motive. We agree that the other crimes evidence would have been admissible to establish identity because of the unique method in which the defendant committed the crimes against D. L., A. D., and G. T. The defendant asserts that the other crimes evidence would not have been admissible in the trials of the other cases because each victim identified the defendant as the perpetrator. See Moore, 6 S.W.3d at 239 (holding that consolidation was improper because the evidence of the other crimes was not relevant to any issue at trial, noting that identity of the perpetrator was not an issue). In this case, however, identity was an issue. Simply because the state had other evidence – victim identification – to indicate that the defendant was the perpetrator does not mean that identity was not a material issue.

At trial, the defendant, as could be anticipated from his cross-examination of the victims at the consolidation hearing, vigorously cross-examined the victims, impeaching their testimony and arguing to the jury that they could not be believed. Moreover, the defendant argued relative to each victim that he was not the perpetrator of the offenses. Indeed, the defendant requested that the jury be instructed regarding identification. The instruction submitted by the defendant, which the trial court used, began, "One of the issues in this case is the identification of the defendant as the person who committed the crime." Accordingly, we conclude that the other crimes evidence was relevant to establish identity relative to offenses committed against D. L., A. D., and G. T. However, because of the factual differences in D. C.'s case, we cannot conclude that the evidence of the offenses

against her were admissible in the trials of the others to establish identity or for any other reason. Likewise, the evidence of the offenses against the other three victims would have been inadmissible in a separate trial of the offenses against D. C.

The defendant next argues that the trial court erred in finding that the probative value of the other crimes evidence outweighed the danger of unfair prejudice. Factors to consider in determining the evidence's probative value include "the prosecution's need for the evidence, the likelihood the defendant committed the other crimes, and the degree of its relevance. The similarity of the acts makes the probative value particularly significant." State v. Edwards, 868 S.W.2d 682, 691 (Tenn. Crim. App. 1993). In this case, the evidence was important to establish identity. Little or no physical evidence of the offenses existed, and the victims' identifications were subject to attack, as demonstrated by the defendant's cross-examination of the victims at the hearing. Also, the evidence presented at the hearing indicated that it was likely that the defendant committed the offenses. Finally, the similarity of the offenses adds to the probative value. We hold that the probative value of admitting the evidence of the other offenses was significant.

We note that the other crimes evidence, though probative, is certainly prejudicial. However, the test requires balancing probative value with the danger of unfair prejudice. See State v. DuBose, 953 S.W.2d 649, 654-55 (Tenn. 1997). "Because the test of Rule 404(b) is one of balance, when evidence of prior acts is highly probative of a material issue at trial, the chance of unfair prejudice to the defendant is correspondingly diminished." State v. Mallard, 40 S.W.3d 473, 488 (Tenn. 2001). In this respect, we believe that the other crimes evidence in this case was highly probative of identity, and we cannot say that the danger of unfair prejudice outweighed its value. Accordingly, we do not believe that the trial court abused its discretion in admitting such evidence. In summary, we conclude that the state's motion was timely, the offenses relative to D. L., A. D., and G. T. were parts of a common scheme or plan, and the evidence of each of these offenses would have been admissible in the trials of the others. We hold that the defendant's offenses relative to D. L., A. D., and G. T. were properly consolidated.

We must now determine whether the error in consolidating D. C.'s case more probably than not affected the judgments. See T.R.A.P. 36(b). Whether to grant a severance under Rule 14(b)(1), Tenn. R. Crim. P., is primarily an evidentiary question, and thus, "the effect of a denial of that right is weighed by the same standard as other non-constitutional evidentiary errors: the defendant must show that the error probably affected the judgment before reversal is appropriate." Moore, 6 S.W.3d at 242. Our supreme court has stated that in most severance cases, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict.'" Spicer, 12 S.W.3d at 447-48 (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)).

In this case, the evidence supporting the convictions consisted almost exclusively of the testimony of the victims. While this evidence was sufficient to support the convictions, it did not provide overwhelming proof of the defendant's guilt. See Spicer 12 S.W.3d at 448. With respect to the perceived propensity to commit similar crimes, we recognize that although a different method

was used in committing the offenses against D. C., the fact that the defendant was accused of committing the same types of crimes against all of the victims created the strong potential for the jury to consider the other crimes evidence improperly as propensity evidence. The unfair prejudice resulting from the jury learning of the crimes against the other victims outweighs any probative value that could be derived from the evidence in the other cases. Thus, the consolidation of D. C.'s case with those of the other victims probably affected the judgments in D. C.'s case.

On the other hand, with regard to the offenses against the other three victims, we do not believe that the defendant was harmed by the evidence relating to D. C.'s case. Importantly, the jury properly heard evidence relating to three victims, and thus, we believe it unlikely that the evidence relating to a fourth victim would sway the jury based upon the defendant's propensity to commit the crimes. The defendant was not harmed by the erroneous consolidation of D. C.'s case with the other three cases.

## ISSUES RELATING TO BOTH CASES

## II. SPEEDY TRIAL

The defendant contends that he was denied speedy trials in all of his cases, including both the first and the consolidated rape cases. We note that much of defendant's argument concerns the denial of his right to a speedy trial in the homicide cases, which are not before this court in this appeal. We address below whether the defendant was denied his right to a speedy trial in both rape cases.

Pursuant to the Sixth Amendment of the United States Constitution and to article 1, section 9 of the Tennessee Constitution, a criminal defendant has the right to a speedy trial. See also Tenn. Code Ann. § 40-14-101; Tenn. R. Crim. P. 48(b). The right is meant to protect the defendant "against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). In Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972), the Supreme Court devised a balancing test to determine speedy trial issues and identified the following factors for consideration: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant. None of the four factors are "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." Id. at 533, 92 S. Ct. at 2193. Rather, the factors must be "considered together with such other circumstances as may be relevant." Id. In State v. Bishop, 493 S.W.2d 81 (Tenn. 1973), our supreme court implicitly adopted the Barker balancing test for our state constitutional and statutory rights to a speedy trial. The remedy for the denial of a speedy trial is dismissal of the charges. Strunk v. United States, 412 U.S. 434, 439, 93 S. Ct. 2260, 2269 (1973).

On April 29, 1996, well after the first rape trial and three weeks before the consolidated rape trial, the defendant moved to dismiss the charges against him for the denial of a speedy trial. Although the motion only stated that the defendant was seeking dismissal of the homicide cases, the

defendant argued that demanding a speedy trial in the homicide cases necessarily meant that he was demanding one in the rape cases. On May 9, 1996, the trial court considered this argument and stated that the defendant's motion to dismiss would apply to all of his cases. On December 12, 1998, the trial court denied the defendant's motion to dismiss. We note, however, that the court's order, on its face, relates to the homicide cases. Regardless, the defendant's failure to secure a ruling on his motion to dismiss as it relates to the rape cases does not waive the issue on appeal. Indeed, even the failure to demand a speedy trial does not constitute a waiver of the issue. See Barker, 407 U.S. at 528, 92 S. Ct. at 2191; Bishop, 493 S.W.2d at 84. Thus, we consider whether the defendant was denied a speedy trial.

The defendant argues that the length of delay between charges being filed and his trials was unreasonable, that the state caused the delay, that he timely demanded a speedy trial, and that he was prejudiced as a result of the delay. The state argues that the defendant specifically stated that his demand for a speedy trial related only to his pending homicide cases and that, regardless, the defendant was the cause of the delay and was not prejudiced.

The first factor, the length of the delay, is a threshold factor, serving as the triggering mechanism that will necessitate consideration of the other three factors. Barker, 407 U.S. at 530, 92 S. Ct. at 2192. If the length of the delay is not presumptively prejudicial, then the other factors need not be considered. Id. Although what constitutes an ordinary length of delay depends on the complexity of the case, delays of one year or longer are usually enough to trigger the Barker inquiry. See Doggett v. United States, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 2691 n.1 (1992); see also State v. Turnbill, 640 S.W.2d 40, 42 (Tenn. Crim. App. 1982) (concluding that a thirteen-month delay was presumptively prejudicial so as to apply the balancing test). In this case, the first rape trial occurred in October 1995, three years after the defendant was charged, and the consolidated rape trial occurred in May 1996, three years and seven months after he was charged. Although these cases were complex, the lengths of these delays trigger consideration of the other Barker factors.

In State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996), our supreme court stated that the second Barker factor, the reason for the delay, generally falls into one of four categories:

> (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. The first type, intentional delay, is weighed heavily against the State. The second type, negligent delay, is also weighed against the State although not as heavily as deliberate delay. The third type of delay is, by definition, justifiable and is not weighed against either party. The fourth type of delay, which is caused or acquiesced in by the defendant, is weighed against the defendant.

Not surprisingly, the defendant and the state differ greatly in their views regarding the reasons for the delay – the defendant asserting that the state was to blame for the delay and the state asserting that the delay was caused entirely by the defendant.

Our review of the record reveals that the reasons for the delays fall into categories (3) and (4). Most of the delay can be attributed to the complexity of the defendant's cases, which required extensive discovery and resulted in a prolific motion practice, largely by the defendant. We note that the trial court granted the defendant numerous extensions of time to file motions. Likewise, the court granted the state extensions of time to respond to the defendant's motions, to which the defendant did not object. We also note that the first rape trial was continued twice at the defendant's request. We conclude that much of the delay associated with both rape trials was necessary to the fair and effective prosecution of the cases. This delay is justifiable and not weighed against either party.

The state argues that the defendant caused the delays by requesting continuances and extensions of time and by his prolific motion practice. Given the number of charges and the complexity of the cases, we do not believe that the defendant's actions were unreasonable. However, the defendant's demand for a speedy trial, or lack thereof, indicates that the defendant acquiesced in the delay. The defendant did not demand a speedy trial until January 1995, and at that time he requested a speedy trial in the homicide cases. Importantly, he specifically stated at that time and even as late as January 16, 1996, that he was not requesting a speedy trial in the rape cases. Indeed, the defendant's argument was based upon his wanting the homicide cases tried before the rape cases to avoid any resulting conviction in the rape cases being used as an aggravating factor in sentencing for the homicide cases. On April 29, 1996, the defendant moved to dismiss all of the charges against him for the denial of a speedy trial. At this time, he argued, and the court accepted, that his motion applied to the rape cases as well as the homicide cases. In summary, the defendant specifically stated that he was not demanding a speedy trial in the rape cases, and he did not change this position until after the first rape trial and only weeks before the consolidated rape trial. We conclude that the defendant acquiesced in the delay, which weighs against the defendant.

Furthermore, we note that the record does not reveal that the state acted intentionally to gain a tactical advantage or to harass the defendant. While the extended time that it took for the state to respond to the defendant's motions could be, in some cases, characterized as neglect or bureaucratic indifference, we believe that in these cases, in light of the number and content of the defendant's motions, the amount of time taken to respond was not unreasonable. Thus, regarding the second Barker factor, we conclude that most of the delay was necessary to the fair adjudication of the cases. Additionally, we conclude that the defendant acquiesced in the delay. Accordingly, this factor weighs against the defendant.

The third Barker factor is the defendant's assertion of his right to a speedy trial. While failure to demand a speedy trial does not result in a waiver of the right, "evidence that the defendant did not want a speedy trial would never warrant the finding of a constitutional violation except in 'extraordinary circumstances.'" State v. Baker, 614 S.W.2d 352, 355 (Tenn. 1981); see also Barker, 407 U.S. at 532, 92 S. Ct. at 2193 ("We emphasize that failure to assert the [speedy trial] right will make it difficult for a defendant to prove that he was denied a speedy trial."). In this case, the defendant first orally demanded a speedy trial on January 12, 1995, about nine months before the first rape trial. However, that request was specifically for the homicide charges against the

-34-

defendant. In fact, defense counsel stated that "we are not requesting a speedy trial in the other cases." The defendant's written demand for a speedy trial, filed February 13, 1995, also referred only to the homicide cases. The defendant restated this position on January 16, 1996. On that date, the parties were discussing the setting of trial dates, and when the state asked the defendant whether he was waiving his right to a speedy trial, the following exchange occurred:

> THE COURT: Do you waive speedy trial, gentlemen?
> . . . .
>
> [DEFENSE COUNSEL]: On the February case, yeah. It doesn't make any difference. We still have the same trial schedule.
>
> [DISTRICT ATTORNEY]: Now – but, now, they've got a speedy trial motion down, you see.
>
> [DEFENSE COUNSEL]: On the death case only. The only case we have a motion for a speedy trial is on the death case.

The defendant's first demand for a speedy trial relative to both rape cases occurred April 29, 1996, well after the first rape trial and about three weeks before the consolidated rape trial. On this date, the defendant filed a motion to dismiss for the denial of a speedy trial in all of his cases. In that motion, he argued that because the state had elected to try the rape cases before the homicide cases, his demand for a speedy trial in the homicide cases was also a demand for a speedy trial in the rape cases. We note that this argument was contrary to his January 12, 1995 oral demand and his February 13, 1995 written demand. In light of the timing of and circumstances surrounding the defendant's assertion of his right to a speedy trial, we conclude that this factor weighs against the defendant.

The fourth factor, whether the defendant has been prejudiced by the delay, is the most important factor. See Baker, 614 S.W.2d at 355-56. Prejudice "should be assessed in the light of the interests . . . the speedy trial right was designed to protect," which are (1) to prevent oppressive pretrial confinement, (2) to minimize the defendant's anxiety and concern that accompanies prosecution, and (3) to limit the possibility of the defense being impaired – the last being considered the most serious interest because of its potential to skew the fairness of the entire system. Barker, 407 U.S. at 532, 92 S. Ct. at 2193.

The defendant does not fully explain how he was prejudiced by the delay in his brief, stating that the "prejudice is so enormous it cannot be adequately summarized." Nonetheless, his brief contains numerous complaints regarding prejudice, and he also incorporates by reference lists from his speedy trial motion and amendments to that motion. In all, the defendant lists eighty-seven items

of prejudice. We note that many of these items relate to alleged prejudice resulting from delays that occurred after one or both of the rape trials. With respect to this appeal, the defendant's complaints regarding prejudice include the following:

(1)     He was denied full and fair consideration of his pretrial motions in the consolidated rape case. Motion hearings were pushed back to the eve of trial, and then after the trial court granted consolidation a few weeks before the trial, the trial court and state rushed to trial (i.e., insisted on keeping the set trial date), preventing full and fair hearings on numerous of his motions.

(2)     He suffered from health problems resulting from living in an unsuitable jail cell and being subjected to an unhealthy diet.

(3)     Prosecutors changed and as a result, procedures changed during the course of the proceedings.

(4)     Lifestyles of witnesses changed to the detriment of the defense and to the benefit of the state.

(5)     The proceedings were affected because parties became involved in political campaigns.

(6)     The law regarding peremptory challenges changed to the defendant's detriment.

(7)     There were changes to the defendant's detriment in the judicial philosophy and public opinion regarding crime.

(8)     His insanity defense was stricken in the rape cases because he did not receive the report from the state's expert on insanity until December 22, 1998.

(9)     Witnesses could not be found or could not remember important information.

(10)    Scientific evidence that was available earlier was no longer available.

(11)    911 tape recordings were destroyed.

(12) The defendant could not reconstruct his whereabouts to present an alibi offense because he did not receive the bill of particulars until March 1996.

(13) The Knox County Sheriff's office misplaced materials.

(14) The trial court's and counsel's memory of rulings were inconsistent and unreliable.

(15) Defense counsel was frustrated, discredited, and ridiculed for insisting that the defendant's motions be heard.

(16) Exculpatory, favorable, and impeaching evidence was withheld.

These assertions do not prove that the defendant was prejudiced. While some of the assertions, if taken as true, would be prejudicial, the assertions are broad and conclusory. They do not describe which witnesses, what evidence, what materials, etcetera form the bases of the complaints. Furthermore, it is not clear how some assertions, even if true, prejudiced the defendant. For example, the defendant does not specify how political campaigns or changes in defense funding prejudiced him. In any event, after reviewing the record and considering the defendant's assertions as they relate to the interests the speedy trial right is designed to protect, we conclude that the defendant suffered minimal prejudice as a result of the delay in his trials.

In this case, the defendant was incarcerated while awaiting trial. However, the defendant had a multitude of serious charges pending against him, including charges for four homicides. Because of these charges, the defendant would have been incarcerated at least for some of the time period in question, reducing the prejudice resulting from his incarceration. See United States v. Grimmond, 137 F.3d 823, 830 (4th Cir. 1998). Also, while we may assume that the defendant experienced anxiety and had concerns regarding the rape cases while awaiting trial, his actions demonstrate that his main concern was the pending homicide cases, in which the state had provided notice that it would be seeking the death penalty. See id. In light of these circumstances and the fact that the defendant did not take steps to expedite his rape trials, we conclude that the prejudice resulting from the defendant's incarceration and from his anxiety and concern relating to the rape charges is minimal.

The final interest of the defendant that we consider regarding prejudice is whether his defense was impaired by the delay. While the defendant has offered many broad, conclusory allegations of prejudice, he has not shown particularized prejudice. We note that courts have recognized that particularized proof regarding prejudice to one's defense is difficult to prove. See Wood, 924 S.W.2d at 348 (stating that it "is often extremely difficult . . . for a defendant to demonstrate specifically how the delay has impaired his ability to defend himself"). Accordingly, "affirmative proof of particularized prejudice is not essential to every speedy trial claim." Doggett, 505 U.S. at

655, 112 S. Ct. at 2692. Moreover, "the presumption that pretrial delay has prejudiced the accused intensifies over time." Id. In this case, we presume that the delay impaired the defendant's ability to present a defense. However, this presumption of prejudice is weakened by the defendant's acquiescence in the delay. See Wood, 924 S.W.2d at 349. In summary, although the defendant was prejudiced by the delay, the prejudice was minimal in light of the defendant's other pending charges and the fact that he acquiesced in the delay.

Summarizing the Barker factors, we conclude that the defendant suffered minimal prejudice. However, most of the delay was necessary to the fair and effective prosecution of the cases. Moreover, the defendant acquiesced in the delay, and he specifically stated that he was not demanding a speedy trial in the rape cases, a position he did not change until after the first rape trial and just before the consolidated rape trial. Upon balancing the factors, we conclude that the defendant was not denied a speedy trial in either the first rape case or in the consolidated rape case.

## III. UNLAWFUL ARREST, SEARCH, AND SEIZURE

The defendant contends that the trial court erred in refusing to suppress evidence seized from his bedroom and his statements, which were gained as a result of his unlawful arrest. The defendant's contentions with regard to his arrest fall into four general categories: he argues that (1) his thirty-day jail sentence for solicitation of prostitution was illegal, (2) the capias upon which he was arrested is invalid, (3) the Knox County detectives lacked jurisdiction to arrest him in Sevier County upon a capias addressed to the Knoxville Chief of Police, and (4) the officers lacked probable cause to arrest him in the absence of the capias. He also contends that the trial court should have suppressed evidence gained in the search of his residence almost three hours after his arrest because the search warrant was invalid and no exception to the warrant requirement applied.

The state contends that the defendant has waived the claims relating to the validity of his arrest, including that of an invalid capias, by pleading guilty to the charge of soliciting prostitution and failing to appeal or collaterally attack that conviction. It also argues summarily that the capias was valid and that the defendant was arrested by a Sevier County deputy. It asserts that the defendant has failed to show that a procedural defect in his arrest requires the suppression of his statements. Finally, it contends that even if the arrest had been unlawful, neither the evidence gathered at the defendant's home nor his statements were introduced in the rape cases and that, therefore, he can prove no prejudice resulting from the arrest. With regard to the search of the defendant's residence, the state argues that the trial court properly admitted the evidence because it was discovered in a search incident to arrest and was in the officers' plain view.

We conclude that the issues of the defendant's arrest and search are moot with regard to the cases that we are affirming because none of the evidence gained from the arrest or search was improperly used in either rape trial. In the event of a retrial of D. C.'s case, we hold that the capias upon which the officers based the arrest was void. We affirm the trial court's ruling that the search warrant was invalid due to its failure to list the executing officer.

We begin by reviewing the facts surrounding the defendant's arrest and the search of his home on October 21, 1992. At a February 7, 1996 suppression hearing, Knox County Sheriff's Detective Michael Upchurch testified that he was in charge of investigating the homicides, which occurred near Cahaba Lane in Knoxville in October 1992. His investigation caused him to focus on the defendant as a suspect, and he checked for outstanding warrants against the defendant. He found an outstanding capias for failure to appear in Knoxville Municipal Court on a charge of solicitation of prostitution. Knowing that the defendant had been employed at Teagues Statuary in Sevier County, Detective Upchurch asked the Sevier County Sheriff's Department to have an officer meet him and Detectives Darrell Johnson, Dan Stewart, Mike Freeman, and Mike Grissom to arrest the defendant on the capias and for questioning about the homicides. They first went to the statuary and then proceeded to the defendant's parents' mobile home, where Detective Upchurch saw a truck matching a description given in conjunction with his investigation parked in the driveway.

Detective Upchurch testified that at 9:30 p.m., he and Officer Jerry Huskey of the Sevier County Sheriff's Department went to the front door of the mobile home and that the other officers went to the back door. Officer Huskey was in uniform and had parked his cruiser in front of the mobile home. The defendant's mother answered the door, and he and Officer Huskey identified themselves. Detective Upchurch told her that he wanted to see the defendant, that a court had issued a capias for the defendant for failure to appear in court, and that they were taking the defendant into custody at that time. Mrs. Huskey told him that her husband and the defendant were in their beds and that she would get the defendant. She invited them inside. The defendant came into the living room and asked what they wanted. Detective Upchurch told him why they were there and that they wanted to talk to him. The defendant said, "Fine. I need to get my shoes." Detective Upchurch told the defendant that he could get his shoes but that they would have to accompany him to his bedroom because he was in custody. The defendant agreed to this and walked ahead of them down the hallway.

Detective Upchurch testified that while he and Detective Stewart were standing just inside the doorway of the defendant's bedroom, he saw an orange hay-baling rope on the defendant's floor. He recognized it as the type of rope used to bind the rape victims. As the defendant sat on his bed putting on his shoes, Detective Upchurch illuminated a dresser with his flashlight and saw a pair of women's earrings and a necklace on the top. The day before, one of the homicide victims' boyfriends had told him that the victim had earrings in her purse. He did not confront the defendant with the rope and jewelry at this point. The defendant refused to sign a consent to search form and was then transported to the Sevier County Jail.

Detective Upchurch testified that Detective Stewart remained at the defendant's bedroom door to make sure that nothing was moved. The other detectives waited in their unmarked cars. Although the defendant's father had given his consent to search the whole residence, the Assistant District Attorney advised him by telephone that he should get a search warrant for the defendant's bedroom. The Sevier County Sheriff's Office provided him with a search warrant form. He consulted with the Assistant District Attorney again and drafted the affidavit and warrant. He acknowledged that he was not familiar with Rule 41, Tenn. R. Crim. P., but that he had undergone

training relating to search warrants and was familiar with probable cause. Nevertheless, at the time of the hearing, he had written only a few search warrants. He admitted that the search warrant affidavit did not mention the jewelry that he had seen in the defendant's room. He said that he noted the jewelry on the list of items for which he was searching because he had seen it in the room and knew it was there.

Detective Upchurch testified that he told Officer Huskey that he needed to go to a judge or magistrate to get a search warrant signed, and Officer Huskey agreed to take him. He was taken to Bruce Baker, who was introduced as a Sevier County magistrate. He handed the warrant to Mr. Baker and asked if he needed to do anything else before Mr. Baker signed it. Mr. Baker signed the warrant, and Detective Upchurch made three copies. He gave one of the copies to Mr. Baker, and the other two copies were for the defendant and his father. Once he obtained the signed search warrant, he returned to the defendant's parents' home and conducted the search. When Detective Stewart picked up the earrings to bag them, Detective Upchurch saw a blonde hair entwined with the necklace and the earrings. In addition to the items found in the defendant's bedroom, he found a knife on the bathroom sink. He said that the defendant's parents never objected to the search of their mobile home, and the defendant never objected to the officers entering his bedroom at the time of his arrest.

Detective Upchurch testified that the defendant arrived at the Knox County Jail at 4:00 a.m. on October 22. Detective Upchurch was not at municipal court when the defendant appeared and did not speak to anyone associated with that charge. He did not consider the defendant to be under arrest for the death of Patricia Rose Anderson until the Knox County Grand Jury returned an indictment for that charge.

Jerry Huskey testified that on October 21, 1992, he was a patrolman with the Sevier County Sheriff's Department, when Knox County officers asked him to help them in investigating the defendant. He confirmed the truth of his affidavit, which stated that the officers showed him a folded capias and told him that it was for the defendant, but said that he did not read it. He took them to the statuary and then to the Huskey residence. He thought that the defendant's father invited them inside. The defendant was not wearing shoes when he first saw the defendant. He heard the detectives ask the defendant's father if they could search the mobile home. The defendant's father agreed to let them search but told them that they would have to ask the defendant about his room. The detectives asked the defendant if they could search his room. The defendant said they could not search his room, and they got a search warrant. He did not see the detectives violate the defendant's rights, and he believed that they acted in a professional manner. He acknowledged that his report states that he transported the defendant to the Knox County line where the defendant was charged with homicide.

Knox County Sheriff's Detective Daniel Stewart testified that on October 21, 1992, he went to the defendant's house with Detective Upchurch. When the defendant walked into his parents' living room, Detective Upchurch announced that the defendant would be taken into custody for failure to appear in court. Detective Stewart considered the defendant to be in custody at that point.

He said he accompanied the defendant to his bedroom for shoes or a shirt. He was standing either in the doorway or just inside the room, and Detective Upchurch stood beside him. He noticed a piece of orange baling twine on the floor by the bed. Detective Stewart said that a rhinestone necklace with a hair entangled in it and a pair of costume pearl earrings were found on a piece of furniture immediately on the left through the doorway, but he did not remember if he saw the jewelry when the defendant was getting his shoes or when they executed the search warrant. The top of the piece of furniture was cluttered, and the jewelry was either on top of or near the edge of some newspapers. When the defendant was taken to jail, Detective Stewart remained at the mobile home to ensure that the defendant's bedroom was not disturbed. He did not search the room while the other officers were away. During that time, the defendant's mother entered the room to turn off a light or radio, and as she left, the rope caught on her foot and was dragged a few inches.

Jessie Huskey, the defendant's mother, testified that she was awakened by knocking after 9:00 p.m. on October 21, 1992. When she opened the door, men wearing police uniforms asked if her husband was there. She said that he was there and called for him. One of the men asked if the defendant was there. She said yes and knocked on the wall adjacent to the defendant's bedroom. She did not ask the officers to come inside. The officers stood in the door until her husband arose. When the defendant entered the living room in his pajama bottoms, the officers walked over to him. At that point, she went to her bedroom to get a housecoat, and when she returned, the officers and the defendant were gone. She never heard the officers ask her husband for permission to search their home or say that they were there to arrest the defendant because he failed to appear for court. The defendant had previously told her that he went to court.

Mrs. Huskey testified that she was frightened and nervous because the officers had taken the defendant. One officer remained standing at the defendant's bedroom door. She denied offering a stool to the officer, who stood the entire time. The officer watched her go into the defendant's bedroom and asked what she was going to do. She told him that she was going to turn the radio off, which she did and then left the room. She noted that a chest of drawers was built into the wall in the defendant's bedroom and that one could not see the chest unless he or she stepped into the room. The officers returned and searched the trailer, but she did not hear her husband give them permission to search. She did not know what was in the defendant's room because she never went in his room except to leave his clean laundry on the bed.

Bruce Dale Baker testified that on October 21, 1992, he was a Sevier County Judicial Commissioner and issued his first search warrant, which authorized a search of the defendant's residence. Detective Michael Upchurch told him that Detective Upchurch had arrested the defendant on a capias, which Commissioner Baker believed to be a state capias. He said he would have given more thought to the legality of the search warrant if he had known that it was a city rather than a state capias. The officers told him that they were arresting the defendant for murder but had taken him into custody on the capias because he was wanted in Knoxville on another charge. He read the affidavit written by Detective Upchurch and filled out the search warrant but overlooked the blank line for the executing officer's name.

-41-

Phyllis Davis, secretary for the Knoxville Municipal Court judge, testified that she maintains the records for the municipal court. City judges serve four-year terms, and Judge John Rosson, Jr., was the city judge in 1992. On June 12, 1992, the city judge issued a warrant for the defendant for solicitation for prostitution on that day. The defendant posted bond and was to appear for trial on June 16, 1992. The trial was continued to July 7, 1992, but the defendant failed to appear. On July 7, the City of Knoxville issued a capias directing the Knoxville Chief of Police to bring the defendant before the City Court judge to answer a charge of failure to appear for a charge of solicitation of prostitution. She said that a capias does not expire and that it is given to the jail, the Police Department, and the Sheriff's Department to keep on file. Also, the Sheriff's Department can access any outstanding process by computer. She said that the capias does not require the Chief of Police to report back to the court.

Ms. Davis testified that she learned the defendant had been arrested on the morning of October 22, 1992, but she did not recall knowing at that time that the police suspected he was the "Zoo Man." The defendant was brought to municipal court around 10:00 a.m. Ms. Davis heard the judge explain the defendant's rights to him. She did not recall the defendant asking any questions or stating that he understood his rights. He did not object to the legality of his arrest or ask for a lawyer. He did not appear to be intoxicated. The city warrant for solicitation of prostitution reflects that the defendant pled guilty and waived his right to an attorney. Special Judge Carlton Bryant, appointed by Judge Rosson as a substitute judge, signed the judgment portion of the warrant on October 22, 1992. Although the signature for the waiver of attorney reads "Kyle Huskey," Ms. Davis was in the courtroom when the waiver was signed, and the defendant was the one who signed it. Apparently, no one noticed that the defendant had signed his name as "Kyle" or else the defendant would have been asked to reconsider his plea and sign again. A lot of defendants give aliases in municipal court, and the warrant gives the defendant's name as "Thomas D. Husky (alias)." The defendant did not deny that he was Thomas D. Huskey.

Carlton Bryant testified that in October 1992, he was an attorney in private practice and sometimes presided as a substitute city judge. Judge Rosson would ask him to serve in that capacity, and then either Judge Rosson or the clerk would administer an oath. He did not independently recall serving as a substitute judge in the defendant's case, but he identified his signature on the city warrant, indicating that he accepted the defendant's guilty plea on October 22, 1992. He would not sign a warrant without discussing the defendant's rights with him or her and witnessing the defendant sign the warrant. If the defendant had said that he was intoxicated or did not know what he was doing, then he would not have accepted the plea. He typically makes an "X" to show defendants where to sign, and he noted that "Kyle Huskey" was signed by an "X." He did not recall whether it was in fact the defendant who signed.

Mr. Bryant testified that after the defendant pled guilty, he ordered the defendant to pay court costs and a fifty-dollar fine and to serve thirty days in jail. He admitted that he did not check the box requiring the defendant to serve thirty days in jail, but typically the clerk checks the boxes after he enters the fine and jail period. Ordinarily, a conviction for solicitation for prostitution in municipal court would result in a fine only. He sentenced the defendant to thirty days in jail based upon

something that KPD Officer Torres told him in open court before he accepted the guilty plea that made this case worse than the typical case. He gave the defendant the maximum sentence based upon the guilty plea and the facts given by the officer. No one, including the homicide detectives, had approached him, told him about the "Zoo Man," or asked him to be particularly harsh on the defendant. This was not the only time he had sentenced a defendant to jail based upon the facts of a prostitution case.

On April 1, 1996, the trial court denied the defendant's motion to declare the arrest invalid and his motions to suppress the evidence gained from the search of his residence and his statements. Regarding the defendant's arrest, the trial court found that the capias was "a valid capias issued by a duly-operating court; that it carried the force of law, and that Mr. Huskey could be arrested on that capias, as it stood in October 1992." It found that the defendant was properly arrested in Sevier County based upon the Knoxville capias because a warrant or capias issued in one jurisdiction can be served in another. With regard to the search of the defendant's residence, it found that the search warrant was invalid because it did not list the executing officer. Nevertheless, it found the search of the defendant's bedroom to be incident to his arrest and that the items seized were in the officer's plain view.

## A.  Lack of Prejudice

It is well-settled that a defendant enjoys "no constitutional immunity from an unlawful arrest." State v. Dulsworth, 781 S.W.2d 277, 282 (Tenn. Crim. App. 1989). Instead, the fact of an unlawful arrest is relevant only if the state seeks to present evidence tainted by the arrest. Id. at 282-83; see also State ex rel. Wood v. Johnson, 216 Tenn. 531, 534-35, 393 S.W.2d 135, 136 (1965) (noting that even if evidence from the search of the petitioner or his room was illegally obtained, the petitioner's trial was not tainted because none of the evidence was used). Furthermore, the remedy for an unconstitutional search is exclusion of the evidence obtained therefrom. See Murray v. United States, 487 U.S. 533, 536-37, 108 S. Ct. 2529, 2533 (1988) (holding that the exclusionary rule requires exclusion of tangible, testimonial, and derivative evidence acquired through an unlawful search); State v. Clark, 844 S.W.2d 597, 600 (Tenn. 1992). In the present case, the state did not use the rope or the jewelry discovered in the defendant's bedroom in either of the rape trials, nor did it use the defendant's statements, as we discuss in Issue IV. The record reveals that the only piece of evidence used at the rape trials and stemming from the arrest or search was a photograph of the defendant taken following his arrest.

## 1. Photograph

The defendant complains that in the first rape trial, the state used a photograph of him that was taken following his arrest. At the suppression hearing before the consolidated rape trial, Detective Upchurch testified that the defendant arrived at the Knox County Jail at 4:00 a.m. on October 22, 1992. The defendant introduced an October 22, 1992 arrest report from the Knox County Jail Intake Center, with a photocopy of the defendant's photograph on the back. Phyllis Davis testified that the defendant pled guilty to solicitation of prostitution in municipal court around

10:00 a.m. on October 22, 1992. During the first rape trial, the victim identified the defendant as her attacker but testified that his appearance had changed since the time of the offenses when he had a beard and longer hair and was thinner. The state introduced the defendant's photograph during the victim's testimony relating to her identification of the defendant as her attacker to illustrate the way that the defendant looked at the time of the offenses. The victim testified that in October 1992, she went to the police station and picked the defendant's picture out of a photograph array. The defendant cross-examined the victim about discrepancies between her initial descriptions of her attacker and the photograph of the defendant. On cross-examination, the victim agreed that Detective McCroskey showed her the defendant's photograph on October 27, 1992.

In Tennessee, a photograph of a defendant is admissible for purposes of identification even if taken following an illegal arrest. See State v. Miller, 608 S.W.2d 158, 160 (Tenn. Crim. App. 1980). This is so because the identification of the defendant from his picture is not the fruit of the arrest. Id. "The basis of the identification is not the arrest but the witness's perception of the accused during the crime. . . . The arrest merely provided the means for the confrontation with the victim . . . . The arrest contributed neither to the knowledge of the witness nor to the accuracy of her identification." Id. Thus, under Tennessee case law, the defendant's photograph, taken after his arrest and used by the victim to identify him as the perpetrator, was admissible to identify the defendant without regard to the legality of the arrest.

We note, though, that the United States Supreme Court has suggested that a photograph taken as the result of an illegal detention may be inadmissible. See United States v. Crews, 445 U.S. 463, 100 S. Ct. 1244 (1980). In Crews, the Court addressed the question of whether an in-court identification of the defendant by the victim is the product of an illegal arrest. In that case, several women were robbed at gunpoint in the women's restroom on the grounds of the Washington Monument. Based upon the victims' description of the perpetrator, officers saw the teenage defendant in the area, unsuccessfully attempted to photograph him at the scene, took him into custody for truancy, photographed him, and released him. The victims identified the defendant from a photograph array and again in a line-up. Finding that the police lacked probable cause to detain the defendant initially, the trial court suppressed the photograph and line-up identifications as products of the illegal detention but allowed the victims to identify the defendant at trial. The Court held that the in-court identifications of the defendant were not the products of his illegal arrest because (1) the victims were present to testify about the offenses, (2) the victims could reconstruct the crimes and their identification of the defendant from their own knowledge and recollection, and (3) the defendant was physically present. Id. at 471, 100 S. Ct. at 1250. The Court held that none of these three circumstances resulted from the exploitation of the Fourth Amendment. Id. In so holding, it noted that the parties conceded that the intervening photograph and line-up identifications were the product of the Fourth Amendment violation. It observed that in some circumstances, these intervening identifications could be so suggestive as to render the in-court identification unreliable and, therefore, inadmissible. Id. at 472, 100 S. Ct. at 1250. Based upon Crews, the photograph taken of the present defendant would be subject to this analysis, if the arrest was illegal.

Nevertheless, we believe that law enforcement would have inevitably obtained defendant's photograph without regard to the legality of his arrest. Evidence obtained as the result of an illegal arrest is not subject to exclusion if it would have been inevitably discovered through lawful means. State v. Ensley, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996); see also Nix v. Williams, 467 U.S. 431, 444, 104 S. Ct. 2501, 2509 (1984). In the present case, the defendant arrived at the Knox County Jail at 4:00 a.m. on October 22, 1992, and his photograph was taken. Around 10:00 a.m., the defendant was taken to municipal court and pled guilty to solicitation of prostitution. At that point, the defendant was legally detained pursuant to his conviction for the municipal offense, and any photograph taken following this conviction would not be subject to exclusion based upon the legality of his arrest. The victim was not shown the defendant's photograph until October 27, 1992. Because it was inevitable that the police would acquire a photograph of the defendant, the exclusionary rule does not apply. See Howard v. State, 599 S.W.2d 280, 283-84 (Tenn. Crim. App. 1980) (holding that a line-up identification of the defendant for the present offense did not have to be suppressed, even if the defendant had been illegally arrested on an unrelated charge, because the police would have inevitably discovered the defendant's identity from descriptions and a license plate number given by eyewitnesses to the present offense).

2. Mootness

With the exception of the photograph discussed above, the state contends that none of the evidence flowing from the arrest or search was used at either rape trial. The defendant contends that in the first rape trial, the trial court admitted descriptions of a truck and license plate number discovered by officers illegally trespassing on his property to serve the capias. He claims that these descriptions matched another description given in the first rape trial. Unfortunately, the defendant fails to cite to the portions of the record where any of these descriptions were given or even to mention the witnesses who gave the description of a truck. The defendant does cite to a jury-out discussion during the consolidated rape trial for this contention, but this portion of the record does not contain a description of a truck. Our own review of the record in the first rape trial reveals that the victim, the sole witness for the state, testified that the defendant was driving a car. None of the detectives who participated in the defendant's arrest and the search of his home on October 21, 1992, testified in the first rape trial. Other than the photograph discussed above, the defendant has failed to show that the state used any evidence resulting from his arrest or search in the first rape trial.

The defendant contends that in the consolidated rape trial, Detective Upchurch testified regarding a car and its license plate, which were seen at the defendant's residence at the time of his arrest. For this contention, the defendant refers us to Detective Upchurch's testimony at the February 7, 1996 suppression hearing. Detective Upchurch did not testify at the consolidated rape trial. We note that at the consolidated rape trial, Detective Michael Grissom testified that he went to the home of the defendant's father after checking a license tag number provided by one of the victims in the consolidated rape trial. Detective Grissom stated that while there, he saw a 1983 Buick LeSabre with the license tag number VLZ-894. This testimony does not relate to or stem from evidence gathered as a result of the defendant's arrest or the search of his home within a few hours of his arrest.

Regarding the illegal search issue, the defendant argues that in the consolidated rape trial, the trial court should have suppressed certain photographs of him, of certain vehicles, and of the rope. In support of this contention, he cites to a jury-out discussion regarding the admissibility of two photographs depicting twine found at two locations at Teagues Statuary, the defendant's employer. The defendant does not explain and the cited discussion does not reveal how the photographs relate to evidence gained from the search of the defendant's home. Instead, during the discussion, the trial court noted its previous ruling that the state could not introduce photographs of brown twine in the back of a pickup truck taken during the October 21, 1992 search. The court determined that the state was limited to the two photographs of the twine taken at Teagues Statuary. Although the detectives went to Teagues Statuary before going to the defendant's home on the night of the arrest, the jury-out discussion reveals that the photographs in question were made at a different time. We fail to see how the passage to which the defendant has cited relates to this issue. Furthermore, we agree with the state that none of the evidence gained in the search of the defendant's home was introduced in the rape trials.

Finally, with regard to the search of his home, the defendant also challenges the admission of certain photographs, a necklace and earrings, and testimony regarding the rope found in his bedroom, which were introduced in his murder trial. As previously noted, the murder case is not a part of this appeal.

The legality of the arrest and search is not in controversy in this appeal of the first rape trial and G. F.'s and A. D.'s cases because the resulting evidence was either not used or, in the case of the photograph, was properly used even if stemming from an illegal arrest. The issue is moot in these cases. See State ex rel. Lewis v. State, 208 Tenn. 534, 537-38, 347 S.W.2d 47, 48-49 (1961); State v. Doe, 813 S.W.2d 150, 152 (Tenn. Crim. App. 1991). On the other hand, the issue remains viable in D. C.'s case, which we are reversing due to its improper consolidation, because the state could attempt to use evidence stemming from the arrest or the search in the event that the case is retried. At the suppression hearing before the consolidated rape trial, Detective Upchurch testified that upon looking into the defendant's bedroom, he saw a piece of orange hay-baling rope, which he recognized as the type of rope used to bind the rape victims. D. C. testified that the defendant bound her with rope, although she did not describe its color or size at either the consolidation hearing or at trial. In ruling upon the suppression issues, the trial court found that the detectives noticed a piece of rope on the defendant's bedroom floor "that they suspected was the same type of string or twine that had been used to tie one or more of the victims that they were investigating – homicides that they were investigating in Knox County." Although this finding suggests that the rope is relevant to the murder case rather than the rape cases, the state might be able to show that the rope is relevant to the retrial of D. C.'s case. In the event of a retrial of D. C.'s case, we will review the trial court's rulings on the legality of the arrest and search in light of the defendant's contentions.

## B. Collateral Attack

The state contends that the defendant may not collaterally attack his conviction and sentence for solicitation of prostitution in this appeal. "The rule has been firmly established in Tennessee that

a facially valid, unreversed judgment in a court with jurisdiction over the subject matter and the person cannot be collaterally attacked in a subsequent proceeding except by the authorized routes of attack." State v. McClintock, 732 S.W.2d 268, 271 (Tenn. 1987).

In the present case, the Knoxville Municipal Court had jurisdiction over the defendant for the municipal offense of solicitation of prostitution occurring within the city. See Tenn. Code Ann. § 16-17-103 (providing that municipal court judges in home rule municipalities have "full power and authority to try and dispose of violations of municipal ordinances"); Knoxville, Tenn., Charter, art. V, § 503 (1982); see also Code of Ordinances, City of Knoxville, Tenn. §19-190(c) (1982) (prohibiting the patronizing of prostitution); State ex rel. Boone v. Torrence, 63 Tenn. App. 224, 242, 470 S.W.2d 356, 364 (1971) (noting that the "primary function of Corporation or Municipal Courts is enforcement of municipal ordinances"). Article V, section 503 of Knoxville's city charter grants the municipal judge concurrent jurisdiction with the Knox County general sessions judges over violations of state criminal laws committed in the city and "exclusive power to impose fines for the breach of any city ordinance." The defendant contends that his sentence was illegal because the municipal court lacked jurisdiction to sentence him to incarceration for the violation of a city ordinance.

Initially, we note that the defendant failed to secure a ruling from the trial court on this issue before either of the rape trials. The defendant raised the issue of the municipal court's jurisdiction to impose a jail sentence in a memorandum of law filed three months before the consolidated rape trial arguing that because the municipal court is not a constitutional court, it lacked jurisdiction to jail or arrest the defendant. He presented evidence regarding his thirty-day jail sentence for the solicitation conviction at the suppression hearing through the testimony of Carlton Bryant, the substitute municipal judge who accepted the defendant's guilty plea. Although the trial court ruled that the capias was issued from a "duly-operating court," it did not speak to the municipal court's jurisdiction to sentence the defendant to incarceration.

In any event, we note that the Knoxville City Code and Tenn. Code Ann. § 6-54-306 reveal that the municipal court had jurisdiction to impose the jail sentence. The state legislature has empowered home rule municipalities "to set maximum penalties of thirty days imprisonment and/or monetary penalties and forfeitures up to five hundred dollars ($500), or both, to cover administrative expenses incident to correction of municipal violations." Tenn. Code Ann. § 6-54-306; see also City of Knoxville ex rel. Roach v. Dossett, 672 S.W.2d 193, 194 (Tenn. 1984) (noting that Knoxville is a home rule municipality). Section §19-190(c) of the Knoxville City Code, which prohibits the patronizing of prostitution, does not specify a penalty for the offense. See Code of Ordinances, City of Knoxville, Tenn. §19-190(c) (1982). Section 1-9 of the Knoxville City Code provides that if the penalty is not specified in the individual ordinance, the violation of the ordinance shall be punished as follows:

> Any person violating any of the provisions of this general penalty
> article shall be guilty of a misdemeanor, and conviction thereof
> shall result in the penalties of a monetary fine not to exceed fifty

dollars ($50.00) and the repayment of administrative costs incident to the correction of the municipal violation in an amount not to exceed five hundred dollars ($500.00) and/or by imprisonment not to exceed thirty (30) days, or both for each separate offense.

Both section 6-54-306 of the state code and section 1-9 of the city code reflect that the municipal court has the power to impose a jail sentence.

In contrast with the municipal court's legislatively granted power to incarcerate, a defendant enjoys an inviolate constitutional right to a jury trial in Tennessee. Tenn. Const. art. I, § 6. This right to a jury trial does not extend to small or petty offenses, which are those offenses punished with a fine not to exceed fifty dollars and no term of confinement. State v. Dusina, 764 S.W.2d 766, 767 (Tenn. 1989). "For violation of general criminal statutes, . . . where a fine of more than $50.00 or any confinement of the accused may be imposed, the right to jury trial under the Tennessee constitution is well-established." Id. at 768. A municipal court has no power to empanel a jury. City of Chattanooga v. Davis, 54 S.W.3d 248, 267 (Tenn. 2001) (stating that "only courts of general jurisdiction have the power to empanel a jury to determine facts or to impose punishment"). The constitutional right to a jury trial limits, but does not eliminate, a municipal court's ability to impose a sentence of incarceration. A defendant may waive his or her constitutional rights and plead guilty to an offense in municipal court. See, e.g., State ex rel. Newsom v. Biggers, 911 S.W.2d 715, 718-19 (Tenn. 1995) (holding that the defendant could not collaterally attack the city court's judgment by arguing that the court lacked jurisdiction when the defendant had acquiesced to the court's authority in pleading guilty to shoplifting). We conclude that once the constitutional bar to the jail sentence in the absence of a jury trial is removed by the defendant's plea, the municipal court may impose such a sentence pursuant to its legislatively granted power.

The record reveals that the defendant waived his right to a jury trial for the solicitation of prostitution offense. The city warrant in the present case contains the following, entitled "WAIVER AND PLEA":

> I UNDERSTAND THAT I HAVE THE RIGHT TO BE TRIED IN COURT UPON AN INDICTMENT OR PRESENTMENT BY THE GRAND JURY. I ALSO HAVE THE RIGHT TO A TRIAL BY JURY. I VOLUNTARILY AND KNOWINGLY DESIRE TO WAIVE THESE RIGHTS AND TO BE TRIED IN THIS COURT ON THIS CASE BY THE CITY JUDGE WHO WILL DECIDE MY INNOCENCE OR GUILT AND SET THE SENTENCE IF FOUND GUILTY.

The warrant also informs the defendant that he is waiving his right to counsel and his right to appeal. The written waiver of the right to counsel is necessary for the facial validity of the judgment because the United States Supreme Court has determined that in the context of using a prior conviction

against a defendant to show guilt or to enhance punishment, a record of conviction that fails to show the existence or waiver of counsel is presumptively void. State v. Tansil, 72 S.W.3d 665, 667 (Tenn. Crim. App. 2001); see Burgett v. Texas, 389 U.S. 109, 114-15, 88 S. Ct. 258, 261-62 (1967). Although the defendant signed the city warrant "Kyle Huskey," the warrant authorizes the arrest of "Thomas D. Husky (alias)." Furthermore, Phyllis Davis, who was in the courtroom at the time the defendant pled guilty, testified that the defendant was the person who signed the warrant. She stated that the municipal judge explained the defendant's rights to him and that the defendant did not ask any questions about his rights. Carlton Bryant testified that he would not have signed the city warrant if he had not discussed the defendant's rights with him and witnessed the defendant sign the warrant. Thus, the defendant waived his right to a jury trial and agreed that the city judge would set his sentence.

In summary, the Knoxville Municipal Court had jurisdiction over the defendant for violating the municipal offense of solicitation of prostitution. The defendant pled guilty and waived his constitutional right to a jury trial. In the absence of this constitutional bar, the municipal court was empowered to impose a jail sentence upon the defendant. The warrant contains the signed judgment of conviction for solicitation of prostitution. A warrant with the judgment entered thereon enjoys, "like any judgment, a presumption of regularity in the proceedings . . . upon becoming final." McClintock, 732 S.W.2d at 270. Thus, we perceive no problem with the defendant's conviction and sentence for solicitation of prostitution, and he may not collaterally attack the legality of his sentence for solicitation of prostitution in this appeal of his rape convictions.

All of the defendant's claims relating to his conviction for solicitation of prostitution, including his allegation that his statements resulted from his illegal confinement, amount to a collateral attack on his solicitation conviction. The defendant contends that the municipal court lacked authority to issue a capias for failure to appear and that his sentence was illegal because (1) the box on the warrant for his thirty-day jail sentence was not checked, (2) the substitute judge who accepted his guilty plea had not taken the constitutionally required oath of office, (3) a private attorney (the substitute judge) has no authority to sentence him to jail, and (4) the judge's secretary, who has no authority to put him in jail, signed the mittimus. These claims, if meritorious, would only make the judgment for his conviction for solicitation of prostitution voidable rather than void. See id. at 271 (holding that a facially valid judgment issued by a court with jurisdiction cannot be attacked in a subsequent proceeding except by an authorize route of collateral attack such as a petition for post-conviction relief). Regarding the statements that he gave while confined, the defendant had been convicted of the municipal offense and was serving his sentence for solicitation of prostitution at the time he gave statements to law enforcement officers. Thus, the statements do not flow from his arrest. On the other hand, although the defendant may not attack the validity of his conviction for solicitation of prostitution, he can and does challenge the legality of his arrest as it relates to the suppression of the evidence gained as a result of that arrest, i.e., the rope. Thus, we do have cause to address the legality of the arrest.

C. Validity of the Capias

The Knox County detectives arrested the defendant based upon an outstanding capias for his failure to appear in Knoxville Municipal Court. We begin by noting that "[u]nder our criminal procedure, a capias is a mesne or intermediate process having the sole purpose of securing the presence of the defendant." Moore v. State, 578 S.W2d 78, 81 (Tenn. 1979).

The defendant contends that the capias used to arrest him is invalid because it was not issued in the name of the State of Tennessee as required by the Tennessee Constitution and the Knoxville City Charter. "All writs and other process shall run in the name of the State of Tennessee and bear test and be signed by the respective clerks." Tenn. Const. art. VI, § 12. This constitutional requirement "applies to all process, civil or criminal, issued by any court, or tribunal established by law having authority to issue process; to process issued under a valid corporation ordinance, or by-law, as much as to process from a court of record, or justice of the peace." Mayor of Nashville v. Pearl, 30 Tenn. 249, 251 (1850) (holding that a distress warrant in the name of the Corporation of Nashville was properly quashed); see McLendon v. State, 92 Tenn. 520, 525, 22 S.W. 200, 202 (1893) (holding that the criminal court's order that the sheriff rearrest the defendant and confine him in the workhouse was facially void because it ran in the name of the criminal court rather than in the name of the state). Additionally, article V, section 503, of the Charter of the City of Knoxville states that all "process shall be issued in the name of the State of Tennessee, with proper designation thereon to show that the same are also issued under the authority of the City of Knoxville." Process that does not properly run in the name of the state is void. See McClendon, 92 Tenn. at 525, 22 S.W. at 202.

In the present case, the capias does not contain a reference to the State of Tennessee but, instead, is headed by the words "City of Knoxville." The notice that the document runs in the name of the state may appear in the body of the document rather than the caption. City of Murfreesboro v. Bowles, 187 Tenn. 134, 137, 213 S.W.2d 35, 37 (1950). The present capias gives no indication that it runs in the name of the state anywhere in the document. For this reason, the capias is void.

The defendant contends that in the absence of the capias, the record is devoid of probable cause that he failed to appear on his solicitation charge. The record does not reveal that the detectives had a valid basis upon which to arrest the defendant for his failure to appear aside from the capias. A misdemeanor arrest without a warrant may occur only for an offense committed or threatened to be committed in the officer's presence. Tenn. Code Ann. § 40-7-103(a)(1). Here, no evidence exists that the Knox County detectives or the Sevier County officer witnessed the defendant's failure to appear in municipal court. On the other hand, we note that the trial court's erroneous finding that the capias was valid pretermitted any rulings on other legal bases for the arrest. Upon remand of D. C.'s case, the trial court must consider the legality of the arrest in light of our holding that the capias was void.

The defendant also argues that the capias is invalid because: (1) it fails to state an offense since the city code contains no offense of failure to appear; (2) it was not a lawful process upon which he could be arrested; and (3) it does not state an expiration date and, being four months old, was stale. Although our holding that the capias is void eclipses these other challenges to its validity,

we will address them briefly in turn due to the possibility of an appeal on this issue. <u>See</u> <u>Jacobs v. State</u>, 224 Tenn. 106, 107, 450 S.W.2d 581, 581 (1970) (stating that the Court of Criminal Appeals may not pretermit duly raised issues).

The defendant contends that the capias is void on its face for failing to charge an offense because the Knoxville City Code does not contain an offense of failure to appear. The present capias directs the Knoxville Chief of Police to bring the defendant before the city court "to answer a charge of the City of Knoxville exhibited against him by Failure to Appear, for a charge of Sol. for Prostitution . . . ." As discussed above, the Knoxville City Code does prohibit the solicitation of prostitution. <u>See</u> Code of Ordinances, City of Knoxville, Tenn. §19-190(c) (1982). Furthermore, a defendant's failure to appear in municipal court is also a violation of the city code. <u>See</u> Code of Ordinances, City of Knoxville, Tenn. § 19-33(i) (providing that the intentional, knowing, or willful failure to appear in court on the date and time designated in one's citation is a violation of the municipal code without regard to the disposition of the original charge). Thus, the present capias does state an offense.

The defendant next contends that the capias was not a valid process in this state or in the City of Knoxville because the Knoxville City Charter does not provide for the arrest of persons who fail to appear in city court for charges of municipal offenses. He also argues that the capias cannot be construed as a subpoena for a witness because it was not issued by a judge or as an arrest warrant because it contains no affidavit of complaint or finding of probable cause. Although the Knoxville City Charter is silent regarding whether a defendant may be arrested for failure to appear, the Knoxville city code provides that if "the person cited [for committing a misdemeanor in the presence of an officer] fails to appear in court on the date and time specified . . ., the court shall issue a bench warrant for such person's arrest." Code of Ordinances, City of Knoxville, Tenn. § 19-33(f). An identical provision appears at Tenn. Code Ann. § 40-7-118(f). Thus, the city and state codes provide for the arrest of persons who fail to appear in court.

We note that in the present case, the defendant was arrested upon a capias issued by the city court clerk rather than a bench warrant from the city court. The judge of a municipal court in a home rule municipality has "full power and authority to try and dispose of violations of municipal ordinances." Tenn. Code Ann. § 16-1-101. The choice to use a capias, a warrant, or an attachment are all means by which a court can control the proceedings before it. <u>See</u> <u>State v. Cazes</u>, 875 S.W.2d 253, 260 (Tenn. 1994) ("It is well-established that a trial judge has broad discretion in controlling the course and conduct of the trial."); <u>State v. Bragan</u>, 920 S.W.2d 227, 239 (Tenn. Crim. App. 1995) (noting that "the courts of this state have the inherent power to supervise and control their own proceedings"). On the other hand, the fact that the city court clerk rather than the municipal court judge issued the capias is significant. The city court clerk does not share the municipal court's inherent power to control the proceedings before it. Although the rule for courts of record permits their clerks to issue a capias for failure to appear, we can locate no similar rule for a capias upon a failure to appear in municipal court. <u>See</u> Tenn. R. Crim. P. 9(e) (providing that the clerk of the criminal or circuit court may issue a capias when a defendant, who is a natural person, fails to appear

in response to a criminal summons). Thus, the present capias is also invalid because it was issued by the city court clerk rather than the city court judge.

Finally, the defendant contends that the capias is invalid because it contains no time period for its return and was nearly four months old at the time of his arrest. In State v. Michael Laymance, No. 180, McMinn County (Tenn. Crim. App. July 17, 1990), the court addressed the question of whether a capias issued by the circuit court and directing that the defendant be arrested and brought before the court on a specific date to answer a contempt of court charge authorized his arrest six months later. Noting that little precedent exists regarding the expiration of a capias, the court deemed that a capias should not exist indefinitely but that "the safe and fair administration of justice" requires that a capias expire at a specified date or within a reasonable time from its issuance. Id. at 2. Commenting that it lacked the authority to compose rules for the expiration of a capias when no time limit is given internally, it held that the capias at issue in that case expired on the date provided therein. Id. at 3.

The present case is distinct from the situation in Laymance because the present capias does not contain a specific date upon which the defendant was to be brought to city court. We contrast the reasoning in Laymance with the unlimited validity of a capias issued when a defendant has forfeited his bond. "Any capias issued pursuant to a forfeit, whether the forfeit is conditional or final, shall remain in full force and effect until the defendant is apprehended and returned to the criminal justice system, and a disposition is entered in the defendant's case." Tenn. Code Ann. § 40-11-33(c) (providing for the arrest of the defendant by the bail bondsman or surety). This statute suggests that the legislature intended an indefinite life for a capias issued because the defendant forfeited his bond. In the present case, Phyllis Davis testified that the city warrant reflects that the defendant posted bond but failed to appear for trial on July 7, 1992. This testimony reveals that the defendant forfeited his bond on the solicitation of prostitution charge. Finally, we note that the capias was issued on July 7, 1992, and the defendant was arrested on October 21, 1992. We cannot say that the three and one-half month time period was unreasonable.

In summary, the capias is void due to its failure to run in the name of the state. Additionally, the fact that the city court clerk, rather than the city court judge, issued the capias renders it invalid.

D. Authority of Knox County Officers

The defendant contends that the Knox County officers lacked jurisdiction to arrest him in Sevier County on a municipal capias. Although we have determined that the capias is void, we touch briefly upon this issue in the event of an appeal of our holding on the capias. Tenn. Code Ann. § 40-6-212 provides in pertinent part:

> When the sheriff, deputy sheriff, coroner or any other officer
> of any county in this state has possession of a warrant or capias
> for the arrest of any person charged with the commission of a
> crime, it is lawful for the sheriff, deputy sheriff, coroner or any

other officer to execute such process, and arrest the person so
charged in any county in this state.

Thus, the Knox County detectives could lawfully execute the capias in Sevier County. We also note that a Sevier County officer was present at the time of the defendant's arrest.

The defendant also complains that Knox County officers cannot act upon a capias directed to the Knoxville Chief of Police. With regard to arrest warrants, the issuing magistrate is not limited to county officers but "may empower any law enforcement officer to execute the warrant anywhere in the state." Tenn. Code Ann. § 40-6-213. Furthermore, arrest warrants "should be directed to any lawful officer of the state, but if executed by any officer having authority, it is valid without regard to its direction." Tenn. Code Ann. § 40-6-209. Although these statutes involve arrest warrants, section 40-6-212, quoted above, empowers an officer of any county to execute an arrest warrant or a capias in any county in Tennessee. Reading sections 40-6-209, -212, and -213 together, the Knox County detectives had the authority to arrest the defendant upon the present capias if it had been a valid process.

The defendant also argues that the Knox County officers were using the capias as a pretext to take him into custody for the homicide investigation. As long as the capias was valid, the Knox County officers could lawfully take the defendant into custody without regard to their subjective reasons for wanting to arrest him. See State v. Duer, 616 S.W.2d 614, 616 (Tenn. Crim. App. 1981) ("Where an officer makes an arrest which is properly supported by probable cause to arrest for one offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest."). If the capias was valid, the Knox County officers had the authority to arrest the defendant.

E. Illegal Search

The defendant contends that the trial court should have suppressed evidence gained in the search of his residence almost three hours after his October 21, 1992 arrest because the search warrant was invalid and no exception to the warrant requirement applied. He argues that the search warrant was invalid because the judicial commissioner lacked authority to issue it, the affidavit contained in the search warrant was defective and failed to state probable cause, and the judicial commissioner did not list the name of the officer to whom the search warrant was issued for execution. He maintains that the seizure of the items from his home does not fall within any of the exceptions to the warrant requirement, arguing that the officers were not lawfully within plain view of the items nor was the search incident to a legal arrest, that his father did not consent to the search of his bedroom, and that no exigent circumstances existed. The state contends that none of the evidence discovered during the search of the defendant's bedroom was used against the defendant in either of the rape trials. Alternatively, it argues that even if the evidence had been introduced, the trial court did not rely upon the illegal search warrant but properly held that the items seized were in plain view of the officers, who were legally on the property arresting the defendant. It also maintains that the items were seized pursuant to a search incident to the defendant's arrest even

though the officers did not take possession of the items until three hours later. We affirm the trial court's ruling that the search warrant was invalid due to its failure to list the executing officer. Our holding that the capias is void calls into question the trial court's bases for the validity of the search – that it was incident to the defendant's arrest and that the items seized were in plain view–which both require the arrest to be valid.

With regard to the search of the defendant's bedroom, the trial court found the following: The detectives went to the defendant's home to arrest him. They told one of his parents why they were there and then stepped into the living area of the home. The defendant came into the living area, and the detectives explained their presence and took him into custody. The defendant wanted to return to his bedroom to get some additional clothing, the detectives explained that they would have to go with him, and the defendant did not object to this. One or more of the detectives went into the defendant's bedroom and another stood in the doorway. The detectives saw twine, which they suspected to be the same type as that used to bind one or more of the murder victims, on the bedroom floor. They also saw a necklace and earrings lying on a dresser in the bedroom.

The trial court found that the detectives did not seize the twine or the jewelry at that time but that one of the detectives remained at the home while Detective Upchurch got a search warrant. The court determined that the warrant was invalid due to its failure to list the executing officer. It found that Detective Upchurch returned to the defendant's home approximately two hours later with the warrant. At that point, the detectives spoke with the defendant's father and asked if they could search his home. The defendant's father signed a form consenting to the search. He placed no limitations on the search in the written consent. A Sevier County officer recalled the defendant's father saying that the detectives were free to search the residence but that they would have to get the defendant's permission to search his bedroom. The trial court noted that the testimony of the defendant's mother established that the defendant's parents did have the right to enter his room when they wanted to do so. The detectives searched the defendant's bedroom, collected evidence, and photographed the residence. The trial court found that the search was valid as incident to a lawful arrest and that the items in question were in the detective's plain view at the time that they affected the lawful arrest.

A search warrant must list the name of the executing officer:

> The magistrate shall endorse upon the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution; and the exact copy of the warrant and the endorsements thereon shall be admissible evidence. Failure of said magistrate . . . to endorse thereon the date, and time of issuance and the name of the officer to whom issued, . . . shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.

Tenn. R. Crim. P. 41(c). In the present case, the line in the search warrant for the executing officer's name is blank. Judicial Commissioner Baker testified that he overlooked the blank line when filling out the search warrant. The search warrant fails to comply with Rule 41(c) and is invalid. See State v. Stepherson, 15 S.W.3d 898, 902 (Tenn. Crim. App. 1999) (holding that the magistrate's listing of the incorrect executing officer violated Rule 41(c) and was fatal to the warrant's validity). The failure to list the executing officer on the search warrant renders the subsequent search illegal unless an exception to the warrant requirement applies.

Initially, we note that a trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The analysis of any warrantless search must begin with the proposition that such searches are per se unreasonable under the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few, specifically established and well-delineated exceptions. Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967); State v. Tyler, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). Before the fruits of a warrantless search are admissible as evidence, the state must establish by a preponderance of the evidence that the search falls into one of the narrowly drawn exceptions to the warrant requirement. State v. Shaw, 603 S.W.2d 741, 742 (Tenn. Crim. App. 1980). One such exception is for a search incident to a valid arrest. United States v. Robinson, 414 U.S. 218, 235, 94 S. Ct. 467, 477 (1973). Another exception is made for an item within the plain view of an officer who has a right to be at a particular vantage point. Armour v. Totty, 486 S.W.2d 537, 538 (Tenn. 1972) (relying upon the plurality opinion in Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct. 2022 (1971)). A third exception is when the property owner voluntarily consents to a search of the property. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973); State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992).

In the present case, the trial court's application of both the search incident to an arrest and the plain view exceptions require that the defendant's arrest be valid. Our holding that the capias upon which the defendant was arrested is void calls the trial court's reliance on these exceptions into question. Upon a retrial of D. C.'s case, the trial court must reexamine the propriety of the warrantless search. In this regard, we note that although the trial court found that the defendant's father consented to the search of his home, it did not determine whether the defendant's father's consent to the search removed the need for a warrant. The trial court noted that the defendant's parents had the right to enter the defendant's bedroom as revealed by the defendant's mother entering the room to turn down the radio or to leave laundry in the room but stated that it "just include[d] that as [the court's] recollection of the facts in this case." We do not foreclose the state from showing upon remand that the search was valid.

### IV. SUPPRESSION OF STATEMENTS

The defendant contends that the trial court erred in not suppressing the four statements that he gave to law enforcement officers on November 9, 10, and 11, 1992. He argues that the statements were the product of his illegal arrest, illegal confinement, and the illegal search of his residence. He also contends that law enforcement took his statements in violation of his right to remain silent and his right to counsel. He argues that he did not knowingly or voluntarily give the statements due to his mental illness and that the statements are unreliable. Finally, with regard to the first rape trial, he asserts that the trial court erroneously refused to hold a hearing on his motion to suppress the statements before the first rape trial.

The state contends that the defendant's statements were not used in either of his trials and that, therefore, the defendant has failed to prove that he was prejudiced by the trial court's decision not to exclude the statements. It also argues that the statements were admissible and that the defendant's reasons for suppression lack legal support. With regard to the first rape trial and the consolidated convictions for offenses against A. D. and G. T., we conclude that the issue is moot because the state did not use the statements at trial. With regard to the offenses against D. C., we conclude that we are unable to review the defendant's contentions because the trial court did not make sufficient findings of fact relative to all of the evidence pertaining to the issue.

The defendant gave four statements while incarcerated in the Knox County Jail serving the thirty-day sentence for solicitation of prostitution. In the first three statements, he purported to be "Kyle" and confessed to murdering four women and to raping others. He gave the fourth statement as "Phillip Daxx," who talked about protecting the defendant from Kyle. The defendant executed rights waiver forms before each of the statements. The trial court ruled that although the defendant had requested a lawyer on October 30, 1992, the statements were admissible because the defendant initiated contact with law enforcement on each occasion. It also found that law enforcement officers advised the defendant of his rights before each statement. It ruled that although the defendant's conduct while in custody was unusual, no evidence existed that when the defendant gave the statements, he did not know what he was doing or that they were involuntary.

The admissibility of the statements is not an issue in controversy with regard to the first rape trial and the convictions relating to the offenses against G. F. and A. D. because the statements were not introduced in either rape trial. For this reason, the issue is moot in this appeal of the rape trials. See State ex rel. Lewis v. State, 208 Tenn. 534, 537-38, 347 S.W.2d 47, 48-49 (1961); State v. Doe, 813 S.W.2d 150, 152 (Tenn. Crim. App. 1991). The defendant argues that although the state did not introduce the statements in its case-in-chief, the fact that the state could have used the statements affected how he approached his defense in terms of strategy, proof, or the potential for a plea agreement. The defendant fails to specify how the admissibility of the statements affected the defense strategy except to suggest that he might have testified by referring to the threat of the state using the statements in cross-examination during the consolidated rape trial. The argument that the defendant did not testify because of the admissibility of the statements is speculative. We conclude that the issue is moot with regard to the first rape trial and the cases relating to G. T. and A. D.

With regard to the reversal of D. C.'s case due to its improper consolidation, the issue of the statements may still be viable in the event of a retrial. Despite the potential use of the statements, we are unable to review their admissibility because the trial court's findings on the issue are insufficient. For example, the trial court has made no findings regarding members of law enforcement having contact with the defendant on November 4 and 5, 1992, in relation to Lieutenant Larry Johnson's testimony that the defendant initiated contact with him and TBI Agent David Davenport on November 9, 1992. For instance, meetings with the defendant on November 4 and 5 may cast doubt upon the credibility of Lieutenant Johnson's testimony regarding the questioning of the defendant. If the suppression of the statements is raised upon the retrial of D. C.'s case, the trial court should make complete findings, and take proof if appropriate, with regard to the issues surrounding the suppression of the statements.

## V. ORDER OF TRIALS

The defendant contends that the trial court erred in allowing the state to set the order of his trials with the homicide cases being last, and that, consequently, his convictions in the first rape case should be reversed and a new trial should be granted. The defendant states that this issue is closely related to the issue relating to the trial court staying other proceedings against him and that the order of trials set by the state coupled with the stay significantly prejudiced him. He also complains that he was denied his right to a speedy trial as a result of the order of his trials as set by the state.

In State v. Nichols, 877 S.W.2d 722, 735-36 (Tenn. 1994), our supreme court held that the state has discretion to determine the order of prosecutions and that it was not an abuse of discretion to choose an order of trials that results in an earlier trial "creating" an aggravating circumstance in a subsequent capital trial. In the present case, the defendant initially objected to the order chosen by the state on the grounds that a conviction in one of the rape trials would create an aggravating circumstance if the capital cases reached sentencing. The defendant now acknowledges the Nichols holding but argues that this case is distinguishable because he had demanded a speedy trial and the trial court had stayed all other proceedings against him until the completion of the first rape case. We have already concluded that the defendant was not denied a speedy trial in the first rape case, noting the timing of and circumstances surrounding his demand as it related to that case. As we discuss in Issue XXII on the stay of other proceedings during the first rape trial, our review of the rape cases reveals no prejudice to the defendant from this practice. While the order chosen by the state to try the defendant's cases may not have been the order preferred by the defendant, we cannot say that the state abused its discretion in setting the rape trials before the homicide trials.

Also within this issue, the defendant complains that by not consolidating the cases initially and then staying the proceedings in the other cases, the state effectively forced the defendant to declare his insanity defense pursuant to Rule 12.2, Tenn. R. Crim. P., before the trial court ruled on pending motions and before discovery was completed. As a result of the defendant's notice, the state requested a mental evaluation at a time when the defendant had no ability to discover the nature of the state's case, making it impossible to evaluate his insanity defense meaningfully. The defendant complains that the state's May 4, 1995 request for a mental evaluation was untimely and that the

state manipulated the process to get his insanity defense stricken. We address the merits of these complaints in the defendant's ninth issue, concluding that the defendant's insanity defense was not improperly stricken.

The defendant also complains within this issue that the state abused its discretion in consolidating the remaining rape cases after the first rape trial. He contends that if consolidation were permissible, then the state should have consolidated the cases, including the first rape case, earlier. The defendant contends that if the cases had been consolidated earlier, then he would have defended the first rape case differently. Although the defendant concedes that he does not know what he would have done differently, he states that he would have had the benefit of the additional discovery and rulings on motions that occurred before the consolidated rape trial.

Initially, we note that because the defendant's insanity defense was similarly limited in the consolidated rape trial, it is unclear how the defendant was prejudiced in the first rape trial by not consolidating it with the other rape cases from the beginning. We also note that the defendant does not state what additional discovery or rulings would have helped his defense in the first rape case. In any event, the consolidation of the rape cases remaining after the first rape case was permissive. See Tenn. R. Crim. P. 8(b), 13(a). Thus, at no point, before or after the first rape trial, was the state required to consolidate any of the cases. Moreover, the record does not reveal that the first rape case could have been consolidated with the other rape cases. The victim testified that she was not a prostitute. The defendant did not proposition her; he pulled her off the street and into his car through the driver's side window. These facts are not consistent with those of the victims in the consolidated rape case, in which consolidation was based, in part, upon the defendant's common scheme or plan to seek dates from prostitutes and then rape them. We conclude that the trial court did not err, relative to the first rape case, by consolidating the remaining rape cases after the first rape trial.

## VI. DISCOVERY

The defendant contends that the state's failure to provide complete discovery in either of the rape cases affected his defense of these cases. The state contends that the defendant has waived this issue by failing to cite to the record and, with regard to the consolidated rape trial, by failing to specify what items the state failed to provide. It also argues that the defendant has failed to show how the missing items were material to his case. Arguing that the penalty for failure to provide discovery is exclusion of that item at trial, it contends that, even if meritorious, this issue does not require reversal because the state did not introduce any of the allegedly withheld items at either trial. We conclude that the defendant has failed to show that most of items were discoverable and that he was not harmed by state's failure to disclose discoverable items.

Rule 16, Tenn. R. Crim. P., governs the discovery process. It provides in pertinent part that upon the defendant's request, the state

> shall permit the defendant to inspect and copy or photograph: any
> relevant written or recorded statements made by the defendant, or

copies thereof, within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general; the substance of any oral statement which the state intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogations by any person then known to the defendant to be a law-enforcement officer; and recorded testimony of the defendant before a grand jury which relates to the offense charged.

(C) Documents and Tangible Objects. Upon request of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, and which are material to the preparation of the defendant's defense or are intended for use by the state as evidence in chief at the trial, or were obtained from or belong to the defendant.

(D) Reports of Examinations and Tests. Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

Tenn. R. Crim. P. 16(a)(1)(A), (C)-(D). The state is not required to disclose "reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law-enforcement officers in connection with the investigation or prosecution of the case, or of statements made by state witnesses or prospective state witnesses" except to the extent required by Rule 16(a)(1)(A) and (D). Tenn. R. Crim. P. 16(a)(2). Both the state and the defendant have a continuing duty to disclose evidence previously requested and subject to discovery under Rule 16. Tenn. R. Crim. P. 16(c). When arguing that the state violated Rule 16, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992).

The state contends that because it did not introduce any of the items listed by the defendant in either of the rape cases, the penalty of exclusion of evidence in Rule 16(d) is not available. The defendant argues that because Rule 16 entitles him to items material to the preparation of his defense, he was prejudiced by the lack of discovery without regard to the fact that the undiscovered

evidence was not introduced at trial. Rule 16 provides the following regarding a party's noncompliance:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2). The "such other order" provision of the rule includes the ability to dismiss the indictment. State v. Collins, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000). The trial court should refrain from excluding evidence for noncompliance with discovery rules "except when it is shown that Defendant is actually prejudiced by the state's failure and the prejudice cannot be otherwise eradicated." State v. Payne, 791 S.W.2d 10, 16 (Tenn. 1990). We agree with the state that the penalties provided in Rule 16(d) – penalties to be imposed by the trial court upon finding a discovery violation – are not available to the defendant at this juncture because they are premised upon the trial being forthcoming or ongoing. Yet, the defendant argues that the state's failure to provide discovery in a timely fashion deprived him of his rights to due process and a fair trial. See State v. Ferguson, 2 S.W.3d 912, 916-17 (Tenn. 1999) (holding that due process under the Tennessee Constitution requires us to inquire whether a trial conducted without evidence lost or destroyed by the state would be fundamentally fair). For this reason, we will examine the defendant's specific contentions regarding the withholding of discovery.

### A. Discovery Violations in the First Rape Case

The defendant contends that the state failed to provide discovery materials in time for him to be able to consider those materials in formulating his defenses for the first rape trial. He claims that in early September 1995 – about a month before the October 1995 trial – the state provided Knoxville Police Department files, which included a photograph array shown to the victim, numerous photographs of the crime scene, the victim's clothing, and the victim's rape kit made on the day of the offenses. He argues that the belated provision of the photograph array resulted in the trial court's refusal to entertain a motion to suppress those photographs. He contends that if he had received the rape kit during the discovery process in 1993, he could have obtained DNA testing to prove his innocence. Instead, he contends that by 1995, the vaginal swab in the kit had deteriorated and could not be tested. He also argues that the state introduced a rope during the first rape trial that was not provided in discovery. The state contends that these items were provided to the defendant before trial and that he cannot demonstrate prejudice with regard to belated discovery.

With the exception of the photograph array, the defendant has failed to substantiate in the record that the items he lists were in fact not provided until early September 1995. Although in the interest of justice we have tolerated less than exemplary citation to the record for other issues in this appeal, here we are also limited by the defendant's failure to challenge the discovery of the listed

items in his motion for a new trial or the amendments thereto. See T.R.A.P. 3(e) (requiring for appellate review that a defendant have raised an issue alleging error in the admission of exclusion of evidence in the motion for new trial). The closest the defendant comes to raising the issue of belated discovery is an unnumbered amendment to the motion for new trial filed on July 29, 1996, which generally alleges that the state failed to disclose exculpatory and favorable evidence to the defense. The motion does not specify the evidence that was not disclosed but states that the defense will "offer proof of exculpatory and favorable evidence the Defense discovered after the trial" and that he would offer the proof at evidentiary hearings beginning on July 30, 1996. Because this amendment addresses exculpatory or favorable evidence and evidence discovered after the trial, it is a stretch to apply it to photographs of the crime scene, rope allegedly used to bind the victim, or the victim's clothing or untested rape kit discovered a month before trial.

At the August 26, 1996 hearing on the motion for new trial, the defendant mentioned the rape kit when arguing that the state should have provided discovery in all cases before the first rape trial. He argued that he first learned of the rape kit's existence in September 1995, that it had been placed in Detective Tom Pressley's desk drawer, and that the police department said that it had spoiled for purposes of serology. He argued that had the rape kit been tested, it could have excluded him as the rapist and that evidence should be presumed to be adverse to the party who spoils evidence in its possession. The defense counsel's argument regarding the rape kit does not constitute proof, and this court's review of the record does not reveal that the defendant presented proof regarding the rape kit in the hearings between July 30 and August 26, 1996. Although the defendant asked Detective Pressley about the rape kit from the victim in the first rape trial at an August 7, 1996 hearing, Detective Pressley testified that he was not involved in that case. Defense counsel's argument also contradicts the trial testimony of Officer Whitson that he collected the rape kit from the hospital on July 18, 1992, and a year later, moved it from the refrigerator where it was stored to a warehouse. Finally, the trial court made no findings or ruling regarding the rape kit. We conclude that the defendant has failed to present the issue properly for our review. Thus, we will examine the defendant's contentions only with regard to the photograph array.

In a September 20, 1995 motion hearing, the defendant contended that a photograph array containing a photograph of the defendant taken after his arrest should be suppressed because the arrest was illegal. He noted that he had not received the array in discovery but had located it himself on September 1, 1995. The prosecutor challenged this contention, indicating that he had talked about the array with the defendant in his office. The defendant clarified that the state had given him a series of six pictures but that he did not know how they related to the array in this case because the state had provided a lineup form in all cases except this one. During the hearing, he acknowledged that the state had allowed him to interview the victim and argued that the interview confirmed that the victim viewed a photograph array and picked out his photograph taken as a result of his illegal arrest.

The defendant contends that the state's failure to provide the photograph array before September 1995 resulted in the trial court refusing to entertain a motion to suppress the array. The record belies this contention. The defendant argued for the suppression of the array at the September

20, 1995 hearing. Citing State v. Miller, 608 S.W.2d 158 (Tenn. Crim. App. 1980), the state argued that the photograph array was admissible for purposes of identification even if taken following an illegal arrest. The trial court declined to address the suppression issue at that time, ruling that it would take up the suppression of the array on the morning of trial. Before the jury was selected, the defendant again argued that his photograph should be suppressed because it resulted from an illegal arrest. The trial court overruled the motion. This course of events does not reveal that the defendant was unable to attempt to suppress the array based upon the timing of its disclosure.

The defendant also argues that the trial court should have required the state to provide discovery for all of the rape cases and the murder cases before the first rape trial. In this regard, he argues that the state did not provide the following discovery until after the first rape trial:

(1) the defendant's November 11, 1992 note to Corrections Officer Birnbaum, asking "Who is Kyle?";

(2) TBI recordings of his statements of October 29 and 30 and November 9, 1992;

(3) the defendant's oral statements made to Detective Johnson;

(4) the defendant's medical records from the Knox County Sheriff's Office;

(5) the defendant's records from Helen Ross McNabb Center;

(6) the defendant's employment records;

(7) property receipts for property examined by laboratories;

(8) the statements of five women relating offenses similar to those on trial;

(9) documents relating to the prior criminal activities of the victims in his cases;

(10) documents concerning prior law enforcement inquiries about the defendant;

(11) the pathologist's records;

(12) the medical examiner's records;

(13) the "bug expert's" reports;

(14) FBI laboratory or scientific reports;

(15) TBI laboratory or scientific reports;

(16) numerous pictures;

(17) Knox County Probation Office records for victims and state witnesses;

(18) Tennessee Department of Corrections records concerning victims and state witnesses;

(19) Tennessee Board of Paroles records concerning victims and state witnesses;

(20) Knox County Sheriff's Department records concerning victims and state witnesses; and

(21) Knoxville Police Department records relating to the credibility of victims and state witnesses.

He does not explain how potential defenses in the first rape trial were compromised by the absence of this discovery. Although he argues that all of his rape and murder cases were "inextricably intertwined," he does not specify how he could have better defended the first rape case if the state had provided the listed items. Instead, he urges this court to interpret the phrase "material to the defendant's preparation of his defense" from Rule 16(a)(1)(C) and (D) using the standard for the scope of civil discovery, which requires disclosure of anything "relevant to the subject matter involved in the pending action," Tenn. R. Civ. P. 26.02(1). The defendant argues that any piece of evidence that the state collected during its investigation must have some relevance to the cases or else the state would not have collected it.

We decline the defendant's invitation to adopt the civil standard for the criminal rule. In determining the proper standard, we believe that it is appropriate to refer to federal authority interpreting Rule 16(a), Fed. R. Crim. P., because our Rule 16 conforms with and was greatly derived from its federal counterpart. See State v. Hicks, 618 S.W.2d 510, 514 (Tenn. Crim. App. 1981). "'Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. . . . There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'" United States v. Buckley, 586 F.2d 498, 506 (5th Cir. 1978) (quoting United States v. Ross, 511 F.2d 757, 762-63 (5th Cir.1975)); see also United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991); United States v. RMI Co., 599 F.2d 1183, 1188 (3d Cir. 1979); United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993); Moore's Federal Practice – Criminal § 616.05 (2002); Timothy M. Hall, Annotation, Books, Papers, and Documents Subject to Discovery by Defendant

Under Rule 16 of Federal Rules of Criminal Procedure, 108 A.L.R. Fed. 380, 400 (1992). This definition of materiality is not restricted to exculpatory evidence because the discovery of inculpatory evidence may enable the defendant to "'alter the quantum of proof in his favor' in several ways: by preparing a strategy to confront the damaging evidence at trial; by conducting an investigation to attempt to discredit that evidence; or by not presenting a defense which is undercut by such evidence." United States v. Marshall, 132 F.3d 63, 68 (D.C. Cir. 1998). In order to be material, the discoverable item must "significantly help[] in 'uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal.'" United States v. Gaddis, 877 F.2d 605, 611 (7th Cir. 1989) (quoting United States v. Felt, 491 F. Supp. 179, 186 (D.D.C. 1979)); Lloyd, 992 F.2d at 350 (relying upon Felt's definition of materiality). This court has previously defined the phrase "material to the preparation of the defendant's defense" using this definition: a tangible object under Rule 16(a)(1)(C) is material "'if there is a strong indication that [the evidence] will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment and rebuttal.'" State v. Hershel Clark, No. 02C01-9112-CR-00273, Shelby County, slip op. at 12 (Tenn. Crim. App. June 2, 1993) (quoting Felt, 491 F. Supp. at 186).

The defendant does not explain what role the twenty-one listed items would have played in his preparation for the first rape trial but, instead, argues only that he could not prepare his defenses in the first rape trial until he had received discovery in all of his cases. He relies heavily upon a comment by the trial court in a January 16, 1996 scheduling conference following the first rape trial but before the remaining rape trials were consolidated. In that conference, the defendant contended that the bulk of his motions related to the murder trials, which were set to be tried after the rape trials. The state argued that the defense was attempting to address motions relating to the later set cases before the next scheduled rape trial. The trial court commented:

> Well, and they [the defense] say, though, that – that depending on the outcome of those motions that can have significant impact upon the way they that they approach the trials before September. I think that's a valid concern.

The defendant argues that this comment supports his assertion that he could not prepare his defenses in the first rape trial in the absence of discovery from all cases. The defendant must do more than emphatically state that he needed certain discovery. He must show how the discoverable items were material to the preparation of his defenses.

The defendant points to the trial court's order for a mental evaluation in the consolidated rape case, which directed the parties to provide the defendant's medical records, employment records, school records, and psychological and psychiatric records, as proof that these items were relevant to his defenses in all of the cases. As examined in depth in Issue IX, the defendant refused to submit to a court-ordered mental evaluation before the first rape trial, lost the ability to present expert testimony on insanity due to this refusal, and announced before trial that he was not going to pursue an insanity defense based upon lay testimony because the expert testimony had been excluded. The

-64-

defendant has failed to explain how the twenty-one items he lists would have helped him prepare a defense he ultimately elected not to present.

The defendant also contends that the trial court's consolidation of the other rape cases and its ruling that evidence of the remaining rape cases was admissible pursuant to Rule 404(b), Tenn. R. Crim. P., in the trials of those cases as well as in the murder case show that he needed discovery on the consolidated rape and murder cases before the first rape trial. Notably, no ruling exists that the other rape cases or the murder case were admissible pursuant to Rule 404(b) in the first rape trial. We are unable to make the mental leap that the defendant requests, and we conclude that he is not entitled to relief on this issue.

### B. Discovery Violations in the Consolidated Rape Case

The defendant contends that the trial court applied the wrong standards to the discovery process during the consolidated rape trial. He asserts that the trial court misapplied Rule 16 by restricting discovery to exculpatory evidence that the state intended to introduce in its case-in-chief. He maintains that the trial court erroneously required him to obtain discoverable materials from a source other than the state if the other source also had the records. He also states that the trial court refused to conduct a Rule 16(d) in camera review of the state's files in order to determine whether the state was withholding discoverable evidence. He contends that the state's discovery violations violated his rights to a fair trial and to due process of law. The state responds that the defendant has waived this issue by failing to cite to the record regarding the evidence that was allegedly withheld. It also argues that the defendant has failed to show that he was prejudiced by the withholding of evidence.

The defendant asserts that the consolidated rape trial ended on May 24, 1996, and that from July 1996 through the homicide trial in early 1999, he received thousands of pages of materials that the state should have provided in discovery before the consolidated rape trial. He argues that "[it] is impossible to discuss all of the suppressed items of discovery in this brief. A review of the receipts of discovery and the record best reflects the information withheld and the efforts of the defense required [to] obtain fundamental disclosures." He claims that the fact that the state's July 3, 1996 open-file discovery policy, which occurred over one month after the consolidated rape trial, resulted in the disclosure of two thousand pages of additional material is alone sufficient reason to reverse his convictions. As examples of items that the state should have provided, he points to TBI summaries of his statements; TBI and FBI laboratory reports revealing that none of the victims' fingerprints were found in his vehicles nor did his vehicles, shoes or clothing contain fibers or debris matching Cahaba Lane; and the complaints of other rape victims whose rapes were similar to those described by the consolidated rape victims. It is the defendant's responsibility to specify which items the state should have provided as well as the reasons why these items were material to the preparation of his defense. See T.R.A.P. 27(7) (requiring that the appellant's brief set forth his or her contentions with respect to the issue, the reasons that those contentions require relief, citations to authorities, and appropriate references to the record); Tenn. Ct. Crim. App. R. 10(b). We decline the defendant's invitation to sift through the voluminous record in search of the purported discovery

violations. In this respect, we will consider only the specific examples of discovery violations that the defendant mentions.

The defendant contends that the state failed to provide TBI Agent David Davenport's summaries of the defendant's statements before the consolidated rape trial. In support of this contention, the defendant cites only to Agent Davenport's handwritten notes and typed summaries admitted as exhibits. Rule 16(a)(1)(A) requires the state to disclose "the substance of any oral statement which the State intends to offer in evidence at trial made by the defendant whether before or after arrest in response to interrogations by any person then known to the defendant to be a law enforcement officer." Otherwise, reports or memoranda of law enforcement officers made in connection with the investigation of a case are not discoverable. Tenn. R. Crim. P. 16(b) (providing that reports, memoranda, and internal state documents pertaining to the investigation or prosecution of the case are not discoverable except as provided in subsections (A), (B), or (D) of Rule 16(a)(1)).

In the present case, the state did not offer any of the defendant's statements at trial but noted its intention to use the defendant's statements in a February 6, 1996 pretrial hearing. At that hearing, the defendant acknowledged that he had received at least six different statements attributed to the defendant. In his brief, the defendant argues that he "did not even know of many of [his] statements until TBI Agent Davenport's summaries were provided" after the rape trials and therefore could not move to suppress these statements. The defendant's brief fails to explain what new statements by him Agent Davenport's notes and summaries contained. We note that our own review of the record reveals that during a July 30, 1996 motion hearing on the state's failure to provide exculpatory evidence in the consolidated rape trial, the defendant attempted to explain what new statements the summaries by Agent Davenport, exhibits 118 and 119, contained beyond the reports by Agent Davenport received in 1993, exhibits 116 and 117. The state argued that exhibits 118 and 119 were merely Agent Davenport's reports to his superiors paraphrasing other statements by the defendant that had already been litigated in this case. Exhibits 116 and 117 are not contained in the record, and, therefore, we cannot compare the reports discovered before the consolidated rape trial with those discovered in the open-file discovery. In any event, even if the notes and summaries contained new statements, the defendant was not harmed by his inability to attempt to suppress them because the state did not use any statements by the defendant at trial.

The defendant also states that the state did not disclose until after the consolidated rape trial TBI and FBI laboratory reports which revealed that none of the victims' fingerprints were found in his vehicles. In his reply brief, he argues that this information was important to his defense in the consolidated rape trial because all of the victims testified that they were inside one of his vehicles. The defendant also argues that the state failed to disclose TBI and FBI laboratory reports revealing that his vehicles, shoes, and clothing did not contain fibers or debris matching Cahaba Lane. He maintains that these reports would have been important in the consolidated rape trial because three of the victims claimed that the offenses occurred at Cahaba Lane.

In support of these arguments, the defendant points us to exhibit 208 in the murder trial, which is a two-inch-thick binder filled primarily with multiple copies of handwritten and typed logs

of items collected from the homicide victims, Cahaba Lane, the defendant's residence, and his vehicles. The binder also contains the FBI's results from textile fiber comparisons, DNA testing, blood and semen testing, and hair comparisons relating to the items collected. Unfortunately, the reports do not contain a complete key for the numbers assigned to the items tested, and therefore, we are unable to evaluate the defendant's contentions regarding what the test results prove and their value to his defense in the consolidated rape trial. See Brown, 836 S. W.2d at 548 (holding that the defendant's failure to provide the discovery in dispute in the record on appeal prevented the court from determining whether the state's failure to provide these items affected the outcome of the trial).

Initially, we note that it is not clear which materials in the black notebook the defendant lacked. The defendant's argument at a hearing on exculpatory evidence held a month and one-half before the consolidated rape trial revealed that he knew about fingerprint and DNA testing relating to the rape and murder cases. At this hearing, he referred to specific results concerning DNA testing contained within the reports located in the black notebook, but he did not refer to the results that he raises in this appeal. Assuming that the defendant did not have the FBI reports that he now argues the state should have disclosed, we turn briefly to the record to attempt to discern whether the results of those reports support the defendant's contentions regarding their materiality to his defense.

The record reveals that at the August 26, 1996 hearing on the motion for new trial in the first rape case, the defendant stated that he received FBI laboratory reports after the open file discovery permitted by the state in June 1996. He said that these reports concerned testing of "Huskey's clothes, of dust, debris, dirt off of his shoes . . . compared with the soil, and the sample, and the fabrics taken from the persons at Cahaba Lane, particularly [one of the murder victims]." He stated that he was arrested on the day that this particular victim was allegedly killed, and yet his shoes bore no dirt. When the trial court questioned the relevance of that test result beyond the murder prosecution, the defendant argued that the jurors in the first rape trial knew about the murders. He contended that his ability to cast doubt upon him being the Zoo Man was relevant to the first rape trial and all of the other cases.

At a September 10, 1996 motion hearing concerning the defendant's motion to compel discovery in the murder case, the defendant argued that he received laboratory reports relating to the processing of his vehicles in the open file discovery but that he still did not have the photographs related to this processing or the items removed from his vehicles. The state questioned the materiality of photographs of the defendant's truck. He stated that the laboratory tests on items taken from his truck revealed that those items had no evidentiary value. He asked whether the state realized that this result "might be exculpatory to the defense."

At the September 16, 1996 hearing on the motion for new trial in the consolidated rape trial, the defendant argued that once he got the laboratory information from the FBI, he

> found that the FBI could exclude Thomas Dee Huskey, or at least
> offer evidence to exclude him as being the person that was in the
> area of Cahaba Lane on the day he was arrested, because they had

> his shoes.  They had the fibers; they had all of those things, and
> none of them matched that area.  Had we had that information,
> that would have been important.

The defendant also adopted the arguments that he made at the hearing on the motion for new trial in the first rape case.

When the state requests the FBI laboratory to conduct scientific tests, the FBI is the state's agent and "reports in its possession are in the state's possession for the purposes of Rule 16(a)(1)(D)." State v. Goodman, 643 S.W.2d 375, 379 (Tenn. Crim. App. 1982).  Assuming that the FBI and TBI reports revealed that dirt or debris from the scene of the crimes were not found on a defendant's clothing or shoes or in his vehicles, they could be material to the preparation of the defense as such evidence could contradict the victims' testimony that the defendant took them to a specific location, Cahaba Lane.  Because the FBI and TBI reports in question were in the state's possession and contained the results of scientific tests that were material to the preparation of the defendant's defense, they were discoverable under Rule 16(a)(1)(D).  We believe that the state should have disclosed these laboratory reports.

However, even taking the defendant's claims about what the FBI and TBI tests prove as true, we believe that the state's failure to provide the tests before the consolidated rape trial was harmless. The rape closest in time to the defendant's October 21, 1992 arrest occurred on October 5, 1992. The absence of material from Cahaba Lane in the defendant's vehicles or on his clothing or shoes sixteen days after the most recent crimes is of limited significance.  In the most specific argument that he made to the trial court on the subject, the defendant argued that the absence of dirt on his shoes was important to show that he did not commit the murders on Cahaba Lane, which were not at issue in the consolidated rape trial.  We are not persuaded that the defendant's inability to present the FBI laboratory results more probably than not affected the judgments in the consolidated rape trial.  See T.R.A.P. 36(b).

With regard to the absence of fingerprints in the defendant's vehicles, our exploration of the record has revealed no instance in which the defendant argued that the FBI/TBI laboratory reports revealed the absence of fingerprints in the defendant's vehicles.  The black binder cited by the defendant reveals that latent fingerprints were taken from his vehicle.  The binder contains a request from Detective Mike Freeman to the TBI for the comparison of the finger and palm prints of the homicide victims with "any fingerprints found during processing."  It contains an April 4, 1993 TBI report, which states that one of the latent fingerprints from the defendant's vehicle matched the defendant's right thumb print.  The binder does not contain the results of fingerprint tests conducted by the FBI.  An October 28, 1996 FBI letter, which is attached to the defendant's October 31, 1996 notice of partial receipt of discovery, states that the FBI conducted fingerprint examinations with regard to the homicide victims.  Neither this notice nor the black binder reveal that any fingerprint analysis involved the fingerprints of the rape victims.  These documents reveal that latent fingerprints were taken from the defendant's vehicle and were compared to the homicide victims' fingerprints and that one of the latent fingerprints was identified as being that of the defendant.

With the reports cited by the defendant not revealing that the fingerprints taken from his vehicle were ever compared to those of the rape victims, we cannot assess any potential for prejudice. In any event, we cannot say that the failure to disclose more probably than not affected the judgments. See T.R.A.P. 36(b).

The defendant contends that the state failed to disclose the complaints of other rape victims whose rapes were similar to those described by the consolidated rape victims. In his reply brief, he argues that the detectives investigating him looked into these complaints because of their similarity to the offenses on trial but excluded him as the perpetrator in these cases. He claims that had he been provided these statements earlier, he could have located and interviewed the complainants. His argument with regard to the usefulness of these complaints is threefold: (1) that he could have used the complaints to argue against consolidation, (2) that he could have used the claims of one of the complainants to show that the defendant's confessions were false or unreliable, and (3) that he could have used the complaints in two of these cases to argue at trial that someone who looked like him was committing the offenses. In support of these contentions, the defendant cites us to the police report of T. S., who was raped on February 19, 1992, and to a letter from the KPD to the FBI requesting that the defendant's blood and hair be compared to evidence from T. S.'s rape kit. He cites to a search warrant for Billy D. Foster's hair and blood samples for comparison to evidence in the rape of A. P. He also cites to the statements of T. M., B. B., and A. R. taken in conjunction with the investigation of the murder case.

Generally, a defendant may not discover police reports before trial. See State v. Daniel, 663 S.W.2d 809, 811 (Tenn. Crim. App. 1983). To the extent that officers investigated other rape complaints to determine whether the defendant committed those offenses, Rule 16(a)(2) provides that they are not subject to disclosure under the discovery rules because they are "reports, memoranda, or other internal State documents made by . . . law enforcement officers in connection with the investigation or prosecution of the case." Furthermore, the statements of witnesses taken during the investigation of the murder case are likewise not discoverable under Rule 16(a)(2). In this respect, we note that Rule 16(a)(2), dealing with information not subject to disclosure to the defendant, excludes discovery under Rule 16(a)(1)(A), (B), and (C) from non-disclosure but not subsection (C) that authorizes the discovery of documents and tangible objects. We will address whether the state had an obligation to disclose these complaints as exculpatory evidence without regard to the discovery rules in the next issue, which deals with alleged Brady violations.

Finally, the defendant contends that the trial court erroneously refused to examine the state's files pursuant to Rule 16(d) to determine if the state had failed to disclose any discoverable evidence. Rule 16(d)(1) provides as follows:

> Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate. Upon a motion by a party, the court may permit the party to make such showing, in whole or in part, in the form of a written statement to be inspected

-69-

by the judge alone.  If the court enters an order granting relief following such an ex parte showing, the entire text of the party's statement shall be sealed and preserved in the records of the court to be made available to the reviewing courts in the event of an appeal.

The plain language of this provision does not authorize a defendant to request that the court conduct an in camera examination of the state's files in order to ferret out discoverable information.  Instead, the in camera review contemplated in this section is of a party's written statement explaining why the court should order the denial, restriction, or deferral of discovery.  Nevertheless, the trial court may perform an in camera inspection of evidence in the event of a discovery dispute.  See State v. Butts, 640 S.W.2d 37, 39 (Tenn. Crim. App. 1982) (holding that although defendants are not entitled to routine access to police personnel records, upon a strong showing that the records contain information material to the defendant's case, the trial court should inspect the records in camera and release the items material to the defense).

In the present case, before the consolidated rape trial, the trial court noted that the defendant had asked it to review the state's files for discoverable evidence because past conduct indicated that the state did not comply with the discovery rules and the state's view of exculpatory evidence differed from the defendant's.  The court noted that it had inspected the files of one of the victims in camera, but it declined to inspect the state's entire file or all law enforcement files.  The court re-instructed the state to disclose to the defendant all information discoverable under the discovery rules and all exculpatory information, including information about witnesses not equally available to the defendant and any promises made to witnesses in exchange for their testimony.  It stated that it was confident that the state had done this.  Regarding the broad review requested by the defendant, the court stated, "It is not called for by the rules.  It is unprecedented, and I don't think it is appropriate.  It is not this Court's function to perform that task."  In light of the defendant's general allegations that the files must contain discoverable evidence, we do not believe that the trial court abused it's discretion in declining to perform the review of the state's files that the defendant requested.

In summary, the defendant is not entitled to relief on his claimed discovery violations.  The alleged violations in the first rape case are either unsubstantiated in the record or unsupported by an explanation of how they were material to the preparation of the defense.  Of the purported examples of violations in the consolidated rape trial, the defendant has failed to demonstrate that he was not provided with some of his statements until after the trial, nor was he harmed by the inability to suppress any undisclosed statements if they existed because the state did not introduce his statements at trial.  With regard to the TBI and FBI laboratory reports, the state's failure to disclose these reports before the consolidated rape trial was harmless error.  Finally, the complaints of other rape victims investigated as a part of this case were not subject to discovery under Rule 16(a)(1)(C) as limited by Rule 16(a)(2).

## VII.  EXCULPATORY EVIDENCE

The defendant contends that the state failed to disclose evidence favorable to the defense before the rape trials. He argues that he could have used this evidence in the first rape trial to show that someone else committed the offenses, to prove that his statements were false, and to decide whether he should use an insanity defense or agree to consolidate all the rape cases. With regard to the consolidated rape trial, he claims that he could have used the withheld evidence to argue against consolidation and to argue for suppression of his statements. He summarily argues that the failure to provide this evidence denied his federal and state constitutional rights to due process of law, a fair trial, and the effective assistance of counsel. The state contends that it did not withhold exculpatory evidence and that the evidence allegedly withheld was not material to the rape cases.

Approximately a year and one-half before the first rape trial, the defendant filed a detailed motion for disclosure of exculpatory evidence in all of the rape cases. In this motion, the defendant asked the court to order the state to furnish any evidence that was favorable, exculpatory, or tended to establish a defense, to aid in avoiding a conviction, or to mitigate punishment. The defendant listed twenty-two examples of evidence that he was requesting, including evidence linking another person to the crimes; information suggesting that his oral or written statements were illegally or unconstitutionally obtained, evidence showing that he has a mental disease; and evidence from examinations, tests, or experiments that failed to implicate him in the crimes. On October 16, 1995, before the parties began selecting a jury, the defendant argued that the state had only provided a boilerplate response that it had provided all exculpatory evidence to him. The trial court denied the defendant's motion, ruling that the state acted at its peril in failing to provide anything to which the defendant was entitled. In the consolidated rape trial, the trial court directed the state to disclose all exculpatory information to the defendant, although it was confident that the state had done this. It declined to determine whether evidence that the defendant was seeking in discovery was favorable or exculpatory evidence under Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963), ruling that those issues would come into play after the trial.

In Brady, the United States Supreme Court determined that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id.; see also Hartman v. State, 896 S.W.2d 94, 101 (Tenn. 1995). In order to establish a due process Brady violation, the defendant must establish the following:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995) (opinion on rehearing). Evidence is considered material under this standard only if there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565 (1995); Edgin, 902 S.W.2d at 390. The "touchstone of materiality"

> is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles, 514 U.S. at 434, 115 S. Ct. at 1566 (citations omitted) (quoting United States v. Bagley, 473 U.S. 667, 678, 105 S. Ct. 3375, 3381 (1985)); see also Edgin, 902 S.W.2d at 390-91. Impeachment evidence, as well as exculpatory evidence, falls under the Brady rule. Bagley, 473 U.S. at 676, 105 S. Ct. at 3380. The burden of proving a Brady violation rests with the defendant, and the violation must be proved by a preponderance of the evidence. Edgin, 902 S.W.2d at 389; State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993).

## A. The First Rape Trial

The defendant contends that the state withheld the following exculpatory evidence in the first rape trial: (1) evidence of similar rapes that he did not commit, (2) TBI Agent David Davenport's memoranda, (3) the "Who is Kyle?" note, (4) a statement by his ex-wife that she thought he had a "split personality," and (5) Detective Mike Freeman's notes stating that the medical examiner's preliminary examination concluded that one of the murder victims was killed while the defendant was in jail. He argues that this evidence was favorable to his defense and preparation of the first rape trial. The state contends that exculpatory evidence, not otherwise discoverable under the discovery rules, must be disclosed only if its absence undermines confidence in the verdict. It argues that the listed evidence was not material to the first rape trial.

(1) Other Rape Complaints

The defendant contends that the state should have disclosed the complaints of other rape victims, T. S., B. M., A. P., T. M., and B. B., who described offenses similar to those in the first rape trial. He argues that because he was excluded as the perpetrator in these other rapes, he could have used this evidence to show that someone else who looked like him was committing these offenses. The state contends that the only similarity between the complaints cited by the defendant and the offenses in the first rape trial is that the perpetrator cursed the victims. It argues that evidence of these dissimilar rapes was not favorable, material, or relevant to the first rape case. The defendant

replies that evidence that another person may be responsible for the crime undermines confidence in the verdict. We will review these victims' statements.

On February 19, 1992, T. S. complained that she had been raped. She said that she was walking home at 5:00 a.m. when a white male in a dark green, blue, or black Monte Carlo with a child restraint seat in the back offered her a ride. She said that en route, he turned into a driveway and began cursing her. She said that he made her get out of the car and remove her clothes and that he tied her hands behind her back with rope. She stated that he forced her to perform oral sex, then forced her into the woods, and hit her in the stomach. He penetrated her vaginally, forced her to perform oral sex again, and ejaculated in her mouth. He returned to his car, brought her clothes to her, and then left in his car. She described her attacker as a white male in his early thirties, weighing about 190 pounds, with black collar-length hair, and a black beard and moustache. Attached to the complaint is a search warrant for hair and blood samples from the defendant for DNA comparison.

Detective Tom Pressley of the KPD testified that he showed T. S. a photograph array containing the defendant's picture but that T. S. identified another person in the array as her attacker. He said that T. S. later called him and changed her identification to the defendant after seeing the defendant on television. Detective Pressley said that he did not charge the defendant in T. S.'s case because he believed her second identification was tainted. He said that he did not know the location of the laboratory results from the DNA comparison of the defendant's samples with T. S.'s rape kit. He said that T. S. was not a known to be a prostitute.

The complaint of T. S. contains a photocopy of a photograph array with the notation "looks like person who raped me" and signed by B. M. An arrow extends from this notation to the defendant's photograph. This is the only evidence relating to B. M. cited by the defendant. Detective Pressley testified that he was also involved with investigating B. M.'s case, which he said was similar to T. S.'s case. He said that the perpetrator picked up B. M. while she was walking home on Woodbine Avenue, which is near Magnolia Avenue, after visiting a neighbor. Detective Pressley testified that the car driven by the perpetrator was similar to that in T. S.'s case and that the rape of B. M. was also violent. He stated that although prostitutes frequent Woodbine Avenue, B. M. was not a known prostitute. He said that he did not charge the defendant in B. M.'s case because the victim was afraid of the defendant and did not want to proceed with a prosecution. The record contains a request from the KPD for a comparison of the defendant's hair and blood samples with B. M.'s rape kit. Detective Pressley stated that he did not know where the results of that comparison were.

The defendant argues that A. P., a German tourist raped in the Bluff Mountain area of Sevier County, is the foreign girl that Kyle confessed in his statements to raping. The defendant refers us to the November 20, 1991 statement of Lea Mynear, who aided A. P. after the rape. Ms. Mynear said that A. P. described her attacker as being in his mid-thirties; having short blonde hair, a beard, and blonde body hair; and driving a beige or cream-colored truck. She said that A. P. said the man was wearing a necklace, which she described as a claw holding a crystal orb on a leather or cloth cord. She said that A. P. told her that the man was giving A. P. a ride to the Smoky Mountains

National Park when he stopped the truck and dragged A. P. into woods. She said that A. P. told her that the man removed A. P.'s and his clothes, tied A. P.'s hands with her necklace, raped A. P. orally and vaginally, repeatedly called her a "whore," and asked her to call him "master." Ms. Mynear said that A. P. stated that the man told her that she would get off easier if she didn't fight like the others who ended up with broken teeth and cuts all over.

The record also contains a report by Detective Mark Turner, who met the victim and Lea Mynear at the Sevier County Medical Center on November 20, 1991. In the report, Detective Turner relates Ms. Mynear's account of what the victim told her about the offenses. This account substantially conforms to Ms. Mynear's statement except that it relates that the victim told Ms. Mynear that the perpetrator performed oral and anal sex on her and then forced her to perform oral sex on him. Ms. Mynear also told the detective that the victim said the perpetrator picked her up at the Greyhound Bus Terminal in Knoxville. The report also states that the victim described her attacker as a well-groomed man in his mid-thirties with blonde hair and a blonde beard. She states that he was approximately five feet, eight inches tall and weighed approximately 200 pounds. The report states that a sexual assault evidence collection kit was taken on the victim.

Agent David Davenport testified that before the defendant's statements, the defendant was a suspect in A. P.'s case because he lived in Sevier County, A. P. was a transient, and A. P. was picked up on Magnolia Avenue. Agent Davenport said that he did not know the results of the comparison of the samples from Billy Foster with A. P's rape kit or if A. P. ever identified the defendant in a photograph array. Lieutenant Larry Johnson testified that after speaking with a captain from the Sevier County Sheriff's Department, it was his understanding that A. P. had identified the defendant from a photograph array.

Also with regard to A. P., the defendant cites to a search warrant requesting blood and hair samples from Billy Foster, who is described as weighing 160 to 180 pounds; being five feet and six or eight inches tall, and having light reddish-brown, shoulder-length hair and a light reddish-brown beard. The samples were to be compared to the A. P.'s rape kit. Citing only to this search warrant, the defendant claims that he was excluded as the perpetrator in this case. In a hearing following the consolidated rape trial, Lieutenant Johnson stated that he did not believe that any laboratory work regarding the defendant was done on A. P.'s samples. Without introducing the laboratory reports, the defendant argued in another hearing that laboratory tests neither included nor excluded him as the perpetrator in A. P.'s case.

On November 5, 1992, T. M. gave a statement to Detective Dan Stewart concerning one of the victims in the murder case. T. M. stated that about two years earlier, she was working as a prostitute and went with a man to his apartment, which contained numerous small statues of elephants. The man forced her at knife point to disrobe and attempted to tie her hands behind her back. He pulled her hair and forced her to perform oral sex. When he laid down his knife, she threw it out an open window, grabbed her clothes, and ran out the door. The statement reflects that T. M. identified an individual in a photograph array as her attacker, but it does not give the identity of the person identified. Lieutenant Johnson testified that although the array that T. M. viewed contained

the defendant's picture, he did not know if it was in the fourth position. He stated that he did not know what became of the array in T. M.'s case but that the defendant was not charged in that case.

On October 29, 1992, B. B. gave a statement relating to the murder investigation. She stated that on September 2, 1991, Fred Allen Sexton picked her up at the bus station on Magnolia Avenue, took her to Jefferson County, and raped her when she refused to smoke cocaine with him. She stated that he pulled her to the back of the van by her neck, strangled her, took her clothes off, forced her to perform oral sex, and had sexual intercourse with her. She said that he told her he was going to kill her. She said that when she regained consciousness, she jumped from the van and ran away. She described Sexton as white and in his early thirties and stated that she thought Sexton suspected her of telling the police that his cousin sold drugs. She said that she knew two other women who had been taken to the murder crime scene, raped, and beaten. She said that they had said their perpetrator had been arrested.

The defendant claims that his DNA had been compared in other cases and that he had been excluded as the perpetrator. To support this contention, he refers us to the two-inch-thick notebook discussed above in Issue VI on discovery. Our review of the materials in the binder does not reveal any comparison of the defendant's DNA with that of T. S., B. M., A. P., T. M., or B. B. In fact, the meager evidence in the record relating to these other rapes reveals that samples were collected only from T. S., B. M., and A. P. The record does contain requests from the KPD to the FBI for a comparison of the defendant's DNA with the rape kits of T. S. and B. M., but the defendant has not cited, nor have we discovered, the results of those comparisons. Additionally, although the defendant does not cite to results from or a request for a comparison of his DNA with A. P.'s rape kit, we note that during argument in a September 16, 1996 hearing, he argued that the results of such a comparison neither included nor excluded him as the perpetrator.

The state argues that these rapes are not similar to the offenses in the first rape trial because none of these victims were snatched off the street or taken to a barn, nor was a firearm used in these offenses. It also argues that the victims' hands were not tied in these offenses, but we note that T. S. did say her hands were tied and that T. M. said her attacker attempted to tie her hands. The defendant argues that these rapes are just as similar as those offenses in the consolidated rape trial. He also notes that the police investigated these cases while investigating the defendant. We agree with the state that these other rapes were dissimilar to the facts of the first rape case. We conclude that they are not material to the first rape trial.

(2) Agent Davenport's Memoranda

The defendant contends that the state withheld memoranda by TBI Agent David Davenport. In the open-file discovery following the consolidated rape trial, the defendant received the typed summaries of the notes of Agent Davenport. The notes included in the record state that Agent Davenport met with the defendant in the Knox County Jail and advised him of his rights but that the defendant declined to speak with the officers and wanted a lawyer. Without further explanation, the

defendant contends that these notes were favorable to his decisions on his mental defense and to his motion to suppress his statements.

The defendant also argues that Agent Davenport's November 10, 1992 memorandum, also disclosed after the consolidated rape trial, was exculpatory. The memorandum reveals that an assistant district attorney had asked Agent Davenport to be available to serve indictments on the defendant to see if the defendant would talk with the agent. The defendant contends that this information is relevant to the suppression of his statements because it is proof that the assistant district attorney directed an officer to reestablish contact with him after he had requested a lawyer. The defendant speculates that if the trial court had suppressed the statements and the evidence gained in the search of his home before the first rape trial, "then the capital murder cases were gone." He argues that if the murder cases had not been pending, then he might have agreed to be evaluated by the court-appointed expert before the first rape trial and had an insanity defense to present in that case. He asserts that he might have also agreed to consolidate all of the rape cases.

Neither the defendant's statements nor a mental defense were used in the first rape trial. Thus, Agent Davenport's notes and memorandum are not material to the first rape trial. Moreover, the defendant's contentions that he might have agreed to a mental evaluation or to consolidate all of the rape cases are speculative at best and fall far short of undermining our confidence in the verdict in the first rape trial.

(3) "Who is Kyle" Note

During the suppression hearing in the consolidated rape trial, the defendant discovered a note that was given to Correctional Officer Terry Birnbaum by the defendant. The note reads as follows:

> Who is Kyle? Kile?
>> Time Loss? How Much? today? And Kyle?
>> I'm told Kyle Hates me? Why?
>> I was told they wanted to talk to Kyle & not me!
>> I'm told that "Kyle" said he killed 4 wemon! [sic] Raped
> Many others?
>> Trying to trap me! Why??
>> Am I 2 people??? more??
>> I know not one of these wemon [sic] I saw in Photos!
>> Who is Kyle? Kile? Me???
>> Why does he hate Me?

The trial court ruled that although it understood the state's argument that it did not intend to introduce the unsigned note and that it had no proof that it bore the defendant's handwriting, the state should have disclosed the note to the defendant. It then stated that the defendant had the note at that time and directed the parties to move on with the proceedings.

The defendant contends that this note was favorable to his insanity defense and his attempt to suppress his statements. He argues that it was critical for him to know all of the evidence supporting his insanity defense before the first rape trial because if he determined that his only defense was insanity, then he might have agreed to consolidation of all the rape cases. The state contends that trial strategy is not relevant to a Brady claim. It also argues that the notes are not material or favorable to the defendant because the statements were not introduced in the first rape trial.

In discussing the standard for materiality in the Brady analysis, the United States Supreme Court has noted that a standard that focused on the withheld evidence's affect on the defendant's ability to prepare for trial would be unworkable in part because "knowledge of the prosecutor's entire case would always be useful in planning the defense." United States v. Agurs, 427 U.S. 97, 112 n.20, 96 S. Ct. 2392, 2401 n.20 (1976). Instead, as stated above, we must determine whether the absence of the withheld evidence undermines our confidence in the verdict. Neither the statements nor the insanity defense were used in the first rape trial, and thus, the "Who is Kyle?" note was not material.

(4) Statement of Sherry Ball

The defendant contends that the state should have provided the statement of Sherry Ball, his ex-wife, in which she describes the defendant as having a "split personality" because he would be nice and calm and then become angry within an expanse of one minute. Although not entirely clear, the defendant apparently argues that this statement was favorable to his insanity defense. Because the defendant did not present an insanity defense in the first rape trial, this statement was not material in that case.

(5) Notes of Detective Mike Freeman

The defendant contends that the state should have disclosed Detective Mike Freeman's notes, which reveal that one of the murder victims was killed while the defendant was in jail. The notes state, in pertinent part, that a doctor, who's name is illegible, "preliminary sez [sic] vict. has not been at location more than 1 or 2 days." The defendant summarily argues that this information was exculpatory because it shows that his confessions are false and that someone else was committing crimes similar to the ones with which he was charged. He also suggests in passing that the murders were potential Rule 404(b), Tenn. R. Crim. P., evidence in the first rape trial. The state contends that the defendant fails to explain how this information, which was only a preliminary finding, was material to the first rape case. We agree with the state that evidence of the murders was not introduced in the first rape trial and, therefore, was not potential Rule 404(b) evidence. Detective Freeman's notes are not material to the first rape trial.

B. Consolidated Rape Trial

The defendant contends that the state withheld the following exculpatory evidence in the consolidated rape trial: (1) the rape complaints of other victims alleging conduct similar to the offenses in the consolidated cases and a description that fit the defendant, who was subsequently excluded as the perpetrator, (2) Agent Davenport's memorandum, and (3) TBI and FBI laboratory reports.

(1) Other similar rape complaints.

The defendant contends that the state withheld evidence of the rapes of B. M., A. P. and Lea Mynear, who described similar conduct by a person fitting his description. He states that he was excluded as the perpetrator of these other rapes. He argues that this evidence was material to his opposition to the state's motion to consolidate to show that the offenses were not signature crimes as the state alleged. He also argues that the fact that he was excluded in the rape of A. P. shows that his statements are false and unreliable. The state argues that the defendant does not explain how these rapes are similar, nor does he cite to support for his claim that he was excluded as the perpetrator. It also argues that the evidence does not exculpate the defendant with regard to the consolidated rape offenses, nor is it impeachment evidence in those cases.

Initially, we note that the record reflects that Ms. Mynear was not a rape victim but, instead, was the person who aided A. P. after she was raped. Ms. Mynear's statement, relating what A. P. told her about the offenses against her, is related above. We have already described the evidence relating to the rapes of B. M. and A. P. Additionally, although the defendant does not mention the state's failure to provide the statements of A. R. in this issue, he does challenge the state's failure to provide A. R.'s statement before the consolidated rape trial in Issue VI on discovery. In light of our analysis on the discovery issue, we will also review the evidence relating to A. R.

On October 21, 1992, A. R. gave a statement to Detective Mike Upchurch, who was investigating the murder cases. After describing her attempt to find one of the murder victims, who was her friend, A. R. stated that about one month before the interview, she encountered a man driving a small yellow pickup truck on Magnolia Avenue around 1:00 or 2:00 p.m. She said that the man asked about P. J., a prostitute who frequented the Magnolia Avenue area. She said that she felt more comfortable with him because he knew P. J. and that he offered her around $75 for oral and vaginal sex, which she thought was a lot of money in light of the fact that he did not know her.

A. R. said that the man drove her to a dead end road in a wooded area where she believed that the murder victims were later found. She said that they got out of the truck and he insisted that she remove her clothing. She said that although she did not want to take off all of her clothes because her ankle was in a splint, she did so because she could tell that the man was getting "edgy." She said that the man tied her hands behind her back with a two-foot length of smooth, off-white, braided cord. She said that he did not have a weapon and that he told her that she would not be hurt unless she tried to fight or untie herself. She said that he made her walk several hundred yards into the woods where he forced her to perform "all different kinds of sex." She said that the man had track

-78-

marks on the inside of his wrist and that she believed him to be an intravenous drug user. She said that he slapped her face and punched her in the chest, breaking a couple of her ribs.

A. R. said that after an hour, the man questioned whether he should let her go because she could have him arrested. She said that she assured him that she would not contact the police and that he said she would go to the graveyard if she did. She said that he left her in the woods and told her to stay there until she could no longer see him. She said that when she finally found her way out of the woods, the man drove away and that she saw the license tag on his truck. She said that in addition to raping her, the man took fifty dollars from her shoe. She said that when she saw a picture of the man before the interview, she immediately recognized him. The record does not reflect who showed A. R. the picture or the identity of the person in the picture.

With regard to the suppression of his statements, again we hold that the evidence relating to other rapes is not material because the statements were not used. As for the defendant's argument that he could have used this evidence to oppose the consolidation of the cases in the second rape trial, we conclude that the rapes of A. P. and B. M. were not similar to the offenses in the consolidated rape case. The record does not reflect that A. P. or B. M. were prostitutes and neither were taken to Cahaba Lane or to the barn at Chilhowee Park. Furthermore, the record does not support the defendant's contention that he was excluded as the perpetrator in these cases. Detective Pressley testified that the defendant was not charged in B. M.'s case because she was afraid of him and did not want to press charges. With regard to A. P., although the record contains evidence that another person, Billy Foster, was pursued as a suspect in A. P.'s case, Lieutenant Johnson testified that he believed that A. P. also identified the defendant's picture from a photograph array. With regard to A. R.'s case, we can understand how the defendant would deem her statement relevant. On the other hand, nothing in her statement undermines our confidence in the jury's verdict in the consolidated rape trial so as to make it material.

(2) Agent Davenport's Memorandum

The defendant again contends that the state should have disclosed Agent Davenport's memorandum that stated that an assistant district attorney wanted Agent Davenport to serve indictments on the defendant to see if the defendant would talk. The defendant argues that this memorandum contradicts the testimony of Lieutenant Larry Johnson that he did not serve the capias as a pretext to get the defendant to talk and that it was a coincidence that Agent Davenport accompanied him to serve the capias. The trial court did not suppress the statements in the consolidated rape trial because it found that the defendant initiated contact with the officers, who were properly serving the capias. The defendant argues that the withheld memorandum shows that the assistant district attorney intentionally violated his right to counsel. We agree with the state that Agent Davenport's memorandum might have been relevant had the statements been introduced at trial but that the memorandum itself is not exculpatory nor does it have any impeachment value outside of the context of the suppression of the statements. Thus, the memorandum is not material to the consolidated rape trial.

(3) TBI and FBI Laboratory Reports

The defendant summarily contends that the state withheld exculpatory TBI and FBI laboratory reports and other impeaching materials until after the rape trials. Citing only to the black notebook discussed in Issue VI on discovery, he argues that all of the TBI and FBI tests were exculpatory because no fibers or soil from Cahaba Lane matched his clothes or cars. He argues that the tests revealed no matching fingerprints and that DNA tests excluded him as the perpetrator of crimes similar to those charged. The state contends that the tests cited by the defendant do not appear to be related to the consolidated rape cases. It argues that the record does not reflect that any samples were obtained in conjunction with the consolidated rape cases and that no reason exists to believe that these laboratory reports are exculpatory or material in this case.

As discussed in Issue VI, the state should have disclosed the FBI and TBI reports under Rule 16(a)(1)(D) because they contained the results of scientific tests that were material to the preparation of the defendant's defense. Nevertheless, we have already concluded that the state's failure to disclose the reports was harmless due to the passage of time between the last of the consolidated rape offenses on October 5, 1992, and the defendant's October 21, 1992 arrest and the fact that the reports cited by the defendant do not reveal that the fingerprints taken from his vehicle were ever compared to those of the rape victims. Furthermore, our review of the notebook does not reveal that it contains any comparisons of the defendant's DNA with that of any surviving rape victim. The defendant has failed to show by a preponderance of the evidence that the FBI and TBI reports are sufficiently exculpatory to the consolidated rape case so as to undermine our confidence in the verdict.

## VIII.  HEARING OF PRETRIAL MOTIONS

The defendant asserts that he was not able to prepare his defenses properly in both trials because the trial court refused to rule on certain motions until the day of trial. He contends that the trial court denied him due process of law by not ruling on all of his pretrial motions relating to all of his cases before the rape trials. The state contends that the trial court did not commit reversible error by refusing to rule on the defendant's motions at the precise time that the defendant requested. We conclude that the defendant has failed to show that he suffered any prejudice from the timing of the trial court's rulings on his various motions.

Rule 12(e), Tenn. R. Crim. P., provides in pertinent part that a

> motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after the verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected.

The rationale behind Rule 12(e) is to avoid inconveniencing the jury and witnesses; to apprise both parties of the evidence admissible at trial, which might affect plea negotiations or trial strategy; and

to preserve the state's right to appeal an adverse ruling. State v. Aucoin, 756 S.W.2d 705, 709 (Tenn. Crim. App. 1988); State v. Feagins, 596 S.W.2d 108, 110 (Tenn. Crim. App. 1979). In light of these purposes, this court has interpreted "before trial" in Rule 12(e) to mean "sometime earlier than the day the trial is to commence." Aucoin, 756 S.W.2d at 709. If "the defendant asks for a hearing prior to trial, but the trial judge refuses to grant the defendant a hearing, the trial judge commits error unless the record reflects good cause for deferring the hearing on the motion." Id.

## A.  The First Rape Trial

The defendant states that although he appeared in court on several occasions ready to argue and present proof on his motions, the trial court chose, at the state's urging, to defer hearing motions until the day of trial. He argues that the trial court's refusal to hear motions until the day of trial simply because that was the court's traditional practice was an insufficient reason to deny him rulings necessary to prepare his defense. He speculates that the delayed rulings were part of the state's plan to force him to plead guilty before he had sufficient information to make informed decisions. He contends that by delaying rulings until the day of trial, the trial court violated his rights to due process, a fair trial, and the effective assistance of his counsel. The state contends that the defendant fails to specify which motions the trial court refused to hear or to explain how he was prejudiced by the timing of the court's rulings.

We agree with the state that the defendant's general references to motions filed pretrial but not ruled upon until the day of trial are insufficient to support his argument. See T.R.A.P. 27(a)(1)(7). In his reply brief, the defendant refers us to his summary of all of the pretrial proceedings located in the procedural facts in his brief. The only specific contentions regarding how he was harmed by the allegedly belated rulings are his assertions that the state was able to show the jury a photograph of him, a photograph array with the word "homicide" on the back, some rope, and some previously undisclosed pictures without him having the benefit of the trial court's rulings regarding Rule 12, Tenn. R. Crim. P., or Rule 104, Tenn. R. Evid., on this evidence. The defendant does not state the nature of the undisclosed pictures, nor do his references to the record relate to any undisclosed pictures. We will address the defendant's contentions only with regard to the specific allegations of prejudice concerning his photograph taken at the time of his arrest, the photograph array from which the victim identified him, and a piece of rope identified by the victim as the rope that the defendant used to bind her during the offenses.

On the day trial was to begin but before the jury was selected, the trial court denied the defendant's motion to suppress his photograph taken at the time of his arrest and placed in a photograph array from which the victim identified him as her attacker. Without addressing the question of whether the trial court had good cause to defer ruling on this issue and assuming that the trial court should have ruled upon this issue before the day of trial, we conclude that the defendant suffered no prejudice from the belated ruling. As discussed in Issue III on suppression of the evidence stemming from the defendant's arrest and Issue XXIV relating to the admissibility of the defendant's photograph and the photograph array in the first rape trial, the defendant was not entitled to suppression of this photograph. With respect to the photograph array from which the photograph

was removed, as we previously note, the record contains no evidence that the jury saw the word "homicide" written on the back of the array. The defendant is not entitled to relief.

With respect to the rope, the state asked the victim to identify a piece of rope. The defendant objected that the state had not laid a proper foundation nor proven the chain of custody with respect to the rope and that the rope was more prejudicial than probative. He also stated that the rope was the subject of a motion to suppress that had not been ruled upon before trial, but he did not give the basis upon which the rope should have been suppressed. The trial court ruled that the rope was admissible through the victim if she could identify it. We are unable to determine that the defendant attempted to suppress this rope before trial. He did file a motion to suppress evidence gained in the search of his home following his arrest and, as we note in Issue III on the propriety of defendant's arrest and the search of his home, rope was taken from the defendant's bedroom floor pursuant to that search. The rope at issue in the first rape trial was taken from the stall in the barn in which the victim was raped. We can discern no error with respect to the timing of the trial court's rulings on the piece of rope from the barn stall.

B. Consolidated Rape Trial

The defendant asserts that the trial court failed to rule on the state's motion for a mental evaluation until the eve of trial and did not rule until after the consolidated rape case on his motions for dismissal due to the violation of his right to a speedy trial, severance of the murder cases, or a new trial in the first rape case. He also states generally that the trial court failed to rule on numerous motions relating to the homicide cases before the consolidated rape trial. He contends that the delay in ruling prevented him from incorporating the rulings into his theory of defense. The state argues that the defendant has failed to show that he was prejudiced by the timing of the trial court's rulings.

The defendant argues that the trial court's failure to order him to submit to a mental examination until three days before trial precluded the opportunity for a meaningful mental evaluation and ultimately resulted in the striking of his insanity defense. Initially, we note that the trial court ruled upon this issue on May 9, 1996, several days before the May 13, 1996 trial date, thereby complying with Rule 12(e). As discussed in detail in the next issue relating to the limitation of the defendant's insanity defense, the trial court ordered Dr. Clifton Tennison to examine the defendant, but Dr. Tennison found that he lacked sufficient experience and expertise to complete the examination. On May 9, 1996, the trial court ordered that the defendant be examined by Dr. Phillip Coons. The defendant refuse to submit to this examination because he objected to Dr. Coons. As noted by the state, the defendant's primary objection to the mental examination was unrelated to the timing of the court's order. Furthermore, as discussed in the next issue, the delay in reaching the mental examination issue was largely due to the numerous motions that the trial court had to address. We can discern no error.

Citing to five volumes of transcript from the hearings preceding the murder trial, the defendant states that the trial court failed to rule before the consolidated rape trial on over fifty motions relating to the murder cases that had been pending since 1994. He summarily argues that

the lack of rulings on these numerous motions affected his ability to make informed decisions about his defenses in the consolidated rape trial. Without stating which motions would have enhanced his ability to make decisions regarding the mental evaluation, he also contends that the inability to make meaningful decisions resulted in the striking of his right to offer expert testimony on insanity in the consolidated rape trial. We deem these contentions too general to review. As with the first rape trial, we will address only the specific motions that the defendant offers as examples in his brief.

The defendant argues that he was prejudiced by the trial court's failure to rule on his motion for a speedy trial until December 1998 because, as time passed, the amount of time and money invested in his trials placed pressure upon the trial court not to dismiss his cases for denial of a speedy trial. The state contends that the defendant is not entitled to relief on this issue because he told the trial court that he was not pursuing a motion for speedy trial in the rape cases but only in the murder case. As discussed in Issue II relating to the violation of the defendant's right to a speedy trial, the defendant moved to dismiss the charges against him for a denial of a speedy trial on April 29, 1996, three weeks before the consolidated rape trial. Although the motion only requested the dismissal of the homicide case, the defendant argued that his demand for a speedy trial in the homicide case necessarily meant that he was also demanding speedy trials in the rape cases, which were to be tried before the homicide case. The trial court considered this argument on May 9, 1996, and stated that the defendant's motion to dismiss would apply to all of his cases. On December 12, 1998, the trial court denied the defendant's motion to dismiss in an order that on its face relates to the homicide cases. Assuming that the trial court should have ruled on this issue before the consolidated rape trial, we conclude that its failure to do so is harmless in light of our holding in Issue II that the defendant was not denied his right to a speedy trial in either of the rape cases.

The defendant contends that the trial court erroneously deferred its ruling on his motion to sever the murder charges before the consolidated rape trial. He argues that he suffered prejudice from this delay because the state could have introduced evidence of the murder cases as Rule 404(b) evidence, on cross-examination, or on rebuttal during the consolidated rape trial. He also argues that had he prevailed on his motion to sever, he could have used this as a basis to exclude his statements in the consolidated rape trial because evidence of the different murders was intertwined in the statements. We agree with the state that the defendant has failed to show any harm from the trial court's failure to rule on this motion pretrial. Neither evidence of the murder cases nor his statements were introduced in the consolidated rape case. Furthermore, the defendant ultimately failed to prevail on his motion to sever the murder charges.

Finally, in his reply brief, the defendant notes in passing that the trial court erroneously failed to rule on his motion for a new trial in the first rape case before the consolidated rape trial. Other than the general assertions discussed above, he gives no explanation of how he was prejudiced by the trial court's failure to rule upon this motion before the consolidated rape trial. Furthermore, we note that the defendant amended his motion for a new trial in the first rape case five times after the consolidated rape trial and that, ultimately, the trial court denied his motion for new trial in the first rape case, relying primarily upon the rulings it made during the rape trials themselves. We cannot conclude that the defendant is entitled to relief on this issue.

## IX.  LIMITATION OF INSANITY DEFENSE

The defendant contends that the manner in which the trial court conducted the mental evaluation process in both trials violated his rights to present a defense and to due process of law. He argues that the trial court erroneously excluded defense experts on the defendant's mental condition in both trials and the insanity defense in the first rape trial.  The state contends that the trial court properly excluded the testimony of defense experts on the defendant's mental condition because he refused to comply with the trial court's orders that he undergo a mental evaluation by a court-appointed expert.  The defendant insists that in order for any waiver of the insanity defense to be valid, he had to refuse to undergo the evaluation personally, either orally or in writing.  We believe that the trial court properly sanctioned the defendant in both cases.

A defendant seeking to present an insanity defense or expert testimony of his or her mental condition as it relates to guilt must notify the district attorney general in writing within the time provided for pretrial motions.  Tenn. R. Crim. P. 12.2(a), (b).  Rule 12.2(c) permits the state to seek a mental evaluation of the defendant by a court-appointed expert:

> In an appropriate case, the court may, upon motion of the district attorney, order the defendant to submit to a mental examination by a  psychiatrist or the other expert designated for this purpose in the order of the court.  No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except for impeachment purposes or on an issue respecting mental condition on which the defendant has introduced testimony.

The purpose behind Rule 12.2(c) is "to provide the prosecution with a means to obtain necessary information to rebut evidence of mental condition presented by the defendant, while at the same time safeguarding the defendant's right against self-incrimination."  State v. Huskey, 964 S.W.2d 892, 889 (Tenn. 1998).  If the defendant fails to give notice or refuses to submit to a court-ordered examination, "the court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's mental condition."  Tenn. R. Crim. P. 12.2(d).  The court may also sanction the defendant by precluding the insanity defense.  Huskey, 974 S.W.2d at 896.

The following factual overview of the mental evaluation process in the defendant's cases is taken from our supreme court's opinion stemming from the defendant's interlocutory appeal of the trial court's Rule 12.2(c) orders in the homicide case:

> In March and April of 1994, Huskey filed notice of his intent to use expert testimony with regard to a mental condition

and to rely on an insanity defense with respect to all the cases. When the State filed a motion to compel Huskey to undergo a mental examination under Rule 12, Huskey moved for a protective order requiring, among other things, that counsel and a defense expert be permitted to attend the examination and that the examination be recorded. Huskey argued that these measures were necessary to preserve his right to counsel and his right against self-incrimination.

The trial judge, Judge Ray Lee Jenkins, denied the motion for a protective order and entered three written orders in all cases compelling Huskey to undergo a mental examination at the Helen Ross McNabb Mental Health Center in Knoxville. Although orders were entered on May 17, 1994, May 8, 1995, and May 11, 1995, no examinations were conducted because the defense refused. Judge Jenkins later ruled that because of the refusal to be examined, the defense could not rely on an insanity defense or introduce expert testimony as to a mental condition in [the first rape case], which was finally tried in October of 1995. Huskey was convicted of rape and related offenses.

With regard to [the consolidated rape case and the homicide case], more hearings were held on the mental examination issues in February, April, and May of 1996. On May 2, 1996, Judge Baumgartner ordered that Huskey was to be examined by Dr. Clifton Tennison at the McNabb Mental Health Center. After a two-hour interview with Huskey, Tennison reported to the trial court that he needed more sessions with Huskey, additional background information, and also "someone with substantive experience and demonstrated expertise," specifically in the field of disassociative identity disorder.

The trial court instructed Tennison to inquire into the availability of additional experts in the field after finding that someone with further expertise and experience was necessary to effectively complete the examination:

> [Dr. Tennison] advised us that due to the nature of the illness that Mr. Huskey may suffer from, that he felt that he was not personally capable of providing the Court with the best evaluation that could be accomplished. And that he felt the appropriate thing for him to do within the discipline that he's an expert

in is to employ the services of an individual who was more qualified, had more experience, [and] had studied in this specific area of disassociative identity disorder.

At a later hearing, Tennison related the qualifications and experience of several experts in the field of disassociative identity disorder, including Dr. Phillip Coons, a psychiatrist in Indiana who had been brought to Tennison's attention by the prosecution.

On May 9, 1996, the trial court ordered in all the cases that Huskey be examined by Tennison and Coons. The order required the examination to be recorded but stated that no one could be present during the examination unless approved by Tennison and Coons. The order required counsel for the State and the defense to make available Huskey's medical records, employment records, school records, psychological/psychiatric records, and witnesses with knowledge of Huskey's conduct. The order stated that upon completion of the examination, the defense would have "a reasonable period" in which to decide whether it intended to proceed with an insanity defense or evidence respecting a mental condition; if it did, the State would be provided with the "evaluation and test results from the examination."

Huskey objected to the participation of Coons, and argued that the order violated his right to counsel, right against self-incrimination, and right to due process. With regard to the four capital cases, the trial court granted Huskey's request for an interlocutory appeal of the May 9, 1996 order pursuant to Tenn. R. App. P. 9. After the Court of Criminal Appeals denied the appeal, [the Supreme Court] granted Huskey's application for permission to appeal . . ., finding that review of the May 9th order prior to conducting the examination would provide guidance to the trial court on these issues and avoid the possibility of serious errors that potentially would require retrials of four complex capital cases.

Huskey, 974 S.W.2d at 893-94 (footnotes omitted).

The defendant refused to submit to the May 9, 1996 order, and pursuant to Rule 12.2.(d), Tenn. R. Crim. P., the trial court precluded him from presenting expert testimony regarding his mental condition in the consolidated rape trial. Following the consolidated rape trial in May 1996,

the trial court entered an order for a mental evaluation in the homicide case on August 12, 1996, which superceded the May 9, 1996 order. This order directed Middle Tennessee Mental Health Institute (MTMHI) to examine the defendant and prohibited defense counsel from attending the examination but did not mandate that defense counsel disclose records or witnesses. Instead, the order encouraged the parties to cooperate with MTMHI's information requests "subject to the attorney-client or other applicable privileges." The supreme court held that the May 9, 1996 and August 12, 1996 orders did not violate the defendant's right against self-incrimination or right to counsel. Id. at 897-98.

## A. The First Rape Case

The defendant contends that the trial court's striking of his insanity defense in the first rape case violated his constitutional rights to present a complete defense and to due process. He asserts that he did not have a meaningful opportunity to comply with the trial court's order for a mental examination before the trial court imposed sanctions and that he did not personally refuse to undergo the examination. He also challenges the harshness of the trial court's sanction, arguing that Rule 12.2(d) does not permit the striking of his insanity defense but only his expert testimony and that his constitutional right to present a defense trumps the state's procedural right to seek a mental examination. Finally, he argues that the trial court arbitrarily denied his subsequent motion for a mental examination, which was made over forty-five days before the trial began on October 18, 1995. The state contends that the trial court properly imposed Rule 12.2(d) sanctions after the defendant repeatedly refused to comply with its orders. It argues that the record does not reflect that the trial court struck the insanity defense as opposed to expert testimony, but striking the entire defense was within the trial court's authority.

In order to address the defendant's contentions, we begin by reviewing the tangled Rule 12.2 proceedings in the first rape case in some detail. As noted above, on March 3, 1994, the defendant filed notice pursuant to Rule 12.2(b) of intent to use expert testimony relating to his mental condition bearing upon guilt. By written motion on April 7, 1994, and orally at an April 8, 1994 hearing, the state moved that the defendant undergo a mental examination pursuant to Rule 12.2(c). On April 15, 1994, the defendant filed a Rule 12.2(a) notice of intent to rely upon the insanity defense. On April 26, 1994, the defendant moved for a protective order, requesting that counsel and defense experts be present at the examination, that the examination be recorded, that only one examination be conducted by a single examiner, and that the trial court impose controls on the release of any information gathered in the process and not release any information to the state until such time as it becomes relevant for impeachment or rebuttal. On April 27, 1994, the trial court denied the defendant's motion for a protective order and denied his request for an interlocutory appeal of the issue. The court directed the state to prepare an order for a mental examination. On May 17, 1994, the trial court entered an order directing that the defendant be examined at the Helen Ross McNabb Center and overruling the defendant's motions for a protective order. On December 22, 1994, this court denied the defendant's application for an extraordinary appeal on the trial court's denial of a protective order.

On January 12, 1995, the state again asked the trial court to order the defendant to submit to a mental evaluation. The trial court agreed and asked the state to submit a written order. The defendant responded that he intended to apply for permission to appeal this court's denial of his extraordinary appeal to the supreme court and believed that he had an agreement with the state not to "push" the mental examination matter. The trial court declined to listen to additional argument if the parties had nothing more of substance to add. The record does not reflect that the defendant pursued an appeal to the supreme court.

On May 5, 1995, the court held a hearing on the state's renewed motion for a mental examination of the defendant. The state asked the court to reenter its earlier order that the state could have the defendant examined. It noted that defense counsel had apparently instructed the defendant not to participate in an examination pending the extraordinary appeal on the protective order. The court agreed to reenter its order, noting that it had not permitted the conditions requested by the defendant. The defendant asked if the examination would be limited to the first rape case. The court agreed with the state that the earlier order for a mental examination applied to all cases. The defendant objected to the state learning his defenses in the other cases through a mental examination conducted in the first rape case. The parties and the court agreed that the May 15, 1995 trial date was no longer viable in light of the time needed for a mental examination.

On May 8, 1995, by a written order entered in all cases, the court again ordered that the defendant submit to a mental examination and directed defense counsel to provide pertinent information to Helen Ross McNabb Center for the evaluation. On May 10, 1995, the defendant moved for a stay of the mental examination, noting that the state had informed him that Helen Ross McNabb Center would examine the defendant at the jail on May 11, 1995. The defendant objected to the court ordering the mental examination in all cases while proceedings on motions had been stayed in all cases except the first rape case. He also contested the standard questions asked by the Helen Ross McNabb Center as infringing upon the attorney-client privilege and renewed his previous objections to the examination. The motion states that in the event that the court denies relief, "counsel respectfully has no alternative but to invoke Mr. Huskey's constitutional protections and decline to have the Defendant participate in an unlimited, uncontrolled mental examination at this time." On May 11, 1995, the court entered a corrected order for mental examination, which did not contain the provision requiring defense counsel to provide information.

On May 15, 1995, the state informed the trial court that on May 12, 1995, the defendant had refused to participate in a mental examination. It requested that the court exclude defense experts on mental condition under Rule 12.2(d) or hold defense counsel in contempt for their willful interference with the court's order. The defense argued that it did not decline to participate in a mental examination but that disputes existed over whether the examination applied to all cases and over the scope and nature of the examination. The defendant contended that standard questions asked by the Helen Ross McNabb Center violated the attorney-client privilege. Defense counsel stated that he had written the center requesting certain conditions, and that the center had agreed to some of his requests. He stated that he had filed a motion for a stay the previous week but that the state had instructed the center to proceed with the examination. He said that he was aware that he

was risking the striking of the mental responsibility defense in this case but that the defense refused to participate in a mental examination that applied in the defendant's other cases. The state reminded the court that it previously had ruled that the mental examination applied to all cases. The court noted that Rule 12.2(c) contained safeguards to protect information revealed by a defendant in a mental examination. The court struck defense experts regarding mental condition pursuant to Rule 12.2(d).

On September 1, 1995, the defendant moved the court to order a mental examination of the defendant pursuant to Rule 12.2. At a September 7, 1995 hearing, the court sustained its earlier Rule 12.2(d) sanction. The defendant insisted that he was consenting to a mental examination at the May 15, 1995 hearing but that the trial court had misunderstood. The court ordered a transcript of the May 15 hearing. On September 20, 1995, the court quoted the portion of the May 15 hearing in which it read Rule 12.2(d) striking the defendant's experts. It stated that its May 15 ruling left no room for interpretation and that the defendant's pending motion for a Rule 12.2 mental examination "comes too late."

The defendant contends that the trial court's administration of the Rule 12.2 proceedings denied him the right to due process. He states that the trial court required him to file notice of intent to use mental defenses under Rule 12.2 in 1994 before he had received discovery in order to evaluate his defenses. Even if the defendant's assertion were true, it would not entitle him to refuse to submit to a court-ordered mental examination and, as such, is not relevant to our review of the propriety of the limitation of his insanity defense in the first rape case. Furthermore, the record does not support his contention: In a December 15, 1993 discussion on scheduling discovery and motions, the state requested that the defendant file notices of defenses and notices relating to expert witnesses under the discovery rules by December 21, 1993, in order to facilitate the scheduling of any evaluations before the May 1994 trial date. The defense stated that it had no problem with the state's request but asked that the deadline be December 24, 1993. The trial court agreed to that time frame. At a February 22, 1994 hearing, the defendant requested until March 3, 1994, to give "a notice of mental responsibility" in order that the defense could review discovery materials with its experts. The trial court said that the notice should be given as close to March 3, 1994, as possible as the trial date neared. The defense agreed it could do that by March 3, 1994. The defendant gave his 12.2.(b) notice on March 3, 1994, and his 12.2(a) notice on April 15, 1994. This course of events does not reveal that the defendant was forced to file his 12.2(a) and (b) notices prematurely.

The defendant also contends that he did not have a meaningful opportunity to comply with the mental examination order before the trial court imposed sanctions on May 15, 1995. He states that he had no notice that the state would seek Rule 12.2(d) sanctions at the May 15 scheduling conference. He argues that he did not have a meaningful opportunity to oppose the sanctions. The record again belies the defendant's contentions. The trial court ordered that the defendant undergo a mental evaluation on May 17, 1994, almost a year before it imposed sanctions. During that year, the defendant requested that the examination be conducted under certain conditions, which the trial court denied. The defendant failed in his efforts to obtain interlocutory and extraordinary appeals regarding the denied conditions. On May 8, 1995, and on May 11, 1995, the trial court again ordered

the examination. The defendant objected to the examination applying to all of his cases and to certain questions he believed the examiners would ask regarding his representation. The trial court heard and rejected the defendant's arguments on these issues on May 5, 1995. The defendant's May 10, 1995 motion for a stay of the examination states that the state informed him that the examination would occur on May 11, 1995. The defendant continued to object to the terms of the examination even after the state proposed sanctions on May 15, 1995, and, in no uncertain terms, declined to submit to an examination that applied in all cases. Thus, the record reveals that the defendant was given a meaningful opportunity to submit to the mental evaluation after the trial court had ruled on his objections.

The record also reveals that on May 15, 1995, the trial court again heard the defendant's arguments regarding the conditions under which he would submit to an examination. The defendant stated that he was aware that he was risking sanctions by insisting upon the conditions. In light of the fact that the trial court had already denied these conditions in the May 5, 1995 hearing, we believe that the defendant had no reason to be surprised by the court's imposition of sanctions. The defendant's right to due process was not violated by the Rule 12.2 proceedings in this case.

The defendant contends that the imposition of Rule 12.2(d) sanctions violated his constitutional right to present a defense because he did not personally refuse to submit to a mental evaluation. He argues that he had no personal knowledge of the rapidly evolving proceedings from May 5 through 15, 1995. He contends that the events of May 12, 1995, relating to his refusal to see Rick Sawyer, a forensic social worker from the Helen Ross McNabb Center, at the jail are disputed. Citing to State v. Ricky Thompson, No. 03C01-9406-CR-00198, McMinn County (Tenn. Crim. App. Jan. 24, 1996), app. denied (Tenn. July 1, 1996) (concurring in results only), he maintains that a defendant must willfully and deliberately refuse to submit to a mental examination before sanctions are warranted. He argues that no evidence exists that he personally, willfully, and deliberately refused the examination. He argues that at a minimum, he is entitled to notice, the right to be heard, and the presentation of evidence in order to resolve this dispute.

We begin by noting that the imposition of Rule 12.2(d) sanctions to preclude the testimony of defense experts in the appropriate circumstances does not violate a defendant's right to present a defense. See Taylor v. Illinois, 484 U.S. 400, 416, 108 S. Ct. 646, 656 (1988) (holding that the exclusion of a defense witness as a sanction for a discovery violation does not violate the defendant's Sixth Amendment right to compulsory process, which embodies the right to present a defense); see also United States v. Nobles, 422 U.S. 225, 241, 95 S. Ct. 2160, 2171 (1975) (holding that the exclusion of the testimony of a defense investigator because the defendant refused to provide the state with the investigator's "highly relevant" report did not violate the defendant's Sixth Amendment rights to compulsory process and cross-examination). The United States Supreme Court has held that a trial court does not have to determine whether the defendant or defense counsel was at fault before imposing a sanction for a discovery violation:

> In responding to discovery, the client has a duty to be candid and
> forthcoming with the lawyer, and when the lawyer responds, he

> or she speaks for the client. Putting to one side the exceptional
> cases in which counsel is ineffective, the client must accept the
> consequences of the lawyer's decision to forego cross-
> examination, to decide not to put certain witnesses on the stand,
> or to decide not to disclose the identity of certain witnesses in
> advance of trial.

Taylor, 484 U.S. at 418, 108 S. Ct. at 658. Although defense counsel may not waive certain basic rights, such as the right to plead not guilty and the right to a trial, counsel necessarily "has full authority to manage the conduct of the trial." Id. at 417-18 & n.24, 108 S. Ct. at 657 & n.24.

No Tennessee case examining the propriety of Rule 12.2(d) sanctions has ever held or even suggested that the defendant must personally refuse to submit to a mental examination as opposed to refusing to comply with Rule 12.2(c) through counsel. See State v. Gerald Leander Henry, No. 01C01-9505-CR-00161, Davidson County (Tenn. Crim. App. Feb. 25, 1999), overruled in part on other grounds, 33 S.W.3d 797 (Tenn. 2000); State v. John Parker Roe, No. 02C01-9702-CR-00054, Shelby County (Tenn. Crim. App. Jan. 12, 1998), app. denied (Tenn. Jan. 4, 1999); see also Huskey, 964 S.W.2d at 896 (noting the trial court may sanction a defendant's failure to comply with Rule 12.2 by precluding the insanity defense or the testimony of defense experts); State v. Martin, 950 S.W.2d 20, 25-27 (Tenn. 1997) (noting that the defendant has a right to counsel's advice in deciding whether to present an insanity defense but holding that the defendant is not constitutionally entitled to have counsel present during a court-ordered mental examination). We note that "the right to a defense belongs to the defendant." Zagorski v. State, 983 S.W.2d 654, 658 (Tenn. 1998) (holding that defense counsel did not provide ineffective assistance in declining to present mitigating evidence at the insistence of a competent capital defendant). Our supreme court has required trial courts to inquire of the capital defendant personally whether he or she understands the right to present mitigating evidence and wants to forego presentation of mitigating evidence at the sentencing phase. Id. at 660-61. However, a defendant has no state or federal constitutional right to conduct his own defense pro se and, at the same time, be represented by counsel. State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976). Typically, with the exception of certain basic constitutional rights, the represented defendant communicates with the court through counsel. Thus, we cannot agree that the trial court had to inquire of the defendant himself whether he intended to submit to the mental examination. Defense counsel spoke for the defendant when he declined to have the defendant submit to a mental examination as ordered by the trial court. The trial court was entitled to rely upon defense counsels' repeated and emphatic refusals regarding the defendant's participation in any mental examination that did not conform to defense specifications.

The defendant challenges the harshness of the Rule 12.2(d) sanctions, contending that the rule does not provide for the striking of his insanity defense but only for the striking of experts. He argues that the trial court lacked authority to strike his insanity defense, which could have been proven through lay testimony. As the state points out, our supreme court has determined that a trial court may sanction a defendant who fails to submit to a Rule 12.2(c) mental examination by striking defense experts on mental condition and by striking the insanity defense. Huskey, 974 S.W.2d at

896. Although the state correctly points out that at the May 15, 1995 hearing the trial court stated that it was striking defense experts, we note that at a September 7, 1995 hearing, the court agreed with the defendant that he had voluntarily foreclosed his insanity defense. At the September 20, 1995 hearing, the trial court reaffirmed that it was striking defense experts pursuant to Rule 12.2(d). Although these events could suggest that the trial court was striking the insanity defense as well as defense expert testimony, we note the following dialogue, which occurred just before selection of the jury:

> [Defense Counsel]: If it please the Court, in light of the Court's ruling concerning not being permitted to call a psychiatrist to testify as to the mental illness of multiple personality disorder and the Court's declining to bifurcate the case, the defendant is going to enter a plea of not guilty but not – he is not going to enter a plea of not guilty by reason of insanity.
>
> We are – based on those rulings, we're – we're – in other words, we – we don't think we can offer just lay testimony without – without the jury being told that there is a mental illness or a mental disease known as this.
>
> [The Court]: All right.
>
> [Defense Counsel]: And if we're in error on that, we are. We – so – so based upon that, we are not going to offer the testimony that we have as to the defendant's insanity.
>
> [The Court]: All right. . . . .

We view this exchange to reveal that the defendant chose not to offer lay testimony on insanity due to the absence of expert testimony on multiple personality disorder rather than that the trial court prohibited lay testimony.

Citing to State v. Brown, 29 S.W.3d 427 (Tenn. 2000), the defendant also argues that the Rule 12.2(d) sanction was excessive because his constitutional right to present a defense trumps the state's procedural rights under Rule 12.2. Brown provides that in order to determine whether an evidentiary or procedural rule that excludes evidence violates a defendant's constitutional right to present a defense, courts must carefully consider the facts of the case in light of the following considerations: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." Id. at 434. Without providing any argument regarding these considerations, the defendant summarily states that the trial court mechanically struck his insanity defense upon the state's oral motion.

Initially, we note that Rule 12.2 does not prevent the defendant from presenting an insanity defense or expert witnesses on the issue of his mental condition. The rule does attach certain conditions to his pursuit of a defense based upon his mental condition, but our supreme court has found those conditions to withstand certain constitutional challenges. See Huskey, 964 S.W.2d at 897-98 (holding that Rule 12.2(c) does not violate a defendant's right against self-incrimination or right to counsel). Unlike the situation in Brown, in which the rule against hearsay excluded evidence critical to the defendant's defense, Rule 12.2 does not exclude the defense of insanity or the defendant's experts. Instead, it was the defendant's refusal to comply with the trial court's order for a mental examination under Rule 12.2(c) that led to the exclusion of defense experts.

Although declining to create a specific standard to guide the trial court's discretion in sanctioning a defendant for a discovery violation by preclusion of a witness, the United States Supreme court has noted the following considerations:

> It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

Taylor, 484 U.S. at 414-15, 108 S. Ct. at 656. In the same vein, this court has stated that exclusionary rules for discovery violations should not be used simply to punish a defendant who has failed to comply with the requirements of the discovery rules. State v. Garland, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981). Instead, in determining whether to exclude defense evidence for a failure to comply with discovery rules, the trial court must determine that the state would be prejudiced and that the prejudice cannot be mitigated by other means. Id. On the other hand, this court has not shied away from affirming a Rule 12.2(d) sanction when the failure to comply would prejudice the state. See John Parker Roe, slip op. at 13-14 (analyzing defendant's refusal to discuss the facts of the killing during his Rule 12.2(c) examination). The defendant may not raise the issue of his mental condition at the time of the offenses and then "tie the hands of the prosecutors" by refusing to participate in a Rule 12.2(c) exam. John Parker Roe, slip op. at 14. The state would be seriously disadvantaged if it were not able to present expert testimony stemming from an examination of the defendant to respond to the defendant's expert testimony regarding his mental condition. Huskey, 964 S.W.2d at 897 (citing Wayne R. LaFave, Criminal Practice and Procedure, § 19.4 at 517 (1984)). The state is also "entitled to a fair trial." John Parker Roe, slip op. at 14.

In the present case, we believe that the trial court properly precluded the defendant's experts because of his failure to submit to a mental examination by a court-appointed expert. Although the

defendant suggests that the state could have acquired an expert to review the reports of defense experts, we question whether that procedure could have approximated an actual examination of the defendant. We believe that limiting the state to review of the defense expert's reports would have undermined the truth-determining function of the trial and would have been insufficient to mitigate the prejudice to the state. The state was entitled to obtain evidence to rebut the defendant's assertions regarding his mental state. The defendant's refusal to comply with Rule 12.2(c) effectively foreclosed the state's access to rebuttal evidence. The sanction imposed by the trial court was not excessive.

The defendant also suggests that the trial court had a number of other, less severe alternatives to imposing Rule 12.2(d) sanctions, including:

> (1) addressing the issues in his motion for a protective order,
>
> (2) calling Dr. Tennison to testify about how the mental examination would be performed,
>
> (3) scheduling a definite time for the examination so that he would know what was happening and could be prepared to videotape it,
>
> (4) ordering an evidentiary hearing to resolve the factual disputes surrounding the events of Mr. Sawyer's attempt to examine the defendant on May 12, 1995,
>
> (5) addressing the defendant personally and informing him that he would lose the right to present an insanity defense if he did not submit to an evaluation, and
>
> (6) ordering defense counsel to permit the examination and holding them in civil or criminal contempt if they failed to do so.

Of these, the first three appear to be alternatives to the conditions for the examination that the defendant requested and the trial court denied. At the time it imposed sanctions, the trial court had already declined to impose these conditions. The fourth and fifth alternatives relate to the defendant's contention that he personally had to waive the examination. We have already determined that the trial court was entitled to rely upon counsels' representations that the defendant would not submit to an examination as ordered by the court. Finally, while the trial court did consider the alternative of holding defense counsel in contempt, it declined to do so in favor of Rule 12.2(d) sanctions. In light of the prejudice to the state in having no rebuttal evidence regarding the defendant's mental condition as the trial approached, we cannot determine that the trial court abused its discretion.

Next, the defendant contends that the trial court arbitrarily refused to grant his September 1, 1995 motion for a Rule 12.2(c) mental evaluation due to the closeness of trial. He argues that the trial court had granted the state's motion for a mental examination on May 5, 1995, just ten days before the May 15, 1995 trial date. We agree with the state that the defendant misconstrues the trial court's comment that his motion came too late. When taken in the context of the entire September 20, 1995 hearing on the matter, we conclude that the trial court denied the defendant's motion because it had already imposed Rule 12.2(d) sanctions due to his failure to submit to a mental examination.

Nevertheless, we are concerned about the trial court's terse denial of the defendant's motion when the record reflects that sufficient time existed to accomplish the examination before trial. As discussed above, a trial court should not exclude defense evidence pursuant to exclusionary rules simply to punish the defendant for a discovery violation. Garland, 617 S.W.2d at 185. Instead, the trial court should apply exclusionary rules only if the state would otherwise be prejudiced and other means for mitigating the prejudice do not exist. Id. In the present case, we question whether the state would have been prejudiced by the trial court's permitting the defendant to submit to a mental examination in early September before the trial in mid-October. On the other hand, the record of the Rule 12.2 proceedings leading up to the consolidated rape trial reveals that, had the trial court permitted a mental examination in September 1995, the defendant would not have submitted to a full examination. In the consolidated rape trial, the defendant submitted to an examination by Dr. Tennison but refused to allow an additional expert, Dr. Phillip Coons, to complete the examination when Dr. Tennison lacked the experience and expertise to do so. Nothing in the record suggests that the defendant's response would have been different if the initial examination by Dr. Tennison had occurred before the first rape trial rather than before the consolidated rape trial. Moreover, the defendant's argument regarding his motion for a mental examination before the first rape trial reveals that he was still insisting upon some of the conditions that formed the basis for his refusal to participate in the examination on May 15, 1995 – in particular, that the examination apply to only the first rape case. Thus, although the time might have been adequate to have an examination in early September 1995, we are not convinced that the defendant would have submitted to it.

Finally, the defendant argues that, the trial court, Judge Jenkins, was disqualified to rule upon the Rule 12.2(c) and (d) issues because he had ex parte communications with Rick Sawyer, the social worker who sought to examine the defendant. He contends that the trial court received a letter from Mr. Sawyer and that he did not discover this letter until 1998. The state contends that the record contradicts this assertion and reveals that the letter from Mr. Sawyer was given to the defendant before the May 15, 1995 hearing and contained no privileged information. First, even if the defendant's contentions were true, this would not have justified his refusal to comply with the court-ordered mental examination. Furthermore, as we note in Issue XX regarding the disqualification of Judge Baumgartner, a trial court may properly communicate ex parte for scheduling and administrative purposes that do not deal with substantive matters. See Tenn. S. Ct. R. 10, Canon 3(A)(7). In this respect, we do not believe that the trial court's receipt of a letter from an expert, relating that the defendant sought to impose unworkable conditions upon a court-ordered mental examination, was improper. Additionally, the record reflects that the state attached a copy

of the letter to its May 4, 1995 renewed motion for a mental examination of the defendant. Thus, the defendant was aware of and had access to the letter before the trial court imposed sanctions on May 15, 1995. Finally, the court again addressed the matter of the conditions that applied to the mental examination at the May 5, 1995 hearing after hearing arguments from both the state and the defendant. Thus, the trial court did not deal with the matter of the conditions ex parte.

## B. Consolidated Rape Trial

The defendant also challenges the trial court's limitation of his insanity defense in the consolidated rape trial in which jury selection began on May 14, 1996. He contends that he was denied his rights to present a defense and to due process because the state and the trial court abused the Rule 12.2(c) process. He also argues that the trial court's May 9, 1996 order for the defendant to submit to a mental examination violated his rights under the state and federal constitutions, the attorney-client privilege, the attorney work product doctrine, and an ethical rule. Finally, he argues that Rule 12.2(d) sanctions are not mandatory and were unwarranted in this case because he did not willfully and deliberately waive the mental examination. The state contends that the trial court properly sanctioned the defendant because he refused to submit to a court-ordered mental examination.

Due to the nature of the defendant's contentions, we begin by reviewing the Rule 12.2 proceedings in the consolidated rape case in some detail. At a February 7, 1996 hearing, the state requested that the defendant be examined under Rule 12.2(c). The trial court asked the defendant if mental responsibility was going to be an issue at trial, and he replied that he would not know until he received the court's ruling on his motion to suppress his statements. He reminded the court that his notice pursuant to Rule 12.2(a) and (b) was still pending from the first rape trial.

The following day, February 8, 1996, the court discussed the need for a mental examination in light of the defendant's suggestion that the court appoint each of his alternate personalities an attorney. After the defendant raised a number of questions regarding the manner in which the examination would be conducted, the court stated that it would question Dr. Clifton Tennison, who would be the court's expert, about the need for certain questions pertaining to the defendant's competency. The state asked the court if it would be allowed to have the defendant examined by an expert of its choice. The court stated that Dr. Tennison would be the court's designated expert and that Dr. Tennison would determine if other experts needed to be consulted. The state pointed to the language in Rule 12.2(c), which states that the court may order an examination "upon motion of the District Attorney," and noted that the state was not making that motion. The defendant argued that the state had already moved for a mental examination during the proceedings in the first rape trial and asked if the state was withdrawing that request. At that point, before the state responded, the court took a recess and then returned and announced that it would reserve any further rulings on the Rule 12.2 issue until it had heard from Dr. Tennison. The hearing then continued on other matters.

Almost a month later, on April 2, 1996, the defendant asked the trial court to rule upon the voluntariness of his statements to the police in light of his mental capacity at the time. The state

requested that the defendant submit to a mental examination, and the trial court asked whether the defendant was putting his mental capacity at issue. The defendant argued that the state had no pending Rule 12.2(c) request because it had withdrawn its request in early February. He contended that any request for a mental examination at this point would be untimely. The state responded that the defendant had yet to decide if he were going to rely upon a mental defense at trial and that if he chose to do so, it was entitled to an examination. The defendant asserted that his Rule 12.2 notices filed during the proceedings in the first rape trial were still pending. The trial court ruled that the state was making a Rule 12.2(c) request at this time, that the state file its written request that day, and that the defendant respond the following week.

On April 17, 1996, the trial court asked the state if it had filed a Rule 12.2 request that the defendant be examined. The state responded that it was awaiting the defendant's notice of whether he was going to rely on a mental defense. The court stated that it believed that the defendant had announced that he was relying on a mental defense at the April 2 hearing. The court told the state that if it wanted to request a mental examination, it needed to do so forthwith. The state agreed to file a written request.

At an April 25, 1995 hearing, the state asked for reciprocal discovery of the reports of defense mental health experts, Dr. Sadoff and Dr. McCoy, because it anticipated that the trial court would soon order a mental examination of the defendant. The defendant objected that the state had withdrawn its Rule 12.2(c) request for a mental examination and had not filed a new request despite the court ordering it to do so on several occasions. The state argued that its April 7, 1994 request made during the proceedings in the first rape trial was still pending, that it had never withdrawn this request, and that it did not need to file a new request with the 1994 request still pending. It noted that although it was not questioning Dr. Tennison's competence to perform the examination, it had been in contact with other experts and had located only three people nationwide who were competent in the area of multiple personality disorder other than Dr. Sadoff, who had been retained by the defendant.

The trial court reminded the defendant that he had wanted to wait until it had ruled on some of his motions before deciding whether he would rely upon an insanity defense in this case. As evidence that the state had withdrawn its Rule 12.2(c) request, the defendant stated that, at the time, the trial court had recessed the hearing and then met with the parties in chambers and pleaded with the state not to withdraw the request. The defendant argued that the state's contention regarding the scarcity of experts on multiple personality disorder revealed that the state had delayed in refiling a Rule 12.2(c) motion because it was shopping for an expert. The court essentially agreed with the defendant's account of the Rule 12.2 proceedings in February, March, and April of 1996. It was perplexed by the defendant's insistence that it hold the state to its verbal withdrawal of the Rule 12.2(c) request but not hold the defendant to his previous refusal to be evaluated under Judge Jenkins's order for an examination in all his cases. The court stated that it did not object to the state filing a request at this time. The state agreed that it was renewing its motion for a mental exam. On that same day, the state filed a renewed motion for a mental examination of the defendant, asking the court to order him to submit to an exam pursuant to Rule 12.2(c).

On April 29, 1996, the trial court noted that the state had filed a motion for a mental examination and stated that it planned to call Dr. Tennison into court for questioning regarding the examination. The defendant objected to the court devoting time to the state's procedural motion instead of his constitutionally based motions. He also objected to having to devote his time to the examination so close to the trial date. He denied that he was withdrawing his notice of intent to rely upon the insanity defense at trial. The court disagreed with the defendant that the state had caused the delay in attaining the examination, noted that the state had filed a request for mental examination, and repeated that it was going to question Dr. Tennison on whether he could perform the examination. The state argued that it was entitled to an expert of equal stature to the defense expert, Dr. Sadoff, but that the Administrative Office of the Courts (AOC) had refused to disclose how much money it gave the defendant for his experts. The court noted that it had instructed the AOC not to disclose that information and ruled that if pretrial motions were not completed before the May 13, 1996 trial date, then it would continue the trial from day to day until the motions were completed.

The following day, April 30, 1996, the court held a hearing on the state's renewed motion for a Rule 12.2(c) mental evaluation. Dr. Tennison was present, and the court directed him to conduct an initial examination, advised him about the scope of the evaluation, and asked him to report back to the court on the need for additional assistance or information. The court stated that Dr. Tennison could conduct a survey of other experts to determine their availability and that he could but was not required to consider the state's recommendations on whom to select. The court denied the defendant's request that defense experts be present during the examination but left the issue of videotaping the examination to Dr. Tennison's discretion. It instructed the defendant not to send Dr. Tennison any letters with conditions for the examination and, instead, to direct all his requests to the court.

On May 2, 1996, the trial court entered an order for the defendant to submit to a mental evaluation by the Helen Ross McNabb Center to determine his mental condition at the time of the offenses and at the time he gave statements during November 1992. The defendant submitted to the examination that day. On May 8, 1996, Dr. Tennison reported that after interviewing the defendant for two hours, he determined the need for an additional examination by a "mental health professional who has substantial experience and demonstrated expertise in the areas of dissociation and dissociative identity disorder." Dr. Tennison identified two persons whom he believed could perform the examination, Dr. Phillip Coons and Dr. Seymour Halleck. The state noted that Dr. Coons's schedule would allow an immediate examination.

The court directed Dr. Tennison to contact these experts and to select one based upon availability and qualification. The defendant objected to this process, arguing that a Tennessee statute directed the way in which experts were to be selected, that the statute required that the defendant be examined by an approved mental health facility, and that the state should not be allowed to shop for an expert. The court ruled that based upon Dr. Tennison's testimony, it was satisfied about the need for an additional examination by an expert with more experience and expertise. The court ordered that an additional examination take place and that Dr. Tennison select

one of the two identified individuals to conduct the evaluation. It declined to permit a hearing for the defendant to question the expert, once selected, on his qualifications and the manner in which he would conduct the examination. It encouraged the parties to supply Dr. Tennison and the selected expert with information that Dr. Tennison had suggested would be helpful. It also suggested that the defendant give the selected expert the records generated by defense experts in order to facilitate a complete and valid examination. It asked Dr. Tennison to advise the court about whether the selected expert would object to videotaping the examination before he scheduled the expert's participation. The court denied the defendant's requests that defense counsel and defense experts be present during the additional examination.

On May 9, 1995, the defendant again objected to the additional examination, arguing that he needed to question any new experts on their qualifications and that the court was delegating its responsibilities under Rule 12.2 to Dr. Tennison. The state also objected to the Rule 12.2(c) proceedings, contending that it should be able to select the expert of its choice for the evaluation because it had the burden of proving the defendant's sanity beyond a reasonable doubt once the defendant raised the issue of sanity at trial. The court ruled that it was proceeding properly under the rules and that it was not delegating its responsibilities but was merely enlisting the assistance of qualified individuals in selecting an expert to complete the examination.

The trial court then conducted a conference telephone call with the parties and Dr. Tennison. Dr. Tennison reported that he had eliminated Dr. Halleck as a possibility because Dr. Halleck had disclosed that his philosophical position regarding dissociative identity disorder (DID) would impair his ability to evaluate the disorder fairly. Dr. Tennison said that Dr. Coons was available, could begin interviewing the defendant the following Sunday, and could possibly complete the evaluation by the next Tuesday, the day of trial. Dr. Tennison stated that Dr. Coons had requested access to the defendant, to the detectives who took the defendant's statements in November 1992, and perhaps to the jail nurse who had observed the defendant's behavior in 1992. Dr. Coons had also asked for a list of the charges and for the defendant's psychiatric and psychological records, including any existing videotaped examinations. Dr. Tennison advised that Dr. Coons did not object to videotaping the examination but did not have the equipment to do the taping. The court told Dr. Tennison that it would issue an order directing Dr. Coons to perform the examination.

After the conference call, the trial court heard the defendant's arguments regarding the examination, although it had already made a preliminary ruling. The defendant again objected to the process by which Dr. Coons was obtained, arguing that Tenn. Code Ann. § 33-7-301 required that the court turn to the Commissioner of Mental Health for designation of an additional expert or to the state Forensic Services Unit for an evaluation of the defendant. The defendant also sought to question Dr. Coons regarding any bias against DID and the details of the examination, including the fee arrangements, whether defense counsel and experts could be present, and the degree of confidentiality to be used by Dr. Coons. The defendant asked the court to set the deadline for his decision on whether he would rely upon evidence of mental condition at trial, which, under the trial court's proposed order for a mental examination, would trigger the state's receipt of the examination results. The court again ruled that it was proceeding appropriately. It noted that the Commissioner

of Mental Health had designated Dr. Tennison to conduct court-ordered mental examinations in Knox County. The court reviewed its findings regarding the need for an additional expert and Dr. Tennison's role in locating that expert. Regarding confidentiality, it observed that Rule 12.2(c) guided the disclosure and use of information gathered in a court-ordered mental evaluation. It repeated that Dr. Coons would be the court's, rather than the state's, witness and again denied the defendant's request to question Dr. Coons, noting that the examination would be videotaped and Dr. Coons could be cross-examined. It stated that Dr. Coons would determine who, if anyone, could be present during the examination.

The trial court stated that the defendant should provide Dr. Coons with the defendant's school records, medical records, psychological and psychiatric records, and employment records. The defendant objected that these records were protected by the attorney-client privilege and work product doctrine because they were developed and maintained during defense counsels' representation of the defendant. The court took this matter under advisement. The court ordered that Dr. Coons would have priority to the defendant over defense counsel during the time needed for the examination. Defense counsel announced that once the court ruled upon the defendant's remaining questions regarding the mental evaluation, they would announce whether the defendant would participate in the evaluation. The defense stated that if the defendant refused to submit and the court prevented the use of mental responsibility evidence, the defendant would seek an interlocutory appeal. The state sought to clarify the record by adding that it had previously had a brief conversation with Dr. Coons regarding his fees but had not had a detailed conversation with him. The court stated that it did not question the state's ethics in that regard.

Later that day, the trial court reported that it had spoken with Dr. Tennison, who had communicated with Dr. Coons and had related the following information to the court: Dr. Coons did not object to the videotaping of his interviews with the defendant or other witnesses, defense attorneys and experts could not attend the interviews of the defendant, and the records that the court had requested the parties provide were necessary for a valid examination. The trial court emphasized that these records did not include conversations between defense counsel and the defendant or information the defendant told defense counsel. The court stated that it considered these records to be protected, that it would disclose them only to Dr. Tennison and Dr. Coons, and that they would be ultimately disclosed only upon the defendant's election to proceed with the defense. The court related that Dr. Coons would need the defendant to be available for interviews between 8:00 a.m. and 5:00 p.m. on Monday, May 13 and 8:00 a.m. and noon on Tuesday, May 14 with appropriate breaks. The results of the evaluation would be available the morning of Wednesday, May 15.

The court recessed to prepare the order for the mental evaluation. The May 9, 1996 order provided that the defendant submit to a mental examination by Dr. Tennison and Dr. Coons, the court's experts. The order directed both parties

> to supply any medical records, employment records, school records, psychiatric or psychological records including test results and prior mental evaluations they have in their possession to the

court so that the court can deliver those materials to Drs. Tennison and Coons to aid in their evaluation.

The order instructed the state to supply the charging instruments and both parties to make the witnesses under their control available to Drs. Tennison and Coons for interviews if the witnesses had personal knowledge of the defendant's conduct at any material time. The order stated that once Drs. Coons and Tennison completed the examination, the court would give the results to the defendant who would have a reasonable time in which to decide if he would use a mental responsibility defense at trial. If the defendant elected to use that defense, the state would get the evaluation and reports of defense experts as well as the those of the court-appointed experts. The state would also be permitted to interview the court-appointed experts in preparation for trial.

The May 9 hearing resumed, and the court read the order to the parties. Defense counsel stated that in the rape cases, the defendant would comply with the order as it related to Dr. Tennison, but they refused to have the defendant participate in the examination by Dr. Coons. The defense stated that the defendant would also cooperate with an expert appointed by the Commissioner of Mental Health. The state asked the court to question the defendant to determine if he understood that he would forfeit a potential defense if he refused to comply with the court's order. Defense counsel refused to allow the defendant to be questioned on the record, stating that his counsel was making the decision. The court declined to question the defendant personally. Pursuant to Rule 12.2(d), it ruled that the defendant would not be permitted to present expert testimony relating to mental responsibility but that he could present lay testimony on that issue if it were otherwise admissible. The court agreed to permit the defendant to seek an interlocutory appeal on this issue as long as the proceedings in the consolidated rape trial were not stayed.

(1) Abuse of the Rule 12.2(c) Process

The defendant contends that the state and the trial court abused the Rule 12.2(c) process, thereby denying his rights to due process and to present a defense. He argues that the trial court arbitrarily applied the rule by denying his motion for a Rule 12.2(c) examination in the first rape case, which was filed forty-six days before trial, as untimely but granting the state's Rule 12.2(c) request in the consolidated rape case, although made only eighteen days before trial. He contends that this was an abuse of discretion. Even if true, the defendant's contention that the trial court arbitrarily applied Rule 12.2(c) is only relevant to this appeal if it relates to his refusal to submit to the mental examination by Dr. Coons or to the trial court's imposition of Rule 12.2(d) sanctions for this refusal. The defendant has failed to relate this contention to either event. Nor do we believe that an arbitrary application of the rule would justify the defendant's refusal to comply with the court-ordered evaluation in the consolidated rape case.

Next, the defendant argues that the state's pattern of delay regarding its Rule 12.2(c) request for a mental examination denied him a meaningful opportunity to present his insanity defense in the consolidated rape trial. He argues that the state delayed in bringing a Rule 12.2(c) request in order to shop for the expert of its choice and to manipulate the proceedings to force the striking of defense

expert testimony. The state contends that the defendant was not prejudiced by the timing of the state's Rule 12.2(c) motion and that the trial court properly allowed the state to request a mental evaluation of the defendant.

Again, even if the state did deliberately delay its pursuit of a mental examination for the nefarious purposes envisioned by the defendant, it would not have justified the defendant's refusal to comply with a court-ordered examination. Furthermore, the record does not reveal that the state's rule 12.2(c) request was untimely. Rule 12.2(c) does not specify a time for the filing of a request for a mental examination of the defendant. Rule 12.2(c) is triggered by the defendant's filing a notice pursuant to Rule 12.2(a) or (b), which must be filed "within the time provided for the filing of pretrial motions or at such later time as the court may direct." Tenn. R. Crim. P. 12.2(a), (b). A Rule 12.2(c) request for a mental examination is not listed among those motions that our rules of procedure require be filed before trial. See Tenn. R. Crim. P. 12(b). Generally, the time for making pretrial motions is within the discretion of the trial court. See Tenn. R. Crim. P. 12(c). The state filed a renewed motion for a mental examination of the defendant on April 25, 1996, two and one-half weeks before the scheduled trial date. The granting of that motion was within the trial court's discretion.

Moreover, although the state could have and, indeed, should have more vigorously pursued the mental examination, the record does not reveal that the state intentionally delayed the Rule 12.2(c) proceedings. As evidence of a pattern of delay, the defendant contends that the state said that it was not making a Rule 12.2(c) request on February 8, 1996. He asserts that the trial court directed the state to file a Rule 12.2(c) request on three separate occasions but that the state did not file the request until April 25, 1996, only eighteen days before trial. The defendant summarily argues that this chronology of events reveals a clear pattern of abuse by the state and the trial court as well as an intentional disregard for the Tennessee Rules of Criminal Procedure, the local rules, and the defendant's rights.

We disagree with the defendant's interpretation of the chronology of events as showing a pattern of delay on the part of the state. As previously discussed, the state initially filed a written request for a mental examination of the defendant on April 7, 1994, a year and one-half before the first rape trial began in October 1995. The state renewed this motion on May 4, 1995, but the defendant ultimately refused to participate in the examination in May 1995. The record does not reflect that the state affirmatively withdrew its Rule 12.2(c) request on February 8, 1996, before the consolidated rape trial. Furthermore, in subsequent hearings on the matter, the state repeatedly denied that it had withdrawn its request and resisted the court's direction that it file a new request for a mental examination, arguing that its April 7, 1994 request was still pending. Although the defendant persistently argued and the trial court on at least one occasion found that the state had withdrawn its 12.2(c) request on February 8, 1996, we believe the record supports the trial court's subsequent finding that the state did not cause the delay.

In discussing the need for Rule 12.2(d) sanctions during the May 9, 1996 hearing, the trial court found that the delay in reaching the Rule 12.2(c) examination was due to the number of issues

being considered in the months leading up to trial. It noted that in early February 1996, the defendant had asked for rulings on other motions before electing to proceed with an insanity defense in the consolidated rape trial. It stated that it had gotten to the mental evaluation issue as soon as possible in this case. In particular, the court noted that since February 7, 1996, it had spent eighteen days hearing arguments and testimony on the defendant's motions. It stated that it simply had not gotten to the mental responsibility issue until the last thirty days and that it "had no option, based on the timing of . . . things, but to proceed in the way that [it] did." We do not detect a pattern of delay on the part of the state regarding the mental examination of the defendant, in particular no delay calculated to force the defendant to refuse to submit to the mental evaluation.

The defendant contends that he was justified in refusing to participate in the examination by Dr. Coons because, due to the closeness of the May 13, 1996 trial date, he did not have a meaningful opportunity to comply with the May 9 order. He argues that submitting to the examination with Dr. Coons would have prevented him from working with his attorneys in the days immediately preceding his trial. He also contends that the trial court's deadline of twenty-four hours to decide whether to pursue his insanity defense at trial upon receipt of the examination results violated his right to due process. The state contends that the trial court offered to continue the trial to give the defendant additional time to prepare. The defendant replies that by requesting a continuance he would have had to give up his right to a speedy trial that he had demanded since January 1995 in order to deal with the state's last minute request for a mental examination. He claims that it is unconstitutional to require him to give up his right to a speedy trial in order to gain a fair trial.

In light of the circumstances surrounding the May 9 order, we do not believe that the defendant's right to due process was violated. We note that the trial court, at length and on several occasions, entertained the defendant's arguments regarding his objections to an examination by Dr. Coons. Although the trial court noted that it did not believe inability to prepare was the reason behind the defendant's refusal to submit to the mental examination, the trial court offered to continue the trial day to day for up to a week in order to give the defendant time to prepare. The defendant cannot, upon filing numerous pretrial motions, disparage the trial court for the time that it takes to address them. As discussed in Issue II, the defendant did not assert his right to a speedy trial in the rape cases until April 29, 1996, only ten days before the trial court's May 9 order. In light of the time needed to address the extensive motion practice in this case and the defendant's recent speedy trial challenge, we do not believe that the defendant was faced with an unconstitutional choice between a fair trial and a speedy one.

The defendant also contends that the trial court's appointment of Dr. Coons to complete Dr. Tennison's examination violated Tenn. Code Ann. § 33-7-301(a) because Dr. Coons was not designated by the Commissioner of the Tennessee Department of Mental Health as required by the statute. He argues that the procedures specified by section 33-7-301(a) help ensure that court-ordered mental examinations are performed by qualified, unbiased experts at a reasonable cost. He also asserts that trial court violated Rule 706, Tenn. R. Evid., because it did not give him a meaningful opportunity to determine Dr. Coons's qualifications to conduct the examination so that he could properly challenge Dr. Coons's appointment. Even if the trial court improperly appointed

Dr. Coons, this does not justify the defendant's refusal to submit to the examination. The trial court struck defense experts on mental condition due to the defendant's refusal to participate in the examination. In this respect, the propriety of Dr. Coons as the examiner is irrelevant unless it justified the defendant's refusal to comply with the court-ordered examination.

Furthermore, we do not believe that the trial court's appointment of Dr. Coons was improper. The decision of whether to grant a mental examination under section 33-7-301 is within the trial court's discretion, and this court will not reverse that decision on appeal except for an abuse of that discretion. State v. Lane, 689 S.W.2d 202, 204 (Tenn. Crim. App. 1984). The "trial court has the authority to designate in its order . . . the expert who is to perform the examination . . . ." Martin, 950 S.W.2d at 23. At the time of the trial court's May 9, 1996 order, section 33-7-301(a)[4] instructed the trial court to appoint an expert designated by the commissioner to conduct a mental examination. In the present case, the trial court's appointment of Dr. Tennison, who was designated by the commissioner, complied with the statute. If an expert designated by the commissioner could not perform the evaluation, the statute directed that the defendant be examined as an outpatient by a designated state or state-supported hospital. Tenn. Code Ann. § 33-7-301(a) (1996, amended 1998). Before the homicide case, experts at Middle Tennessee State Mental Health Institute (MTMHI) examined the defendant. Although the staff had some experience with DID cases, the state mental hospital was unable to complete a mental examination of the defendant. The plain language of the statute does not address a situation in which the designated expert believes that he cannot complete the evaluation of mental capacity due to his lack of experience and expertise and that no one in Tennessee is qualified to perform the evaluation. Importantly, in the defendant's interlocutory appeal of the Rule 12.2(c) proceedings in the homicide case, our supreme court did not disapprove of the trial court appointing an out-of-state expert, Dr. Richard Kluft, upon the advice of Dr. Tennison once MTMHI could not complete the examination. Huskey, 964 S.W.2d at 894. Similarly, we do not view the trial court's appointment of Dr. Coons in the consolidated rape trial to be improper under section 33-7-301(a) as it existed in 1996.

Pursuant to Rule 706(a), Tenn. R. Evid., a trial court "may not appoint expert witnesses of its own selection on issues to be tried by a jury except as provided otherwise by law." The defendant's mental state at the time of the offenses is an issue to be determined by the jury. Section 33-7-301 and Rule 12.2(c) govern the trial court's appointment of an expert to conduct the court-ordered mental evaluation. Thus, the selection of the court-appointed expert in this case was "provided otherwise by law." See Tenn. Code Ann. § 33-7-301(a); Tenn. R. Crim. P. 12.2(c); see also Neil P. Cohen, Tennessee Law of Evidence § 7.06[3][b] at 7-77 (noting that the trial court may select an expert appointed to examine a defendant who raises a defense of mental condition in a criminal trial). Also with regard to Rule 706, the defendant argues that the trial court's order

___

[4]We note that the legislature amended section 33-7-301(a), effective July 1, 1998, adding provisions that allow the trial court to permit the district attorney general "to designate a qualified expert" to examine the defendant if in "the case of a pre-trial proceeding the court receives notice from an inpatient evaluator under subdivision (a)(1) that . . . [t]he type or extent of assessment required exceeds the expertise or resources available to the evaluator . . . ." Tenn. Code Ann. § 33-7-301(a)(2)(A)(i).

appointing Dr. Coons failed to prescribe the standards by which Dr. Coons was to conduct the evaluation or to ask Dr. Coons to give opinions. The May 9 order fixed the conditions under which the examination was to take place and required Dr. Coons to submit a report on the examination. Additionally, the trial court directed Dr. Tennison to continue to participate in the examination of the defendant. Thus, the trial court communicated to Dr. Coons the parameters of the examination and the need for his opinion. We perceive no error with regard to Rule 706.

The defendant also contends that the state manipulated the Rule 12.2 proceedings in order to select the expert of its choice. Even if true, the defendant fails to explain how this would justify his refusal to participate in the court-ordered examination, and, indeed, we conclude that it would not. Furthermore, as previously discussed, the trial court acted within its discretion in appointing Dr. Coons. Although the state repeatedly argued that it should be allowed to select the expert who would perform the court-ordered examination, the trial court rejected this request. From the inception of the Rule 12.2 proceedings in this case, the court firmly and consistently ruled that the Rule 12.2(c) examination would be conducted by the court's expert. When Dr. Tennison, the court-appointed expert, reported that he lacked the necessary experience and expertise in DID to complete the defendant's evaluation, the court directed Dr. Tennison to suggest an expert who was qualified to complete the examination. The court permitted but did not require Dr. Tennison to consider the state's recommendations. Dr. Tennison testified that he did not recognize Dr. Coons when the state gave him Dr. Coons's vita prior to Dr. Tennison's initial examination of the defendant. When Dr. Tennison subsequently recommended Dr. Coons to complete the examination, he stated:

> I looked into my own educational and training materials and found that particular doctor has a very high stature in forensic psychiatry and in the diagnosis and treatment of dissociative identity disorder. In fact, several of his papers are ones that I have used myself. And when I was asked if I remembered him and didn't remember him, I'm embarrassed to say that I actually had been trained with materials that he had produced.

Thus, the record reflects that Dr. Tennison suggested Dr. Coons based upon his qualifications rather than upon the state's recommendation. The trial court found the proposed examination by Dr. Coons to be "extremely fair." Our review of the Rule 12.2 proceedings in this case does not reveal that Dr. Coons, although preferred by the state, was in any way affiliated with the state or biased in the state's favor. We do not believe that the evolution of the Rule 12.2 proceedings in this case were crafted to provide the state with the expert of its choice.

Finally, the defendant argues that the trial court's <u>ex</u> <u>parte</u> communications with Drs. Tennison and Coons reveal that the trial court and the District Attorney were manipulating the Rule 12.2(c) evaluation to ensure that the defendant was examined by the state's chosen expert. This assertion likewise provides no justification for the defendant's refusal to submit to the May 9 order. As discussed in Issue XX on disqualification, the record does not reflect that the trial court

-105-

communicated ex parte with Drs. Tennison and Coons in order to provide the state with its preferred expert. The defendant is not entitled to relief on this issue.

(2) Constitutionality of the May 9, 1996 Order

The defendant contends that the May 9, 1996 order directing that he submit to a mental examination by Dr. Coons violated his rights under the state and federal constitutions; the attorney-client privilege; the attorney work product doctrine; and disciplinary rule 4-101 of the Code of Professional Responsibility, Tenn. S. Ct. R. 8. In this regard, he challenges the order's requirement that he turn over certain records to Drs. Tennison and Coons and make the witnesses under his control available to these experts. He argues that he rightfully declined to be examined under an unconstitutional and unlawful order and that the resulting sanctions erroneously denied him a meaningful opportunity to present his insanity defense. The state contends that the defendant has failed to specify how the disclosure of the records enumerated in the May 9 order would violate any privileges. It argues that the supreme court's rulings in Martin and Huskey control this claim. It also argues that the defendant did not object to giving this information to Dr. Tennison but only refused to give it to Dr. Coons. Although the records in question are the work product of the defense, the record does not reflect that the trial court's order that the defendant provide these records was the basis for his refusal to submit to the examination.

Without further explanation, the defendant argues that the trial court's order that he provide medical, school, employment, psychological, and psychiatric records as well as make witnesses available to the experts violates his Fifth and Sixth Amendment rights under the United States Constitution and his article I, section 7, 8, and 17 rights under the Tennessee Constitution. We decline to speculate in what way. See Tenn. Ct. Crim. App. R. 10(b) (providing that issues unsupported by argument are waived). We note, though, that as long as the protections built into Rule 12.2(c) are scrupulously followed, "statements made by [the defendant] during the examination, any expert testimony based on such statements, and any 'fruits' derived from the statements are admissible" without violating the defendant's right against self-incrimination or right to counsel. Huskey, 964 S.W.2d at 897-98; see also Martin, 950 S.W.2d at 24, 27.

The defendant contends that the attorney-client privilege and the work product doctrine protect the requested materials because defense counsel obtained all of the materials subject to the order as a result of communications with the defendant. We agree with the defendant that our supreme court's ruling in Huskey did not address this specific issue with regard to the May 9 order. Huskey, 964 S.W.2d at 900. Instead, the court noted that the trial court's superceding August 12 order directed the disclosure of materials to the examining experts "'subject to'" any relevant privileges. Id. The supreme court held that the defendant could "on remand, object to disclosure of specific materials to the state following a Rule 12.2(c) examination and attempt to establish the applicability of a privilege or other basis for non-disclosure." Id.; see also Martin, 950 S.W.2d at 25.

-106-

The May 9 order does not directly violate the attorney-client privilege. See Tenn. Code Ann. § 23-3-105 (providing that an attorney may not disclose communications made by a client). The attorney-client privilege does not apply if a third party is present during the communication. See Bryan, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992); see also Hazlett v. Bryant, 192 Tenn. 251, 257, 241 S.W.2d 121, 124 (1951). The nature of the requested materials suggests that third parties were necessarily involved in their creation as well as their being obtained by the defense.

To the extent that the defense had the requested records in its possession, they were collected by defense counsel or their agents in preparation for the defendant's trials. Thus, they were work product. See State v. Hunter, 764 S.W.2d 769, 770 (Tenn. Crim. App. 1988) (defining work product as the "internal reports, documents, memoranda, etc. prepared or collected by the attorney or his representatives in preparation for trial"); see also Tenn. R. Crim. P. 16(b)(2). Nevertheless, work product does not enjoy an absolute privilege and may be disclosed if the failure to do so would impose a hardship on the other party by depriving it of relevant, non-privileged facts essential to its case. Hickman v. Taylor, 329 U.S. 495, 511, 67 S. Ct. 385, 394 (1947); Southeastern Fleet Leasing, Inc. v. Gentry, 57 Tenn. App. 162, 172, 416 S.W.2d 773, 778 (1967). In the present case, we question the trial court's order that the defendant provide records because no evidence exists that the experts were unable to obtain these documents from another source. Furthermore, with the exception of expert witnesses, a defendant may not be required to disclose his or her witnesses before trial. See generally Tenn. R. Crim. P. 16(b)(2).

In any event, the record reveals that the trial court's ordering the defendant to produce work product did not influence his decision to refuse an examination by Dr. Coons. At the May 9 hearing, the defendant offered to comply with the order as it related to Dr. Tennison but refused to comply with regard to Dr. Coons. He made this statement immediately after clarifying that the records required by the order included those that he did not intend to introduce at trial. In this respect, we believe that the defendant's argument that the order threatens defense confidences is somewhat disingenuous as he would have willingly provided the records to Dr. Tennison. The defendant's stance on this issue at the May 9 hearing reveals that the heart of the defendant's objection was to the trial court's appointment of Dr. Coons as the examiner. Furthermore, on August 12, 1996, after the consolidated rape trial, the trial court entered a superceding order, which deleted the offensive provisions and, instead, "encouraged [prosecution and defense counsel] to cooperate with requests for information from [MTMHI], subject to the attorney-client or other applicable privileges." This suggests that violations of the work product rule will not be an issue in a retrial of D. C.'s case.

Finally, the defendant contends that the May 9 order's provision for the disclosure of the listed materials required defense counsel to violate DR 4-101, Tenn. S. Ct. R. 8., which prohibits an attorney from revealing a secret or confidence of a client or from using such to the client's disadvantage. The materials listed in the order do not fall within the disciplinary rule's definition of a confidence, which is "information protected by the attorney-client privilege under applicable law." DR 4-101(A). Under DR 4-101(A), a secret "refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Assuming arguendo that the listed materials fall within this definition, the rule provides that a lawyer may reveal confidences

-107-

or "secrets when permitted under . . . court order." DR 4-101(C)(2). Thus, this disciplinary rule does not prevent compliance with the May 9 order.

(3) Rule 12.2(d) Sanctions Unwarranted

The defendant contends that Rule 12.2(d) sanctions were unwarranted in this case because the trial court imposed the sanctions for his attorneys' actions rather than those of the defendant, who did not personally, deliberately, and willfully refuse to participate in the court-ordered examination by Dr. Coons. He also argues that the trial court erroneously concluded that Rule 12.2(d) required that it impose sanctions. The state contends that the sanctions were proper. We agree with the state.

The defendant again faults the trial court for failing to ask the defendant personally whether he refused to submit to the Rule 12.2(c) evaluation rather than sanctioning him for the actions of his attorneys. As discussed above with regard to the proceedings in the first rape trial, a trial court does not have to question the defendant personally with regard to his or her refusal to submit to a Rule 12.2(c) mental examination. Instead, the trial court is entitled to rely upon the representations of defense counsel that the defendant will not participate in the examination. Furthermore, we note that in the consolidated rape case, the state requested that the trial court question the defendant personally to insure that he understood the ramifications of his refusal to submit to the examination. Defense counsel objected to the court questioning the defendant, and the trial court observed:

> Mr. Huskey is present in the courtroom as we speak. He's been present at every proceeding that I've had with respect to this case. He's familiar with what his lawyers are representing to the Court. I assume if Mr. Huskey at some point in time disagrees with their counsel, that he will let me know about it. I don't hear anything from him at this time, and I'm not going to . . . personally address myself to Mr. Huskey. He's represented by counsel, and I think the appropriate thing for me to do is to address myself to counsel.

The defendant cannot object to the trial court questioning him at trial and then argue on appeal that the trial court should have done so. See State v. Miller, 668 S.W.2d 281, 285 (Tenn. 1984). The trial court did not err in relying upon the defense counsels' representations that the defendant would not participate in the examination.

The defendant also contends that the trial court erroneously determined that imposition of Rule 12.2(d) sanctions was mandatory rather than discretionary. We agree with the defendant that Rule 12.2(d) sanctions are discretionary. See Tenn. R. Crim. P. 12.2(d) (providing that the trial court "may exclude" defense expert testimony on mental condition for the defendant's failure to comply with Rule 12.2). We differ, though, in our interpretation of the trial court's comments regarding the imposition of sanctions. After declining to be examined by Dr. Coons, the defendant argued that the court should not impose sanctions due to the circumstances surrounding the Rule 12.2(c) proceedings in this case. He argued that because of the state's belated request, the timing of the

examination would leave him with inadequate time to prepare for trial, to consider the results of Dr. Coons's examination, or to consult with defense experts about the results. He objected to his inability to investigate Dr. Coons and to delaying the trial. Finally, he argued that his constitutional right to a defense should take precedence over the state's statutory right to a mental examination so close to trial.

The trial court responded to these arguments by noting the defendant's desire to wait until the court had ruled on other motions before deciding whether he would proceed with a defense of mental responsibility in this case. It found that due to the amount of time needed for motions on this case, it had only addressed the issue of mental responsibility within the last thirty days. It stated that although it had attempted to protect the defendant's rights, it would not allow the defendant to thwart the rules to gain an unfair advantage. The court stated that if the defendant sought to use expert testimony to present a mental defense, then a fair and true determination of that issue required that he be examined by the court's experts. It stated that the defendant had refused to submit to an extremely fair evaluation. Then, it ruled that as "a result of that, it's my opinion that the rules and the law in this state direct this court, mandate the court under the facts of this case to exclude any testimony by expert witnesses with respect to the mental responsibility of this defendant." We do not interpret the trial court's use of the term "mandate" to mean that it mistakenly believed that Rule 12.2(d) sanctions were mandatory. Instead, taking this statement in the context of the defendant's arguments and the court's findings, we believe that the court ruled that the impact of the defendant's refusal to be examined by Dr. Coons justified the striking of defense experts in this case. The defendant is not entitled to relief on this issue.

Finally, the defendant contends that the trial court abused its discretion in striking his experts pursuant to Rule 12.2(d) in this case. He argues that the state was not harmed by his refusal to submit to the examination. He states that the state could have presented expert testimony through experts who had reviewed Dr. Tennison's videotaped examination, the defendant's audiotaped statements, and information about him from the detectives, other inmates, and a background investigation. As discussed with regard to the proceedings in the first rape trial, we do not believe that an evaluation limited to these sources could approximate one conducted with the defendant. The defendant notes that in the homicide case, the state relied upon the testimony of Dr. Herbert Speigel, who never examined the defendant. We would point out that in the homicide case, the defendant did submit to a complete examination by the court-appointed experts. In imposing sanctions in the consolidated rape trial, the court noted that a complete examination by a court-appointed expert was necessary to a fair determination of the mental responsibility issue. We agree and do not believe that the trial court abused its discretion in imposing sanctions.

## IX. CHANGE OF VENUE

The defendant contends that the trial court erred in its rulings regarding his motions for change of venue. In the first rape case, the trial court denied the defendant's motion, and the defendant was tried in Knox County by a Knox County jury. In the consolidated rape case, the trial court ruled that a jury was to be selected from Hamilton County but then transported to Knoxville

for the trial. The defendant contends that the trial court erred in moving the Hamilton County jury to Knox County. The state contends that the trial court properly denied the defendant's motion in the first rape case and that the trial court properly held the consolidated rape trial in Knox County with a Hamilton County jury.

In support of his motion for a change of venue, the defendant offered the affidavit of Dr. Charles C. Bebber, a psychologist and trial behavior consultant. The affidavit provided the following: Dr. Bebber had reviewed the indictments and information in the defendant's cases. He had also reviewed transcripts of television and radio newscasts and copies of newspaper articles from Knox County and surrounding counties regarding the defendant's cases. Dr. Bebber discussed four factors to support his opinion that pretrial publicity was prejudicial and had influenced prospective jurors. First, he said that an imagery-learning factor made the defendant and the charges against him especially memorable. He explained that the use by the media of terms such as "Zoo Man" and "Cahaba Lane murders" with photographs of the defendant when he appeared "wolfman-like" established a strong and unforgettable mental image of a person associated with the allegations of violence. Second, an isolation-effect factor also made the defendant and the charges against him more memorable. Dr. Bebber explained that referring to the case as Knoxville's first serial murder and the case "that shocked East Tennessee" made the case unique and, thus, made it stand out. Third, a dramatic exposition variable made the case stand out from other criminal cases in the area. Dr. Bebber stated that the dramatic manner in which the media reported the investigation from start to finish, including the fact that prominent forensic experts were involved, would cause people to remember the events reported in the media more vividly than any facts the defense presented at trial to dispute the charges. Finally, he said that a sensationalism factor also made the defendant's case more memorable, stating that the substance of the news reports was of a highly sensational quality. Based upon his research, experience, exposure to people in the community, and review of the publicity, Dr. Bebber believed that an unbiased jury could not be selected in Knox County or a contiguous county.

At the hearing on the motion for a change of venue, Thomas Kohntopp, an industrial psychologist, testified that he conducted a public opinion survey relative to the defendant and his cases. He admitted that this survey was only the second one he had conducted relating to fair jury selection. He reviewed the defendant's motion for a change of venue, the state's response to that motion, the newspaper articles regarding the defendant's cases, and the criteria for a person to be eligible to serve on a Knox County jury, and based upon all of this information, he developed a questionnaire. He determined that the number of potential jurors in Knox County was approximately two hundred thousand. Based upon this number, he determined that five hundred people should be polled, which was done via telephone. He stated that the margin of error for the survey was plus or minus five percent.

Mr. Kohntopp testified that in order to insure that the interviewees were potential jurors, the interviewers first asked whether the interviewee was at least eighteen years old, was registered to vote, and had lived in Knox County for at least twelve months. He said that he received five hundred seventy-three qualified responses, of which 82.2 percent responded that they had read or heard

something about a Knoxville legal case involving Thomas Dee Huskey, also referred to as the "Zoo Man," and the 1992 serial murders of women at Cahaba Lane. Mr. Kohntopp stated that he found this percentage to be extremely high. The interviewees were then asked about their impression of Thomas Huskey, the Zoo Man. The responses were written down and then classified as favorable, neutral, or unfavorable. The results were 52.3 percent unfavorable, 41.4 percent neutral, and 6.3 percent favorable. The next question was "Based upon what you have read or heard about the case, do you think the defendant, Thomas Huskey, also known as the Zoo Man, is definitely not guilty, probably not guilty, probably guilty, or definitely guilty," to which 61.9 percent stated they thought the defendant was either definitely guilty or probably guilty. Mr. Kohntopp stated that although "no opinion" was not given as a possible response, 31.6 percent of people surveyed said that they did not have an opinion as to the defendant's guilt or innocence. Finally, the interviewees who answered that they believed the defendant was definitely or probably guilty were asked whether the defendant should receive life in prison or the death penalty if convicted. About 38 percent responded that the defendant should receive life in prison, about 44 percent said that he should be sentenced to death, and about 18 percent responded that they had no opinion.

On cross-examination, Mr. Kohntopp testified that he had only seen a jury selected one time. He stated that he hired students to conduct the telephone surveys and that they were trained but that the phone calls were not monitored. He said that the telephone calls were not recorded and that the students wrote down the interviewees answers. He stated that he and a clerk of one of the defendant's attorneys reviewed the answers to the question regarding the interviewee's impression of the defendant, and they decided how to classify the answers. He said that he included the Zoo Man reference in the questions because it was the general label applied to the defendant in the newspaper articles.

## A. The First Rape Trial

The defendant argues that the evidence shows that a fair trial was not possible in Knox County and that the trial court did not properly apply Rule 21, Tenn. R. Crim. P., or Tenn. Code Ann. § 20-4-201. Thus, the defendant contends, the trial court improperly denied his motion for a change of venue. The state responds that the trial court properly denied the defendant's motion. It argues that the defendant failed to present any legitimate reason to change the venue and that the evidence presented did not indicate that a fair and impartial jury not be selected in Knox County.

The decision of whether to grant a motion for a change of venue based on pretrial publicity rests within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion. State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993). Furthermore, the defendant must show that the jurors were biased or prejudiced against him before his conviction will be overturned on appeal. State v. Melson, 638 S.W.2d 342, 360-61 (Tenn. 1992).

The defendant contends that the trial court failed to determine whether "a fair trial probably could not be had" as required by Rule 21(a), Tenn. R. Crim. P, which provides:

> In all criminal prosecutions the venue <u>may</u> be changed upon
> motion of the defendant, or upon the court's own motion with the
> consent of the defendant, if it appears to the court that, due to
> undue excitement against the defendant in the county where the
> offense was committed or any other cause, a fair trial probably
> could not be had.

(Emphasis added); <u>see</u> <u>also</u> Tenn. Code Ann. § 20-4-201(1) (stating venue "<u>may</u> be changed . . . upon good cause shown") (emphasis added). The defendant insists that the trial court erred in denying his motion and in waiting to see if a fair jury could be selected. He argues that the pretrial publicity regarding his cases was so pervasive and inflammatory that a fair trial could not be had in Knox County. The state argues that the trial court did not abuse its discretion in denying a change of venue.

Initially, we emphasize, as indicated above, that Rule 21 gives the trial court discretion regarding decisions to change venue. We do not believe the trial court abused this discretion. Regarding the defendant's expert's survey, we note that most of it was of questionable relevance as applied to the rape cases. The questions concerned the defendant's homicide cases, asking whether the interviewee had heard about the serial murders and whether, if the defendant were convicted, they would impose a sentence of life in prison or death. Also, although 82 percent of the 573 people polled had heard of the defendant, the Zoo Man, or the serial murders at Cahaba Lane, that fact does not mean that a fair trial probably could not be had. Indeed, mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice. Prospective jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury. <u>State v. Bates</u>, 804 S.W.2d 868, 877 (Tenn. 1991). Also, whether a person's impression of the defendant was favorable or unfavorable does not reflect whether the person could be an impartial juror, although we note that 47.7 percent of the people surveyed responded that they had a neutral or favorable impression of the defendant even after they had been asked questions about the Zoo Man and serial murders. We are also skeptical of the value of the question regarding the defendant's guilt or innocence. The interviewees were not even given the option of "no opinion." Nevertheless, 31.6 percent of the people questioned said that they did not have an opinion regarding the defendant's guilt or innocence. We do not believe that the defendant's proof established that a fair trial probably could not be had.

The defendant relies upon <u>State v. Hoover</u>, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979), in which this court listed seventeen factors to consider when determining whether to grant a change of venue:

      (1)   Nature, extent, and timing of pre-trial publicity.

      (2)   Nature of publicity as fair or inflammatory.

      (3)   The particular content of the publicity.

(4) The degree to which the publicity complained of has permeated the area from which the venire is drawn.

(5) The degree to which the publicity circulated outside the area from which the venire is drawn.

(6) The time elapsed from the release of the publicity until the trial.

(7) The degree of care exercised in the selection of the jury.

(8) The ease or difficulty in selecting the jury.

(9) The veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire.

(10) The defendant's utilization of his preemptory challenges.

(11) The defendant's utilization of challenges for cause.

(12) The participation by police or by prosecution in the release of publicity.

(13) The severity of the offense charged.

(14) The absence or presence of threats, demonstrations or other hostility against the defendant.

(15) Size of the area from which the venire is drawn.

(16) Affidavits, hearsay or opinion testimony of witnesses.

(17) Nature of the verdict returned by the trial jury.

The defendant argues that all of these factors either favored changing venue or were neutral.

While we agree with the defendant that some of the publicity was inflammatory, we note that much of the publicity was fair reporting of the facts. More importantly, we note the timing of the articles and reports cited by the defendant. The first rape trial occurred in October 1995. In reviewing all of the articles and reports cited by the defendant that were published before the first rape trial, we note that most of them were published in October or November 1992. Furthermore,

the latest article cited by the defendant – but still before the first rape trial – was published on April 9, 1994, about eighteen months before the first rape trial. Thus, the timing of the publicity supports the trial court's decision. Moreover, five of the Hoover factors relate to the jury selection. In this respect, we cannot say that the trial court erred in denying the defendant's motion for a change of venue at the pretrial hearing and in opting to wait and see the jury selection process before determining whether a change of venue was warranted. Significantly, as we discuss in Issue XXIII, the defendant failed to use his peremptory challenges to strike jurors with knowledge of his other charges despite having an opportunity to do so. Furthermore, the jury was selected in the first rape case after a lengthy and thorough voir dire. We cannot conclude that the trial court abused its discretion in denying the defendant a change of venue in the first rape case.

## B. Consolidated Rape Trial

On April 29, 1996, the trial court ruled on the defendant's motion for a change of venue in the consolidated rape case. Because of the considerable amount of recent publicity about the case, the trial court ruled that a jury be selected from Hamilton County but returned to Knox County for the trial. The defendant contends that the trial court erred in returning the jury to Knox County. He complains that because the trial venue was not also changed to Hamilton County, eleven potential jurors were dismissed for cause because they stated that traveling to Knox County for a trial would be a hardship. Thus, the defendant argues, he was denied the opportunity of having these jurors sit on his jury. The defendant contends that moving the jurors exposed them to a prejudiced Knox County community through motel clerks, restaurants, and Knox County court personnel. The defendant also complains that the Knox County Sheriff's Department "hosted" the jurors and "cared for their every need," prejudicing him because part of his defense was that the sheriff's investigators rushed to judgment. The state contends that the trial court did not abuse its discretion and the defendant was not prejudiced by transporting the jury to Knox County for trial, a procedure expressly permitted by case law and statute. We agree with the state.

In State v. Nichols, 877 S.W.2d 722 (Tenn. 1994), the defendant moved for a change of venue from Hamilton County. The trial court granted the motion, but only for the limited purpose of selecting a jury from another county. The jury, over the defendant's objection, was then transported to Hamilton County for the trial. Id. at 727. Our supreme court concluded that filing a motion for a change of venue constituted a waiver of the defendant's constitutional right to have a jury selected from the county where the crime was committed, noting that case law has interpreted this right to include being tried in the county where the crime was committed. Id. The court held that "unless the defendant is prejudiced, the administration of justice harmed, or the trial court abuses its discretion, no reversible error occurs when a trial court" has a jury selected from another county and then brought to the county of the indictment for trial. Id. at 728. The court encouraged the legislature to address this issue to "ensure uniformity and fairness across the state and to avoid error from excessive experimentation." Id. at 729. The following year, the statute relating to change of venue was amended, allowing the procedure used in Nichols. Effective May 30, 1995, in all criminal cases,

> (1) The venue may be changed, at any time before trial, upon good cause shown, as prescribed in this part; or
>
> (2) A court may issue an order for a special venire of jurors from another county if in its discretion it determines the action to be necessary to insure a fair trial.

Tenn. Code. Ann. § 20-4-201. Thus, although we recognize that selecting a jury from another county and returning it to the county where the defendant was indicted increases the possibility of the jury being exposed to prejudicial information, this procedure has been expressly approved by our supreme court and our legislature. The defendant does not allege, and the record does not reflect, that the jurors actually selected were unfair or unbiased or that the court officers acted improperly or influenced the jury in any way. Therefore, we conclude that the trial court properly ordered a special venire from Hamilton County as authorized by Tenn. Code Ann. § 20-4-201(2) and <u>Nichols</u>.

## XI. ACCESS TO VICTIMS' RECORDS

The defendant contends that the trial court's failure to allow him access to various records of the victims violated his right to compulsory process under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. He argues that drug and alcohol treatment records, Sexual Assault Crisis Center (SACC) records, Department of Paroles records, Knoxville Police Department records, Knox County District Attorney's Office records, and various medical or psychiatric records from the Knox County Jail and the Community Alternatives to Prisons Program (CAPP) enjoyed no privilege and were material to the victims' testimony. He maintains that he was entitled to review these records without regard to their admissibility. The state contends that the trial court allowed the defendant to view the victim's drug treatment records in the first rape case although they were privileged under federal law. It argues that the trial court properly denied access to the victim's SACC records upon determining that they contained nothing beneficial to the defense. It maintains that the defendant has shown no prejudice resulting from the denial of either set of records. With regard to the consolidated rape case, the state contends that the defendant has waived this issue because his claims are wholly unsubstantiated.

A "defendant has a fundamental constitutional right to compulsory process for the obtaining of witnesses and when the witness is shown to be material, the trial court has no discretion as to the issuance of such process." <u>State v. Morgan</u>, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991); <u>see</u> U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. In Tennessee, the right to compulsory process is extended by statute as well as the constitution. <u>See</u> Tenn. Code Ann. § 40-17-105 (providing that all criminal defendants have the right to compulsory process in order to acquire favorable witnesses). Unless granted a privilege or right by constitution, statute, common law, or rule, no one "may refuse to be a witness," "to disclose any matter," or "to produce any object or writing." Tenn. R. Evid. 501(1)-(3). Procedurally, a defendant may exercise the right to compulsory process through subpoenas for witnesses or documents as provided by Rule 17, Tenn. R. Crim. P. Tenn. Code Ann.

§ 40-17-122. A court may issue a subpoena for the production of documents, may require the documents be produced before trial, and may permit the parties and their attorneys to inspect the documents once produced. Tenn. R. Crim. P. 17(c).

On the other hand, a defendant's right to compulsory process is not without limit:

> "A court is not required to issue compulsory process for anyone whom accused may designate as a witness; the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible. Within these limitations accused may obtain the attendance of any witnesses he cares to use . . . ."

Bacon v. State, 215 Tenn. 268, 273, 385 S.W.2d 107, 109 (1964) (quoting 97 C.J.S. Witnesses § 9); State v. West, 767 S.W.2d 387, 401 (Tenn. 1989). The trial court "has the power and the duty to prevent abuse of its process by abating subpoenas for witnesses whose testimony would be immaterial." State v. Womack, 591 S.W.2d 437, 443 (Tenn. Crim. App. 1979). This court will reverse the trial court's decision to abate a subpoena only if it has abused its discretion. State v. Connie Easterly, No. M2000-00077-CCA-R10-CO, Sequatchie County, slip op. at 8 (Tenn. Crim. App. Mar. 1, 2001); see, e.g., State v. Burrus, 693 S.W.2d 926, 929 (Tenn. Crim. App. 1985); Womack, 591 S.W.2d at 446; c.f. Morgan, 825 S.W.2d at 117 (noting that a trial court's denial of a continuance to secure a witness is reviewed for an abuse of discretion).

## A. The First Rape Trial

Before trial, the defendant sought the victim's Drug and Rehabilitation Institute (DRI) and SACC records. On October 5, 1995, the trial court gave the defendant an excerpt from the DRI records but filed the balance of the DRI records under seal after reviewing them in camera. The court denied the defendant access to the victim's SACC records, determining that federal regulations did not require their release. During trial, the defendant renewed his motion for the SACC records and the remaining DRI records. After reviewing all of the records in camera, the court ruled that it would not release the SACC records because they were not relevant to the case. It noted that the SACC records were not covered by any statutory privilege but stated that, as a matter of policy, a general privacy protection should apply unless the information became relevant to the issues at trial. The court noted that it would reverse its ruling if the cross-examination of the victim caused it to believe that the information in the SACC records was relevant.

Before the defendant's cross-examination of the victim, the trial court gave the defendant the remaining records pertaining to the victim's DRI treatment from July 1992 to September 1992 that were not released before trial. The trial court denied the defendant's motion for a continuance to investigate matters in the records, stating that the records did not contain any astounding new information. The court also obtained and reviewed additional DRI records relating to treatment of

-116-

the victim before July 1992. It determined that these earlier DRI records were not relevant to the case and stated that it would file them in the record under seal.

We believe that the trial court properly denied the defendant access to most of the victim's SACC records and to her earlier DRI records. Despite the defendant's contentions to the contrary, the admissibility of the records is relevant to the trial court's disclosure of the records under his right to compulsory process. See Bacon, 215 Tenn. at 273, 385 S.W.2d at 109. The trial court reviewed the records in camera and determined that they were not relevant to the issues at trial. We agree with the trial court's determination with regard to the DRI records and most of the SACC records.

Regarding the SACC records, the defendant contends that the victim testified that she was approached by an SACC employee before she spoke with the police about the rape on July 18, 1992. Thus, he speculates that the SACC records contain prior statements to the SACC about the rape. The only account of the offenses contained in the SACC records is the following, which was entered on a form entitled Criminal Justice Support Log Form and dated November 9, 1992: Victim "apprehended by assailant after he had stopped and asked her for directions. July 18, 1992. Assailant assaulted [the victim] in barn [at the] Knoxville Zoo." This brief account is consistent with the victim's testimony and was written almost four months after the offenses. The account is followed by the rather cryptic statement that "SACC/Jean Spangler accompanied to St[.] Mary's ER." It is unclear whether Ms. Spangler accompanied the victim to the emergency room, some unnamed person accompanied Ms. Spangler to the emergency room, or the statement merely refers to Ms. Spangler's support of the victim while at the emergency room. The first possibility conflicts with the victim's testimony that her aunt took her to St. Mary's emergency room where she met with Jean Spangler from the SACC after telling a nurse that she had been raped. As noted by the trial court, the remaining SACC records consist primarily of scheduling notations.

We believe that the phrase regarding Ms. Spangler going to the emergency room could be exculpatory to the defense. The trial court did not hold an evidentiary hearing regarding the SACC records, and we do not have the benefit of any findings from the trial court as to what the phrase in question means. If the victim told someone at the SACC that Ms. Spangler accompanied her to the emergency room, the defendant could have used this statement to impeach the victim's account of her trip to the emergency room. On the other hand, if the statement refers to someone else – perhaps the person who prepared the Criminal Justice Support Log Form – accompanying Ms. Spangler to the hospital, the form would not be exculpatory. Even if exculpatory, the statement would have to be material before the defendant's right to due process compelled disclosure of the form. See Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963); see also Hartman v. State, 896 S.W.2d 94, 101 (Tenn. 1995). Evidence is considered material under the standard announced in Brady only "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 1565 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985)); State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995).

In the present case, although the statement about Ms. Spangler is potentially exculpatory, we do not believe it to be material. The defendant thoroughly cross-examined the victim about her delay in telling anyone about the rape. Also, he emphasized that she had spoken with a rape counselor before she spoke with the police at the hospital. Thus, the defendant was able to present to the jury the possibility that the rape counselor colored the victim's account of what happened in light of the fact that the victim had not previously claimed to have been raped. Furthermore, the records of the victim's treatment at St. Mary's Hospital state that the victim said that she had been raped, that she complained of a shoulder injury, and that x-rays were subsequently taken at 11:30 p.m. The hospital records reveal that a police officer interviewed the victim after midnight and that she met with the "Rape Crisis Lady" after 1:30 a.m. The state introduced the hospital records during the victim's direct examination. Thus, the defendant had an opportunity to impeach the victim's order of events but did not use the records to this end. Because we see no reasonable basis to believe that the statement relating to Ms. Spangler would probably have changed the outcome of the trial, we conclude that the trial court's failure to release the Criminal Justice Support Log Form to the defense was at most harmless error. As for the remainder of the SACC records, we affirm the trial court's determination that they were irrelevant to the case.

Regarding his need for the DRI records, the defendant states only that the victim was addicted to cocaine and treated before and after the offenses on July 18, 1992. The defendant received the DRI records from July 1992 through September 1992 and thoroughly cross-examined the victim with these records at trial. We note that the defendant originally requested only those records relating to the period from July through October 1992, arguing the victim's drug addiction was relevant to the credibility and reliability of her identification of her attacker. During trial, the defendant requested the victim's earlier DRI records. The trial court found the earlier DRI records to be irrelevant. We cannot locate these earlier DRI records within the record on appeal in order to review them. The defendant does not point to the location of the sealed DRI records. See T.R.A.P. 27(a)(7) (requiring that the appellant's brief shall contain appropriate references to the record relied upon in the argument). In the jury out hearing on the records, the trial court designated the undisclosed DRI records as exhibit ten for identification. Exhibit ten to the first rape trial is three unsealed pages of the DRI records of one of the victims in the Consolidated Rape case. Our review of the record has not revealed the earlier DRI records of the victim in the first rape trial in another location. Although we appreciate the difficulties in dealing with a record of this magnitude, it remains the responsibility of the appealing party to make sure that the record is complete. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993) (holding that the appealing party has a "duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal."). In the absence of a complete record, we must presume the trial court correctly found that the earlier DRI records were irrelevant. See State v. Boling, 840 S.W.2d 944, 951 (Tenn. Crim. App. 1992) ("Absent an essential part of the record, this court must presume that the trial court's determination is correct.").

The state contends that the DRI records were privileged under 38 U.S.C. § 7332(b)(2)(D). This United States Code section is inapplicable to this case as it deals with the confidentiality of medical records generated for programs by or for the Veteran's Health Administration. See 38

U.S.C. § 7332(a)(1).  The record contains no indication that the victim's DRI records fall within that category.  On the other hand, we note that federal law provides that

> [r]ecords of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall . . . be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b).

42 U.S.C. § 290dd-2(a).  Subsection (b)(2)(C) permits disclosure without the patient's consent in the following circumstance:

> If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefore, including the need to avert a substantial risk of death or serious bodily harm.  In assessing good cause the court shall weigh the public interest and need for disclosure against the injury to the patient, to the  physician-patient relationship, and to the treatment services.  Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

In the present case, the record does not reveal whether the programs offered by DRI were "conducted, regulated, or directly or indirectly assisted" by a federal department or agency, but the parties and trial court acted as though the records were covered by this section and the related federal regulations.  The defendant sought a court order for the release of the records and the trial court evaluated the need for disclosure.  As discussed in the preceding paragraph, due to the absence of the earlier DRI records in the record, we must presume the trial court correctly determined that they need not be disclosed.

Finally, we note that in his reply brief, the defendant summarily states that a public policy concern for privacy cannot trump the defendant's state and federal constitutional rights to confront and cross-examine witnesses and to a fair trial.  Other than this brief mention of these other constitutional rights, the defendant makes no argument about how the trial court's failure to disclose the victim's SACC records and early DRI records violate his rights to confrontation, cross-examination, and a fair trial.  We view these issues to be waived.  See Tenn. Ct. Crim. App. R. 10(b).

## B.  Consolidated Rape Case

With regard to the consolidated rape case, the defendant contends that the trial court violated his right to compulsory process by withholding the following unprivileged records: DRI records, medical records from the Knox County Jail, psychiatric or medical records from the Community Alternative to Prisons Program, Department of Paroles Records, and unspecified records from the Knoxville Police Department and Knox County District Attorney's Office relating to the victims. He argues that these records are relevant because two of the victims testified on direct examination about their drug usage, criminal histories, and current probation or parole status. Without further explanation, he states that the requested records were material to the testimony of these two victims.

Regarding the DRI records, at a May 6, 1996, hearing, the trial court disclosed three pages of these records to the parties. The court ruled that the remainder of the records contained no information relating to the case and were protected from disclosure by federal regulations. The trial court sealed the remainder of the DRI records and made them a part of the record. As noted earlier, the right to compulsory process extends only to admissible, relevant evidence. See Bacon, 215 Tenn. at 273, 385 S.W.2d at 109. In the present case, neither party has discussed the federal statute and corresponding regulations that extend confidentiality to drug treatment records. See 42 U.S.C. § 290dd-2(a); 42 C.F.R. § 2, et seq. We view the parties briefs to be inadequate in this regard, especially in light of the fact that this federal privilege formed one of the trial court's two bases for non-disclosure. In any event, we have reviewed the sealed DRI records and agree with the trial court's ruling that they are not relevant to the case.

The defendant obtained the victims' files from the Knox County Sheriff's Department and CAPP under Tenn. Code Ann. § 10-7-503(a), which generally permits the public to inspect all state, county, and municipal records. The trial court determined that the defendant was not entitled to medical records contained within the files because those records were protected by a statutory exception. See Tenn. Code Ann. § 10-7-504(a)(1). The court initially delayed ruling upon a psychological report contained within the CAPP file in order to determine whether the victim had waived any privilege with regard to the report by including it in materials that she submitted to the court in relation to the CAPP program. Although the defendant does not point us to the trial court's subsequent ruling on this issue, we observe that the trial court later noted that it had ruled that the medical and psychological records were protected by statute.

The exception relied upon by the trial court provides in pertinent part as follows:

> The medical records of patients in state, county and municipal hospitals and medical facilities, and the medical records of persons receiving treatment, in whole or in part, at the expense of the state, county or municipality, shall be treated as confidential and shall not be open for inspection by members of the public.

Id. The defendant argues that the Knox County Jail is not a hospital. The defendant never challenged the application of this exception on this ground before the trial court. In fact, at the hearing on this matter, the defendant agreed that the exception applied but argued that discovery

rules and the state's duty to produce exculpatory material required the disclosure of these records despite the exception. The defendant may not argue that he is entitled to the medical and psychological records despite the exception before the trial court and then argue that the exception does not apply on appeal. See State v. Miller, 668 S.W.2d 281, 285 (Tenn. 1984). Based upon the scant record before us, which contains neither evidence of the treatment facilities at the jail nor the medical or psychological records in question, we believe that the records would at least be those of a person receiving treatment at government expense. In any event, nothing in the record contradicts the trial court's finding that this exception applies to exclude these records. The defendant's right to compulsory process was not violated by the trial court's withholding of these records.

Regarding the Department of Paroles records, the record does not reflect that the requested information was withheld from the defendant. During the April 17, 1996 consolidation hearing, the defendant requested the state's files on any new arrests of one of the victims. The defendant argued that he spoke with the victim's parole officer and learned that the parole officer was requesting a warrant to arrest the victim for violation of her parole for new charges against her. He stated that he wanted to present the trial court with this information to show that the victim had lied during her testimony at the consolidation hearing. After making these statements, the defendant began to argue other matters without securing a ruling on his request.

After a protracted discussion of other matters, the trial court turned to the issue of what documents qualified as public records and had to be disclosed pursuant to the Public Records Act. The state asserted that it had made its closed files on the victim in question available to the defendant. The defendant responded that he was satisfied with the closed files that had been provided but wanted the District Attorney's computer file on that victim. The state argued that its computer files were confidential but that it had told the defendant that any charges against the victim were brought in Knox County. The court noted that a statutory exception to disclosure of public records existed for confidential information in the District Attorney's files relating to contemplated or pending legal proceedings. See Tenn. Code Ann. 10-7-504(a)(5). The trial court observed that a party seeking information in the possession of the District Attorney's office and also in the possession of another public official must seek that information from the other public official. See Tenn. Code Ann. § 10-7-504(a)(5)(A)(v). It ruled that the defendant would have to get any information that could be obtained from the clerks of the General Sessions Court and the Criminal Court from those sources. It also ordered the state to comply with the Public Records Act, and the cases interpreting it, and to give the defendant any information discoverable under the Act. It stated that this information included arrests and closed files relating to the victims. From this account, it is not apparent to us that the defendant was denied the Department of Paroles Records. The defendant has not pointed to subsequent requests for these records or rulings of the trial court on this matter. In any event, we note that the defendant ought to have been able to retrieve information on new charges against the victim from the court clerks. In fact, during her cross-examination at trial, the victim admitted that she had been arrested on April 26, 1996; had entered a plea bargain; and hoped to receive help from the state regarding her parole violation. The record does not reflect that the defendant's right to compulsory process was violated with regard to the parole records.

-121-

Finally, regarding the unspecified records of the Knoxville Police Department and Knox County District Attorney's Office relating to the victims, the defendant points again to the May 10, 1996 hearing on the Knox County Sheriff's Department inmate files and a CAPP file of one of the victims. We are hard-pressed to guess to which records from the Knoxville Police Department and the District Attorney's office the defendant refers. To the extent that the defendant is referring to the information sought at the April 17, 1996 hearing, the state noted its disclosure of closed files on the victim to the defendant, and the trial court ordered the District Attorney to comply with the Public Records Act. Otherwise, this issue is too generally presented for us to give a proper review. We cannot grant any relief.

## XII. IMPROPER EXAMINATION

The defendant contends that the trial court erred by allowing the state to use improper leading questions on direct and redirect examination of the victims and by allowing improper redirect examination of the victims. The state's only argument regarding the merits of these complaints is that the trial court did not err in its handling of the defendant's objections during the state's redirect examination of the victim in the first rape trial. As to the defendant's other arguments, the state asserts that the defendant has waived this issue for failure to cite to any specific objection improperly overruled by the trial court. We agree with the state that the defendant's citations to the record were inadequate. Nonetheless, we conclude that the trial court did not err relative to these complaints.

The propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial court, whose ruling will not be disturbed absent an abuse of discretion. State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993); see also State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) ("The admissibility of testimony and other evidence, as well as the scope of redirect examination, is within the discretion of the trial court."). Rule 611(c), Tenn. R. Evid., provides that "[l]eading questions should not be used on direct examination of a witness except as may be necessary to develop testimony. Leading questions should be permitted on cross-examination." Although the Tennessee Rules of Evidence do not address the scope or manner of redirect examination of a witness, "Tennessee law is well-settled that redirect examination can broach topics raised on cross-examination even though those matters were not inquired into on direct examination." State v. Baker, 966 S.W.2d 429, 433 (Tenn. Crim. App. 1997).

### A. The First Rape Trial

The defendant contends that the trial court erred by (1) allowing the state to make speaking objections and comments in the presence of the jury, (2) allowing the state to ask improper leading questions during its direct examination of the victim, (3) sustaining the state's objections during his cross-examination of the victim, (4) allowing the state to ask improper leading questions during its redirect examination of the victim, and (5) allowing the state to offer evidence during its redirect examination that was not rebuttal to his cross-examination. The state contends that the defendant has waived these complaints for failure to cite to the record. The state also asserts that the trial court

did not err in its handling of the defendant's objections during the state's redirect examination. The state does not address the merits of the defendant's other complaints.

In his first complaint, the defendant asserts that throughout the first rape trial, the district attorney general made speaking objections and comments in the presence of the jury and that the trial court did not sustain a single defense objection to the district attorney's actions. Initially, we note that in support of this claim, the defendant cites to the entire trial transcript and does not provide any argument. We agree with the state that the defendant has not complied with Rule 27(a)(7), T.R.A.P., regarding references to the record. In any event, the record reveals that on the few occasions the defendant objected on these grounds, the trial court did not sustain or overrule the objections. Instead, the trial court told the parties to move on, which they did without further discussion, or objection by the defendant, at that time. We fail to see any error relative to this complaint.

The defendant next complains that the trial court erred in overruling his objections to the state asking leading questions during its direct examination of the victim. The defendant's citation in support of this contention is to the entire direct examination. He does not provide any argument relative to this complaint. Our review of the testimony reveals that the defendant objected five times to the state asking a leading question. Two objections were overruled, and one objection was sustained. The trial court responded to the other two objections by instructing the prosecutor to "be careful," at which point the prosecutor continued questioning without any further objection from the defense at that time. We conclude that the trial court did not abuse its discretion in its handling of the defendant's objections to the state's leading questions during the direct examination of the victim.

The defendant next contends that the trial court erroneously sustained the state's objections during his cross-examination of the victim. The defendant's citation in support of this contention is to the entire cross-examination. He does not specify which objection was improperly sustained, and he does not provide any argument relative to this complaint. Our review of the cross-examination of the victim reveals that the trial court overruled many of the state's objections, did not rule on several objections with the cross-examination continuing after brief comments by the court or counsel, and sustained only one of the state's objection – that objection being to the phraseology of a defendant's question. This complaint is without merit.

The defendant's last two complaints involve the state's redirect examination of the victim. Of the defendant's five objections to leading questions on redirect, the court sustained one of the defendant's objections, the court allowed two of the questions – "Are you embarrassed?" and "Did you attempt to give the best description of your assailant to Detective McCroskey?" – and the prosecutor offered to rephrase on the other two occasions. We cannot conclude that the trial court abused its discretion in this regard. Regarding the defendant's contention that the state improperly offered evidence in its redirect examination, we note that the defendant does not provide a specific citation to the record or argument on this issue. In any event, the record reveals that the state's redirect examination addressed matters raised in the defendant's cross-examination, as the trial court found. The trial court did not abuse its discretion in controlling the examination of the victim.

-123-

## B.  Consolidated Rape Trial

The defendant contends that the trial court erred by (1) allowing the state to make speaking objections and comments in the presence of the jury, (2) allowing the state to ask improper leading questions during its direct examination of the victims, (3) allowing the state to ask improper leading questions during its redirect examination of the victims, and (4) allowing the state to offer evidence during its redirect examination of the victims that was not rebuttal to his cross-examination.   The state argues that the defendant has waived these issues for failure to cite to the record and to provide argument.

The defendant states that he "cannot summarize the improper manner that [the state] examined [the four victims].  A reading of the transcript is required for a full understanding of this issue."   Accordingly, the defendant cited to the entire testimony of the four victims.  Also, and importantly, the defendant does not provide any argument regarding any specific errors.  We agree with the state that the defendant's "argument" on this issue was inadequate.  In any event, from our review of the record, we fail to see any reversible error relative to these complaints.

## XIII.  EVIDENTIARY ISSUES RELATING TO DISCOVERY

The defendant contends that the trial court erred in admitting certain evidence that was not disclosed to him during discovery and/or was not listed in the state's notice of intention to use evidence. Rule 12(d)(2), Tenn. R. Crim. P., requires that upon the defendant's request, the state will provide the defendant notice of its "intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16." See also State v. Louis Francis Giannini, No. 36, Shelby County, slip op. at 9 (Tenn. Crim. App. June 12, 1991), app. denied (Tenn. Nov. 12, 1991) ("The purpose of Rule 12(d)(2) is to afford the accused an opportunity to suppress any evidence that (a) the State intends to use in its case-in-chief and (b) is discoverable pursuant to Rule 16."). Rule 16, Tenn. R. Crim. P., governs discovery and includes a provision concerning sanctions for failure to comply with a discovery request. See Tenn. R. Crim. P. 16(d)(2). One possible sanction for noncompliance is exclusion of the evidence. Id. The rules do not provide a sanction for noncompliance with Rule 12(d)(2). Moreover, given the rule's purpose, we question the defendant's position that the remedy for failure to disclose evidence pursuant to this rule is exclusion of the evidence. In any event, we address the defendant's contentions below.

### A.  The First Rape Trial

The defendant complains about the introduction of a rope, a photograph of him taken after his arrest, and a photograph array that included him.  The state contends that all of these items were properly admitted, arguing that all of them were included in its notice of intention to use evidence, which listed eight items, including "22 photographs," "1 rope," and "one picture line-up form."

The defendant first complains that the "six-foot rope" was not disclosed to him in discovery and not listed in the state's Rule 12(d)(2) notice.  Although the notice did not specify the length of

the rope, it did list "a rope." Moreover, the arguments of defense counsel at trial indicate that counsel had known about the rope for some time. Indeed, counsel argued that there was no foundation for the victim to identify the rope, that the state could not establish a chain of custody, and that they had filed motions regarding the admissibility of rope. They also argued that the defendant had moved to suppress this rope. We note that the defendant's motion to suppress relates to other rope discovered in his bedroom, not to the rope removed from the barn where the first rape victim was attacked. Although defense counsels' argument is confusing in this respect, the state consistently argued before trial that it did not intend to introduce any evidence from the search of the defendant's home in the first rape trial. Thus, the only rope at issue was the rope recovered from the barn. We cannot conclude, relative to the defendant's complaint regarding discovery and Rule 12(d)(2), that the trial court erred in admitting the rope into evidence.

The defendant also contends that a photograph of him was improperly admitted. The photograph about which the defendant complains was introduced through the victim's testimony to show how the defendant looked around the time of the crime. The defendant's complaint within this issue specifically relates to the state's failure to provide Rule 12(d)(2) notice of the photograph. While the state's notice on its face is unclear in that it merely lists "22 photographs," we note that the defendant moved pretrial to suppress this particular photograph. We do not believe that the defendant was prejudiced by any deficiency in the state's Rule 12(d)(2) notice.

The defendant next contends that the photograph array, about which the victim testified she viewed to identify the defendant as her attacker, was not listed in the state's Rule12(d)(2) notice. The state contends that it was listed, citing the reference to the "one picture line-up form." In his reply brief, the defendant asserts that this listed item referred to a form that was completed after the victim identified the defendant from the photograph array but not to the photograph array itself. While it is possible that the state's notice was unclear in this regard, we note that the defendant had sought pretrial to suppress the photograph array. Thus, as this complaint relates to Rule 12(d)(2), we cannot conclude that the trial court erred in admitting this evidence.

### B. Consolidated Rape Trial

The defendant complains about the introduction of a photograph array, testimony about a rope, photographs of a rope, photographs of a car, and "new" evidence during the redirect examination of Detective Pressley. The state contends that the defendant has waived this issue for failure to cite to any authority supporting his position. The state only addresses the merits of the defendant's last complaint, asserting that no new evidence was introduced during the redirect examination of Detective Pressley.

The record does not include a written notice of intention to use evidence; however, the state orally provided the defendant with such notice on February 7, 1996, stating that it intended to introduce in its case-in-chief only the testimony of the four victims and the photograph array that it had used in the first rape trial. The state did introduce this photograph array during its direct examination of D. C. Although the defendant complains that the trial court erred in admitting this

evidence, he presents no argument as to how this admission was error relative to discovery or Rule 12(d)(2), and we fail to see any.

The defendant next complains about the trial court allowing D. C. to testify about rope. The defendant and the state disagreed about whether the state had to provide notice of its intention to present testimony regarding suppressible evidence. The state argued that Rule 12(d)(2) only required it to provide notice if it intended to introduce the rope but not if it merely elicited testimony about the rope. We agree with the defendant that testimony regarding items of evidence that could be suppressed must also be included in a Rule 12(d)(2) notice. However, in this case, the state did not present testimony in its case-in-chief, through D. C. or any of its witnesses, about rope used by the defendant, other than the victims' testifying that they were bound or that their hands were tied together with rope. Testimony about the type and color of rope used by the defendant was elicited during the state's cross-examination of Detective Michael Freeman, who was called as a defense witness. Because this testimony was not presented in the state's case-in-chief, we conclude that allowing this testimony was not error relative to Rule 12(d)(2). Similarly, the defendant complains about the introduction of photographs of rope. These photographs, however, were introduced by the defendant during its redirect examination of Detective Freeman. Accordingly, the trial court did not err in admitting these photographs.

The defendant's next two complaints relate to evidence introduced through Detective Pressley, whom the state tendered for cross-examination. First, although within this issue the defendant asserts that new evidence was introduced in the state's redirect examination of Detective Pressley, he provides his argument relative to this complaint in Issue XXXI, in which we conclude that no new evidence was introduced during the redirect examination of Detective Pressley. Regarding the defendant's complaint about the photographs of the car that Detective Pressley and G. T. saw when they arrived at Cahaba Lane, we note that the trial court only admitted one photograph, that being a photograph of the outside of the car. The defendant acknowledged that the state had shown him this photograph before. The photographs of the interior of the car were not admitted. We note that G. T. testified earlier in the trial, without objection, that the defendant was driving a gray car and that the car was at Cahaba Lane when she and Detective Pressley returned to the crime scene. We question whether the photograph of the outside of the car that G. T. and the detective saw when they arrived at Cahaba Lane is evidence which could be the subject of a motion to suppress. See Giannini, slip op. at 9. In any event, we fail to see how the defendant could have been prejudiced by a photograph of a car whose presence at the scene and description were not contested. We cannot conclude that the trial court abused its discretion in admitting this evidence.

Finally, in his reply brief the defendant lists numerous items of evidence that he claims were not disclosed to him in discovery or were not listed in the state's Rule 12(d)(2) notice. The additional items, as listed by the defendant, are: (1) pictures on May 21, 1996; (2) G. T.'s statement; (3) uncharged conduct of the defendant on February 27, 1992; (4) reading from D. C.'s statements; and (5) a car license number on the defendant's property. First, we note that the defendant does not provide argument as to these items. Second, we note that some of these complaints do not relate to discovery or Rule 12(d)(2) notice. For example, the defendant's complaint at trial regarding G. T.'s

statement was that she should not be allowed to read from her statement while he was cross-examining her about it. Third, we note that the defendant's arguments at trial indicate that he knew about all of the items of evidence about which he now complains. Our review of the record reveals no discovery or Rule 12(d)(2) violation relative to any of the above-listed complaints.

## XIV. ADMISSIBILITY OF EXPERT TESTIMONY ON CHARACTER TRAITS

The defendant contends that the trial court erroneously excluded the testimony of defense expert Henrietta Ogle on the character traits of persons addicted to cocaine to the extent of the victims. He argues that Rules 702 and 703, Tenn. R. Evid., permit experts to testify to their opinions on relevant character traits of witnesses. With regard to the first rape trial, he asserts that the expert's proffered testimony – that people who used as much cocaine as the victim are untruthful, manipulative, and have a distorted view of reality – was relevant to impeach the victim's testimony. He also argues that similar testimony should have been permitted in the consolidated rape trial with regard to two victims, who testified about their drug use on direct examination. Pointing to the fact that the expert never examined any of the victims, the state contends that general expert testimony regarding the credibility of witnesses is inadmissible. We agree with the state.

In the first rape trial, the defendant called Henrietta Ogle as an expert in diagnosing, evaluating, and treating individuals addicted to drugs. The victim's Detoxification and Rehabilitation Institute (DRI) records reflect that she reported using two and one-half grams of cocaine daily from January 1992 through July 1992. Ms. Ogle testified that two and one-half grams of cocaine would have a street value of three to four hundred dollars and that smoking that amount per day would be a severe addiction. The defendant sought to question her about the character for honesty in persons addicted to that extent, and the state objected. In a jury-out hearing, Ms. Ogle testified that persons with a severe addiction are very manipulative, have a distorted view of reality and honesty, and are unreliable. She stated that she did not know the victim and based her opinion only upon persons that she had previously treated and the victim's DRI records. She denied that everyone addicted to cocaine was dishonest but said that, generally, people using cocaine were very unreliable and untruthful. Following this proffer, the trial court determined that Ms. Ogle was speaking generally and was not in a position to testify about the victim's truthfulness. It also found her testimony on the victim's truthfulness to be untrustworthy information under Rule 703, Tenn. R. Evid. In the consolidated rape case, the defendant asked the court whether it would permit Ms. Ogle to testify as an expert in alcohol and drug counseling about the effects of drugs and alcohol on the drug addict's ability to function. Noting that the defendant was seeking the same testimony that he sought in the first rape trial, the trial court ruled that it continued to believe that the expert was not qualified to give this testimony.

Rule 702, Tenn. R. Evid., permits an individual qualified by experience, training, or education to testify to his or her opinion if "scientific, technical, or other specialized knowledge will substantially assist" the jury in understanding the evidence or determining a fact in issue. The Tennessee Supreme Court has broadly held that expert testimony regarding the credibility of

witnesses is inadmissible because juries do not need assistance in assessing a witness's credibility. See State v. Coley, 32 S.W.3d 831, 835 (Tenn. 2000) (emphasizing that "the assessment of witness credibility . . . is always left to the jury"); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993) (holding that expert testimony that the victims exhibited symptoms of post-traumatic stress syndrome generally found in child sex abuse victims "invades the province of the jury to decide on the credibility of the witness").

In Coley, our supreme court determined that "general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does not substantially assist the trier of fact." 32 S.W.3d at 838. Similarly, in the present case, Ms. Ogle's general testimony that persons using two and one-half grams of cocaine daily are untruthful and unreliable is relevant only to the victim's credibility and is, therefore, inadmissible. The defendant cross-examined the victims about their drug addictions. Under Coley, the jury was capable of weighing the credibility of their testimony in light of the victims' addictions without the aid of an expert. Furthermore, as the state points out, the jury heard Dr. Paul E. Kaufman, an expert in forensic medicine, testify in the first rape case about the effects of ingesting two and one-half grams of cocaine per day for six months: substantially impaired judgment, memory, and ability to concentrate or recall and describe events accurately. In the consolidated rape trial, Dr. Kaufman testified that a person abusing drugs to the extent that one victim admitted would have a substantially impaired memory, judgment, and ability to recall and restate events and that people with serious drug problems tend to lie to maintain their lifestyle. With regard to another victim, Dr. Kaufman addressed a hypothetical regarding a person that used two hundred dollars of cocaine per day, used acid, injected Demerol, and drank alcohol excessively, concluding that the person would have characteristics similar to the ones he described relative to the other victim.

The defendant relies upon State v. Shuck, 953 S.W.2d 662 (Tenn. 1997), to argue that experts may give opinions on a person's relevant character traits. In Shuck, the supreme court held that expert testimony that a defendant's mental condition rendered him susceptible to inducement was admissible although it related to the ultimate issue of whether the defendant was entrapped. Id. at 669; see Tenn. R. Evid. 704. In so holding, the court observed that although expert testimony is not inadmissible because it embraces an ultimate issue, it must still be otherwise admissible, e.g., it cannot invade the jury's determination of credibility. Id. (noting that Ballard held that expert testimony relating to an ultimate issue was inadmissible because it attempted "to evaluate the credibility of witnesses, a task which a jury is capable of performing without expert testimony"). In the present case, the defendant argues that Ms. Ogle's testimony is relevant to the jury's weighing of the victims' credibility and, thus, the holding in Shuck avails him no relief. We hold that the trial court properly excluded Ms. Ogle's testimony that individuals who used cocaine to the extent of the victims were untruthful.

## XV.  MOTIONS FOR MISTRIAL

The defendant contends that the trial court erred in denying three of his motions for mistrial, two of which were made in the first rape trial and one of which was made in the consolidated rape trial. The state contends that the trial court properly refused to grant mistrials.

The decision of whether to grant a mistrial is within the sound discretion of the trial court, and this court will not disturb that decision absent a finding of abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The entry of a mistrial is appropriate when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994); see also State v. Seay, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996) ("The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict."). A mistrial will be declared in a criminal case only when there is a "manifest necessity" requiring such action by the trial court. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A manifest necessity is shown only when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d, 593, 596 (Tenn. Crim. App. 1981). The defendant has the burden of establishing a manifest necessity. Seay, 945 S.W.2d at 764.

## A. The First Rape Trial

The defendant contends that the trial court erred in denying two motions for mistrial. The defendant complains that a mistrial should have been granted after the jury was confronted by protestors against the defendant on its way to lunch. He argues that the confrontation constituted a break in the sequestration of the jury. The defendant also contends that the trial court erred by denying a mistrial after it called a defense argument "bullshit" in the presence of the jury.

After lunch on October 18, 1995, which was before any witnesses had testified, the trial court asked the jurors whether any of them had heard any comments about the case while on their way to lunch. Four jurors indicated that they had, and the attorneys were allowed to question them. Juror Shelton stated that as she and the other jurors were waiting for the bus to take them to lunch, two females ran behind them and said "'give him life' or something like that." She stated that she could put the comments completely out of her mind and that the comments did not have any impact on her and would not affect her ability to listen to the evidence and render a fair and impartial verdict. Juror Rogers said that two females ran past them, and one shouted "put him away for life." He stated that the comments would not affect him or his ability to serve as a juror in the case. He also stated that none of the jurors talked about this incident during lunch. Juror McKenzie stated that two females ran behind them as they were waiting for the bus and shouted "give him life." He said that the comments would not affect him in any way. Juror Varner stated that two females ran out the door behind them and said "put him away for life, put him away for life" as they ran around the corner. She said that the comments did not have an impact on her and would not affect her ability to make a decision based upon the evidence.

The defendant contends that a mistrial should have been granted because of the prejudice to him resulting from this incident. He argues that the prejudice was heightened because the Knox County jury had knowledge about the defendant, the murders, and the other rapes. We disagree. As soon as the jurors returned from lunch, the trial court, which had been advised of the incident, questioned the jurors about it. All of the jurors who heard the comments were then questioned by both parties, and each juror stated that the incident would not affect his or her ability to listen to the evidence and render a fair and impartial verdict. We cannot conclude that this incident constituted a manifest necessity requiring a mistrial. The trial court did not abuse its discretion in denying the defendant's motion for a mistrial based upon the jury's exposure to these protestors.

The defendant also argues that this incident constituted a separation of the sequestered jury and that once a separation is shown, the state has the burden of showing that such separation did not result in prejudice to the defendant, otherwise a new trial must be granted. We conclude that the defendant has not shown that the jury separated. The key in determining whether there was jury separation is whether "a juror was outside the presence and control of a court officer." State v. Bondurant, 4 S.W.3d 662, 673 (Tenn. 1999). The defendant does not allege, and there is no proof in the record, that any juror was not with the group going to lunch or that the jurors were not under the supervision of the court officers when this incident occurred. To the extent the event should be viewed as giving extraneous information to jurors, the testimony of the jurors reflects that no prejudice was incurred.

The defendant next contends that the trial court erred in failing to grant a mistrial after the trial court commented that a defense argument was "bullshit." During the state's redirect examination of the victim in the first rape trial, the state asked her why she did not run to a stranger and tell him or her what had happened. The victim responded, "I was terrified. I was in shock. I have never been in this position before, and I'd never had anything like that happen to me." Defense counsel then asked to approach the bench, but what occurred thereafter – the defense counsel's comments, the court's remark, and the parties' responses – were not recorded by the court stenographer because of an equipment malfunction. After learning of the missing portion of the transcript, the defendant filed a proposed statement of the evidence on December 14, 1998, which provided the following: Both defense attorneys approached the bench, but the district attorney remained at the state's counsel table. One of the defense attorneys stated to the court that the victim had opened the door for questioning about her Sexual Assault Crisis Center (SACC) records. The trial court responded, "Bullshit," loudly enough for the jury to hear, and the jury laughed. The court then stated, "Ladies and gentlemen, I should not have said that and I apologize." The district attorney then said, "The state agrees with your Honor," to which the jury laughed again. At this point, the defendant moved for a mistrial, which the court denied, stating that it was sorry for the comment, that it told the jury that it should not have said it, that it apologized, and that "is all that is necessary." The defendant then requested a limiting instruction, but the court refused, stating that it "apologized and that is it."

The state did not file an objection to the statement of the evidence, and on January 5, 1999, the defendant sought the trial court's approval of the statement. However, the trial court stated that

it had instructed the jury to disregard the remark in addition to apologizing. The trial court stated that he would consider what the defendant filed but added that the defendant's version of what occurred was not accurate.

On July 8, 1999, the trial court amended its order denying the defendant's motion for a new trial. The court acknowledged making the remark and that the remark was inappropriate but provided a slightly different version of the incident. The amendment provides that defense counsel was objecting to every question asked by the state on its redirect examination of the victim and that after she answered that nothing like "that" had happened to her, both defense counsel simultaneously stood and said that she had "opened the door." The court responded "bullshit," and the jury laughed. In the amendment, the court stated that it did not believe the remark affected the jury in any material way, noting that it apologized and instructed the jury to disregard the remark at that time. The trial court added that in its final jury instructions, it had instructed the jury to disregard any evidentiary rulings made by the court.

Although the defendant and the trial court remember the incident differently, the trial court's rendition controls. See T.R.A.P. 24(3). In any event, we do not believe the remark constituted a manifest necessity requiring a mistrial. The trial court's comment was clearly inappropriate, which the state concedes and the court admitted. Importantly, however, the court immediately addressed the jury after making the remark, stating that it should not have made it and that it was sorry. We do not believe, given the context of the remark and the court's apology, that the remark prejudiced the defendant or damaged the judicial process such that an impartial verdict was precluded. See Seay, 945 S.W.2d at 764. We conclude that the trial court did not abuse its discretion in denying the defendant a mistrial on this ground.

## B. Consolidated Rape Trial

The defendant contends that the trial court erred in refusing to grant a mistrial based upon the prosecutor's misconduct. The defendant's complaints about the prosecutor's conduct include the following:

> (1) He made improper and inflammatory arguments, including referring to the consolidated cases as a "reign of terror" and the defendant as "evil personified" during his opening statement.

> (2) He made facial expressions toward the state's witnesses when the defendant was conducting his cross-examination.

> (3) He turned his chair to face the defendant and glared at him with "an angry and disgusted expression."

-131-

(4) He did not attend bench conferences and, instead, while the defense attorneys were at the bench, glared at the defendant or smiled at the jury.

(5) He demeaned defense counsel and the defendant.

(6) He spoke in a voice loud enough for the jury to hear when sitting at the state's counsel table.

(7) He walked to the back of the courtroom in disgust.

(8) He referred to the witnesses by their first names.

(9) He displayed evidence to the jury prior to the defense having an opportunity to object.

The state contends that none of the prosecutor's actions warrant a reversal.

We note that the defendant has not cited to the record regarding most of these alleged acts of misconduct. Nonetheless, from our review of the record, we cannot say that a mistrial was warranted based upon the prosecutor's conduct. We address in detail the defendant's complaints regarding the state's opening statement and closing argument in his next issue, in which we recognize that some of the prosecutors comments were improper but conclude that the improper comments did not affect the verdict to the prejudice of the defendant. Likewise, we cannot say that the prosecutor's improper comments amounted to manifest necessity for a mistrial.

The defendant next complains that the prosecutor made facial expressions toward the state's witnesses when he was cross-examining them. Although the defendant does not cite to the specific instances about which he complains, our review of the record reveals three occasions when the defendant voiced an objection to the prosecutor's "expressions." At a bench conference during the cross-examination of D. L., defense counsel stated, "I don't know if it is inadvertent, but she keeps looking at Detective Johnson, and he keeps nodding his head." The court responded that it had been watching and had not seen this, stating that he did not believe that the state would coach its witnesses. A second time, defense counsel, after asking D. L. a question, told her not to look at the prosecutor. D. L. said she was not, and the court stated that it did not see her look anywhere. Finally, at a bench conference during the cross-examination of A. D., one of the defendant's attorneys moved for a mistrial, stating that after he asked a question but before A. D. answered, A. D. looked at the prosecutor, who shook his head to indicate no. Before the court responded, the defendant's other attorney complained that at that very moment the prosecutor was staring at the jury. The court then asked defense counsel where he wanted the prosecutor to look, to which defense counsel asked why the prosecutor was not at the bench. The court then instructed, "Let's go on," and the defendant complied without further comment. We note that the defendant did not move for a mistrial on the first two occasions and did not secure a ruling on the third occasion. In

-132-

any event, we conclude no proof is in the record of any improper conduct in this regard. Accordingly, a mistrial was not warranted based upon the prosecutor's alleged facial expressions to witnesses.

The defendant next complains that the prosecutor turned his chair to face the defendant and glared at him with an angry and disgusted expression on various occasions throughout the trial. Of course, from the record before us, we cannot view the expression about which the defendant complains. However, the court did view the prosecutor's conduct. Indeed, on one occasion, the defendant voiced his objection to the prosecutor's rocking and glaring. The court stated that it saw what the prosecutor was doing but that "sitting there looking at the defendant, to me, is not offensive. . . . If I see something that I consider to be offensive, I will address it." The court later stated that it would not order the prosecutor not to look at the defendant. Although we question the professionalism of the prosecutor's conduct, in light of the fact that the trial court did not believe it to be offensive, we cannot say that the trial court abused its discretion in refusing to grant a mistrial based upon this conduct.

The defendant also contends that the trial court should have granted him a mistrial because the prosecutor did not attend bench conferences and, instead, while the defense attorneys were at the bench, glared at the defendant or smiled at the jury. First, we cannot say that it was prosecutorial misconduct not to approach the bench each time the defendant asked if he could approach. Indeed, the prosecutor asked the trial court if he were required to come to the bench with defense counsel, and the trial court said that he was not. Additionally, as noted above, the trial court stated that it had seen the manner in which the prosecutor faced and looked at the defendant, that it was not offensive, and that it would address the conduct if it became offensive. Regarding the prosecutor's smiling at the jury, again, we cannot view the conduct about which the defendant complains. This conduct occurred when defense counsel was at a bench conference during the cross-examination of A. D. During the bench conference, defense counsel complained that the prosecutor was staring at the jury, to which the court asked where defense counsel wanted the prosecutor to look. At this point, the defendant complained that the prosecutor should be at the bench conference, and then the transcript reflects that the remainder of the conference was inaudible because the defense attorneys were speaking at the same time. The court then stated, "Let's move on," and the defendant complied without voicing any further objection. The record contains no proof that the prosecutor behaved improperly in looking at the jury. We cannot conclude that the trial court abused its discretion in refusing to grant a mistrial based on the prosecutor not attending bench conferences and, instead, looking at the defendant or the jury.

The defendant next contends that a mistrial should have been granted because the prosecutor demeaned defense counsel and the defendant. Initially, we note that although the defendant moved for a mistrial on numerous occasions, he never moved for one on these vague grounds. We presume that the defendant's other complaints within this issue, e.g., staring at the defendant and walking to the back of the courtroom while defense counsel was talking, encompass the prosecutor's behavior which he believes demeaned him and his counsel. In any event, the record does not reveal behavior

-133-

by the prosecutor demeaning the defendant or his attorneys that warranted the granting of a mistrial.

The defendant also contends that the trial court should have granted a mistrial because the prosecutors spoke loudly enough for the jury to hear when they were sitting at the state's counsel table. The defendant objected to the prosecutors whispering to each other "while facing the jury" statements like "they are going to get it in before the jury." The court refused to impose a rule preventing co-counsel from talking, noting that when one of the defense attorneys "whispered" to his co-counsel, which he did frequently, everybody in the courtroom heard him. However, the court ordered the prosecutors to control their whispering and not to make any inappropriate comments. The defendant did not raise this issue again during the trial. Moreover, there is no proof that any of the jurors heard what the prosecutors whispered or that what they whispered was inappropriate. We conclude that a mistrial was not warranted based upon this ground.

The defendant next contends that the trial court should have granted a mistrial because the prosecutor walked to the back of the courtroom in disgust. During a jury-out hearing, defense counsel suggested to the court that some Knox County Sheriff's deputies, including some who had been subpoenaed in the case, had talked amongst each other about the proceedings and their testimony. The district attorney stated, "I choose not to hear this." After a brief exchange between the attorneys, the district attorney asked the court if he could be excused, to which the court responded, "Go ahead. We are going to take a little recess." Defense counsel continued talking, stating, "My objection – could the record reflect [the prosecutor] is walking out of the courtroom?" The prosecutor replied, "In utter disgust." This incident did not occur in the presence of the jury, and the defendant did not move for a mistrial at this time. Moreover, before the prosecutor walked to the back of the courtroom, the trial court specifically excused him, stating that it was taking a recess. Although defense counsel continued to voice an objection, the court recessed almost immediately thereafter. We conclude that a mistrial was not warranted based upon this conduct.

The defendant contends that the trial court should have granted a mistrial because the prosecutor referred to the witnesses by their first names. Although the defendant fails to cite to the specific instances of which he complains, the record reveals that the prosecutor addressed A. D. by a nickname on two occasions. The first time, on direct examination, the defendant did not object. At the beginning of his redirect examination, the prosecutor mentioned the nickname and the defendant immediately objected. The prosecutor apologized and continued his questioning, addressing the witness as A. D. Again, we note that the defendant did not move for a mistrial. In any event, we cannot say that these two instances amount to prosecutorial misconduct. This complaint is without merit.

The defendant also complains that the prosecutor displayed evidence to the jury before the defense had an opportunity to object. The defendant does not cite to the record the instance or instances underlying this complaint. However, the complaint appears to be referring to the prosecutors displaying a rope and a photograph of the defendant in the first rape trial. Conduct from the first rape trial would not be grounds for a mistrial in the consolidated rape trial. Furthermore, to the extent that the defendant is complaining about the evidence used by the state in the

consolidated rape trial, we addressed those complaints in the defendant's thirteenth issue regarding the admissibility of evidence not disclosed in discovery or in the state's Rule 12(d)(2) notice.

Although we conclude that the trial court did not abuse its discretion in denying any of the defendant's motions for a mistrial, we recognize that the cumulative effect of prosecutorial misconduct warrants a reversal when the misconduct affected the verdict to the prejudice of the defendant. See State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). However, as set forth above, almost all of the defendant's complaints did not involve misconduct by the prosecutor. Moreover, we cannot say that the few instances of improper conduct, specifically the prosecutor's improper remarks in his opening statement and closing argument, as discussed within the next issue, more probably than not affected the verdict to the defendant's prejudice.

### XVI.  OPENING STATEMENTS AND CLOSING ARGUMENTS

The defendant contends that the state made improper and prejudicial comments during its closing argument in the first rape trial, requiring reversal of his convictions and a new trial. He also contends that he should be granted a new trial because of the state's improper comments in both its opening statement and closing argument in the consolidated rape trial. The state contends that its closing argument in the first rape trial was proper. It also contends that most of the alleged improper comments in the consolidated rape trial were proper and that none of the improper ones require reversal.

When a defendant raises the issue of prosecutorial misconduct based upon improper comments, the defendant is required to show that the argument was so inflammatory or so improper that it affected the verdict to his or her detriment." State v. Seay, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996). Factors relevant to that determination include:

> 1.  The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2.  The curative measures undertaken by the court and the prosecution.
>
> 3.  The intent of the prosecutor in making the improper statement.
>
> 4.  The cumulative effect of the improper conduct and any other errors in the record.
>
> 5.  The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Our supreme court has recognized that closing argument is a valuable privilege for both the state and the defense and that counsel is

afforded wide latitude in presenting final argument to the jury.  See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998);  State v. Cone, 665 S.W.2d 87, 94 (Tenn. 1984).

## A.  The First Rape Trial

The defendant contends that the prosecutor's closing argument was improper because he

(1)  referred to the defendant as the "human predator";

(2) bolstered the victim's credibility by praising her and thanking her for her courage;

(3)  stated personal opinions;

(4)  implied that the defendant had the burden of proof or an obligation to produce evidence;

(5) invited the jury to return to the sentencing hearing and watch the defendant go to prison;

(6) characterized the defendant's case as a "big, big lie";

(7) made inflammatory comments about defense counsel;

(8) referred to a juror by name; and

(9)  made inflammatory comments appealing to the jury's sympathy for the victim or her family.

The defendant's first complaint is that the prosecutor referred to him as the "human predator."  The prosecutor argued, "The big, big truth is that Thomas Dee Huskey, cruising down Fifth Avenue on Saturday morning, the human predator, snatched her in and had his way." The state contends that this phrase was not derogatory and accurately described the defendant's actions. We disagree.  We believe that describing the defendant as a human predator was derogatory and improper. See People v. Peeples, 616 N.E.2d 294, 322 (Ill. 1993) (referring to the defendant as the human predator was improper); see also State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998) (using epithets to characterize the defendant is improper).

The defendant next contends that the prosecutor improperly bolstered the victim's credibility by praising and thanking her for her courage.  The prosecutor argued, "And now you know why [rapes] oftentimes [are] not reported, because you are now – you've had the opportunity to see what happens. Thank you [victim], for being strong.  Thank you [victim], for getting in front of these

-136-

people that you don't know and reliving this ordeal and embarrassing yourself beyond all measure." At this point, the defendant objected, and the court told the prosecutor, who was apparently facing the victim, who was sitting in the audience, to address the jury. We conclude that these comments, especially considering that the prosecutor was addressing the victim and not the jury, were inappropriate.

The defendant also contends that the prosecutor stated his personal opinions regarding the credibility of witnesses and the guilt of the accused during his closing argument. Although the defendant does not cite the specific instances about which he complains, the basis of this complaint appears to be that the prosecutor repeatedly used "I" and "we" during his argument. Our review of the closing argument does not reveal any misconduct in this respect. Initially, we note that although it is improper for a prosecutor to express a personal belief or opinion, this court has noted that if the "argument is predicated by the words 'I think' or 'I submit,' it is unlikely to be adjudged as a personal opinion." Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Thus, it is not necessarily misconduct each time a prosecutor uses "I" or "we." Moreover, in this case, the defendant's first objection to the prosecutor's argument was when the prosecutor stated, near the beginning of his argument, "Now, we're asking you to convict him . . . . I'm asking you to convict him . . . ." After the defendant objected, the prosecutor volunteered to rephrase and stated, "The State of Tennessee, the people of the county of Knox are asking you to convict" the defendant. Even though the prosecutor used the words "I" and "we" after this incident, we do not believe their context was of significance.

The defendant next contends that the prosecutor implied that the defendant had the burden of proof or an obligation to produce evidence. At the end of the prosecutor's closing argument, the prosecutor encouraged the jury to listen closely to the defendant's argument, stating,

> You listen and then you think about, while they're talking to you, in your mind you – you think and you let them know by the way you're thinking, we want to know where the big lie is in the stall. We're not concerned about 1991. We're not concerned about 1989. We're concerned with July the 18th, 1992, at 7:30 to 8 o'clock in the morning at a stall at the zoo. Now, you talk about that, and you convince us of the big, big lie on those activities, and we'll acquit him.

This argument was a response to the defendant's opening statement and proof. The defendant claimed in his opening statement that the victim's story was a "big, big lie." Moreover, the defendant vigorously attacked the victim's credibility during the trial. The prosecutor's argument here asked the jury to focus on the facts of the offense, suggesting that although the defendant had attacked the victim's credibility, he had not impeached her relative to her story of being raped by the defendant. We conclude that this argument was proper.

-137-

The defendant's next complaint relates to the prosecutor's inviting the jury to return to the sentencing hearing and watch the defendant go to prison. The prosecutor ended his rebuttal closing argument by asking the jury to find the defendant guilty and "then come back at sentencing and watch him go to prison." The defendant contends that this was a comment on the general problem of crime in the community and that it implied that the jury had a duty to protect the community. We disagree that this comment produced such an implication, and we note that the defendant does not explain how such an implication is derived from this comment. However, because the comment was not based upon the evidence and was totally irrelevant to the defendant's innocence or guilt, it was inappropriate. See Cauthern, 967 S.W.2d at 737.

The defendant contends that the prosecutor improperly referred to his defense as a "big, big lie." As noted above, in the defendant's opening statement, he stated that the case was a big, big lie. In the state's closing argument, the prosecutor played on this phrase, discussing the evidence and then asking where the big lie was and commenting that the big lie never showed up. We cannot conclude that this was improper argument.

The defendant also contends that the prosecutor made inflammatory comments about defense counsel, arguing that it was improper to comment about what "Herb" did. While it is true that the prosecutor referred to one of the defendant's attorneys by his first name, the defendant does not explain how this was inflammatory.

The defendant next argues that the prosecutor improperly referred to a juror by name. The prosecutor argued,

> And whomever is elected the foreperson of this jury walk back in in a few minutes, and whoever it is will sit here where Mr. Gorman is, and the judge is going to ask you to rise. And rise up, foreman – foreperson of this jury, and when he tells him to stand, look him in the eye and say, we, the jury, find Thomas Dee Huskey guilty.

Generally, it is improper to address a juror individually or by name during argument. See Pendleton v. Evetts, 611 S.W.2d 607, 608 (Tenn. Ct. App. 1981); see also Johnson v. State, 453 N.E.2d, 365, 369 (Ind. Ct. App. 1983) (holding that it was improper to address a juror by name because in doing so a juror would be "especially likely to be influenced by a direct appeal to his or her individual fears or prejudices"); Annotation, Prejudicial Effect of Counsel's Addressing Individually or by Name Particular Juror during Argument, 55 A.L.R.2d 1198, 1199 (1957) (stating that the reason for not allowing counsel to address jurors by name is the "fact that it brings to bear a collateral influence which may tend to prejudice the mind on the basis of something irrelevant to the real issues of a case"). However, in this case, the prosecutor did not use the juror's name to make a direct appeal to him or to try to influence him in any way. Rather, the prosecutor used the juror's name only to indicate where the foreperson would sit. Thus, although the prosecutor used a juror's name, it was

in the context of informing the entire jury of a particular location. We conclude that the prosecutor's using the juror's name in this way did not constitute an improper argument.

The defendant's last contention regarding the prosecutor's closing argument in the first rape trial is that the prosecutor made inflammatory comments appealing to the jury's sympathy for the victim or her family. Again, the defendant does not cite the portion of the argument that supports this claim. However, we note that the prosecutor questioned the defense's theory that the victim was simply maintaining a lie, arguing,

> [I]t was a terrible trade, wasn't it, [T.H.], to stand here on this stand before people that you have never seen before in your life, your mother, members of the press, the citizens of this county and relate this horrific story? You're going to go through that. You're going to go through that to maintain the big, big lie.

We do not believe that this argument was improper. Moreover, from our review of the prosecutor's argument, we fail to see any other improper argument in this regard.

Finally, we must determine whether the prosecutor's improper comments – referring to the defendant as the "human predator"; addressing the victim, who was in the audience, and thanking her for her courage; and inviting the jury to return to watch the defendant go to prison – warrant a reversal in this case. First, the prosecutor referred to the defendant as the human predator only one time. The defendant did not object at the time or at the end of the arguments when additional objections were made, see State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that a complaint of improper argument is waived "for failure to make an objection during argument"), and thus, the trial court did not provide a curative instruction regarding this comment. Also, although inviting the jury back to the sentencing hearing was improper, because of the nature of the charges, the jury almost certainly knew that the defendant would go to prison if convicted. Indeed, the trial court instructed the jury about the range of punishment for each charged offense. Considering the improper comments in this light, as well as the trial court's instructions to the jury that arguments of counsel were not evidence and that its decision was to be based upon the evidence, we cannot say that the improper argument affected the verdict to the prejudice of the defendant.

## B. Consolidated Rape

The defendant contends that the prosecutor made improper statements in his opening statement and closing argument. The defendant complains that the prosecutor

(1) referred to the cases as a "reign of terror";

(2) stated his personal opinions;

(3) argued that victims were saved "by the grace of god";

-139-

(4) stated that the evidence would include "the most sordid details of decadence and pure evil that you have ever seen, that you have ever heard";

(5) referred to the defendant as "evil personified";

(6) stated, "The necessity of evil to prevail is for good people not to come forward.";

(7) provided the jury with an improper standard of reasonable doubt;

(8) referred to the defendant as the "human predator";

(9) stated that the defendant preyed "on the weakest of the weak";

(10) described the defendant's conduct as "brutalization";

(11) acknowledged that he made a mistake relative to the bill of particulars;

(12) stated that he was paid by the people of Knox County and that prosecuting was a full-time job;

(13) stated that he was "not ashamed of this prosecution, and these ladies have told you the truth";

(14) made inflammatory comments regarding defense counsel; and

(15) implied that the defendant had the burden of proof or an obligation to produce evidence.

Regarding the defendant's first complaint, the prosecutor described the defendant's course of conduct as a "reign of terror" in his opening statement and closing argument. The state argues that this phrase accurately described the evidence as outlined in the opening statement and then produced during the trial. Although we do not believe it was appropriate in an opening statement, we believe it was proper in closing argument. An opening statement is for the purpose of advising the jury of the salient facts expected to be proved in the framework of the party's theory of the case. It is not argument. Describing the defendant's conduct as a "reign of terror," given the evidence in this case, was not outside the bounds of proper argument. See People v. Poree, 456 N.E.2d 950, 955-56 (Ill. App. Ct. 1983) (concluding that prosecutor's reference to the defendants as "professionals" and their conduct as a "reign of terror" was not improper when supported by the evidence).

-140-

The defendant contends that the prosecutor stated personal opinions throughout his opening statement and closing argument. Initially, we note that the basis for some of the above-listed complaints – for example, the prosecutor's use of "weakest of the weak" and "brutalization" – is that the statements were personal opinions. We address the merits of these below. However, we note that at trial the defendant complained that the prosecutor repeatedly stated his personal opinion because he used "I" throughout his opening statement and closing argument. The defendant argued that it was improper for the prosecutor to say, "I am going to argue to you," "I am going to speak to you," "I called her in to testify," and "I am going to persuade you." Again, we note that if the "argument is predicated by the words 'I think' or 'I submit,' it is unlikely to be adjudged as a personal opinion." Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). To the extent that the defendant's complaint regarding the prosecutor stating personal opinions is based upon his using "I," we conclude that the argument was not improper.

The defendant next complains that the prosecutor improperly stated that the victims were "saved by the grace of god." "It is well-established in Tennessee law that references to biblical passages or religious law during the course of a criminal trial are inappropriate." State v. Cribbs, 967 S.W.2d 773, 784 (Tenn. 1998). The state argues, however, that this phrase is not biblical but a common phrase devoid of any religious significance. Although the phrase "saved by the grace of god" may be one of common usage among all people, regardless of their faith, if any, we acknowledge that in this case the phrase could have been used as a contrast to calling the defendant evil, as discussed in the next paragraph. In this respect, the prosecutor's use of "saved by the grace of god" borders on impropriety.

The defendant's next three contentions involve the prosecutor's use of the word evil. In his opening statement, the prosecutor, in discussing what the state believed D. C.'s testimony would be, stated, "This wasn't a regular date. There was problems early on, and then she is going to tell you, I suggest to you, the most sordid details of decadence and pure evil that you have ever seen, that you have ever heard. Evil personified, there he sits." We agree with the defendant that these comments were improper. See State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998) (referring to the defendant repeatedly as the "evil one," used as an epithet to characterize the defendant, was improper); State v. Griffis, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997) (referring to defendants as "evil, despicable human beings" was improper). The defendant also complains about the prosecutor's reciting a quote from Sir Edmond Burke. In his closing argument, the prosecutor attempted to explain the delay between D. C. being raped and her filing a formal complaint. He argued,

> [D. C.] testified to you first, and she said to you that, in August of
> 1991 – and she has trouble on the date – the first couple of weeks
> in August. Okay. As you know, she didn't go to the police
> formally until October of 1992 – about a fourteen-month swing,
> as you will remember, on the testimony. Although she did say
> something to, I believe it was Stiles or Pressley – somebody said,
> "Don't file a report." Something to the effect that, "Well, you

-141-

know, after all, you are a prostitute, and probably nothing is going to happen."

It reminds me of Sir Edmond Burke, a great Englishman, said, "The necessity of evil to prevail is for good people not to come forward." They did.

In its context and on its face, this argument was proper rhetoric. However, because the prosecutor twice characterized the defendant as evil in his opening statement, we question the propriety of using this quote, in which the prosecutor indirectly characterized the defendant as evil. Nevertheless, as discussed below, we conclude that the prosecutor's referring to the defendant as evil did not affect the verdict to the prejudice of the defendant.

The defendant also contends that the prosecutor provided the jury with an improper standard of reasonable doubt. The prosecutor argued,

He made [G. T.] then, as she was still on her knees, to lean back over, and attempted to penetrate her vaginally unsuccessfully. I think you could probably figure out that, if you are on your knees, and your hands are bound, and you are trying to lean back, and somebody is trying to penetrate you vaginally, that would be difficult to do. And let me tell you – you know what she said. You remember the words.

Now, you know, let me just be square with you. You know, I think this is a perfect example of reasonable doubt. Is there reasonable doubt that he actually penetrated her? You know there is a doubt. Did he really penetrate her vaginally?

Now, that is the pure – pure definition of reasonable doubt. Am I satisfied to a moral certainty that he raped her vaginally? I think there is reasonable doubt. The Judge is going to instruct you on attempted rape. Hit him on that.

THE COURT: That is incorrect, General.

DISTRICT ATTORNEY: I am sorry?

THE COURT: That is incorrect.

DISTRICT ATTORNEY: Thank you, Your Honor. Not going to be charged. Acquit him of it. Say not guilty on that count on vaginal rape. Then use that as your standard for reasonable

doubt. Convict him – convict him in regard to [G. T.] on what you know to be the truth. Rape by anal intercourse, rape by fellatio, the first and second counts.

In Ledford v. State, 568 S.W.2d 113, 117 (Tenn. Crim. App. 1978), the prosecutor argued that "if the jury 'knows' the defendant is guilty, but concludes that the State has failed to prove its case, the jury must nevertheless convict the defendant because the State has actually proved its case otherwise the jury could not 'know' the defendant was guilty." This court held that the argument was a "prejudicially erroneous explanation of the reasonable doubt standard. Id. In this case, though, we cannot say that the argument, in which the prosecutor used "moral certainty" to describe the reasonable doubt standard and told the jury to convict the defendant on what it knew to be the truth, provided the jury with a prejudicially erroneous explanation of reasonable doubt. Moreover, the trial court properly instructed the jury regarding the reasonable doubt standard.

The defendant's next complaint is that the prosecutor referred to the defendant as the human predator. As we already concluded in the analysis relating to the first rape trial, this comment was improper.

The defendant contends that the prosecutor improperly commented that the defendant preyed "on the weakest of the weak." Although the defendant does not explain how this statement was improper, at trial he objected that this was a statement of personal opinion. The victims were four prostitutes, and the evidence showed that in their profession, they were susceptible to sexual assaults and rapes. Also, there was evidence that prostitutes would not always report rapes and that their claims of rape were not credible. In this respect, the victims were weak. We cannot say that this was outside the bounds of the wide latitude afforded counsel for closing arguments.

The defendant also contends that the prosecutor's describing the defendant's conduct as "brutalization" was improper, asserting that this was a statement of the prosecutor's personal opinion. Given the victims' testimony, we cannot conclude that the prosecutor's use of the words brutalize and brutalization was improper closing argument.

The defendant next complains that the prosecutor improperly acknowledged that he made a mistake relative to the bill of particulars. In the defendant's closing argument, he questioned the dates listed in the state's bill of particulars, arguing,

> Now, when [the district attorney] gets up in his closing argument to you, ladies and gentlemen of the jury – on August 8th of 1996,

-143-

[the district attorney] filed a bill of particulars in this case. That is eight days before August the 16th, 1996.[5]

In that bill of particulars . . . [he] alleged under his signature that the date of [D. C.'s] crime was August 23, 1991, until September the 6th of 1991. . . .

What happens, all of a sudden when he gets [D. C.] in on August the 16th, says, you know, "Whatever happened to me happened to me in the first of August."

So, [district attorney], possibly in your closing argument, you could tell the ladies and gentlemen of the jury why you told the defense, on August the 8th, that it happened after August the 23rd.

In his rebuttal closing argument, the prosecutor responded to the defendant's argument,

I made a mistake when I told them that we believed the crime in regard to [D. C.] was this date. I said that. There is no doubt about it. I said it back in early April, and then what we did is we called her into this courtroom before this Judge. She testified from right there to this Judge when it happened, under oath.

She said it happened the first couple of weeks in August of 1991. Lo and behold, the indictment that you see that was filed on the 9th day of November, 1992, says it happened in August of 1991. That is what she always said.

The defendant argues that the prosecutor's explanation for the variance in the dates in the bill of particulars and the trial testimony constituted material not in evidence and the prosecutor's personal opinion. Although we agree that a prosecutor may not express his or her personal opinion or discuss matters not in evidence, we believe that the defendant invited the prosecutor's remarks by challenging him to explain the dates in the bill of particulars. After the defendant issued this challenge, we do not view the prosecutor's response to be improper argument.

---

[5] The record reveals that the actual dates to which the defendant was referring were April 8th and 16th, 1996.

The defendant's next two complaints involve the prosecutor's response to the defendant's argument that the prosecutor had put a "political spin" on the facts of the cases to cover the state's mistakes. The prosecutor argued,

> So you know, this political spin that we are talking about that we are here – that there is something peculiar that we are here makes no sense. The people of Knox County pay me to prosecute. That is my full-time job.
>
> Nobody wants to do that every day. Nobody wants to talk about forced anal intercourse, and forced oral sex, and forced vaginal intercourse, and robbery, and kidnapping. Goodness, nobody would want to do that every day, would they? But, ladies and gentlemen, as I stand here with this front row, I am not ashamed of this prosecution, and these ladies have told you the truth.

The defendant does not explain how the prosecutor's reference to his job and how he was paid – something the jury almost certainly knew – was improper. We cannot conclude that this statement was improper. Moreover, contrary to the defendant's assertion, the statement that "these ladies have told you the truth" was not a statement of the prosecutor's personal opinion. We cannot conclude that this statement was improper.

In the defendant's last two contentions, he complains about the prosecutor arguing that the defendant wanted the jury to believe that the prosecutor and the victims "have orchestrated and planned this prosecution. We have made it up." The defendant asserts that these statements were inflammatory toward his counsel and that it implied that he had the burden of proof or an obligation to produce evidence. The defendant does not explain either of these assertions. Nonetheless, this argument, a response to the defendant's questioning the victims about their meeting with the prosecutor before the trial, was not improper.

In summary, we conclude that the prosecutor should not have referred to the defendant's "reign of terror" and as being evil in his opening statement, as evil (through quoting Sir Edmond Burke), and as a "human predator" in his closing argument. Also, the prosecutor questionably argued that the victims were "saved by the grace of god." However, given that these were the only comments of concern, we cannot conclude that the prosecutor's argument was so inflammatory or so improper that it more probably than not affected the verdict to the prejudice of the defendant.

## XVII. SENTENCING

The defendant contends that the trial court erroneously enhanced his sentences based upon conduct that occurred while he was insane and failed to sentence him as an especially mitigated offender for his convictions in both rape trials. He also argues that Tenn. Code Ann. § 33-6-302

required that the trial court commit him to an institution as a mentally ill person rather than sentencing him to incarceration in the Department of Correction. The state contends that the defendant is not insane, that section 33-6-302 does not apply to this case, and that the defendant's sentences are appropriate. We agree with the state.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

Because the present offenses were committed in 1991 and 1992, the sentence to be imposed by the trial court is presumptively the minimum in the range if neither enhancement nor mitigating factors are present.[6] Tenn. Code Ann. § 40-35-210(c) (amended 1995). Procedurally, the trial court

_____

[6]The legislature amended the statute to provide that for offenses committed on or after July 1, 1995, the presumptive sentence for Class A felonies is the midpoint of the range. Tenn. Code Ann. § 40-35-210(c).

is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169. We will first briefly set forth the facts relating to sentencing for each rape trial, and then we will examine the defendant's contentions.

## A. The First Rape Trial

In the first rape trial, the jury convicted the defendant of two counts of aggravated rape and one count of aggravated robbery. At the sentencing hearing, the state introduced the presentence report as an exhibit. The defendant presented the May 14, 1995 statement of the victim and sought to introduce the report of Dr. Robert Sadoff. The state objected to the introduction of the report, arguing that it was hearsay, that the state had not examined it, and that the defendant had refused to submit to a court-ordered mental examination before trial thereby preventing the state from gaining any evidence to respond to the report. The defendant denied that he wanted to use Dr. Sadoff's report as notice of a mental disease or defect but instead assured the court that he wanted to use it in support of the mitigating factor that he was suffering from a mental condition that significantly reduced his culpability for the offense. See Tenn. Code Ann. § 40-35-113(8). The trial court agreed that it could consider the report as evidence appropriate to sentencing but expressed concern that the report was hearsay and asked the state whether it wanted the opportunity to cross-examine Dr. Sadoff. The state did not insist upon Dr. Sadoff testifying at the hearing, and the court concluded that it would consider the report.

In the November 1, 1995 report, Dr. Sadoff diagnosed the defendant as having Dissociative Identity Disorder (DID) and stated that his review of the records and examinations of the defendant revealed that the defendant's "alter" personality Kyle was responsible for the rapes and murders. He concluded with reasonable medical certainty that because the defendant had no knowledge of Kyle and could not control Kyle's emergence, the defendant lacked substantial capacity to conform his conduct to the law when Kyle emerged.

The trial court noted that the defendant was a Range I, standard offender. It applied the following enhancement factors to all three convictions:

> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
>
> (6), The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; [and]
>
> . . . ;

(16) The crime was committed under circumstances under which
the potential for bodily injury to a victim was great . . . .

Tenn. Code Ann. § 40-35-114(5), (6), (16). It applied enhancement factor (7), that the "offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement," to the defendant's two convictions for aggravated rape. Tenn. Code Ann. § 40-35-114(7). It also applied mitigating factor (8), that the "defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense." Tenn. Code Ann. § 40-35-113(8). Finding that the enhancement factors substantially outweighed the mitigating factors, the court sentenced the defendant to twenty-two years for each aggravated rape conviction and to eleven years for the aggravated robbery conviction to be served concurrently in the Department of Correction.

### B. Consolidated Rape Trial

At the consolidated rape trial, the defendant was convicted of the following with regard to the three victims:

| D. C. | three counts of aggravated rape, Class A felonies, especially aggravated kidnapping, a Class A felony, |
| A. D. | two counts of rape, Class B felonies, aggravated kidnapping, a Class B felony, |
| G. T. | two counts of rape, Class B felonies, robbery, a Class C felony. |

The state again presented no witnesses at the sentencing hearing but relied upon the presentence report and the evidence presented at trial. The defendant likewise presented no witnesses but asked the court to consider, in addition to Dr. Sadoff's report, an affidavit from Dr. Diana McCoy and the pretrial testimony of Dr. Clifford Tennison and Jailor Terry Birnbaum on his mental condition. Also on this issue, he asked the court to consider the fact that at the suppression hearing, Detective Johnson testified that he addressed the defendant as Kyle while interrogating him.

The trial court sentenced the defendant as a Range I, standard offender. It applied enhancement factor (5), that the defendant treated the victim with exceptional cruelty, to all of the rape and kidnapping convictions. See Tenn. Code Ann. § 40-35-114(5). Finding that enhancement factor (6), that the victims sustained particularly great personal injuries, includes both physical and mental injuries, the court also applied this factor to all the various rape and kidnapping convictions. See Tenn. Code Ann. § 40-35-114(6). Looking to the manner in which the defendant carried out the sexual acts, it enhanced the various rape convictions with factor (7), that the defendant committed the offense involving a victim to gratify his desire for pleasure or excitement. Tenn. Code Ann. § 40-35-114(7). It applied factor (9), that the defendant possessed or employed a deadly weapon

-148-

during the commission of the offenses, to the rape convictions relating to A. D. and the rape and robbery convictions relating to G. T. See Tenn. Code Ann. § 40-35-114(9). Finally, it enhanced all of the various rape and kidnapping convictions with factor (16), that the circumstances under which the crimes were committed carried great potential for bodily injury to the victims. See Tenn. Code Ann. § 40-35-114(16). The trial court stated that after reading Dr. Sadoff's report and listening to Dr. Tennison's testimony, it believed that the defendant suffers from a mental illness, and it applied mitigating factor (8), that the defendant was suffering from a mental condition, which significantly reduced his culpability for the offense. See Tenn. Code Ann. § 40-35-113(8).

The trial court found that the enhancement factors substantially outweighed the mitigating factor. With respect to the offenses against D. C., it sentenced the defendant to concurrent sentences of twenty-two years for each aggravated rape conviction and to twenty years for the especially aggravated kidnapping conviction for an effective sentence of twenty-two years. For the offenses against A. D., it sentenced the defendant to concurrent sentences of eleven years for each rape conviction and ten years for the aggravated kidnapping conviction for an effective sentence of eleven years. With regard to the offenses against G. T., the trial court sentenced him to concurrent sentences of eleven years for each rape conviction and to three years for the robbery conviction for an effective sentence of eleven years. The court ruled that the defendant would serve all sentences in the Department of Correction.

In light of the defendant's multiple convictions for rape, kidnapping, and robbery of four victims, the trial court found that the defendant had an extensive record of criminal activity for purposes of consecutive sentencing. See Tenn. Code Ann. § 40-35-115(2). It also determined that he was a dangerous offender. See Tenn. Code Ann. § 40-35-115(4). It ordered the defendant to serve his sentences with respect to each consolidated rape victim consecutively to each other and to the sentence stemming from the convictions in the first rape trial for an effective sentence of sixty-six years.

C. Application of Enhancement Factors in Light of Defendant's Mental Condition

The defendant contends that because he presented unrefuted evidence at both sentencing hearings that he was insane, the trial court erroneously applied any enhancement factors and ordered that his sentences be served consecutively. He argues that it is wrong to punish someone for being mentally ill and that "constitutional precepts" prohibit enhancing his sentences or running them consecutively based upon conduct that occurred while he was insane. He concludes that, instead, the trial court should have sentenced him as an especially mitigated offender. See Tenn. Code Ann. § 40-35-109. He also contends that the trial court erroneously ignored and rejected Dr. Sadoff's report in the first rape trial despite the lack of countervailing proof of sanity in the record. The state contends that the defendant's argument is misplaced because neither the jury in either rape trial nor the trial court found him to be insane. It argues that the trial court considered the evidence that the defendant was mentally ill in applying mitigating factor (8) in both trials.

The defendant contends that the only proof presented at the sentencing hearings reveals that he was insane at the time of the conduct upon which the enhancement factors are based. Although he now attempts to parlay Dr. Sadoff's report into unrefuted evidence of his insanity, at the sentencing hearing in the first rape trial, the defendant repeatedly confirmed that he was only offering this report in support of his mitigating factors. In fact, he specifically stated that he was not seeking a ruling on his mental condition: "Now, this case was not tried on an issue of mental responsibility, and we do not seek to have Your Honor declare that Thomas Huskey is insane." The trial court made no finding that the defendant was insane but considered the report with respect to mitigating factor (8), finding it to be compelling evidence that the defendant suffered from a mental disease or defect. In the consolidated rape trial, the defendant again argued that he was mentally ill rather than arguing that he was insane. The trial court found:

> I believe that Mr. Huskey suffers from a mental illness. If nothing else – of course, I have read Dr. Sadoff's report. I listened to the testimony of Dr. Tennison. I don't know what it is. I don't understand it, but I believe that Mr. Huskey does indeed suffer from some type of mental illness.

We agree with the state that the basic premise of the defendant's argument – that he was insane at the time of the offenses – fails because neither the trial court nor the jury ever found him to be insane. Although he argues that the evidence at the sentencing hearings of his insanity was unrefuted, we note that the defendant denied that he was asking the court to consider Dr. Sadoff's report on the issue of insanity at the first rape trial. In the consolidated rape trial, the defendant directed the trial court to the pretrial testimony of Dr. Tennison, Detective Johnson, and Jailor Birnbaum as well as the report of Dr. Sadoff and the affidavit of Dr. McCoy. We note that Dr. Tennison testified that he was unable to determine whether the defendant was insane due to his lack of expertise in the field of DID and that Detective Johnson testified that he discovered information revealing that the defendant was malingering, although he addressed the defendant as Kyle when questioning him. The defendant is not entitled to relief on this issue.

Although not raised by either party, we question the trial court's basis for applying enhancement factor (7) to the consolidated rape convictions. Although the trial court noted that the manner in which the offenses were committed such as the verbal and physical abuse and the repeated sexual acts "apparently gave this defendant pleasure," it essentially found that the defendant committed the crimes in order to gratify his desire for pleasure or excitement because no other explanation such as financial or social purposes seemed to apply. With regard to factor (7), our supreme court has held that

> some acts of rape are not committed for pleasure at all. Some crimes of this nature are simply acts of brutality resulting from hatred or the desire to seek revenge, control, intimidate, or are the product of a misguided desire to just abuse another human being.

-150-

> The desire for pleasure or excitement should not be inherently presumed from the act of rape.

State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). Likewise, the desire for pleasure or excitement should not be attributed based solely upon the lack of another explanation.

We also determine that the trial court should not have applied enhancement factor (16), that the circumstances of the crime reveal great potential for bodily injury to a victim, to the aggravated rape convictions relating to the victim in the first trial, the aggravated rape and especially aggravated kidnapping convictions relating to D. C., or to the aggravated kidnapping conviction relating to A. D. All of these charges alleged that the defendant used or threatened the use of a deadly weapon. A great potential for bodily injury necessarily exists whenever a deadly weapon is used. State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (holding that factor (16) should not be applied to enhance an especially aggravated robbery conviction because it encompasses an element of the offense); see also State v. Imfeld, 70 S.W.3d 698, 706 (Tenn. 2002) (reasoning that the elements of aggravated assault – recklessly causing bodily injury to a victim with a deadly weapon – are contained in the statutory language of factor (16), making it inapplicable to enhance the sentence). Thus, great risk of bodily injury was inherent in the aggravated rape and the especially aggravated and aggravated kidnapping convictions. On the other hand, the trial court properly applied factor (16) to the rape convictions relating to A. D. and G. T.

Although the trial court should not have applied factor (16) to the aggravated rape convictions in the first rape trial, the remaining factors – (5), (6), and (7) – amply support the trial court's assignment of substantial weight to the enhancement factors. The twenty-two-year sentence imposed for the aggravated rape convictions is justified.

Factors (7) and (16) were misapplied to the convictions the consolidated rape trial, but we conclude that enhancement factor (1), regarding the defendant's "previous history of criminal convictions or criminal behavior" applies based upon the defendant's convictions for two counts of aggravated rape and one count of aggravated robbery in the first rape trial. The trial court did not apply this factor out of an abundance of caution because all of the consolidated rape offenses occurred before the offenses in the first rape trial except those against D. C. We believe that the trial court was too cautious. "Trial judges can consider criminal convictions or any other criminal behavior which occurred prior to the sentencing hearing as being 'a previous history of criminal convictions or criminal behavior' under Tenn. Code. Ann. § 40-35-114(1), regardless of whether the convictions or behavior occurred before or after the criminal conduct under consideration." State v. Ed Waters, No. 01-C-01-9106-CR-00158, Hickman County, slip op. at 6-7 (Tenn. Crim. App. Feb. 20, 1992); see also State v. Servando Galvan, No. 01C01-9807-CC-00313, Marshall County, slip op. at 7 (Tenn. Crim. App. 1999). With the defendant being a dangerous offender, our de novo review of the sentences also reveals that they are reasonable in relation to the severity of the offenses and necessary to protect the public from other serious crimes by the defendant. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). We conclude that the sentences imposed by the trial court are appropriate, although the reversal of the

convictions regarding the offenses against D. C. changes the effective sentence to forty-four years in the Department of Correction.

### D.  Manner of Service

The defendant also contends that the trial court erroneously sentenced him to incarceration rather than committing him to an institution for the mentally ill.  He argues that Tenn. Code Ann. § 33-6-302 (repealed 2000) creates an irrebuttable presumption that he is mentally ill.  See Dean v. McWherter, 70 F.3d 43, 45 (6th Cir. 1995). He asserts that he should be confined in a mental facility pursuant to this statute.  The state contends that the defendant misconstrues the statute.

Tenn. Code Ann. § 33-6-302 provides:

> Sex offenders constitute a species of mentally ill persons in the eyes of the general assembly, and where this tendency is pronounced, they should have the same care and custody as mentally ill persons generally, and such persons should be given continued care and treatment so long as their release would constitute a threat to them or to the general public.

(Repealed 2000).  The defendant meets the definition of a sex offender within the repealed chapter as a person convicted of rape.  Tenn. Crim. Ann. § 33-6-301 (repealed 2000).  Section 33-6-303 states that once convicted of a sex crime, an inmate shall be examined by a psychiatrist or licensed psychologist "as soon as practicable after admittance to the penal institution."  If the examination reveals that the sex offender can be successfully treated, this fact and the suggested treatment shall be certified to the commissioner of correction, who shall provide the treatment.  Tenn. Code Ann. § 33-6-304 (repealed 2000).  Section 33-6-305(a) provides that sex offenders shall be examined by a Department of Correction psychiatrist or  psychologist, between a year and six months before release.  (Repealed 2000).  If the examination reveals that the sex offender is mentally ill and due to his or her illness poses a likelihood of serious harm, the director of the correctional institution shall petition that the offender be judicially committed to a hospital or treatment resource.  Tenn. Code Ann. § 33-6-305(c) (repealed 2000).

Reading these sections together, section 33-6-302 did not require the trial court to commit the present defendant to a mental institution.  Instead, this chapter directed the director of the correctional institution to provide treatment for sex offenders at the penal institution and to petition that they be judicially committed if they have a mental illness posing a likelihood of serious harm within a year of their release.  In rejecting the contention that section 33-6-302 stigmatizes sex offenders in violation of the due process clause, the Sixth Circuit observed that "the statute neither mandates any type of involuntary treatment nor requires that sex offenders be transferred to a separate correctional facility for special treatment." Dean, 70 F.3d at 45.  The trial court properly sentenced the defendant to the Department of Correction.

# XVIII. POST-TRIAL MOTIONS

The defendant contends that the trial court denied his rights to a speedy trial and to due process of law by delaying three years in ruling on his motion for new trial in the first rape case and two and one-half years in the consolidated rape case. He argues that as a result of the trial court's delay, he was deprived of the ability to appeal these convictions before his trial for the four homicides. He asserts that had the rape convictions been reversed on appeal before the homicide trial, the state would not have had the rape convictions to use in plea negotiations or as an aggravating factor supporting the imposition of the death penalty. The state argues that the trial court's delay in ruling on these motions was caused by the defendant's numerous amendments to his motions for new trial.

The trial court entered the judgments of conviction in the first rape case on November 17, 1995, and in the consolidated rape case on July 8, 1996. The following chart presents the relevant filings regarding the defendant's motions for new trial, the dates filed, the case to which the filing applies, and the number of grounds for relief contained therein:

| Motion | Filed on | Filed in | Grounds |
|---|---|---|---|
| Motion for New Trial | December 6, 1995 | First rape trial | 47 |
| Amendment | March 29, 1996 | First rape trial | 4 |
| Amendment | April 15, 1996 | First rape trial | 1 |
| Motion for New Trial | July 29, 1996 | Both | 1 |
| Motion for New Trial | August 8, 1996 | Consolidated Rape | 57 |
| Amendment | October 18, 1996 | Consolidated Rape | 1 |
| Amendment | October 23, 1996 | Consolidated Rape | 1 |
| Amendment | October 25, 1996 | First rape trial | 3 |
| Amendment | October 25, 1996 | Consolidated Rape | 3 |
| Amendment | October 28, 1996 | First rape trial | 3 |
| Amendment | October 28, 1996 | Consolidated Rape | 3 |
| Amendment | April 30, 1998 | Consolidated Rape | 1 |
| Amendment | July 17, 1998 | First rape trial | 9 |
| Amendment | August 27, 1998 | First rape trial | 12 |

The trial court conducted the final hearing on the motion for new trial in the first rape case on August 26, 1998. The final hearing on the motion for new trial in the consolidated rape trial was held on September 16, 1998. On December 4, 1998, the trial court denied the defendant's motion for a new trial in the first rape trial, ruling that none of the alleged errors merited a new trial. On December 7, 1998, the defendant moved the trial court pursuant to Rule 33(d), Tenn. R. Crim. P., to enter findings of fact and conclusions of law on the issues raised in his motions for new trial in the first rape case. On January 8, 1999, the trial court filed an order denying the defendant's motion for a new trial in the consolidated rape case. On February 9, 1999, the trial court entered a second order denying the defendant's motion for new trial in the first rape trial and presenting its specific findings.

Although the defendant contends that the delayed rulings on his motions violate his right to a speedy trial, he argues that restrictions on a defendant's right to appeal must be measured under due process requirements like pre-arrest delay. We note that regarding a delay in hearing a motion for new trial, a panel of this court has observed that "the court must examine the conduct of the government and the defense to determine whether a violation of the defendant's due process right to a prompt appeal has occurred." State v. Billy Joe Baggett, No. 01C01-9604-CC-00160, Dickson County, slip op. at 12 (Tenn. Crim. App. Apr. 3, 1997), app. denied (Tenn. Dec. 22, 1997) (citing United States v. Smith, 94 F.3d 204, 207 (6th Cir. 1996)). Regardless of whether such delay should be analyzed as a violation of the speedy trial right or of due process, other than a nonspecific notation in passing, the defendant does not assert that he has suffered prejudice in his appeal of his rape convictions as a result of the delayed rulings on the motions for new trial. Instead, his claim of prejudice – that he lost the opportunity to have the rape convictions reversed before his homicide trial – relates to the homicide trial. Furthermore, we note that even this claim of prejudice is now moot. The defendant contends that if he had been able to have the rape convictions reversed on appeal before the homicide trial, the state would not have had the rape convictions to use in plea negotiations or as an aggravating factor supporting the imposition of the death penalty. The defendant's homicide trial resulted in a deadlocked jury, and this court affirmed the trial court's determination that he could be retried for those offenses. State v. Thomas Dee Huskey, 66 S.W.3d 905 (Tenn. Crim. App. 2001). The defendant has appealed his rape convictions before the retrial of his homicide charges. The defendant has failed to present any prejudice flowing from the trial court's delayed rulings. Thus, we conclude that the delay did not violate the defendant's rights.

With regard to the consolidated rape trial, the defendant also contends that once the trial court ruled on the motion for new trial, it failed to provide factual findings as requested pursuant to Rule 33(d), Tenn. R. Crim. P. He argues that the trial court's order on the motion for new trial does little more than restate his grounds for relief and then state that the grounds are without merit. He summarily requests that this court give the trial court's findings no weight on appeal and review his contentions de novo without a presumption of correctness in favor of the trial court's findings. The state contends that the defendant has waived this issue for failing to cite to any authority in support of his claim. Despite the state's argument, the defendant's reply merely restates his initial contention without elaboration or the addition of any supporting authority.

Rule 33(d), Tenn. R. Crim. P., provides that upon "ruling on the motion for a new trial the court, upon motion by either party, shall make and state into the record findings of fact and conclusions of law to explain its ruling on any issue not determined by the jury." The defendant filed a motion requesting that the trial court make specific findings pursuant to Rule 33(d) in the first rape case, but the record reveals that no such motion was filed in the consolidated rape case. We note that the defendant has argued on numerous occasions in his briefs and in the record, that before the first rape trial, the trial court ruled orally that a motion filed in one of the cases would be deemed filed in all of the defendant's cases. Although we have not located this ruling in the record, we note that the parties agreed that it existed at the hearing on the motion for new trial in the first rape trial. Although the trial court's findings in its order denying the motion for new trial in the consolidated rape case are succinct, we disagree with the defendant's characterization that the trial court

essentially made no findings. We note that at several points, the trial court refers to detailed findings that it made following extensive hearings on the various issues. We also note that in some instances, the trial court was hampered with regard to the defendant's failure to specify the errors of which he complained. In any event, even considering the Rule 33(d) motion in the first rape trial to apply to the consolidated rape case, the defendant has failed to explain how he has been prejudiced by the abbreviated findings or why the trial court's failure to make more extensive findings should cause this court to give the trial court's findings no weight. We do not believe that the defendant is entitled to his requested relief on this issue.

## XIX.  MOTIONS IN ARREST OF JUDGMENT

The defendant contends that the trial court failed to rule on his motions in arrest of judgment filed in both rape cases pursuant to Rule 34, Tenn. R. Crim. P. He argues that as a result of the trial court's failure to rule, this court should take the allegations in the motions as true, reverse the judgments of conviction, and dismiss the charges. The state contends that the defendant did not state grounds appropriate for relief under Rule 34 in the motion relating to the first rape case. With regard to the Rule 34 motion in the consolidated rape case, the state argues that the defendant's claim that the presentments fail to allege the requisite mental state was rejected by State v. Hill, 954 S.W.2d 725 (Tenn. 1997).

On December 6, 1995, the defendant filed a motion in arrest of judgment in the first rape case, contending that prejudicial and constitutional error made the judgments constitutionally infirm. Although he did not specify any instances of error in this motion, he incorporated by reference the grounds stated in his motions for mistrial and for a new trial. We note that the trial court did rule upon these grounds in ruling upon his motions for a mistrial and his new trial motions. On July 25, 1996, the defendant amended his motion, alleging that the presentment in the first rape case failed to state an offense because it did not contain the requisite mental state. Also on July 25, 1996, the defendant filed a motion to arrest the judgments of conviction and to dismiss the presentments in the consolidated rape case on the basis that they failed to allege the requisite mental state. On July 30, 1996, the trial court held a hearing on the defendant's motions in both cases. Following arguments from both parties, the trial court denied the motions. We note that in his notice of appeal in the consolidated rape case, the defendant stated that he appealed as of right from the trial court's denial of his motions for new trial, arrest of judgment, and resentencing. The defendant's contention that the trial court failed to rule on these motions is incorrect.

Rule 34, Tenn. R. Crim. P., provides that the trial "court on motion of a defendant shall arrest judgment if the indictment, presentment or information does not charge an offense or if the court was without jurisdiction of the offense charged." With regard to the allegations that the charging instruments were insufficient for failing to state the requisite mental state, we affirm the trial court's ruling that the defendant is not entitled to relief. Only the counts alleging aggravated rape and rape in the presentments from both cases fail to allege a mental state. Each of the aggravated rape counts allege that on a date in Knox County, the defendant "did unlawfully and forcibly and coercively, while armed with a weapon . . . sexually penetrate [the victim] by [fellatio or sexual intercourse or

-155-

anal intercourse], in violation of T.C.A. 39-13-502 . . . ." The rape counts allege that on a date in Knox County, the defendant "did unlawfully and by force and coercion sexually penetrate [the victim] by [fellatio or vaginal intercourse or anal intercourse]," violating Tenn. Code. Ann. § 39-13-503.

An indictment satisfies the constitutional guarantees of notice to the accused "if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court an adequate basis for entry of a proper judgment, and (3) to protect the accused from double jeopardy." Hill, 954 S.W.2d at 727 (citations omitted). Our supreme court has held that "where the constitutional and statutory requirements outlined in Hill are met, an indictment that cites the pertinent statute and uses its language will be sufficient to support a conviction." State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999) (holding that reference to the pertinent statute cured the indictment's omission of the mental element); State v. Ruff, 978 S.W.2d 95, 100 (Tenn. 1998) (holding that reference to the pertinent statute cured the indictment's omission of the mental element).

In the present case, the presentments refer to the appropriate statutes and follow their language, alleging every element with the exception of the mental state. We believe that they sufficiently informed the defendant of the charges that he was facing. Moreover, the factual allegations and the references to the pertinent statute provided the trial court with an adequate basis for entry of proper judgments. See Carter, 988 S.W.2d at 149. Likewise, the factual allegations and the statutory reference protect the defendant from being placed in jeopardy for the same offense a second time. We conclude that the presentments provided notice to the accused, and therefore, are sufficient to support the defendant's convictions. Thus, the trial court properly denied the defendant's motion to arrest the judgments.

The defendant also contends that because the state failed to file responses to his motions for arrest of judgment, the motions should have been granted by default. He contends that Rule 47, Tenn. R. Crim. P.; Rule II, Knox County Crim. Ct. R.; and the trial court's September 9, 1994 order, which granted the defendant's request that the state file a written response to all defense motions, required the state to file responses. He summarily argues that because the state failed in this regard, his motions for arrest of judgment should have been granted by default. This issue would normally be waived due to the defendant's failure to provide authority or argument, showing that the state's failure to comply with Rule 47, the local rules, or the trial court's order, requires an automatic grant of his motions for arrest of judgment. See Tenn. Ct. Crim. App. 10(b).

Nevertheless, we do not believe that Rule 47, local Rule II, or the trial court's order command such an exceptional result as dismissal of the charges by default. None of these three sources provide for the automatic grant of a motion as a possible sanction. Furthermore, Rule 47, Tenn. R. Crim. P., is directed to parties filing motions, not to those responding to them. Rule II, Knox County Crim. Ct. R., states in pertinent part: "If written responses by the State are demanded, a separate notice shall be included with the Motions. The State shall file written responses within 10 days of the receipt of the notice." The sole sanction mentioned in Rule II follows a provision

requiring that a defendant filing a discovery motion certify that he or she has irreconcilable questions after conferring with the state. The sanction provides that the "[f]ailure to comply with this Rule constitutes a waiver of discovery under Rule 16, Tennessee Rules of Criminal Procedure." Knox County Crim. Ct. R. II. Finally, the trial court's September 9, 1994 order merely grants seven defense motions, including the request for written responses by the state. The contention that the motions for arrest of judgment should have been granted by default is without merit.

## XX. DISQUALIFICATION OF JUDGE

The morning of October 18, 1995, before opening statements in the first rape trial, Judge Ray L. Jenkins recused himself from the defendant's cases, stating that he had discovered that one of the defendant's sons was in a class taught by his daughter and that another of the defendant's sons went to the same school as his granddaughter. Judge Richard Baumgartner replaced Judge Jenkins and presided over the rape and homicide trials and related proceedings. The defendant filed his first motion to disqualify Judge Baumgartner on October 15, 1996, which was after both rape trials and sentencing hearings. This motion was filed in the homicide cases. Subsequently, the defendant filed fourteen additional motions to disqualify Judge Baumgartner from presiding over the homicide cases, alleging numerous actions or inactions requiring his disqualification. All of these motions to disqualify were filed before Judge Baumgartner ruled on the defendant's motions for a new trial in both rape cases. Accordingly, the defendant amended his motions for a new trial to incorporate by reference his arguments from his motions seeking disqualification, asserting that Judge Baumgartner should recuse himself from ruling on the motions for a new trial. On appeal, the defendant maintains this position, asserting that Judge Baumgartner erred in failing to recuse himself from ruling on the motions for a new trial. In addition, the defendant contends that a disqualified judge presided over both rape trials, denying him his right to a fair trial and requiring reversal and dismissal of his convictions. The defendant also asks us to reconsider the standards our case law provides for disqualification of a judge.

The defendant alleges numerous instances of judicial misconduct in support of his contentions, including that Judge Baumgartner called a defense argument "bullshit," gave the prosecutor wide latitude throughout the proceedings, limited his insanity proof, imposed a harsh sentence in the first rape trial, had ex parte communications with expert witnesses, met ex parte with expert witnesses, allowed the state to hold back expert proof on insanity for rebuttal in the homicide trial, released to the public and allowed to be published defense attorneys' applications for fees and expenses, delayed the cases from May 1998 until September 1998 because of his political campaign for reelection, made improper comments to the jury in the homicide trial, received ex parte a letter from the foreman of the jury in the homicide trial, and disapproved of fees for the defendant's appointed attorneys that should have been granted. The state contends that the defendant has waived this issue because (1) all of his motions seeking disqualification occurred after both rape trials, and (2) he did not provide any argument explaining why his contentions regarding the judge's alleged misconduct require disqualification. The state further asserts that many of the defendant's contentions are inaccurate and that no reason existed for the trial judge to disqualify himself. The

state, however, does not address the merits of the numerous instances of misconduct alleged by the defendant.

The matter of recusal is left to the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of that discretion. State v. Boggs, 932 S.W.2d 467, 472 (Tenn. Crim. App. 1996). A trial judge should consider a motion to recuse objectively as well as subjectively. Thus, a trial judge should grant a recusal whenever the judge "has any doubts about his or her ability to preside impartially" or "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994); see also Tenn. S. Ct. R. 10, Canon 3(E). "A court should examine the facts alleged by the movant and consider 'whether assuming the truth of the facts alleged, a reasonable person would conclude that a particular judge is biased or prejudiced against a particular defendant.'" Alley, 882 S.W.2d at 821 (quoting United States v. Baker, 441 F. Supp. 612, 616 (M.D. Tenn. 1977)). "Not every bias, partiality, or prejudice merits recusal. To disqualify, prejudice must be of a personal character, directed at the litigant, 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case.'" Id. at 821 (quoting State ex rel. Wesolich v. Goeke, 794 S.W.2d 692, 697 (Mo. Ct. App. 1990)). "Adverse rulings by the trial court are not usually sufficient grounds to establish bias. Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." Id. at 821. Furthermore, the issue to be determined is not "the propriety of the judicial conduct of the trial judge, but whether he committed an error which resulted in an unjust disposition of the case." Boggs, 932 S.W.2d at 472.

Initially, we address the defendant's argument that we should review this issue de novo. He relies upon the fact that Judge Baumgartner's written order denying his motions to disqualify was filed only in the homicide case, and in that case, not until after the defendant filed his notices of appeal in these cases. We note that the transcript reveals that Judge Baumgartner, on at least four occasions, the latest being January 5, 1999, orally denied the defendant's motions to disqualify. Accordingly, we review this issue for an abuse of discretion.

We next address the defendant's request that we refine the standards stated in Alley. Specifically, the defendant asks us to adopt a standard in which a judge must recuse himself if a defendant can articulate a reasonable basis to question the partiality of the judge. In the event we do not adopt this standard, the defendant asks that we adopt an articulable basis standard to require a disinterested judge to hear a motion to disqualify. Finally, the defendant urges us to hold that when there is an allegation of actual misconduct requiring disqualification, the disqualification motion must be heard by a different, disinterested judge. First, were we to adopt the defendant's proposed articulable basis standard, which the defendant characterizes as a low threshold, judges would be required to recuse themselves simply when a defendant articulates a reasonable basis to question his or her partiality. We question who would determine whether the basis articulated is reasonable – the judge or a different, disinterested judge. Regardless, this standard would not promote judicial economy as some impartial judges would be disqualified simply based upon a defendant's

"reasonable" assertion. Indeed, in this case, it is questionable whether a new judge, not having been privy to the lengthy, complex history of the cases, could have ruled on the motions for a new trial, but if he or she could have, it would have taken a significant amount of time to do so. Also, we note that judges are often placed in a position of ruling upon their allegedly erroneous rulings or improper conduct. We believe that judges can, and do daily, rule upon their alleged misconduct while remaining impartial. Moreover, and importantly, Tennessee law is well-settled regarding the matter of recusal. Our Supreme Court has held that the matter of recusal addresses itself to the sound discretion of the trial court. State v. Smith, 993 S.W.2d 6, 27 (Tenn. 1999); State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995). We are not in a position to change the law in this area.

We next address the defendant's contention that the convictions in both rape trials are void and should be dismissed because he was tried before a disqualified judge. The defendant does not cite authority for this position. In any event, we conclude that the defendant was not tried before a disqualified judge. We note that the defendant did not move to disqualify Judge Baumgartner until after the completion of both trials at issue in this appeal. It was the conduct after the rape trials, which occurred relative to proceedings in the homicide cases, that prompted the defendant to move for disqualification, and we believe it is significant that the defendant relies on this later conduct in support of his disqualification argument. The defendant's focus in his disqualification motions and arguments was that Judge Baumgartner should recuse himself from presiding over the homicide cases. He did not argue then that the convictions from the rape cases should be reversed and dismissed, and he does not explain now how his rights at the trials were affected by conduct that occurred after the trials. The defendant does not explain, and we fail to see, how this later conduct disqualified the judge relative to presiding over these trials. Therefore, relative to the defendant's complaint that he was tried by a disqualified judge, we address the conduct that occurred before or during the trials.

With respect to the first rape trial, the defendant first argues that because Judge Jenkins had ex parte communications with Rick Sawyer of the Helen Ross McNabb Mental Health Center regarding the defendant's insanity defense, Judge Baumgartner was disqualified. Initially, we note that we fail to see, and the defendant does not explain, how the alleged misconduct of Judge Jenkins disqualified Judge Baumgartner from presiding over the trial. Moreover, Judge Jenkins recused himself before the trial began, although not on these grounds. When Judge Jenkins disclosed his potential conflict, the defendant agreed that a new judge should take over the case. The defendant did not object when Judge Baumgartner took over his case, which was after the defendant had already complained about Judge Jenkins's alleged misconduct. See Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997) (discussing waiver of disqualification issue when it is not raised at the time the party seeking disqualification knew about the facts supporting disqualification).

The defendant's other complaints regarding Judge Baumgartner's conduct that occurred during the first rape trial include the "bullshit" comment (Issue XV), the wide latitude given to the prosecutor (Issues XII and XVI), the limitations of his insanity proof (Issue IX), and the harsh sentence imposed (Issue XVII). The defendant did not seek to disqualify Judge Baumgartner when these events occurred. Moreover, the defendant merely lists these complaints and does not provide

-159-

any argument regarding how this conduct disqualified Judge Baumgartner from presiding over the first rape trial. The defendant appears to offer these, as well as the complaints discussed below, as examples of Judge Baumgartner's bias against him. We view the conduct, rulings, and events differently than the defendant. Specifically, we note that the defendant's trials and related proceedings were intense with heated arguments. Defense counsel were zealous advocates, who admitted that their style was very aggressive. At times, counsels' zealousness crossed the line into overzealousness. The trial judge admitted that defense counsels' tactics made him angry at times, specifically noting that defense counsel challenged the court's rulings and insisted on rearguing issues that had been already discussed and ruled upon. In addition, the prosecutor's behavior and comments were inappropriate at times. In this respect, we can understand the trial judge's frustrations, which led him, on occasion, to respond inappropriately. See Tenn. S. Ct. R. 10, Canon 3(A). However, the judge's frustrations do not excuse his inappropriate conduct. A judge must maintain dignity and professionalism in the face of all onslaughts, and we do not condone behavior to the contrary, whatever the circumstances. Nonetheless, although we recognize that some of Judge Baumgartner's behavior was inappropriate, our review of the record does not reveal a reasonable basis for questioning his impartiality.

Likewise, we cannot conclude that the defendant was tried by a disqualified judge in the consolidated rape trial. First, the defendant asserts that Judge Baumgartner allowed the district attorney to "do as he wished when he wished." He provides no citations and no argument for this assertion, although we believe he refers, at least in part, to complaints raised in Issues XII and XVI regarding the prosecutor's use of leading questions, his exceeding the scope of redirect examination, and his making improper comments in his opening statement and closing argument. In any event, the record does not support the defendant's assertion. The defendant objected frequently to the prosecutor's conduct. The trial court ruled on the objections – sometimes for and sometimes against the defendant. There is no evidence that the rulings that were adverse to the defendant were the product of the judge's favoritism toward the prosecution. Second, the defendant asserts that Judge Baumgartner, due to his bias and prejudice against the defendant, made clearly erroneous rulings from January to May 1996. He does not specify which rulings or present any argument relative to this assertion. In any event, we do not believe that Judge Baumgartner was biased against the defendant, and there is no evidence that his rulings were based upon anything other than the merits.

The defendant next contends that Judge Baumgartner had ex parte communications with Dr. Clifton Tennison of the Helen Ross McNabb Mental Health Center regarding the defendant's mental evaluation. The defendant asserts that the judge "planted the thought" in Dr. Tennison's head to seek further evaluations outside of the Department of Mental Health. Initially, we note that not all ex parte communications are per se improper. For example, a trial judge is authorized to communicate ex parte for scheduling and administrative purposes that do not deal with substantive matters. See Tenn. S. Ct. R. 10, Canon 3(A)(7). In this respect, we do not believe it is improper merely to inform a doctor performing an evaluation for the court that additional evaluations would be allowed if needed.

-160-

To the extent that the defendant implies that the judge did not merely inform Dr. Tennison of the possibility of another evaluation but suggested that Dr. Tennison recommend such action, we note that the defendant's complaint appears to be the product of his speculation. The record reveals that on May 7, 1996, Judge Baumgartner told the parties that they were going to hear from Dr. Tennison the next day. The defendant asked if the proceeding would be ex parte without the district attorney present to receive the doctor's report. The following exchange then occurred:

| The Court: | Not at this time – what I am going to inquire of Dr. Tennison tomorrow is where he is in his investigative process and what additional things he needs to do, if any, in the future, and that I anticipate would be something we do in open court. |
|---|---|
| [Defense Counsel]: | Well, we have got to examine him with regard to his preliminary impressions. We have got to do that. |
| The Court: | No. You know, if he says he feels – for instance, if he says he feels he needs the assistance of a further expert to help him in arriving at any conclusions that he might want to offer, I am going to direct him to do that posthaste. I mean, I am not going to put him in a position of saying – I don't anticipate we are going to get some opinion out of Dr. Tennison tomorrow morning with respect to – now, we may. I do not know. |
| [Defense Counsel]: | He has examined our client for two hours. He has got all the information. He has got a whole file on him. Surely, he has some impression. |
| [District Attorney]: | He does not either. He has asked us to give stuff, and you have told us not to comply. He can't have the information. |
| The Court: | He can't. There is no possible way he can have his opinion formulated by tomorrow morning, in my judgment. Now, he may surprise me. He may come in here and say |

|  |  | he does, but I do not anticipate that. So that is the first thing we are going to do. |
| --- | --- | --- |
| . . . . | | |
| [Defense Counsel]: | | Well, how could you possibly make a decision as to the need of another examination if you don't ask him: Do you have any opinions? He might have some opinions. He might like to support them by shoring it up with somebody else to help him. |
| . . . . | | |
| The Court: | | My point is that I am not going to ask him to do that – if he says to me, "I have formulated an opinion. I don't feel I need to do anything else," that creates a whole different situation than what I am anticipating. We are going to have to wait and see. |

The following day, Dr. Tennison was questioned by the court and both parties and stated that he did not have the necessary expertise to evaluate the defendant and that additional evaluation needed to be done by a mental health professional with substantial experience and demonstrable expertise in the diagnosis and treatment of dissociative identity disorder. Dr. Tennison said that he had two potential candidates to perform the evaluation, and the court asked him to check on their availability. We note that according to defense counsel, Dr. Tennison only examined the defendant for two hours. Thus, the court and the parties could have anticipated that Dr. Tennison would not have formulated an opinion. Moreover, the court and the parties, including the defendant, acknowledged, if not anticipated, that another evaluation may be necessary. There is no evidence that the judge suggested to Dr. Tennison through ex parte communications that Dr. Tennison recommend a second evaluation.

The defendant next asserts, relative to the consolidated rape trial, that Judge Baumgartner had ex parte communications with the district attorney about paying for a second evaluation. Specifically, the defendant relies upon a May 9, 1996 memorandum written by Dr. Tennison, which states that Dr. Tennison contacted Dr. Phillip Coons, the doctor selected to evaluate the defendant, and that he told Dr. Coons that Dr. Coons had been "appointed as court's witness, not state witness. Reimbursement arranged through conference of state district attorney's, but funds to be turned over to Court." From this memorandum, the defendant speculates,

> Did [the district attorney] tell Judge Baumgartner that the
> district attorneys were paying for Dr. Coons before Judge

Baumgartner ordered Mr. Huskey examined by Dr. Coons on May 9, 1996? If [the district attorney] did tell Judge Baumgartner this information, this communication was <u>ex parte</u> because this was never said on the record and was a shock to the defense when it was learned in 1998.

We note that on May 9, 1996, Judge Baumgartner, Dr. Tennison, the district attorney, and defense counsel participated in a telephone conference call, in which Dr. Tennison recommended, and the court approved, having Dr. Coons evaluate the defendant. During this conference, the court asked Dr. Tennison, per the defendant's request, whether Dr. Tennison had discussed payment of fees with Dr. Coons. Dr. Tennison responded, "Only vaguely. I told him that I hoped that that would be worked out during the officers of the Court, that I didn't know what the details were." After the conference call ended, the trial court clarified that Dr. Coons was the court's witness, to which defense counsel asked who was paying for his services. The court responded,

> The issue of payment, I don't know. I – I candidly do not know the answer to that question. This is a – certainly not your run of the mill situation. And hopefully there will be sufficient funds available to pay Dr. Coons from some source. Obviously, it will be State money, whether it comes from the Administrative Office of the Courts, or the District Attorneys' Conference, or from the Legislature directly, or wherever it comes from. I'm going to attempt to compensate Dr. Coons fairly for his time and services. However, I consider him to be the Court's witness in this case.

The defendant did not object and made no further comment regarding payment. Dr. Coons did not perform an evaluation of the defendant for the consolidated rape trial. Indeed, Dr. Tennison's May 9, 1996 memorandum provides, "Follow-up call from Judge Baumgartner. Defense has instructed defendant not to participate in evaluation. Will call Dr. Coons and tell him to cancel plans."

The record does not reveal how and when it was arranged for Dr. Coons to be paid by the district attorneys' conference, had he evaluated the defendant. The only evidence that this was the case is Dr. Tennison's memorandum. We note that Judge Baumgartner's comments after the conference call do not indicate that the district attorney arranged for and told the judge that the district attorneys' conference would pay for Dr. Coons's services before Judge Baumgartner ordered Mr. Huskey to be examined by Dr. Coons. Moreover, Judge Baumgartner told the defendant on the record that the district attorneys' conference was one possible source of funding, and the defendant did not object or comment. From the record before us, we cannot conclude that Judge Baumgartner had improper <u>ex parte</u> communications with the district attorney relative to paying for Dr. Coons's services. Having considered all the defendant's complaints relative to events that occurred before or during the consolidated rape trial, we conclude that the defendant was not tried by a disqualified judge.

The remaining issue is whether Judge Baumgartner should have recused himself from ruling on the motions for a new trial. With respect to this contention, almost all of the complained-of conduct occurred before these rulings. The defendant asserts that Judge Baumgartner's prejudice against him grew over time, blinding Judge Baumgartner and causing him to make unexplainable and unjustifiable erroneous rulings. The defendant contends that because Judge Baumgartner was disqualified, his rulings on the motions for a new trial are void. First, we note that Judge Baumgartner's rulings on the issues presented in the defendant's motions for a new trial were consistent with rulings made earlier in the cases. Many of these issues were litigated extensively, and the trial court ruled upon them before almost all of the complained-of conduct occurred. This timing makes it difficult to see how the events relating to the homicide cases caused Judge Baumgartner to make unexplainable, erroneous rulings on the motions for a new trial. We also note that we have concluded throughout this opinion that most of Judge Baumgartner's rulings were not erroneous. In any event, we recognize that if judicial misconduct occurs before ruling on a motion for a new trial, it may be of a nature that a person of ordinary prudence may have a reasonable basis for questioning the judge's impartiality relative to the rulings on these new trial motions. Accordingly, we examine below the defendant's contentions regarding conduct which occurred after both rape trials.

The defendant contends that through ex parte communications, Judge Baumgartner, similar to his conduct in the consolidated rape case, "telegraphed the message that if more experienced expertise was needed from MTMHI he would order additional evaluations." The defendant does not cite to the record to support this assertion. Our review of the record does not reveal any evidence of improper ex parte communications. The record reveals that in May 1996, Dr. Tennison stated that he did not have the necessary expertise to evaluate the defendant and recommended that a mental health professional with substantial experience and demonstrable expertise in the diagnosis and treatment of dissociative identity disorder (DID) evaluate the defendant. Likewise, Middle Tennessee Mental Health Institute (MTMHI) stated that it needed additional assistance in evaluating the defendant. We again note that we do not believe it is improper merely to inform a doctor performing an evaluation of a defendant for the court that additional evaluations would be allowed if needed. Regardless, in this case, Dr. Tennison testified that MTMHI telephoned him and asked whether they could use an outside consultant. Moreover, there is no evidence that Judge Baumgartner influenced MTMHI's evaluation or decision to ask about using an outside consultant. From the record before us, we cannot conclude that the judge had improper ex parte communications regarding the potential for a second mental evaluation.

The defendant next complains that Judge Baumgartner was communicating ex parte with Dr. Tennison while his motion to be sent to MTMHI was pending. On June 13, 1996, the defendant filed a motion to be sent to MTMHI. The defendant states that this motion was not heard until August 8, 1996, because Judge Baumgartner wanted to hear from Dr. Tennison regarding whether MTMHI had the ability to evaluate DID. On August 8, Dr. Tennison was questioned by the court and the parties regarding his recommendation for evaluating the defendant. Dr. Tennison stated that because of complications specific to the defendant's case, including the change in the defendant's mental status over the past four years, the defendant needed to be evaluated by someone more

experienced than he was in the area of DID. Dr. Tennison recommended that the defendant be hospitalized and stated that MTMHI could do the evaluation. He said that he did not know if MTMHI would need further consultation, but "either way [was] okay." The court then stated that the defendant would be sent to MTMHI for evaluation and asked Dr. Tennison to remain in contact with the doctors there. The court also stated that Dr. Tennison should let it know if the doctors at MTMHI needed additional assistance in making their evaluation. The court said, "In other words, if they feel they need additional assistance in this evaluation process, before that's done I want to have some input into it, and know exactly what's needed and why it's needed." The court also commented that after the evaluation was completed and if the defendant chose to present insanity as a defense, the state "would be in a position, if they choose to do it, to consult with their own expert, and offer that expert at trial."

The defendant relies upon three memoranda either from or to Dr. Tennison as evidence of Judge Baumgartner's improper ex parte communications. These memoranda were introduced as exhibits, without objection, at the recusal hearing. The first memorandum is not dated and is from Dr. Tennison to Kathy Guin, asking her, per Judge Baumgartner's request, to contact Dr. Coons about possible dates that he would be available to evaluate the defendant for a September trial. The defendant contends that this memorandum must have been written shortly after the consolidated rape trial was completed but before the second memorandum, dated July 15, 1996. We agree that the content of the memorandum suggests this to be the case. The July 15, 1996 memorandum to Dr. Tennison from Ms. Guin reflects that she had telephoned Dr. Coons, and Dr. Coons provided a list of dates that he would be available to evaluate the defendant. The memorandum also reflects that Dr. Coons said he would need a court order before he came to evaluate the defendant and that he would need to know who would be paying his expenses and how to contact that person. The third memorandum, which includes a handwritten date of August 9, 1996, is from Dr. Tennison and asks Ms. Guin to telephone Dr. Coons and relay the following information:

> Judge Baumgartner has ordered the defendant to the Forensics Services Program of the Middle TN Mental Health Institute (state hospital in Nashville) to complete the forensic evaluation as a Court's witness. He has said off the record that the prosecution (District Atty. Gen. Randy Nichols) may still want to call on you to examine the defendant for the prosecution. The trial has again been postponed, this time until approximately November 4. If your consultation is to be sought, I will contact you again some time in September (if called as a Court's witness) or Gen. Nichols' office will call (if for the prosecution).

With respect to the handwritten date, we note that because the memorandum's content reflects the substance of the August 8, 1996 court proceedings, it appears to have been written on or after that date.

-165-

The defendant contends that these three memoranda are evidence of Judge Baumgartner's sua sponte and ex parte efforts to get the defendant evaluated by Dr. Coons, the expert the state wanted. We disagree with the defendant regarding his inferences from the memoranda. The first two memoranda reveal only that Judge Baumgartner asked Dr. Tennison to contact Dr. Coons about possible dates that Dr. Coons could evaluate the defendant and that Dr. Tennison complied. While the defendant is suspicious of the timing of this contact (because he had not yet been ordered to MTMHI and had a motion pending to be sent to MTMHI), the inquiry into Dr. Coons's availability was not improper. Indeed, one can easily infer that the judge was being proactive. In May 1996, Dr. Tennison had stated that he believed that an experienced expert would be needed and identified Dr. Coons as one potential candidate, whom the court subsequently approved. Also, the August 8, 1996 proceedings indicate that Judge Baumgartner had not predetermined that Dr. Coons would be used instead of or subsequent to MTMHI's evaluation. Indeed, he specifically stated that MTMHI would need to determine whether additional assistance was needed. Also, we note that when MTMHI did request the help of an outside consultant, Dr. Kluft, not Dr. Coons, was the doctor selected to perform the evaluation. Accordingly, we do not believe the first two memoranda support the defendant's assertion that Judge Baumgartner was attempting sua sponte and ex parte to get the defendant evaluated by Dr. Coons.

Regarding the third memorandum, the defendant asserts that its August 9, 1996 date was before Judge Baumgartner entered his order sending the defendant to MTMHI. Thus, the defendant claims, the judge must have had improper, ex parte communications with Dr. Tennison. However, although the trial court's written order was not entered until August 12, 1996, the court stated on August 8 that it was going to send the defendant to MTMHI. Also, on August 8, the court stated that MTMHI would determine if they needed additional assistance in evaluating the defendant. The court also acknowledged that after the evaluation was completed and if insanity was going to be raised, the state may choose to consult with its own expert. What was not stated on August 8, but included in the memorandum, was that the prosecution may want to use Dr. Coons as its expert. However, the prosecution had made it clear in the proceedings before and after the consolidated rape trial that it had talked to Dr. Coons and that it wanted him to evaluate the defendant. Thus, it was safe to assume that if MTMHI did not need additional assistance, then the prosecution may call Dr. Coons. We do not believe that it was improper to advise Dr. Coons of this possibility.

However, what is bothersome on its face is that the memorandum states that Judge Baumgartner told Dr. Tennison this "off the record," which connotes secrecy. We note that these were Dr. Tennison's words and not necessarily Judge Baumgartner's. If these were Judge Baumgartner's words, they were inappropriate. However, we note that it was not a secret that the state would possibly call Dr. Coons if he was not a court's witness. Thus, despite the "off the record" characterization of the matter, the memorandum does not reveal that anything improper was stated. As noted, we believe it would have been appropriate for Judge Baumgartner to advise Dr. Coons, through Dr. Tennison, of the possibility that the state would call him. From the record before us, we cannot conclude that Judge Baumgartner had any improper ex parte communications regarding the possibility of the state calling Dr. Coons.

The defendant next complains about the instructions Dr. Craddock, who evaluated the defendant at MTMHI, gave to the defendant regarding the confidentiality of the evaluation. The transcript of the videotaped evaluation provides that Dr. Craddock told the defendant the following:

> Down here it says that what you tell us is going to be kept confidential, and if information is released it would be because you have given us written permission. Or that the Judge has essentially said I want to see what you have, and he probably – we [sic] not doing this for nothing.
>
> And number three, sometimes we're subpoenaed to go to court or at trial and at that time then we may say what other things, our impressions of what you have said. There's a Tennessee Criminal Procedure says that what you say is not to be used to try to convict you by the prosecution. Now that's not to say whether that would happen or not, sorta thing but it's, that would be grounds for a mistrial if it was.
>
> So um, the point is for us to make at this time is that what you tell is kept confidential unless you give us permission we won't be talking to anybody else.

The confidentiality portion of the judge's August 12, 1996 written order sending the defendant to MTMHI stated,

> Upon completion of the evaluation of the Defendant Thomas Dee Huskey, Middle Tennessee Mental Health Institute shall provide only to the Court a report of the evaluation. **Otherwise, Middle Tennessee Mental Health Institute shall hold in strict confidence all information developed and opinions formed concerning the Defendant pending further directions and orders from the Court, and specifically shall not release any information regarding the Defendant Thomas Dee Huskey to the State, the Office of the Knox County District Attorney General, the prosecuting attorney, or law enforcement.**

The order went on to say that when the court received the report, it would provide it to the defendant for him to decide whether to pursue a defense of insanity. If the defendant elected to present such a defense, then the prosecution would also receive the report.

Dr. Craddock's instructions were not entirely consistent with the judge's order. The defendant asserts that Dr. Craddock's mistake "obviously" resulted because "either Judge Baumgartner told Dr. Tennison to tell Dr. Craddock something that was not said in court or Judge

Baumgartner's ex parte communications through Dr. Tennison to Dr. Craddock got garbled." The defendant does not support this assertion with any argument or citation to the record. We do not believe that the defendant's explanations are the only "obvious" ones, or even the most likely. Certainly, it is possible that Dr. Craddock, unilaterally, made a mistake. In any event, the record does not reveal that Dr. Craddock's confidentiality explanation was the result of ex parte communications.

The defendant next contends that on September 17, 1996, when Dr. Craddock came to the court to report his findings, Dr. Craddock and Dr. Tennison first met with Judge Baumgartner in Judge Baumgartner's chambers. The defendant speculates as to what was discussed in the judge's chambers,

> Did Judge Baumgartner telegraph or outright state to Dr. Craddock and Dr. Tennison his predisposition reflected in the August 9, 1996 memo? . . . With this judicial "woodshedding" it is no wonder that Dr. Craddock and Dr. Tennison came into the courtroom with the same recommendation and Mr. Huskey was set up for yet another evaluation – this time with a stranger from Philadelphia, Dr. Kluft.

Although the defendant fails to mention the fact, the record reflects that when Drs. Tennison and Craddock came into the courtroom, the defendant was allowed to question Dr. Tennison first. The defendant asked Dr. Tennison to state why he was here and "what you reported to the Court in chambers." Dr. Tennison responded,

> I am here because we wanted to – we were ordered – by "we," I mean the forensic team at McNabb combined with the forensic team at Middle Tennessee – by the Court to consult with one another about the case, to stay in touch all during his evaluation there at Middle Tennessee, which we have in conference calls, and to come back to the Court so that decisions about any use of outside consultants would be decided in open court by His Honor with everybody discussing the pros and cons.
>
> So the treatment team – the diagnostic team at Middle Tennessee – initiated an inquiry into whether or not they could use an outside consultant, which directly fell under the order the judge gave me. So I called the Judge, told him that this was happening, and he told me to come here today. . . . What I reported to him is that, after talking with Dr. Craddock and Dr. Farouk at Middle Tennessee, it appears – and you will have to ask Dr. Craddock this – but it appears that they have reached the same kind of conclusions that I did in my initial evaluation . . . and that

is that there was enough pieces of clinical information that led me to believe that there may well have been the presence of a dissociative disorder present and active at the time of the alleged offenses, but that I could not make a determination with regard to insanity defense, because I had no access to the confessing personality state, and I did not have the experience to know how to proceed from that point, and it appears that is where this forensic team in Nashville is at, also, and that is what we discussed in chambers.

Dr. Craddock subsequently testified that he and his team had concluded that "there might be a multiple personality, that has merit or is worthy of pursuing. However, we don't feel as though we have the experience to make a diagnosis with confidence." He then recommended Dr. Coons or Dr. Kluft as potential candidates to perform the evaluation.

We question the appropriateness of having an ex parte meeting with the doctors before going into court. When the defendant questioned the doctors about their conversation immediately thereafter, Dr. Tennison testified that he informed the judge that the Middle Tennessee team had inquired about using an outside consultant. We view this as procedural matter and again note that a trial judge is authorized to communicate ex parte for scheduling and administrative purposes that do not deal with substantive matters. See Tenn. S. Ct. R. 10, Canon 3(A)(7). However, Dr. Tennison also stated that MTMHI inquired about using an outside consultant because, apparently, they had found, like he had, evidence of DID but did not have the expertise to evaluate the defendant. Although we do not know the extent of the conversation, we question whether this subject matter was appropriate to discuss ex parte. Nevertheless, we cannot conclude that this conduct warrants disqualification from ruling on the motions for a new trial in the rape cases.

The defendant next complains about ex parte communications between Judge Baumgartner and Dr. Kluft regarding matters that were not addressed in Dr. Kluft's evaluation or report. We take judicial notice of the trial court's order denying the defendant's motion to disqualify, in which Judge Baumgartner admitted that he met ex parte with Dr. Kluft in October 1996 after Dr. Kluft had interviewed the defendant and shortly before Dr. Kluft was scheduled to leave Knoxville. The judge's order provides that the

> substance of our conversation involved Dr. Kluft relating his opinions of Mr. Huskey's mental condition and the procedures he used to arrive at those opinions. The Court requested that Dr. Kluft set forth his findings in a report and forward it to the Court as soon as possible. Dr. Kluft sent his report to the Court two days later and the report, which was favorable to the defendant, was provided to defense counsel upon receipt. The Court also authorized defense counsel to speak directly with Dr. Kluft.

> Everything the Court learned during the brief meeting with Dr. Kluft was also communicated to the defense counsel.

Because this order was filed in the homicide case and after the notices of appeal were filed in both rape cases, we cannot presume that the court's account is true. However, the record reveals that the defendant received Dr. Kluft's report and spoke with him. In any event, the judge's ex parte meeting with Dr. Kluft and discussing substantive matters was inappropriate. However, we cannot conclude that this meeting with an expert in the homicide trial disqualified the judge relative to ruling on the motions for a new trial in the rape cases.

The defendant next complains about ex parte communications between Judge Baumgartner and Dr. Tennison that occurred on October 29, 1996. The defendant asserts that defense counsel met with Dr. Tennison on October 28, 1996, and Dr. Tennison, after reviewing Dr. Kluft's report, said that the defendant could not have made a knowing, voluntary, and intelligent waiver. The defendant states that the following morning, Dr. Tennison telephoned defense counsel and said that he had spoken with Judge Baumgartner, who told him that Dr. Kluft's report was preliminary and that Dr. Kluft would be submitting additional reports relating to the defendant's statements. The defendant asserts that Dr. Tennison then told defense counsel that he needed to see the additional reports before he made conclusions regarding the voluntariness of the defendant's statements. The defendant contends that by telling Dr. Tennison what the additional reports were going to address, Judge Baumgartner exceeded the scope of proper ex parte communications. The defendant also contends that the court's knowledge of additional reports could only have come from improper ex parte communications with Dr. Kluft. Assuming the defendant's contentions are true, we agree that the judge's behavior would be inappropriate. However, the defendant does not explain, and we fail to see, how this behavior regarding communications with expert witnesses in the homicide case warrants recusal relative to the motions for a new trial in the rape cases.

The defendant next complains about numerous rulings, which he asserts are erroneous. He contends that Judge Baumgartner improperly refused to conduct a hearing pursuant to McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997), on the admissibility of the testimony of Dr. Speigel, the state's expert, and failed to exclude Dr. Speigel's testimony on the basis of Rules 104, 403, 702, and 703, Tenn. R. Evid. The defendant also complains that the judge erroneously permitted Dr. Speigel to testify about opinions not contained in his report and permitted the state to present the testimony of Dr. Speigel in rebuttal. All of these errors, the defendant asserts, were because the judge wanted to help the state get its case to the jury. The defendant also complains that the judge made improper comments to the jury regarding defense counsel's closing argument. Essentially, the defendant is complaining about rulings in the homicide trial that were adverse to him, asserting that these adverse rulings were the result of Judge Baumgartner's bias against him. Initially, we note that the order denying the motion for a new trial in the consolidated rape case was filed January 8, 1999, which was before the homicide trial. Thus, these events do not support disqualification relative to the consolidated rape motion for a new trial. Moreover, rulings of a trial judge, even if erroneous, numerous, and continuous, do not, without more, justify disqualification.

Alley, 882 S.W.2d at 821. We fail to see how these rulings in the homicide trial could have warranted disqualification from ruling on the motions for a new trial in the rape cases.

We note that the defendant also complains that Judge Baumgartner received and did not disclose an ex parte letter from the foreman of the jury in the homicide trial. This occurred after the judge's orders denying the motions for new trial were filed in both rape cases. Accordingly, these complaints do not support disqualifying the judge from ruling on the motions for a new trial. Indeed, the defendant even argues that the letter from the foreman of the jury in the homicide trial disqualified Judge Baumgartner from hearing the defendant's motions to dismiss and for judgment of acquittal in the homicide cases.

The defendant next complains about Judge Baumgartner's actions regarding financial records of the defense – specifically, defense counsel's requests for attorneys fees and expenses, including money for the payment of the expert witnesses. The defendant complains that Judge Baumgartner changed the confidentiality rules regarding these documents during the course of the proceedings. Originally, the judge kept the financial documents under seal. On June 2, 1997, The Knoxville News-Sentinel filed a motion to intervene in the case and asked the trial court to unseal documents relating to fees and expenses of the defense. After a hearing, Judge Baumgartner partially granted the News-Sentinel's motion, ordering many of the documents to remain sealed but ordering the summary cover sheets setting forth total amounts paid to defense counsel to be unsealed. This court upheld Judge Baumgartner's order in Knoxville News-Sentinel v. Huskey, 982 S.W.2d 359, 362 (Tenn. Crim. App. 1998), stating that it "was unable to discern how revelation of the 'barebones' information ordered unsealed will prejudice Mr. Huskey's right to a fair trial." Accordingly, despite the defendant's assertions that there are serious issues regarding the validity of the Knoxville News-Sentinel opinion, we conclude, again, that Judge Baumgartner's actions relative to the unsealing of these records were not improper. Moreover, we fail to see, and the defendant does not explain, how any of the complained-of conduct relative to the unsealing and subsequent publication of these records warranted disqualifying the judge from ruling on the motions for a new trial in the rape cases.

The defendant also complains that in October 1998, Judge Baumgartner improperly released defense counsel's applications for fees and expenses to The Knoxville News-Sentinel. We note, however, that the judge issued a temporary restraining order on October 24, 1996, to restrain the News-Sentinel from publishing the information. However, on October 25, 1998, the News-Sentinel violated the order and published an article revealing some information regarding the defense's expenses. On November 4, 1998, the trial court converted the restraining order into a temporary injunction, effective while the defendant's case was pending in the trial court. Further litigation concerning this matter, and publication of any additional information, did not occur until after Judge Baumgartner filed his orders denying the motions for a new trial in both rape cases. Therefore, even assuming that Judge Baumgartner released the records inappropriately to the News-Sentinel, we cannot conclude that this conduct supports disqualifying him from ruling on the motions for a new trial.

The defendant also complains that Judge Baumgartner improperly denied defense counsel's requests for fees in an effort to punish and silence counsel. The denial of the requested fees at issue occurred in May 1999, several months after the rulings on the motions for a new trial were filed. Accordingly, we cannot conclude that the denial of these fees and expenses, even if erroneous, disqualified Judge Baumgartner from ruling on the motions for a new trial.

The defendant next complains that the proceedings in the homicide case were delayed from May 1998 to September 1998 because Judge Baumgartner was running for reelection. The defendant asserts that Judge Baumgartner avoided conducting hearings and ruling on motions during this time because Judge Baumgartner's opponent was critical of how he was handling the defendant's cases. Although not entirely clear, the defendant appears to be complaining that the judge's political situation was one part of the denial of his right to a speedy trial in the homicide case. This issue is not before us on this appeal. Moreover, the defendant does not explain, and we fail to see, how this political climate warranted disqualification relative to ruling on the motions for a new trial.

The defendant also complains about when he received the defendant's MTMHI records. The defendant had Rule 17(c), Tenn. R. Crim. P., subpoenas issued in May 1998 for the defendant's records from MTMHI. The defendant asserts that Judge Baumgartner then "embarked on a series of ex parte communications with MTMHI that resulted in the records being delayed, being produced, then produced to Judge Baumgartner in his office rather than to Mr. Huskey's attorneys." The defendant merely states that because of the judge's interference, he did not receive the records until July 7, 1998. The defendant does not cite to the record or any authority in support of this contention. However, the defendant again appears to be complaining that this delay was one part of the denial of his right to a speedy trial in the homicide case, an issue not properly before us in this appeal. Moreover, we note that Rule 17(c), Tenn. R. Crim. P., provides that "[t]he court may direct books, papers, documents or tangible things be produced before the court at a time prior to the trial or prior to the time when they are to be offered into evidence and may upon their production permit them to be inspected by the parties and their attorneys." In any event, the record does not reveal any improper ex parte communications regarding the defendant's MTMHI records.

In summary, although many of the defendant's complaints are not supported by the record, some of his complaints reveal that some of Judge Baumgartner's conduct was inappropriate. However, we cannot conclude that a person of ordinary prudence in Judge Baumgartner's position, knowing all of the facts known to him, would find a reasonable basis for questioning his impartiality. Moreover, the issue to be determined is not "the propriety of the judicial conduct of the trial judge, but whether he committed an error which resulted in an unjust disposition of the case." Boggs, 932 S.W.2d at 472. The record does not reveal that Judge Baumgartner committed any errors resulting in an unjust disposition of the defendant's motions for a new trial. Accordingly, we conclude that Judge Baumgartner was not disqualified from ruling on the defendant's motions for a new trial.

## XXI. PROSECUTORIAL MISCONDUCT

The defendant contends that the prosecutor's misconduct (1) denied him due process of law, requiring dismissal of the indictments against him and (2) required disqualification of the prosecutor. The defendant also contends within this issue that the participation of a special prosecutor in the consolidated rape case requires reversal of the convictions in that case.

Initially, we note that this issue was presented in the defendant's common issues brief. To the extent that his argument relates to the homicide cases, those complaints are not before us in this appeal. Also, we note that the state did not respond to this issue, apparently because the issue, unlike the other issues in the defendant's common issues brief, was not separately listed in the briefs for the first and the consolidated rape trials. However, most of the defendant's complaints within this issue are repetitive, and thus, addressed by the state elsewhere.

The defendant relies upon State v. Culbreath, 30 S.W.3d 309 (Tenn. 2000), in support of his argument that the presentments against him should be dismissed and/or the prosecutor should have been disqualified. In Culbreath, the defendants were charged with several offenses relating to their running sexually-oriented businesses. The trial court dismissed the indictments because of the involvement of a special prosecutor, finding that the special prosecutor was substantially involved in the case and that he had been paid over four hundred thousand dollars over a nineteen-month period by a private, special interest group that opposed the types of activities in which the defendants were involved. Id. at 312. The trial court found that the conflict of interest required disqualification of the special prosecutor as well as the district attorney and his office. Id. Moreover, the trial court dismissed the indictments because it concluded that the prosecutor's misconduct denied the defendants their due process rights. Id. Our supreme court stated that although dismissal of an indictment is not a usual remedy for prosecutorial misconduct, such remedy may be appropriate when the misconduct denies a defendant his right to due process. Id. at 317. The court held that dismissal of the indictments was appropriate in the defendants' case given that the "conflict of interest and resulting misconduct permeated the entire prosecution and rendered the proceedings as a whole fundamentally unfair." Id. at 318 n.7.

Within this issue, the defendant restates many of the complaints he raises in other issues. For example, he complains that the prosecution withheld discovery, made improper arguments to the jury, illegally obtained statements from the defendant, and intentionally delayed his trials. Previously, we concluded that these complaints did not warrant a reversal and a new trial. Here, the defendant asserts that the prosecutor's misconduct violated his due process rights, requiring a dismissal of the presentments. As set forth elsewhere in this opinion, we do not believe that the prosecutor's misconduct was pervasive or egregious. We cannot conclude that the defendant's due process rights were violated by the prosecutor's conduct. Accordingly, we conclude that dismissal of the presentments is not warranted due to prosecutorial misconduct.

Regarding the defendant's contention that the prosecutor should have been disqualified, we note that the defendant never moved for disqualification of the district attorney in either of the rape cases, although he did move for disqualification in the homicide cases. The defendant adopts these motions by reference, but he does not make any additional argument as to why the district attorney

and his office should have been disqualified. We note that the defendant's arguments in his motions, excluding those relating to the special assistant prosecutor (which are discussed below), relate to disqualification based upon events arising from the homicide cases, specifically the disclosure to the state of confidential materials relating to the mental evaluations. In any event, the record does not reveal that the district attorney and his office had an actual conflict of interest. Moreover, the record is devoid of any conduct creating an appearance of impropriety. See Culbreath, 30 S.W.3d at 312-13.

The defendant also moved in the homicide cases for the disqualification of special assistant prosecutor Neil Cohen. The defendant submitted an affidavit from Deputy Knox County Court Clerk Angie Nesbitt stating that an oath of office was not on file for Mr. Cohen. The defendant argued that the special assistant prosecutor performed duties reserved for the publically elected district attorney and his lawful assistants, asserting that the special prosecutor was the author of the consolidation motion and, in the homicide cases, the author of the motion seeking to introduce the rape victims' testimony. The defendant asserted that the court gave preferential treatment to Mr. Cohen because he was a law professor and the author of a book on the law of evidence in Tennessee. The defendant now argues that because it was error to allow the special assistant prosecutor to participate in the consolidated rape case, those convictions should be reversed, and he should receive a new trial. We disagree. Although the defendant incorporates his disqualification motion by reference, he does not provide any additional explanation as to why the special assistant prosecutor's participation was error. The defendant did not object to Mr. Cohen's participation in the consolidated rape case until after he was convicted at trial, although before the court's ruling on his motion for a new trial. We do not believe that the defendant can reserve his objection to the special assistant prosecutor's participation until after he is convicted at trial. See T.R.A.P. 36(a).

## ISSUES RELATING ONLY TO THE FIRST RAPE TRIAL

## XXII. STAY OF PROCEEDINGS

The defendant states that about ten months before the first rape trial, the trial court erroneously stayed all proceedings relating to the other cases pending against him and that hearings on these motions did not resume until after the first rape trial. He contends that the stay violated his rights to due process, a fair trial, and the effective assistance of counsel under the state and federal constitutions; Rule 12(e), Tenn. R. Crim. P., requiring the trial court to rule on all pretrial motions before trial unless the court defers ruling for a good cause; and rules of judicial conduct requiring prompt adjudication of cases. He maintains that before he could develop or declare his defenses in the first rape trial, he needed discovery and bills of particulars in his pending rape and murder cases as well as rulings on the admissibility of evidence and consolidation relating to the other cases. The state disputes that the trial court stayed proceedings in the other cases, arguing that, instead, the trial court deferred rulings in the other cases in order to allow the first rape trial to proceed. It also argues that the defendant has failed to allege any prejudice in the first rape trial. It contends that any infringement of his right to gain access to the court would affect the other pending cases, not the first rape case. In reply, the defendant contends that the stay was not necessary in order for the first rape

trial to proceed but, instead, was a device instigated by the state to prevent him from making informed decisions regarding his defenses, trial strategy, and guilty pleas in all of his cases.

Although we do not necessarily condone the trial court's decision to approach the defendant's motions piecemeal before the first rape trial, our review of the rape cases reveals no prejudice to the defendant from this practice. As discussed in Issue V regarding the order of the defendant's trials, it was within the discretion of the prosecution to set the order of the trials. See State v. Nichols, 877 S.W.2d 722, 735-36 (Tenn. 1994). We also conclude in that issue that consolidation of the rape cases was permissive and, therefore, the state was not required to consolidate the first rape trial with the others. Indeed, we questioned whether it could have been consolidated in light of the differing circumstances surrounding the rapes. In light of our holding on this issue, we fail to understand – and the defendant has not explained – how he was harmed by the trial court deciding the motion to consolidate the remaining rape cases after the first rape trial.

Furthermore, we hold in Issue VI regarding discovery and Issue VII regarding exculpatory evidence that the defendant has failed to demonstrate that he was prejudiced in the first rape trial by evidence he acquired afterward. Additionally, we have held that the defendant was not harmed by the trial court's decision to address his motions to suppress his statements or evidence, other than the defendant's photograph, gained as a result of his arrest or the search of his home after the first rape trial. The trial court determined the admissibility of the defendant's photograph, which was the only evidence relating to these motions used in the first rape trial. Evidence of the other rapes and the murders was not introduced in the first rape trial. The defendant has failed to explain how he was harmed by the lack of a bill of particulars or his inability to know the admissibility of evidence in these cases before the first rape trial. The defendant is not entitled to relief on this issue.

## XXIII. DISQUALIFIED JURORS

The defendant contends that in the first rape case, the trial court failed to excuse for cause potential jurors who had inherently prejudicial knowledge relating to his other rape and murder charges. He also argues that the trial court erroneously denied him individual voir dire of all potential jurors and limited voir dire to questions which would reveal the need for a challenge for cause. He claims that due to the erroneous jury selection process, five of the jurors who decided his case possessed prejudicial knowledge. The state contends that four of the jurors about whom the defendant complains said that they could be impartial despite their knowledge about the defendant's cases and the fifth juror did not know about the defendant's other charges. It also asserts that the jury selection procedures complied with the applicable rules.

Control of the voir dire is within the sound discretion of the trial court. State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). Our supreme court has ruled that the "ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994). Rule 24(b), Tenn. R. Crim. P., governs challenges to potential jurors for cause and states in pertinent part:

> Any party may challenge a prospective juror for cause if:
>
> (1) there exists any ground for challenge for cause provided by law;
>
> (2) the prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability. A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or <u>that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected</u>, the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed. If the prospective juror admits to having formed an opinion, he or she shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

(Emphasis added). The defendant contends that the trial court failed to determine whether the publicity regarding the other charges against the defendant was so prejudicial that it created a substantial risk of affecting the potential jurors' judgments even though the jurors stated that they could be impartial.

"Rule 24(b) provides that information possessed by jurors which would be inadmissible in the trial may be so prejudicial that a juror must be excused because of the substantial risk of prejudice regardless of the jurors' statements of impartiality." State v. Shepherd, 862 S.W.2d 557, 569 (Tenn. Crim. App. 1992). In this respect, the rule recognizes that there are limits to what the human mind can be expected to set aside. Id. The trial court bears the burden of assessing the level of prejudice existing aside from the jurors' assurances that they can remain impartial:

> The rule recognizes that the risk of a juror being influenced by admissible evidence – which will be introduced at the trial to influence anyway – is acceptable in our system, if the juror's unequivocal claim of impartiality is believed. Obviously, such knowledge does not inherently interfere with the reliability of the truth finding process at trial. On the other hand, the juror's knowledge of information which is inadmissible at trial because of its prejudicial effect may, depending upon the amount of prejudice, improperly influence a juror and undermine the

> reliability of the trial result regardless of the juror's good
> intentions. Because of this risk, the rule implicitly places the
> burden upon the trial court to assess the level of prejudice apart
> from the juror's statements.

Id. The record in the present case reflects that the trial court relied upon the jurors' statements that they could be impartial and made no determination regarding the level of prejudice stemming from the publicity on the other charges.

The defendant asks this court to create a bright-line rule that a juror is disqualified if he or she has knowledge of the defendant's other uncharged crimes which are inadmissible at trial. Without citation or further explanation, he argues that such a rule would be consistent with case law regarding consolidation of cases for trial and admissibility of evidence under Rule 404(b), Tenn. R. Evid., and with rules requiring the disqualification of judges who have personal knowledge about a case. The plain language of Rule 24 explicitly contemplates that some information "may be inadmissible but is not so prejudicial as to create a substantial risk that [the juror's] judgment will be affected." The rule places this determination within the discretion of the trial court, and we decline the invitation to remove an entire category of information – that of other crimes not the subject of the present trial – from the trial court's discretion.

Alternatively, the defendant argues that jurors in this case with knowledge of serial murders or other rapes should have been disqualified under Rule 24(b) because such information is so prejudicial that it risks affecting the jurors regardless of their claims of impartiality. He contends that the state could not have introduced evidence of these other crimes at trial and that the trial court should not have permitted potential jurors who had this knowledge on the jury. He asserts that this is especially true because some of the jurors possessed inaccurate knowledge about the other crimes. He contends that Jurors Shelton, McKenzie, Melton, Rogers, and McAfee should have been disqualified because they knew about his other charges.

We begin by noting that Jurors Shelton and McKenzie did not state that they knew about the defendant's other charges. Furthermore, the defendant did not challenge Juror McKenzie for cause. It is well-settled that the failure to challenge a juror for cause forecloses the argument upon appeal that the juror is disqualified. See Sommerville v. State, 521 S.W.2d 792, 797 (Tenn. 1975). Although the defendant made no individual challenge for cause to Juror Shelton, he made a general challenge for cause to the panel of which she was a part due to the fact that the jurors had been discussing the defendant while awaiting individual voir dire. In any event, Juror Shelton stated that she had heard other potential jurors talking about the defendant's former appearance, whether he was the person whom they had seen on television and in the newspaper, and if he lived or worked at the zoo. She said that she had not heard anything about Cahaba Lane and had not overheard any discussion of the charges against the defendant. The information known to Juror Shelton was not so prejudicial that it created a substantial risk of affecting her judgment.

Juror Melton stated that he had seen something about the case on the television news that morning. He said that he saw a picture of a man with a long beard and a lot of hair, but he was not sure that it was the defendant. He said that he heard that the defendant was accused of killing some people and raping someone. He said that he formed no opinion about the defendant but merely thought that this might be the case he would hear because he was reporting for jury duty that day. He said that he overheard other potential jurors calling the defendant the Zoo Man and saying that he had worked at the zoo. He said that he could give one-hundred-percent assurance that he would not consider this information in rendering a verdict and that he could render a fair and impartial verdict. The trial court denied the defendant's challenge for cause to Juror Melton.

Juror Rogers said that he had read about the defendant's cases in the newspaper about a year earlier but that all he really remembered was the defendant's name. He stated that he had no opinion about the defendant's guilt or innocence and agreed that he could give a fair and impartial verdict. Upon additional questioning by the defendant, he stated that he remembered reading that the defendant's nickname was the Zoo Man because he had worked at the zoo. He said that he also heard the name Zoo Man mentioned when other potential jurors were speculating about which case this was. Although he initially said that he did not remember what crimes the defendant was accused of committing, upon additional questioning by the defendant, he agreed that he had read about Cahaba Lane in the newspaper and believed that a murder occurred there. He agreed that he assumed the defendant was one-hundred-percent innocent. The trial court denied the defendant's challenge for cause to Juror Rogers.

Juror McAfee stated that he had seen television reports and read newspaper articles about the defendant around the time of the crimes. He said that he knew that the defendant allegedly killed prostitutes near a road in Knoxville. After the defendant mentioned Cahaba Lane, Mr. McAfee remembered that was the name of the road linked with the murders. He recalled that the defendant had the nickname of Zoo Man because he had worked at the zoo at one time. He thought that there were possibly six homicides associated with the defendant. He agreed that if he heard this information again at trial, it could have the effect of refreshing his memory and confirming what he knew if the information turned out to be a fact. He denied hearing other potential jurors talking about the case and stated that he had formed no opinion of whether the defendant was guilty of any charges. He agreed that he could put this information out of his mind and give a fair and impartial verdict. The defendant challenged Mr. McAfee for cause, but the trial court denied the challenge.

Although the defendant did not include Juror Varner in his list of jurors exposed to information about the other crimes, we note that she also stated that she had been exposed to pretrial publicity and that the defendant challenged her for cause. Ms. Varner stated that she had seen publicity relating to the defendant in the newspaper and on television around the time of the offenses. Regarding the murder cases, she said she had heard that once the police discovered the last victim, they had traced the other victims to the defendant. She said she remembered that the victims could have been prostitutes and believed there were three murder victims. She said that she had not heard much about the rape but knew that after the discovery of the murders, the police had reviewed other charges against the defendant. She said that she had heard the defendant called the Zoo Man in the

-178-

media. She denied hearing other potential jurors talking about the case. She stated that she had not formed an opinion regarding the defendant's guilt or innocence as a result of the publicity and agreed that she could render a fair and impartial verdict.

In Shepherd, this court held that the trial court's failure to assess the prejudice inherent in the information about the defendant's other crime without regard to the jurors' statements that they could be impartial constituted reversible error. 862 S.W.2d at 569. In that case, nine of the twelve jurors had seen an "Unsolved Mysteries" program, depicting the defendant's involvement in the murder of two teenage girls. The program included a graphic portrayal of the events surrounding the murder that was not the basis of the trial; the narrator's report that a judge had determined that the evidence in that case was sufficient to charge the defendant with first degree murder; and an opinion by the investigating deputy, who would appear as a witness in the case on trial, that the defendant was a "cold-blooded, psychopathic killer." We concluded that "the amount of inadmissible information possessed by most of the members of the jury regarding the defendant's involvement with and charges for other crimes, particularly the [murder not on trial], was so prejudicial that a substantial risk existed that those jurors' judgments were affected." Id. at 571.

The present case is somewhat similar to Shepherd in that Jurors McAfee and Varner and, to a lesser extent, Jurors Melton and Rogers were exposed to information indicating that the defendant had committed the murders with which he was accused. Jurors McAfee and Varner knew that the defendant was accused of killing prostitutes. Jurors Melton and Rogers knew that the defendant was accused of murder. Jurors McAfee and Rogers knew that the killing had occurred on Cahaba Lane, and all four jurors knew that the defendant was called the Zoo Man. Juror Varner remembered more of the details of the accounts that she had read or heard, such as that after the police discovered the last of the murder victims, they had traced the defendant to the other bodies. This information shows how the defendant was linked to the murders and implicates him in their commission. Although Shepherd, in which the jurors watched a dramatization of the events surrounding the other crime, presents a more extreme case, here the four jurors knew that the defendant was accused of murder. At least Juror Varner and arguably Juror McAfee were exposed to information indicating that the defendant had committed the murders. Jurors Varner and Melton also mentioned that they had heard that the defendant had been accused of rape. Because the defendant was on trial for rape, the information was not necessarily inadmissible. Nothing indicates that these jurors linked the information about rape to a victim other than the one in this case.

Although the information about the defendant's other charges known to the four jurors was prejudicial, we view the defendant to have waived his disqualification argument by failing to remove these jurors with his peremptory challenges. Before a defendant can be heard to complain about a tainted juror sitting on the jury, he or she must have exhausted "any available peremptory challenge to remove the objectionable juror." Sommerville, 521 S.W.2d at 797. Thus, in order to maintain an allegation that the trial court's refusal to remove a juror for cause rendered his trial unfair, the defendant must remove the juror in question with a peremptory challenge, exhaust all peremptory challenges, and be forced to accept a disqualified juror once his peremptory challenges are depleted. Howell, 868 S.W.2d at 248; State v. Thompson, 36 S.W.3d 102, 107 (Tenn. Crim. App. 2000); see

State v. Crawford, 620 S.W.2d 543, 545 (Tenn. Crim. App. 1981) (quoting Sommerville and noting that at the time the trial court refused to remove a juror for cause, the defendant still had two peremptory challenges remaining).

In the present case, the defendant used all eight peremptory challenges and requested additional challenges because jurors with knowledge of his other charges remained on the panel. The trial court denied this request. The defendant contends that he was forced to "burn" his peremptory challenges and still have jurors with knowledge of the other charges on the panel because the trial court erroneously refused to strike these jurors for cause. The trial court denied the defendant's challenges for cause to jurors with knowledge of his other charges before the defendant exercised any of his peremptory challenges.

Of the seventeen potential jurors initially seated, five – including Jurors Varner, McAfee, and Rogers –  knew of the defendant's other charges, but the defendant only removed one of the five with his first six challenges. In this respect, we know that the defendant, not the state, exercised the challenges because the defendant stated at a bench conference following the first six challenges that he had two challenges left. Of the subsequent replacement jurors, only two knew of the defendant's other charges. The parties exercised three more peremptory challenges – presumably two by the defendant and one by the state – striking two more jurors with knowledge. Thus, a total of seven potential jurors with knowledge entered the panel, and three were removed by peremptory challenge. The defendant could have used his eight challenges to strike all seven jurors with knowledge. Thus, the defendant's assertion that he used all of his peremptory challenges to remove jurors with prejudicial knowledge of inadmissible evidence and was forced to accept jurors with such knowledge on the panel is incorrect. Because the defendant did not use his available peremptory challenges to remove those jurors whom he now argues that the trial court should have removed for cause, he cannot now challenge their qualifications on appeal. See Howell, 868 S.W.2d at 248; T.R.A.P. 36(a) (providing that a defendant who "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error" is not entitled to relief on appeal). In light of the defendant's failure to take available steps to correct this error, we do not examine his contention that the trial court's failure to excuse jurors with knowledge for cause contradicts its stated purpose  – to be able to select a Knox County jury without knowledge of the defendant's other cases – for staying the proceedings in the other rape and murder cases.

The defendant has filed supplemental authority, arguing that he was denied his constitutional right to an impartial jury under the Sixth Amendment of the United States Constitution and article I, sections 8 and 17 of the Tennessee Constitution. In Quintero v. Bell, 256 F.3d 409 (6th Cir. 2001), the court examined the violation of the defendant's constitutional right to an impartial jury resulting from seven jurors having served on a codefendant's jury as part of an ineffective assistance of counsel claim. In the present case, the issue of the effectiveness of counsel's representation is not before us nor is the record sufficient for us to make a determination in that regard.

The defendant also contests the trial court's method for screening the venire for potential jurors exposed to publicity about his cases. He contends that the trial court should have questioned

the jurors about their knowledge of Zoo Man, Cahaba Lane, and the murder and/or rape of prostitutes, rather than limiting its questions to the charges in the first rape case. He argues that the trial court's ruling requiring him to mention the other charges if they were to be revealed presented him with a Hobson's choice: Either risk seating jurors who did not know about the charges in the first rape case but did know about the other charges or potentially taint the other unexposed jurors with questions about the other charges.

The trial court called the potential jurors in panels of twelve and asked them to raise their hands if they had heard anything about the defendant. Then, the court permitted individual voir dire of each potential juror who had raised his or her hand indicating knowledge of the defendant. First, the court questioned the juror to determine whether he or she could render an impartial verdict despite knowledge of the defendant. Then it allowed the parties to question the jurors about the extent of their knowledge. The defendant agreed to this procedure before the voir dire began but subsequently objected to it, arguing that potential jurors who initially claimed to have only vague knowledge about publicity recalled more of the details of the murder cases when asked about the Zoo Man or Cahaba Lane during individual voir dire. The court ruled that it would not mention the defendant's other charges and that it would be up to the defendant to mention those if he chose to do so. During the individual voir dire of the first panel, one of the prospective jurors revealed that some of the jurors had been talking about the Zoo Man and the other charges in the hall while waiting to be questioned. The trial court directed a court officer to tell the prospective jurors not to talk about this case or the defendant. Following the examination of the first twelve members of the venire, the defendant moved to dismiss the jury panel for cause because the prospective jurors had discussed the defendant's appearance, the murder charges, and the name Zoo Man. The court denied the motion.

The court asked the four panels of twelve the following questions respectively:

> [To panel one:] Now, do you know . . . the defendant . . . Do you know any of the facts or circumstances surrounding this alleged occurrence, anything you have read in the papers or seen on television, or anything of that nature.

> [To panel two:] Has any member of this jury panel heard anything or read anything concerning this defendant, Mr. Huskey?

> [To panel three:] Do you know, have you read anything concerning the defendant, Thomas D. Huskey – television, anything of that nature? All right. Connected with this case or any other case?

> [To panel four:] Do you know or have you heard anything concerning the defendant, Thomas Huskey, either on television

> or in the – in the papers or on the radio, anything? Have you heard anything about this man?

The trial court phrased its inquiry in such a way as to extract those jurors who had been exposed to publicity without revealing the other charges against the defendant and thereby tainting the entire panel. Except perhaps for the questions to the first panel, the questions applied to any knowledge about the defendant and were not limited to the charges in the first rape case. Although the questions to the first panel seem limited to the charges in the first rape case, we note that the parties were able to question individually all twelve jurors on this panel. Thus, the defendant was not harmed by this limitation. Furthermore, the questions are also broad enough to apply to those potential jurors who had overheard other jurors discussing the defendant while waiting for voir dire.

A defendant is entitled to individual voir dire if a significant possibility exists that a juror knows about potentially prejudicial information. State v. Claybook, 736 S.W.2d 95, 100 (Tenn. 1987). On the other hand, the trial court retains broad discretion over the way in which voir dire is conducted. Howell, 868 S.W.2d at 247. In Howell, our supreme court affirmed the trial court's limitation of individual voir dire to those potential jurors who had been exposed to pretrial publicity and who remembered the specific details of the reports. Id. at 247-48. In the present case, the trial court permitted individual voir dire of all prospective jurors who indicated that they had heard something about the defendant. We conclude that the trial court did not abuse its discretion by structuring the jury selection in this way.

The defendant also contends that the trial court erred in restricting his questions during the voir dire to those that would reveal a challenge for cause. He argues that he should have been permitted to ask other questions in order to make intelligent use of his peremptory challenges. In addition to its own questioning of prospective jurors, the trial court shall allow the parties to question them "for the purpose of discovering bases for challenging for cause and enabling an intelligent exercise of peremptory challenges." Tenn. R. Crim. P. 24(a). In the present case, the trial court allowed both parties to question the prospective jurors during individual and group voir dire. The defendant does not cite to points in the record showing that the trial court restricted his questioning, and our reading of the record reveals a single incident in which the trial court restricted the defendant's questions during the individual voir dire. Juror Melton testified that he had seen a photograph of a man with long hair and a beard on television that morning and that he had wondered if he would be on that case when he reported for jury duty that day. The defendant asked him what he thought about when he saw the photograph, and the trial court sustained the state's objection that the question was improper at that time. The defendant then asked Juror Melton if seeing the individual on television and hearing that he was charged with murder made an impression upon him. Juror Melton said that it did not and that he could put what he had seen and heard out of his mind if selected as a juror in this case. He also stated that the photograph that he had seen on television did not look like the defendant. Thus, the defendant was able to learn Juror Melton's reaction to the photograph on television and suffered no prejudice as a result of the restriction.

-182-

During group voir dire, the parties questioned the jury venire on a variety of topics, many of which were not related to disqualification. During the group voir dire and with the jury out, the defendant noted that the court had ruled that the defense was not to ask additional questions about exposure to publicity aside from asking if the potential jurors had been exposed to any information about the defendant since the individual voir dire. We do not view this restriction to limit the defendant to questions designed to reveal disqualifying information. It merely reflects the trial court's desire not to cover matters already covered in individual voir dire. The defendant, who was allowed to question the jurors exposed to information about him during individual voir dire, suffered no prejudice from this ruling.

## XXIV. ADMISSIBILITY OF PHOTOGRAPH AND ARRAY

The defendant contends that the trial court erred by denying him a hearing on his motions to suppress a photograph of him taken at the time of his October 21, 1992 arrest. He argues that the photograph was not listed in the state's Rule 12(d)(2), Tenn. R. Crim. P., disclosure notice and that the picture of the defendant was taken as the result of an illegal arrest. He also alleges that the trial court should have granted his motion for a mistrial when the prosecutor displayed an array containing the photograph to the jury because it bore the word "Homicide" on the back. The state contends that a photograph is admissible for purposes of identifying a defendant even if taken following an illegal arrest. It also argues that the jury did not see the word "Homicide" on the back of the photograph array because the prosecutor carefully covered the word.

As discussed in Issue III, the admission of the defendant's photograph was proper because law enforcement would have inevitably obtained his photograph without regard to the legality of his arrest. The defendant was not prejudiced by the absence of a hearing on his motion to suppress the photograph because no legal basis existed for its suppression.

We turn briefly to the defendant's other contentions regarding the admissibility of the photograph. As discussed in Issue XIII, the state's Rule 12(d)(2) notice listed photographs and a picture lineup form as items that it intended to introduce in the first rape trial. More importantly, Rule 12(d)(2) does not contemplate the exclusion of evidence as a sanction for failure to comply. The purpose of the rule – to give the defendant a chance to suppress evidence that the state seeks to introduce in its case-in-chief – has been fulfilled in this case because the defendant moved pretrial to suppress the photograph. Thus, lack of compliance with Rule 12(d)(2) does not form a basis for the exclusion of this evidence.

The defendant also contends that a photograph array containing the photograph taken at the time of his arrest should have been excluded because it bore the word "Homicide" on the back. The record reveals that during the direct examination of the victim, the state sought to question her regarding the photograph array. The defendant requested a bench conference, and the state said that it did not intend to pass the photograph array to the jury. The trial court directed the prosecutor not to show the back of the photograph array, and the prosecutor stated that he had been careful not to let the jury see the back. The defense noted its objection for the record. At the end of the day, the

defendant requested a mistrial because the jury saw the word "Homicide" on the back of the array. Defense counsel argued that his associate told him that the jury saw the word when the state prepared to show the array to the victim. The state wanted the associate to testify about what she saw. The trial court stated that it did not believe that the word on the back of the array created any problem but that, out of an abundance of caution, it would question the jurors to determine if they saw the back of the array. This questioning never occurred. Initially, we note that the defendant did not subsequently ask the trial court to question the jurors about the array. In any event, the record does not reflect that the jury saw the word "Homicide" on the array.

## XXV.  ADMISSIBILITY OF VICTIM'S STATEMENTS IN HOSPITAL RECORD

The defendant contends that in the first rape trial, the trial court erroneously admitted statements of the victim contained in her hospital record. He argues that the statements were not admissible as statements made for diagnosis or treatment, the basis upon which the trial court admitted them, or as fresh complaint. He asserts that the trial court erred by failing to hold a hearing to assess the reliability and purpose behind the statements. He argues that no medical professional testified regarding whether the statements were necessary for diagnosis and treatment. The state initially contends that the statements were admitted only for identification and that the record does not indicate nor the defendant cite to their introduction into evidence. It also argues that if admitted, the statements were pertinent to diagnosis and treatment because they relate the timing and source of the victim's injuries. Finally, the state contends that the trial court was not required to hold a hearing because the victim was an adult rather than a child.

Following opening statements, the parties discussed the admissibility of the hospital record from the victim's emergency room visit about fifteen hours after the offenses. The patient history taken by a nurse states as follows:

> States was walking home – getting some breakfast [at] 7:30 a.m.
> and a man stopped to ask directions then pulled her into his car,
> took her to a barn and raped her. [Complains of] injured [right]
> shoulder . . . and soreness all over. Tearful.

The defendant argued that although he agreed that the record was authentic and kept in the regular course of business, the patient history was not admissible substantively. He argued that the patient history did not fall within the hearsay exceptions for fresh complaint or statements made for diagnosis or treatment. He asserted that it would only serve to bolster the victim's testimony improperly. The defendant acknowledged that he wanted to use the hospital record to show that the victim had no bruises at that time and the timing of the rape counselor's involvement with the victim. The court ruled that the victim's statements were admissible under Rule 803(4), Tenn. R. Evid., permitting statements made for medical diagnosis and treatment, and that either party could use any portion of the record.

Despite this ruling, the record does not reveal that either party introduced the hospital record into evidence. As the state notes, the court reporter recorded the hospital record as Exhibit 2 for identification. During a break in the direct examination of the victim, the defendant argued that although the state had already introduced the victim's hospital record, case law prevented the admission of the patient history as fresh complaint. The court reminded the defendant that it had allowed the record into evidence under the diagnosis and treatment basis and not as fresh complaint. The only testimony at this point had been that of the victim, and she had not testified regarding the hospital record. While cross-examining the victim, defense counsel showed her the hospital record and asked if it stated that she had suffered from any concussions, bruises, or lacerations. The defendant called the emergency room doctor who attended the victim on the evening following the offenses. Upon cross-examination, the doctor testified that when he saw the victim, the nurse had already indicated that the victim had been taken to a barn and raped. The defendant made no objection to this testimony. Thus, the defendant was the only party to make use of the hospital record, and his use of the record was not related to the victim's statements. The record does not reveal that the hospital record was shown to the jury. Nevertheless, in the event that the jury did see the hospital record, we will address whether the patient history was properly admitted. We will also consider whether the testimony of the emergency room doctor regarding the statements made by the victim to the nurse was properly admitted.

Rule 803(4), Tenn. R. Evid., provides the following exception to the hearsay rule of exclusion:

> Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source there of insofar as reasonably pertinent to diagnosis or treatment.

The reason behind the admission of such statements is the belief that the statement is reliable because the patient is induced to give a truthful account by his or her desire to receive an accurate diagnosis and treatment and because the doctor's use of the statement for diagnosis and treatment indicates its reliability. State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997).

Citing State v. McLeod, 937 S.W.2d 867 (Tenn. 1996), the defendant contends that the trial court erred in not holding a hearing to determine the admissibility of the statements under Rule 803(4). He argues that the trial court did not have the benefit of testimony from a medical professional stating that the statements were necessary for the victim's diagnosis and treatment. He argues that here, as in McLeod, the statements were improperly influenced by another, in this case a Sexual Assault Crisis Center (SACC) worker.

In McLeod, the supreme court stated that a trial court is to hold a jury-out hearing to decide if a child victim's statement is admissible under Rule 803(4). Id. at 869. The court noted that the rationale supporting the admissibility of statements made for diagnosis and treatment "becomes

-185-

questionable when the patient is a child because children may not be able to understand the need to be truthful in the medical setting." Id. at 870. Thus, the trial court must examine the circumstances surrounding the making of the statement, such as whether the individual interviewing the child asked suggestive questions or whether the child's family was involved in a custody or other dispute. Id. at 871. The trial court should exclude statements that were improperly influenced by another. Id. This court has previously noted that whether this requirement of a hearing extends to statements made by an adult victim is not clear. State v. Spratt, 31 S.W.3d 587, 600 (Tenn. Crim. App. 2000). Certainly the underlying reason for the court's requiring a jury-out hearing in child victim cases – the fact that the child might not be able to appreciate the need to tell the truth in order to get proper treatment – does not normally exist in the case of an adult victim.

In any event, in the present case, the trial court heard the arguments of the parties regarding the admissibility of the victim's patient history out of the presence of the jury. Although the trial court did not hear the testimony of the nurse who took the victim's history or the doctor who examined the victim in the emergency room, the state argued that the victim was complaining of a sore shoulder and that the history revealed how the victim had been hurt. The defendant did not argue that the statements were improperly influenced by the SACC worker, and, in fact, the hospital record indicates that the victim met with the rape counselor after giving her patient history, not before. Thus, the record reflects no reason for the trial court to have provided the defendant a hearing on the admissibility of the victim's statements.

The defendant also argues that portions of the victim's statements were not relevant to diagnosis and treatment. In particular, he points to the events leading up to the abduction and the fact that the attacker held the victim at gunpoint. He claims that the trial court erroneously introduced the entire hospital record. Initially, we note that the patient history makes no reference to the victim being held at gunpoint. We agree that the fact that a statement is made while giving a medical history does not necessarily make it admissible under Rule 803(4). State v. Williams, 920 S.W.2d 247, 256 (Tenn. Crim. App. 1995). Statements not germane to diagnosis and treatment should be redacted. Id. In Williams, this court held that statements about the events leading to the rape as well as the victim's description of her attacker should have been redacted from the medical history as they were not pertinent to diagnosis and treatment. Id. In the present case, if the hospital record was introduced into evidence, the portions of the statements revealing that the victim was walking home, had gotten breakfast, was stopped by a man who asked for directions, and was taken to a barn are not relevant to her diagnosis and treatment. Similarly, the doctor's testimony that the nurse reported that the victim had been taken to a barn was not pertinent to the victim's diagnosis and treatment. These statements do not fall within the Rule 803(4) exception.

On the other hand, we note that the victim's statements in the patient history were admissible as a prior consistent statement for the purpose of corroborating the victim's testimony. Generally, prior consistent statements are not admissible to bolster a witness's credibility. State v. Hodge, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998) (citing State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). However, three exceptions to this general rule exist. First, a "prior consistent statement may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication

have been made or when deliberate falsehood has been implied." State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). In such a situation, a prior consistent statement is allowed to show that the trial testimony is consistent with what the witness said when no influence or motive to lie existed. State v. Sutton, 155 Tenn. 200, 204, 291 S.W. 1069, 1070 (1927). Second, a prior consistent statement may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness's testimony was either fabricated or based upon faulty recollection. State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). Moreover, "the impeaching attack which allows for corroboration may occur during cross-examination of the witness . . . . Under such circumstances, the [witness's] statement made before the inconsistent statement but which was consistent with his trial testimony" is admissible to rehabilitate the witness. Id. (citations omitted). Third, a prior inconsistent statement may be admissible when a witness's prior statement is used out of context to cross-examine the witness. State v. Boyd, 797 S.W.2d 589, 593-94 (Tenn. 1990).

In the present case, the defendant attacked the victim's credibility on cross-examination, insinuating that the victim was a prostitute and that the encounter was consensual. The defendant questioned the victim about her records from a visit to the Detoxification Rehabilitation Institute four days after the offenses. The defendant noted that the records state the victim was "'jumped'/raped" on July 18, 1992. The victim denied using the word "jumped" and stated that she did not know that it was a street term meaning that someone who had agreed to have sex for money was not paid. The defendant also sought to cast doubt on the victim's claim of rape by showing that she did not immediately tell someone about the attack. Therefore, the victim's patient history would be admissible as a prior consistent statement for the sole purpose of countering the defendant's attack upon the victim's credibility. The defendant contends that the trial court erred in admitting this evidence substantively. Although prior consistent statements are not admissible substantively, the fact that the patient history could have been admitted to corroborate the victim's testimony diminishes any concern of harm.

Furthermore, although the jury was given no limiting instruction regarding the use of the patient history, generally, if a defendant does not request a limiting instruction, the issue is waived. See Tenn. R. Evid. 105; State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000); State v. Robinson, 971 S.W.2d 30, 43 (Tenn. Crim. App. 1997). We note, though, that in the case of the admission of a prior inconsistent statement for impeachment purposes, a limiting instruction should be given, even when not requested, if the state's proof is weak and the prior statement is very damaging. See State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982). Even if, for argument's sake, we were to apply that principle to the present circumstance, it would avail the defendant nothing. Although the state's proof consisted solely of the victim's testimony, it was not weak. We do not consider the patient history very damaging when viewed relative to the other evidence. Therefore, the defendant was not harmed by the trial court's failure to give a limiting instruction regarding the patient history.

The emergency room doctor's statement that the nurse indicated the victim had been taken to a barn was erroneously admitted. Nevertheless, we do not believe that this reference to the location of the attack more probably than not affected the judgment. See T.R.A.P. 36(b). The jury

heard the victim testify in detail to the events surrounding the rape and witnessed the defendant thoroughly cross-examine her about her account. The victim positively identified the defendant as her attacker. Finally, we again note that the defendant did not object to this testimony. The doctor's mention of the location of the attack was harmless.

## XXVI.  STATE'S CROSS-EXAMINATION OF ADVERSE WITNESS

The defendant contends that the state improperly cross-examined Officer Chuck Whitson, who was called by the defense as an adverse witness. He argues that because the officer was an adverse witness, the trial court should have limited the scope of the cross-examination to matters addressed on direct examination. He also maintains that the state erroneously presented certain testimony, which was relevant to the state's case-in-chief, during the officer's cross-examination. Finally, he argues that portions of the officer's testimony on cross-examination were inadmissible under the Rules of Evidence. The state contends that Tennessee permits unlimited cross-examination and that in the present case, the officer's testimony on cross-examination was, in fact, related to the direct examination. It also argues that the officer's testimony on cross-examination was relevant and admissible.

The trial court permitted the defendant to call Officer Chuck Whitson of the Knoxville Police Department as an adverse witness but denied the defendant's request that the state's cross-examination be limited to topics covered on direct examination. On direct examination, Officer Whitson testified as follows: He took possession of the victim's rape kit on July 18, 1992, but the kit was never sent to a laboratory for analysis. He took photographs as a part of the investigation of this case. He saw the victim at the hospital but did not recall that she had any bruises, marks, or abrasions, and none were brought to his attention.

On cross-examination by the state, Officer Whitson testified that he saw the victim at the hospital but did not have a lengthy conversation with her at that time. The victim appeared nervous, upset, and reluctant to have come to the hospital. He did not examine the victim for bruises or abrasions. The following day, the victim took him to the scene of the rapes, and he took photographs of the barn stall where she said the rapes occurred. Officer Whitson identified exhibit five, the rope previously identified by the victim, as the rope that was tied to the back of the stall and that he removed from the stall. He also identified an enlargement of a photograph that he took of the back wall of the stall. He explained that he did not send the rape kit for analysis because no one requested that he do so. A year later, the rape kit was taken from the refrigerator where it was stored and placed in a warehouse. After speaking with someone at the FBI laboratory, he felt there was no need to send the rape kit for analysis.

On redirect examination, Officer Whitson admitted that the victim had identified the defendant on October 27, 1992, following the July 18, 1992 attack, but that no one asked him to send the rape kit for analysis at that time. When asked to confirm that no scientific evidence corroborated the victim's story, he first stated that he could not answer that question and then stated that the rape kit was not sent for analysis. On recross-examination, he stated that another woman was with the

victim at the hospital but that he did not recall if she was from the Sexual Assault Crisis Center (SACC). He did not question the victim at that time. Because it was late and the victim was distraught, she was asked to come to police headquarters the next day and to bring the clothing that she wore on July 18. The next day, the victim gave him the requested clothes.

In arguing that the scope of the officer's cross-examination should have been restricted to the topics discussed during direct examination, the defendant points to Rule 611(d), Tenn. R. Evid., which provides:

> When a party in a civil action calls an adverse party (or an officer, director, or managing agent of a public or private corporation or of a partnership, association, or individual proprietorship which is an adverse party), interrogation on direct examination may be by leading questions. The scope of cross-examination under this paragraph shall be limited to the subject matter of direct examination, and cross-examination may be by leading questions.

Although the defendant acknowledges that Rule 611(d) is limited to civil actions, he contends that the trial court may restrict cross-examination in this manner in a criminal case to prevent abuse of the cross-examination by counsel. See Tenn. R. Evid. 611(a) (providing that the trial "court shall exercise appropriate control over the presentation of evidence and conduct of trial when necessary to avoid abuse by counsel"). He argues that criminal defendants are entitled to equal or greater protections than civil litigants. He summarily asserts that the trial court's failure to restrict cross-examination in this fashion violated his rights to a fair trial, to due process of law, to compulsory process for witnesses, and to the equal protection of law. He also contends that his only means of presenting certain evidence was through the testimony of Officer Whitson. He concludes that the failure to limit cross-examination to matters covered on direct examination violated his right to present a meaningful defense under Crane v. Kentucky, 476 U.S. 683, 690-91, 106 S. Ct. 2142, 2146-47 (1986) (holding that a criminal defendant's right to present a meaningful defense is guaranteed by the due process clause of the Fourteenth Amendment).

Initially, we note that in Tennessee, cross-examination is not limited to matters discussed during direct examination but may encompass any matter relevant to the case. Tenn. R. Evid. 611(b) (noting the exception for adverse parties in civil cases); Sands v. Southern Ry. Co., 108 Tenn. 1, 7, 64 S.W. 478, 480 (1901); Long v. State, 607 S.W.2d 482, 485 (Tenn. Crim. App. 1980). In adopting the English rule of unrestricted cross-examination as a part of Tennessee common law, our supreme court explained that in addition to ease of application, this rule "tends in a larger measure to elicit the truth, the chief end of all judicial investigation." Sands, 108 Tenn. at 7, 64 S.W. at 480. Under the English rule, the party who chooses to call the witness in effect abdicates the ability to object to the broad nature of the cross-examination. Id. Rule 611(b) represents the codification of this common law rule. Tenn. R. Evid. 611(b), Advisory Commission Comments.

The defendant seeks to have us apply Rule 611(d), a rule fashioned for civil law, in a criminal case. Absent a constitutional problem, we lack the authority to go beyond the meaning of Rule 611(b), which provides for unrestricted cross-examination. Furthermore, we believe that the protection provided by Rule 611(d) in a civil case is unnecessary in a criminal case. When a civil litigant calls the adverse party to testify, both the direct and cross-examinations are conducted through leading questions. Tenn. R. Evid. 611(d). One treatise notes that limiting cross-examination to the scope of the direct examination guards against the jury hearing all of the evidence in the form of leading questions. Neil P. Cohen et al., Tennessee Law of Evidence, § 6.11[5][b], at 6-118 (4th ed. 2000). Without this protection, the jury would be deprived of the opportunity to hear the adverse party relate the evidence in his or her own terms. See Cohen, Tennessee Law of Evidence, § 6.11[9][d], at 6-123. In a criminal case, the state must offer proof of the elements of the offense in its case-in-chief or risk the trial court's granting a judgment of acquittal for the defendant. A defendant's right against self-incrimination under the Fifth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution prevents the state from calling him or her as an adverse party in its case-in-chief. Thus, the possibility that the evidence in the case will be developed only through leading questions is greatly diminished. Even if the defendant calls a witness who could be deemed an adverse party, any new evidence elicited during the cross-examination of that witness would not be the sole evidence proving the crime. For these reasons, we conclude that the need for Rule 611(d) does not exist in a criminal trial.

The defendant argues that he was prevented from presenting a meaningful defense because the state was permitted unlimited cross-examination of Officer Whitson. The defendant obviously was able to call Officer Whitson as a witness and elicit the information regarding the failure to test the rape kit and the absence of bruises to the victim. The state's ability to present other evidence through this witness did not prevent the defendant from calling him. The fact that the defendant was faced with a tactical decision in calling this witness and facing the potential presentation of unfavorable evidence during cross-examination is no different than the decision faced in calling any witness that possesses both helpful and unfavorable information. We conclude that the necessity of making that choice did not prevent him from presenting a meaningful defense. Furthermore, the defendant has failed to explain and we do not perceive how the unlimited cross-examination infringed upon other constitutional rights belonging to the defendant.

Before we leave this point, we note that we agree for the most part with the state's assertion that Officer Whitson's testimony on cross-examination did relate to his testimony on direct examination. During his cross-examination, Officer Whitson sought to explain why he had not sent the rape kit for analysis and why he may have failed to notice any bruises or abrasions on the victim. He also expanded upon his direct testimony regarding the fact that he took photographs as a part of his investigation of the case, including the photograph of the barn stall where the rapes allegedly occurred. We note that the officer's identification of the rope was not related to his testimony on direct examination, but the victim had already identified the rope, which was then introduced into evidence during the state's case-in-chief. We fail to see how the officer's testimony regarding the rope infringed upon the defendant's ability to present a meaningful defense or his other constitutional rights.

-190-

Citing State v. West, 825 S.W.2d 695 (Tenn. Crim. App. 1992), the defendant also contends that the state had to present the new evidence elicited during the cross-examination of Officer Whitson during its case-in-chief rather than holding this evidence back. We believe that the defendant paints with too broad a brush by applying West in this way. In West, this court held that the state could not call as a rebuttal witness an eyewitness to the shooting, who was known to the state before trial but not disclosed to the defendant. Id. at 698. This court determined that the witness was not properly a rebuttal witness based upon the content of her testimony, which it characterized as proof-in-chief. Id. In the present case, though, the state did not seek to call Officer Whitson as a rebuttal witness. Furthermore, Officer Whitson was not an eyewitness to the crimes, and the defendant admitted to the trial court that Officer Whitson was listed on the indictment as a witness for the state. "It is a well-established principle of law that the State of Tennessee has the right to cross-examine defense witnesses." State v. Adkisson, 899 S.W.2d 626, 646 (Tenn. Crim. App. 1994). The fact that the state chose not to call Officer Whitson during its case-in-chief does not mean that it could not cross-examine him when the defendant called him as a witness at trial. The state is not prohibited from cross-examining the officer about topics beyond the scope of direct examination simply because the state could have called him to testify during its case-in-chief.

Finally, the defendant contends that portions of Officer Whitson's testimony on cross-examination were inadmissible. Without explaining the reasons, the defendant challenges the officer's testimony regarding the FBI laboratory and the victim's emotional state almost twenty-four hours after the offenses. He also contends that the testimony regarding the SACC was inadmissible. Regarding the FBI laboratory, the court sustained the defendant's hearsay objection to statements the FBI made to the officer. Over the defendant's objection, the court permitted the officer to testify that he spoke with the FBI and that as a result of this conversation, he saw no reason to send the rape kit for analysis. We conclude that to the extent that the state was seeking to prove Officer Whitson's state of mind in failing to send the rape kit for analysis, the testimony is not hearsay because the testimony is not offered to prove the truth of the condition of the rape kit. See Tenn. R. Evid. 801(c) (defining hearsay as an out of court statement offered "to prove the truth of the matter asserted"). On the other hand, to the extent that the testimony went to prove that the rape kit was ruined, the statement is inferential hearsay. See Tenn. R. Evid. 801(c). In any event, the defendant has failed to explain how he was harmed by the testimony, and, therefore, we conclude that any error was harmless.

At trial, the defendant objected to the state asking Officer Whitson about the victim's emotional condition when he encountered her at the hospital on July 18. The defendant argued that the officer was not qualified to testify about the victim's emotional condition. The trial court ruled that the officer could testify about his observations. Then, the following dialog took place:

[Prosecutor]: How did she appear to you?

[Witness]: When she – at the hospital she appeared real nervous and upset and like she had not really wanted to come to the hospital for quite a while.

[Defense Counsel]: Objection.

[Prosecutor]: Reluctant?

[Defense Counsel]: Objection.

[Court]: Overruled.

[Witness]: Yes, sir, she was reluctant to come.

A lay witness may give "opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Because it is the province of the jury to draw conclusions from facts in evidence, a "non-expert must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions." State v. Middlebrooks, 840 S.W.2d 317, 330 (Tenn. 1992), superseded by statute on other grounds as recognized by, State v. Stout, 46 S.W.3d 689 (Tenn. 2001). An exception to this rule is when the lay witness's opinion is the only clear means of describing a fact. Id. "In situations where a witness 'cannot readily and with equal accuracy and adequacy' testify without an opinion, the witness may state opinions requiring no expertise." Tenn. R. Evid. 701, Advisory Commission Comment. Thus, lay opinions are admissible only when:

> "facts perceived by the senses are numerous, and it is difficult to describe them adequately to the jury, and the conclusion or inference to be drawn from such facts is simple and within the range of common experience, and the witness can relate what he has seen more accurately and more easily by stating his conclusion than by attempting to detail the [evidentiary] facts."

Middlebrooks, 840 S.W.2d at 331 (quoting Reed v. Allen, 522 S.W.2d 339, 343 (Tenn. Ct. App. 1974)).

In the present case, we view Officer Whitson's description of the victim as nervous and upset to be the type of lay opinion testimony permitted by Rule 701, Tenn. R. Evid., because it was rationally based upon his perception of the witness. Furthermore, this testimony was relevant to the victim's credibility, a central issue in the case. On the other hand, the record does not provide a foundation for the officer's statements that the victim was reluctant or "like she had not really wanted to come to the hospital for quite a while." The officer's testimony that the victim appeared

-192-

nervous and upset does not provide a rational basis for his conclusion that she was reluctant. Additionally, we do not believe that the opinion regarding the victim's reluctance falls within the circumstances described in Middlebrooks such that it was more accurately and easily stated in the form of an opinion than an account of the evidentiary facts. Nevertheless, in light of the officer's testimony that the victim was nervous and upset, we do not believe that the defendant was harmed by the officer's testimony that she appeared reluctant.

The defendant also complains about Officer Whitson's mention of the SACC. On recross-examination, the prosecutor asked the officer if the woman from the SACC was with the victim when he arrived at the hospital. The officer responded that a woman was with the victim but that he did not recall who she was. The defendant objected that the testimony was beyond the scope of the direct examination and violated State v. West. The trial court overruled the objection, noting that it had already ruled on the matter. The officer proceeded to testify that he did not question the victim at that time because it was late and she was distraught. On appeal, the defendant has not explained why the officer's testimony on this matter was inadmissible. We have already ruled that the officer could properly testify on cross-examination beyond the scope of the direct examination and that West does not prevent the state from cross-examining him. We conclude that the officer's testimony regarding the woman with the victim was admissible.

## XXVII. FAILURE TO RULE AS THIRTEENTH JUROR

The defendant contends that in the first rape case, the trial court failed to rule on the sufficiency of the evidence as the thirteenth juror pursuant to Rule 33(f), Tenn. R. Crim. P. The state contends that the trial court explicitly found the evidence to be sufficient in its ruling on the defendant's motion for a new trial. We agree with the state.

"The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(f). When the trial court overrules a motion for a new trial without comment, we presume that it has approved the verdict. State v. Moats, 906 S.W.2d 431, 434-35 (Tenn. 1995). In its December 4, 1998 order denying the defendant's motions for a new trial, the trial court ruled that none of the alleged errors merited a new trial. Thus, we may presume that it acted as the thirteenth juror. Furthermore, we note that the trial court expressly found the evidence to be sufficient in a subsequent order. On December 7, 1998, the defendant moved the trial court pursuant to Rule 33(d), Tenn. R. Crim. P., to enter findings of fact and conclusions of law on the issues raised in his motions for new trial. On February 2, 1999, the trial court entered a second order denying the defendant's motions for new trial. This order provides:

> The defendant also claims that the trial court . . . has waited too late in its actions as thirteenth juror. The defendant also alleges that there is insufficient evidence to support these convictions. The trial court acted within its discretion in all these matters. None of the allegations of error warrant the granting of a new trial under existing law on the facts of this case.

The order concludes with the following: "Pursuant to Tennessee Rule of Criminal Procedure 33, the court finds that the weight of the evidence supports the jury's verdicts of guilt on each and every count." Thus, the trial court explicitly fulfilled its role as the thirteenth juror and found that the evidence weighed in favor of the jury's verdict.

Despite the state's responding with the above quote from the February 2, 1998 order, the defendant insists in his reply brief that the state has failed to answer his contention that the trial court did not rule on the sufficiency of the evidence under Rule 33(f). Citing to State v. Gordon Scott Katz, No. E1999-01220-CCA-R3-CD, Davidson County (Tenn. Crim. App. Oct. 2, 2000), the defendant argues that this court must order a new trial because the trial court failed to rule. In Katz, the trial court made comments at the hearing on the motion for a new trial indicating that it was dissatisfied with the weight of the evidence. It also suggested that it felt that the appellate court, which had remanded the case to the trial court, was directing it to reinstate the jury's verdict. Relying upon Moats, 906 S.W.2d at 434-36, this court concluded that

> if the record reflects that the trial court was dissatisfied with or disagreed with the jury's verdict or the weight of the evidence, made statements indicating that the trial court misunderstood its responsibility or authority to act as thirteenth juror, or absolved itself of the responsibility of acting as thirteenth juror, the appropriate remedy is for the appellate court to grant a new trial.

Id., slip op. at 3. It held that the trial court had avoided performing its role as the thirteenth juror or failed to understand its authority to act upon the remand of the case. In the present case, the trial court has explicitly ruled as the thirteenth juror. The defendant has not pointed to anything in the record which reveals that the trial court was dissatisfied with the jury's verdict. We fail to see the connection between this case and the circumstances in Katz. The defendant's contention that the trial court failed to rule as the thirteenth juror is without merit.

Finally, the defendant contends that because the state failed to file written responses to his his motions for a new trial and his motion for specific findings, his motions for a new trial should have been granted by default. He argues that Rule 47, Tenn. R. Crim. P.; Rule II, Knox County Crim. Ct. R.; and the trial court's September 9, 1994 order, which granted the defendant's request that the state file a written response to all defense motions, required the state to file an answer. We addressed this argument in Issue XIX and found it to be without merit.

## ISSUES RELATING ONLY TO CONSOLIDATED RAPE

### XXVIII. BIFURCATION OF FACTUAL AND INSANITY DEFENSES

The defendant contends that the trial court erred in denying his motion to sever and/or bifurcate his factual defense from his insanity defense. He argues that he could not adequately present all of his defenses in one trial because of the inconsistencies in his factual defenses and his

insanity defense. Specifically, the defendant argues that it would have been difficult to defend against the charges on the theories of alibi, consent, and that no crime was committed and, at the same time, to argue that the defendant was not guilty by reason of insanity. The state asserts that the defendant was not entitled to a bifurcated trial.

In the defendant's motion for bifurcation, he admitted that he "was not aware of case law in this state addressing this issue." However, he argued, as he does now on appeal, that Rule 57, Tenn. R. Crim. P., provided the court an avenue to bifurcate the trial. Rule 57 states, "If no procedure is specifically prescribed by rule, trial courts may proceed in any lawful manner not inconsistent with these rules or with any applicable statute." The defendant asserts that because the trial was not bifurcated, he was denied a full and fair opportunity to present his defense.

Because the defendant did not present an insanity defense at trial, this issue is moot. In any event, the we fail to see how the trial court abused its discretion in denying the defendant's motion. Although many jurisdictions have provided for, either by statute or case law, bifurcation of factual and insanity defenses when certain circumstances exist, see generally State v. Green, 355 So.2d 789 (Fla. 1978); Debra T. Landis, Annotation, Necessity or Propriety of Bifurcated Criminal Trial on Issue of Insanity Defense 1 A.L.R. 4th 888 (1980), Tennessee law does not provide for such a procedure. Moreover, this issue was addressed in Stone v. State, 521 S.W.2d 597 (Tenn. Crim. App. 1974), in which the defendants were tried and convicted of rape. One defendant asserted that the trial court erred in refusing to try the issue of insanity in a separate proceeding from the one determining guilt. We held that the defendant "was not entitled to a bifurcated trial," stating that the "defense of insanity at the time of the crime is at issue under a plea of not guilty." Id. at 600. Also, a defendant does not have to admit guilt before raising a plea of not guilty, and although presenting defenses such as alibi and insanity "is often perceived as a presentation of inconsistent defenses, one may nonetheless pursue both the insanity defense and a general not-guilty plea." Ginger Turnmire v. State, No. 329, Greene County, slip op. at 5 (Tenn. Crim. App. June 18, 1991), app. denied (Tenn. Sept. 30, 1991). Furthermore, there is no constitutional right to a bifurcated trial. See Spencer v. Texas, 585 U.S. 554, 567-68, 87 S. Ct. 648, 656 (1967); see also State v. Hinsley, 627 S.W.2d 351, 356 (Tenn. 1982). We fail to see any error relative to this complaint.

## XXIX. PEREMPTORY CHALLENGES

The defendant contends that the trial court erred in allowing the state eight peremptory challenges pursuant to a statute enacted after he committed his offenses but before trial, arguing that this constituted an ex post facto application of the law. The defendant also contends that the trial court erred in limiting him to eight peremptory challenges pursuant to the statute, arguing that he should have been allowed additional challenges because he was defending four cases that had been consolidated for trial. The state contends that the trial court allowed the parties the correct number of peremptory challenges and asserts that our supreme court has considered identical arguments and resolved them adversely to the defendant's positions.

In 1995, after the offenses were committed but before the trial, the legislature amended Tenn. Code Ann. § 40-18-118 to increase the number of peremptory challenges for the state from four to eight in cases in which the offense charged was punishable by imprisonment for more than one year but not by death. Initially, we note that the state only exercised four peremptory challenges. Nevertheless, the defendant asserts that creating the possibility that the state could exercise more than four peremptory challenges changed the manner in which he selected the jury. He argues that applying the amended statute constituted an ex post facto application of the law. We disagree. In State v. Pike, 978 S.W.2d 904, 925 (Tenn. 1998), a capital case, the defendant complained that the application of amended Rule 24(d), Tenn. R. Crim. P., violated the ex post facto provision of the Tennessee Constitution. When the defendant committed his crimes, Rule 24(d) provided defendants in capital cases with fifteen peremptory challenges and the state with only eight. The rule was amended before the defendant's trial, giving him and the state eight peremptory challenges each. The court held that the rule regarding peremptory challenges was procedural and did not affect any substantial right of the defendant, and thus, applying the amended rule did not violate the ex post facto prohibitions. Id. at 926. We conclude that Pike controls this issue and that the trial court did not err in applying the amended statute in the defendant's case.

The defendant notes that at the time of his trial, Tenn. Code Ann. § 40-18-118 and Rule 24(d), Tenn. R. Crim. P., were in conflict. While the statute was amended in 1995, Rule 24(d) was not amended to conform to the statute until 1997. Thus, during the 1996 trial, the statute provided for eight peremptory challenges for the state, but Rule 24(d) provided for only four. However, this conflict does not help the defendant's argument. The Committee Comments to Rule 1, Tenn. R. Crim. P., state, "These rules take precedence over pre-existing statutes and case law which are in conflict with them, but statutes passed subsequent to their adoption which conflict with these rules shall control." The Tennessee Rules of Criminal Procedure were adopted in 1978 and the Comments reflect a deference to legislative changes. We note that our supreme court has subsequently stated that judicial obeisance to legislative action that affects procedural and evidentiary rules is a matter of comity, not requirement. See State v. Mallard, 40 S.W.3d 473, 481 (Tenn. 2001). However, to the extent, if any, Mallard presages any change in the view taken by the Committee Comments, it does not affect the defendant's 1996 trial. Thus, the trial court correctly relied upon amended Tenn. Code Ann. § 40-18-118.

Within this issue, the defendant also complains that he was prejudiced because the amended peremptory challenges statute applied to him only because he was denied a speedy trial. As discussed in the defendant's second issue, he was not denied a speedy trial in the consolidated rape case.

The defendant also contends that he should have been allowed additional peremptory challenges because the trial was a consolidation of four cases. The defendant originally requested thirty-two peremptory challenges, which the trial court denied. After the defendant exercised his eight peremptory challenges, he requested the trial court to allow him additional peremptory challenges. Again, the court denied the request. The state asserts that Ellis v. State, 218 Tenn. 297, 403 S.W.2d 293 (1966), controls this issue. We agree. In Ellis, the defendant was convicted of

receiving and concealing stolen property in a trial in which two indictments had been consolidated. The defendant argued that the trial court erred in allowing him only eight peremptory challenges, instead of sixteen, eight for each indictment. The Tennessee Supreme Court held that the trial court did not err in allowing the defendant only eight peremptory challenges, stating

> On this matter we need to keep in mind peremptory challenges are given in addition to challenges for cause. In fact they are given in addition to challenges for cause, out of an abundance of caution, to insure both the state and a defendant a fair and impartial jury. Whether there be only one indictment or two consolidated there is only one defendant and one jury to be chosen.

218 Tenn. at 305, 403 S.W.2d at 297. Accordingly, we cannot say that the trial court erred in allowing the defendant only eight peremptory challenges in this case.

## XXX. SEQUESTERED JURORS' USE OF TELEPHONE

The defendant argues that his convictions should be reversed because the sequestered jurors were allowed to telephone family members. The state contends that the defendant has waived this issue because he did not object and did not include the issue in his motion for a new trial.

At the end of the first day of the trial, the court provided the jury with thorough instructions regarding its sequestration. Within these instructions, the trial court stated that it would allow jurors to telephone "home in the presence of an officer. . . . [T]hey will stand there and listen to your end of the conversation. In other words, it will be in your presence. If you want to make a phone call, under those circumstances, you will be allowed to do that at our expense." The defendant did not object. However, he claims that he objected to allowing such telephone contact the day before at a meeting with the trial judge and jurors at the motel. Although he recalls a court reporter being present at that meeting, he acknowledges that there is no transcript of that meeting. Thus, the defendant admits that the record does not reveal an objection to allowing the jurors to telephone their families. Also, as the state points out, the defendant did not raise this issue in his motion for a new trial or in one of his numerous amendments to that motion. Accordingly, we agree with the state that the defendant has waived this issue. See T.R.A.P. 3(e), 36(a).

The defendant, however, asserts that allowing telephone contact was a break in the jury's sequestration constituting plain error, and thus, cannot be waived. See Tenn. R. Crim. P. 52(b). We disagree. Allowing the jurors to telephone their families in the presence of a court officer was not error. In State v. Bondurant, 4 S.W.3d 662, 671 (Tenn. 1999), our supreme court stated that the test in determining whether jury separation occurred is "whether a juror passes from the attendance and control of the court officer." In this case, the trial court specifically instructed the jurors and the court officers that any telephone calls would occur in the officer's presence. There is no evidence in the record, and the defendant does not allege, that any juror passed from the attendance and

-197-

control of the court officer. This issue is without merit. Moreover, the defendant cannot assert plain error when the state was not given a chance in the trial court to rebut any presumption of prejudice that might arise from a finding of a sequestration break.

## XXXI.  REDIRECT EXAMINATION OF TOM PRESSLEY

The defendant contends that the trial court erred by allowing the state to introduce new evidence in its redirect examination of Detective Tom Pressley.  The defendant complains that the state asked Detective Pressley about the car he saw when he went to Cahaba Lane with G. T., about statements G. T. made, and about G. T.'s emotional state when he first saw her.  The defendant argues that this evidence was not rebuttal evidence to his cross-examination and, therefore, should not have been admitted during the state's redirect examination.   The state contends that no new evidence was introduced in its redirect examination, arguing that all of the evidence elicited on redirect had already been introduced.  We agree with the state.

"The admissibility of testimony and other evidence, as well as the scope of redirect examination, is within the discretion of the trial court, whose ruling will not be reversed absent an abuse of that discretion."  State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999). "Tennessee law is well-settled that redirect examination can broach topics raised on cross-examination even though those matters were not inquired into on direct examination."  State v. Baker, 966 S.W.2d 429, 433 (Tenn. Crim. App. 1997).

During the state's redirect examination of Detective Pressley, he testified that G. T. gave him a description of the car that the defendant was driving when the defendant picked her up.  He said that this description matched the car he saw when he took G. T. to Cahaba Lane, including that the car had a child restraint seat.  The state correctly points out that the defendant questioned Detective Pressley about the car on cross-examination.  The defendant asked, "Then she told you, as she got in the car with this white male in a gray car, with a baby seat in the back, she told you – excuse me – 'He told me,' is what it was, 'that she could take me where it had occurred.'  Is that correct?" Also, we note that G. T. testified earlier in the trial that the defendant was driving a gray car and that the same car was at Cahaba Lane when she and Detective Pressley returned to the crime scene.  The state's redirect examination about the car was not improper.

The defendant also complains that the state improperly introduced new and inadmissible hearsay evidence when Detective Pressley testified on redirect examination about statements made by G. T.  On redirect examination, Detective Pressley testified that when he and G. T. arrived at the crime scene and saw a car, G. T. said, "There is the car now."  Also, Detective Pressley testified that when they saw the defendant, G. T. said, "That is him there." Initially, we note that the defendant did not object as to hearsay or as to exceeding the scope of redirect examination on either of these occasions.  In any event, the defendant raised these issues on his cross-examination of Detective Pressley.  The defendant questioned the detective about the car, providing a description of it, and even asked him, regarding when he and G. T. returned to the Cahaba Lane and saw the defendant,

"Okay. She says, 'That is the man,' is that right?" The trial court did not abuse its discretion in allowing redirect examination testimony regarding issues raised on cross-examination.

The defendant next contends that the trial court improperly allowed Detective Pressley to testify about G. T.'s emotional state. On redirect examination, the state asked Detective Pressley to describe G. T.'s physical and emotional state when he first saw her. The defendant's objection was overruled, and Detective Pressley stated that she was upset. The defendant objected to the answer as conclusory, and the court instructed the detective to describe her appearance. Detective Pressley then testified that G. T. was weeping and scared. We do not believe that this was improper redirect examination. On cross-examination, the defendant attacked G. T.'s credibility, suggesting that she lied about being raped. Thus, G. T.'s emotional state was relevant because from this evidence the jury could infer that she was not lying about being raped. Moreover, on cross-examination, the defendant asked Detective Pressley, "Well, would it surprise you to learn that she, testified that, when she went in and asked them for a drink of water, they could see that she was upset about something, and so they called the police? Would that surprise you?" Thus, the defendant had stated on cross-examination that G. T. was upset just before Detective Pressley first saw her. No new evidence was introduced during the state's redirect examination of Detective Pressley. We conclude that the trial court did not err in its handling of this redirect examination.

## XXXII. BILL OF PARTICULARS

The defendant contends that the trial court erroneously failed to grant his motions for judgments of acquittal in the consolidated rape trial due to a fatal variance between the proof and the dates of the offenses alleged in the bill of particulars. He argues that the weight of the evidence was contrary to the jury's verdict after he established through unchallenged proof that he was elsewhere at the times specified in the bill of particulars. He also argues that the trial court prevented him from presenting a defense of alibi by refusing to instruct the jury on the dates alleged in the bill of particulars. The state questions whether any variance exists and, alternatively, contends that any variance between the dates alleged in the bill of particulars and the trial testimony was neither material nor prejudicial.

On January 24, 1994, the defendant moved for a bill of particulars in each of the rape cases. The state opposed this motion on November 16, 1994, contending that the indictments provided sufficient notice of the charges and that the defendant was instead seeking broad discovery through his request for a bill of particulars. On April 2, 1996, the trial court ordered the state to provide the defense with the dates, places, and persons present during the offenses. On April 8, 1996, the state filed a bill of particulars. Beginning on April 15, 1996, the victims testified regarding the offenses at the hearing on the state's motion to consolidate the rape cases. On April 29, 1996, the defendant filed a notice of alibi for the dates listed in the bill of particulars. The following chart gives the dates alleged in the presentments, in the bill of particulars, in the victims' testimony at the consolidation hearing, and in the victims' trial testimony:

Bill of                          Consolidation

|         | Presentments | Particulars | Hearing | Trial |
|---------|--------------|-------------|---------|-------|
| D. C.   | ___ day of August 1991 | Between August 23, 1991 and September 6, 1991 | First or second week in August | Second week in August |
| A. D.   | October 5, 1992 | October 5, 1992 | First week of October 1992 | October 5, 1992 |
| G. T.   | ___ day of February 1992 | On or about February 27, 1992 | February 1992 | February 1992 |

The defendant moved for a judgment of acquittal at the end of state's proof, arguing that a fatal variance existed between the proof of the dates of the offenses against the victims and the dates alleged in the bill of particulars. He again moved for a judgment of acquittal following the close of all proof. The trial court denied both motions, agreeing with the state that it only had to prove that the offenses occurred before the finding of the presentment.

The trial court instructed the jury on alibi using the instruction requested by the defendant. The defendant contends that he also filed requests asking the trial court to instruct the jury on the dates of the offenses provided in the bill of particulars and on variance. These requests are not contained within the forty-two pages of technical record cited by the defendant, nor did our review of the remainder of the technical record reveal these filings. However, in a jury-out discussion preceding the defendant's proof, the court ruled that it would not submit the bill of particulars to the jury with the indictment. The court permitted the defense to read the bill of particulars to the jury at the start of the defense proof and to argue the dates in the bill of particulars during closing argument. Regarding the bill of particulars, the trial court instructed the jury as follows:

> The defense read to you a bill of particulars. It was filed in this case by the State before the witnesses testified under oath. The bill of particulars stated the approximate dates for each offense. The bill of particulars is not conclusive evidence that anything happened on the dates stated in it.
>
> You are instructed to determine the dates of the alleged offenses on the basis of all the testimony and other evidence in the case. The State must prove beyond a reasonable doubt that the alleged crime was committed before the finding and returning of the indictment in this case.

We begin by noting that the only variance between the bill of particulars and the trial testimony that we can discern is that relating to the date of the offenses against D. C. The state contends that no variance exists because D. C. testified that her memory was not reliable in

-200-

remembering dates and times. It argues that the jury was entitled to find that D. C. was mistaken about the date. The state relies upon State v. Jeffery Edward Pitts, No. 01C01-9701-CC-00003, Wayne County (Tenn. Crim. App. Mar. 18, 1999), app. denied (Tenn. Oct. 11, 1999), in which the defendant argued that the dates to which the sexual battery victim testified – two consecutive days in the summertime – varied fatally from the non-consecutive dates in June provided by the state in the bill of particulars and its election of offenses. This court held that no variance existed, noting that the state presented documentation relating to the non-consecutive dates and the victim testified that the offenses occurred in the summertime. Id., slip op. at 6. This court observed that the only evidence relating to the consecutive dates came from the testimony of the mentally disabled victim and that this conflict in the proof was for the jury to resolve. Id.

In contrast in the present case, the state presented no evidence at trial that the offenses against D. C. occurred between August 23 and September 6, 1991. The victim testified that although she did not recall the exact day, the offenses occurred the second week of August 1994. She explained that she was certain that it was the second week of August because she was only making "regular" money when the offenses occurred, stating that in the first week of the month the prostitutes made "good" money. While being cross-examined about a November 2, 1992 statement she gave to the police, the victim testified that her memory of when she talked to the police was not good regarding dates and times. Although she admitted that her memory was not as good at the time of trial as when she gave the statement in 1992, she asserted that there was nothing wrong with her memory in this case. In light of the state's proof that the offenses occurred in the second week of August and the absence of proof otherwise, we believe that a variance existed between the proof at trial and the dates provided in the April 8, 1996 bill of particulars.

"A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984)). A variance is not material if the allegations and evidence at trial substantially agree. Moss, 662 S.W.2d at 592.

> "Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error."

Id. A material variance results when the state presents proof or uses theories at trial that the indictment does not fairly encompass. Shropshire, 45 S.W.3d at 71.

A charging instrument does not have to allege the time of the offense unless time is a material element of the offense. Tenn. Code Ann. § 40-13-207. Instead, "the offense may be alleged to have been committed on any day before the finding thereof, or generally before the finding of the indictment." Shropshire, 45 S.W.3d at 71. The state does not have to provide strict proof that the offenses transpired on the dates in the charging instrument or a bill of particulars "unless those dates are essential to proving the offense or imposing a defense." State v. Ealey, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997). Time is not a material ingredient in the offenses with which the defendant was charged and convicted: aggravated rape, rape, especially aggravated kidnapping, aggravated kidnapping, and robbery. See Tenn. Code Ann. §§ 39-13-304, -305(a)(1), -401, -502, -503. Thus, any variance between the time alleged in the indictment and the time proven at trial is not a material variance. See State v. Vickers, 985 S.W.2d 1, 9 (Tenn. Crim. App. 1997) (holding it immaterial that the indictment alleged April 1990 and the proof showed August 1990 when both months preceded the return of the indictment).

Furthermore, the defendant was not prejudiced by the variance. The defendant contends that the variance deprived him of notice of the offenses. He argues that the trial court's refusal to hold the state to the dates charged in the bill of particulars made the narrowing of the presentments by the bill of particulars meaningless. He concludes that the trial court's instruction on the bill of particulars amounted to a constructive amendment of the indictment and bill of particulars following the proof, which violated his constitutional right to notice under the Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution.

Rule 7(c), Tenn. R. Crim. P., provides that "[u]pon motion of the defendant the court may direct the filing of a bill of particulars so as to adequately identify the offense charged." The committee comments note that this rule allows a bill of particulars if the defendant needs one to know the precise charges against him or her. Committee Comments, Tenn. R. Crim. P. 7(c). The comments caution that the rule "is to be construed to serve that singular purpose, and is not meant to be used for purposes of broad discovery." Id. The function of a bill of particulars is to give the defendant sufficient information about the charges in order that he or she may prepare a defense and to prevent prejudicial surprise at trial. State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984); see also State v. Hammonds, 30 S.W.3d 294, 303 (Tenn. 2000).

In the present case, the trial court found that the defendant was on notice of the dates that the state intended to prove at trial because he heard the victims testify to these dates at the consolidation hearing. We agree that the defendant had notice at the consolidation hearing, which occurred over a month before the trial. The defendant argues that oral testimony fails to satisfy the requirement of notice under the Tennessee Constitution. Article I, section 9 of the Tennessee Constitution provides that a criminal defendant has the right "to demand the nature and cause of the accusations against him, and to have a copy thereof." The defendant does not allege that he was not provided a copy of the presentments, which informed him of the charges that he faced. Our supreme court has recognized that a bill of particulars is not necessary when the state has provided the defendant with the information in another acceptable form. See Hicks, 666 S.W.2d at 56. Moreover, this court has held that a defendant was not unfairly surprised by a variance in the indictment and proof when

the victim had given the same evidence in the first trial which ended in a hung jury. Shropshire, 45 S.W.2d at 71. In the present case, the defendant learned of the dates that the state would seek to prove at trial through the victims' sworn testimony at the consolidation hearing and had the opportunity to cross-examine the victims at that time. The defendant was not surprised by the dates to which the victims testified at trial.

The defendant also contends that the trial court prevented him from presenting a defense by refusing to hold the state to the dates alleged in the bill of particulars. As discussed, after hearing the victims testify at the consolidation hearing, the defendant was on notice of the dates for which he should provide an alibi. He had no basis for relying upon the dates in the bill of particulars when he knew that the state would prove the other dates at trial.

The defendant next contends that the variance between the bill of particulars and the proof at trial places him at risk of being convicted anew on the offenses to which the victims testified. He also contends that by refusing to instruct the jury on the bill of particulars, the trial court instructed the jury on different crimes from those alleged. The Double Jeopardy Clause of both the state and federal constitutions "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076; State v. Phillips, 924 S.W.2d 662, 664 (Tenn.1996). A defendant "can rely upon the entire record in the event that future proceedings are taken against him for the same offense." State v. Mayes, 854 S.W.2d 638, 642 (Tenn. 1993) (holding that the indictment combined with the record would prevent subsequent prosecution for a drug sale at the time and place in the indictment despite the variance regarding the purchaser). As discussed above, all of the proof at trial with regard to the offenses against D. C. revealed that the offenses occurred in the second week of August. The defendant is secure against future convictions for the same offenses.

Finally, the defendant contends that in the state's rebuttal closing argument, the prosecutor made improper and prejudicial arguments to the jury regarding the mistakes he made with regard to the dates in the bill of particulars. He argues that the prosecutor's explanation for the variance in the dates in the bill of particulars and the trial testimony constituted material not in evidence and was the prosecutor's personal opinion. We address this contention in Issue XVI(B) and hold that the defendant cannot now complain about the prosecutor's explanation of the variance in the dates when he challenged the prosecutor to explain the variance in his closing argument.

## XXXIII. MOTIONS FOR JUDGEMENTS OF ACQUITTAL

Finally, the defendant contends that the trial court erroneously denied his motions for judgments of acquittal in the consolidated rape trial with regard to the counts of anal and vaginal rape of G. T. and the robbery of D. L. He summarily argues that although the jury acquitted him of the vaginal rape and robbery counts, he nonetheless suffered prejudice because the submission of these "throw away" counts to the jury increased the probability that it would convict him on the other charges despite the weak proof. The state contends that the defendant has failed to show how

he was prejudiced by the trial court's denial of the motions for a judgment of acquittal on these counts. It also argues that the state's evidence of the anal and vaginal rapes of G. T. was sufficient for the trial court to summit those counts to the jury.

Before a defendant may receive relief from a conviction, he or she must demonstrate that an "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b). In the present case, the jury acquitted the defendant of the vaginal rape of G. T. and deadlocked as to the counts relating to D. L. The defendant has failed to explain how he was prejudiced by the trial court's denial of his motions for judgment of acquittal other than his bare assertion that submitting these counts to the jury increased the likelihood that he would be convicted of something. The defendant does not support this assertion with any authority or with an explanation of why submission of these counts to the jury would necessarily result in the jury convicting him on the remaining counts. We deem the defendant's bare assertion on the harm from the acquitted counts to be unconvincing.

The defendant contends that the trial court erred in submitting the anal rape count to the jury because the victim testified at the consolidation hearing that the defendant was not able to penetrate her anally. The trial court shall grant a judgment of acquittal upon motion or sua sponte "if the evidence is insufficient to sustain a conviction." Tenn. R. Crim. P. 29(a). Our standard of review when the sufficiency of the evidence is questioned is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). At trial, G. T. testified that the defendant inserted his penis into her anus. The trial court did not err in submitting the anal rape count to the jury.

The defendant also contends that the prosecutor used the trial court's erroneous denial of his motion for a judgment of acquittal on the vaginal rape count to make an improper argument on the standard for reasonable doubt. We address this argument in Issue XVI(B) and determine that the prosecutor did not give an improper standard for reasonable doubt.

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgments of conviction in the first rape trial and those convictions in the consolidated rape trial for the offenses against A. D. and G. T. We reverse the convictions for three counts of aggravated rape and one count of especially aggravated kidnapping of D. C. because that case was improperly consolidated with the other rape cases and remand those counts to the trial court for a new trial.

_____
JOSEPH M. TIPTON, JUDGE